IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS

| | |
|---|---|
| Jason M. Hatfield, P.A., | |
| *Plaintiff* | |
| v. | Case No. 5:22-cv-05110-PKH |
| Michael McCoy, Cesar Ornelas, Nunez & Associates, Kherkher Garcia, LLP, Steven Kherkher, Tony Pirani, Pirani Law PA, and Noe Jesus Mancia Polanco, individually and as Personal Representative and Special Administrator of the Estate of Flor Maribel Recinos Valle, | * * * **Jury Trial Demanded** * * * |
| *Defendants.* | |

# First Amended Complaint

## Summary

On November 23, 2020, Ana Delia Mejia Flores ("Flores") and Flor Maribel Recinos Valle ("Recinos") were tragically killed when a tractor-trailer crossed the line, rolled over, and crushed their vehicle. What happened following the accident is both fraudulent and prohibited by the rules governing all Arkansas attorneys. It represents a stark warning for the practice of law in Arkansas. Here, non-attorney case-runners were dispatched from Texas to directly contact survivors and even attend funerals of the victims to secure contracts. The non-attorney case runners did so using (1) false claim of association with a United States law firm to give the appearance of legitimacy; (2) false promise of United States citizenship to induce non-citizen survivors to sign with such non-attorney case runners; (3) unethical payment of funeral expenses to fraudulently

strongarm or fraudulently induce other survivors into entering into engagement contracts; and (4) fraudulently predating documents and using such contracts in court proceedings in fraudulent attempt to gain an unfair position in a subsequent fee dispute with Hatfield. Further, Defendant Kherkher knowingly made specific false and fraudulent statements to Hatfield using interstate wire and mail.

Defendant Arkansas attorneys Kherkher and Pirani were aware of the procurement of the engagement contract using non-attorney case runners, and thus they were willing participants to the procurement of contracts using non-attorney case runners to accomplish that which neither could legally nor ethically do themselves. All these fraudulent acts were advanced using interstate wire, radio, and mail communications.

This lawsuit is filed to address a continuing years-long pattern of criminal, fraudulent, and unethical solicitation of victims of catastrophic incidents using non-attorney case-runners and to bring to light substantial use of materially false statements, unethical means, and criminal means to induce grief-stricken survivors to sign engagement contracts. Included are claims for intentional torts for which exemplary punitive damages are proper.

A copy of this amended lawsuit is being provided to the Arkansas Professional Conduct Committee regarding Arkansas attorney defendants Steven Kherkher and Tony Pirani for disciplinary and disbarment proceedings, thereby satisfying Plaintiff's continuing obligation to report such illegal and unethical conduct required by Ark. R. Prof. Cond. 8.3.

## Jurisdiction and Venue

1. The Court has jurisdiction over the federal claims pursuant to its federal question jurisdiction under 28 U.S.C. § 1331 and 18 U.S.C. § 1964(a), which provides a district court shall have jurisdiction to prevent and restrain violations of RICO, at § 1962.

2.  The Court has supplemental jurisdiction over the remaining state law claims pursuant to 28 U.S.C. § 1367 which provides district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article II of the United States Constitution.

3.  The Court has jurisdiction pursuant to 28 U.S.C. § 2201(a), to declare the rights and interests of parties and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

4.  Venue is proper pursuant to 29 U.S.C. § 1391(1) in that at least one defendant resides in the State of Arkansas in this district and pursuant to § 1391(2) in that a substantial part of the events giving rise to the claims occurred in Northwest Arkansas, and specifically in Springdale, Arkansas.

## The Parties

5.  Jason M. Hatfield is an Arkansas licensed attorney who provides legal services using the entity Jason M. Hatfield, P.A. ("Hatfield"), which is a business in good standing and organized pursuant to the State of Arkansas. The principal place of business for Hatfield is Springdale, Arkansas. On November 30, 2020, survivors of Recinos signed a contract for legal representation with Hatfield. Any of the three survivors who signed the contract could have properly served as the representative of the estate to bring wrongful death claims.

6.  Michael (Mike) McCoy ("McCoy") is an individual residing in Texas. He is not a licensed attorney, nor has he ever been an attorney. He is an illegal and unethical professional case-runner. McCoy has a long history in the funeral home industry and a history of being sued for his illegal conduct in Texas, including how McCoy regularly targets families immediately following an accident and even attends funerals to deliver business cards. While at funerals or in visitation with the family, McCoy makes

fraudulent statements and false promises to unlawfully induce survivors to sign with law firms with whom McCoy has an illegal and unethical partnership or arrangement to divide attorney's fees. McCoy personally travelled to Springdale, Arkansas to meet with family members when doing so is absolutely prohibited by the Arkansas ethics rules governing attorneys. McCoy attended the funerals of two women killed in a tractor-truck accident. McCoy gave his business card, **Exhibit 1**. On such card, he claims an intentionally false association with "Nunez & Associates," which depicts the scales of justice. He then presents the family members with a "contract" to sign on promise of payment of funeral expenses, which is also prohibited in Arkansas. McCoy uses any false and unethical means necessary to secure a signature by a survivor for the wrongful death case. McCoy declares to hesitant family members that because he has paid funeral expenses, they cannot terminate representation. McCoy engages in "barratry," commonly known as "ambulance chasing." It is a crime in Texas to engage in barratry, yet the money is excellent both for the law firms and for McCoy when his conduct is marginally penalized. McCoy is a willful, habitual violator who preys upon people during a most vulnerable moment, for sheer profit.

7. Cesar Ornelas ("Ornelas") is an individual residing in Texas. He is not a licensed attorney, nor has he ever been an attorney. He is an illegal and unethical professional case-runner. Ornelas has a long history in the funeral home industry and a history of being sued for his illegal conduct in Texas, including how Ornelas regularly targets families immediately following an accident and even attends funerals to deliver business cards. While at funerals or in visitation with the family, Ornelas makes fraudulent statements and false promises to unlawfully induce survivors to sign with law firms with whom Ornelas has an illegal and unethical partnership or arrangement to divide attorney's fees. Ornelas personally travelled to Springdale, Arkansas to meet with family members when doing so is absolutely prohibited by the Arkansas ethics rules governing attorneys. Ornelas attended the funerals of two women killed in a tractor-truck accident.

Ornelas gave his business card, **Exhibit 1**. On such card, he claims an intentionally false association with "Nunez & Associates," which depicts the scales of justice. He then presents the family members with a "contract" to sign on promise of payment of funeral expenses, which is also prohibited in Arkansas. Ornelas uses any false and unethical means necessary to secure a signature by a survivor for the wrongful death case. Ornelas declares to hesitant family members that because he has paid funeral expenses, they cannot terminate representation. Ornelas engages in "barratry," commonly known as "ambulance chasing." It is a crime in Texas to engage in barratry, yet the money is excellent both for the law firms and for Ornelas when his conduct is marginally penalized. Ornelas is a willful, habitual violator who preys upon people during a most vulnerable moment, for sheer profit.[1]

8.  Nunez & Associates ("Nunez & Associates") is one or more of the following: (1) a purely fictional entity invented for use on business cards distributed by Ornelas and McCoy to entice family members to falsely portray legitimacy or affiliation with a United States law firm; (2) an intentionally false business name used on Ornelas and McCoy's business cards to create uncertainty or ambiguity as to the business relationship between Ornelas and McCoy with a non-United States firm operating in Mexico under the name "Nunez Law Firm,"; or (3) is one and the same as "Nunez Law Firm" in which case Ornelas and McCoy are authorized agents thereof. [2]

---

[1]  Law.com reporting: https://www.law.com/texaslawyer/2019/08/08/lawsuit-claims-san-antonio-pi-firm-preyed-on-grieving-families/; https://gvilaw.com/faqs/barratry/cesar-ornelas-funeral-home-barratry-scam/; https://www.tortreform.com/news/san-antonio-pi-lawyer-faces-another-unlawful-solicitation-suit/

[2]  Defendant Steven Kherkher declared in open court, on July 7, 2022, how Nunez Law Firm is run by Arturo Nunez, a Mexico-based attorney regularly working with Kherkher Garcia, and specifically Jesus Garcia.

9. There are no law firms doing business as Nunez & Associates or Nunez Law Firm having any listing of, or affiliation with either Ornelas or McCoy. A phone call to the numbers listed on Ornelas or McCoy's business cards is not answered by a law firm but rather only Ornelas or McCoy respond. The phone numbers listed on the Nunez & Associates cards for both Ornelas and McCoy are the identical phone numbers tied to Ornelas and McCoy in the past when they did business under a different name, "Group of Legal Specialties." As will be set forth in more detail below, the Group of Legal Specialties is a sham operation which provided kickbacks to funeral homeowners in exchange for funneling survivor clients to McCoy and Ornelas. The fraudulent use of Nunez & Associates, together with the indicia of the scales of justice, were done with criminal purpose and willful intent to defraud and deceive not only the family members but also courts of record when, as here, there has been a formal application to the Washington County Probate Court to pay fees from the estate as having provided legitimate legal services.

10. Kherkher Garcia, LLP ("Kherkher Garcia") is a Texas-based law firm doing business in Houston, Texas. Kherkher Garcia was formed in 2019. Steven Kherkher is at all times relevant to this case an authorized agent of Kherkher Garcia, LLP, he is a named partner with Kherkher Garcia, and his actions in connection with the facts of this case were authorized or ratified by Kherkher Garcia. Steve Kherkher's unethical, illegal, and fraudulent efforts resulted in Kherkher Garcia obtaining clients that he could not otherwise fairly nor ethically obtain, resulting in Kherkher Garcia collecting substantial sums of money from settlements.

11. Steven Kherkher ("Kherkher") is a resident of Houston, Texas. He is licensed to practice law in Texas and Arkansas. Kherkher is well-aware of the litigation and case-running procedures by Ornelas and McCoy and illegality of such actions as barratry, and Kherkher is keenly aware of their improper client or case procurement. Kherkher is charged with knowledge of the Arkansas Rules of Professional Conduct, the Texas

Disciplinary Rules of Professional Conduct, and the Texas Penal Code. Kherkher learned on or about November 30, 2020, how surviving family members signed a lawful engagement contract by and between Hatfield and three lawful survivors of Recinos. Kherkher intentionally and fraudulently interfered with such Arkansas contract using false and deceptive means using interstate phone and wire systems. Kherkher fraudulently induced the heirs who signed with Hatfield to terminate Hatfield's contract for legal services and instructed Hatfield to cease all communications with his clients. Kherkher fraudulently declared to Hatfield he received the case from an Arkansas law firm, and he knew such statements to be false at the time of making such statements using interstate phone and wire systems on or about December 1, 2020. Kherkher specifically intended to defraud Hatfield using false statements via interstate wire and mail systems. Kherkher himself advertises on many websites using a variety of law firms, including Kherkher Garcia also with another law firm, Pulaski Kherkher, https://pulaskilawfirm.com. Kherkher also intentionally and unethically interfered with Hatfield's engagement contract for legal services involving adult survivor Vidal Recinos on or about June 3, 2021. Kherkher, at an open court hearing before the Washington County Arkansas Circuit and Probate court taking place on July 7, 2022, declared in open court that he was "guilty as charged!" relative to his unethical payment of funeral expenses. Kherkher declined to identify in open court a formal association between himself and McCoy and Ornelas but did announce that the Nunez Law Firm is run by a person out of Mexico named Arturo Nunez. Following the hearing in the probate court,

Kherkher's co-counsel produced **Exhibit 3**, which confirmed the existing relationship between Nunez Law Firm and Kherkher Garcia.[3]

12. Tony Pirani ("Pirani") is an Arkansas licensed attorney who resides in or around Fayetteville, Arkansas. He is an authorized agent of Pirani Law PA.

13. Pirani Law PA ("Pirani Law") is the entity used by Pirani in his practice of law in Arkansas. In May 2021, Pirani and Pirani Law entered an appearance to create a probate matter in Washington County Arkansas for the Estate of Recinos. On August 12, 2021, Pirani and Pirani Law filed a First Amended Complaint against J.B. Hunt Transport, Inc. and Keondrick Banks in the Washington County Circuit Court. With full knowledge of Hatfield's lien and pre-existing contracts with Vidal Recinos, and in violation of the ethics rules, Pirani initiated contact with Vidal Recinos, a surviving brother and also a person known by Pirani to be represented by Hatfield. As such, Pirani Law via Pirani intentionally interfered with Hatfield's legitimate Arkansas contract and business expectancies using improper and unethical means. Further, Pirani Law, through Pirani, learned of the case-running procurement by the foregoing defendants Ornelas, McCoy, Nunez, and Kherkher Garcia but did nothing to disavow such illegal and unethical client procurement. The rules governing practice in Arkansas prohibit a lawyer licensed in Arkansas from assist others practicing law in a jurisdiction in violation of the regulation of the legal profession in Arkansas. *See* Ark. R. Prof. Conduct 5.5. Pirani Law, through Pirani, knew that Nunez Law Firm was not admitted to any United States jurisdiction.

---

[3] **Exhibit 3** does not appear to be a correct nor complete copy of the relevant contracts for legal representation for the Recinos survivors. The date of November 25, 2020 is highly suspicious for numerous reasons: (1) the decedent died on November 23, 2020, (2) the date is written in different handwriting and unlike any signature of any named client, (3) none of the signatories/clients actually dated their own signature, (4) the first page of the document has vastly different sizing and format than the following pages, and (5) the meta-data for such document shows a created date of May 24, 2022. Discovery is thus warranted.

Despite knowing of the unethical, fraudulent, and illegal procurement of contracts for the survivors, Pirani Law, through Pirani, nonetheless actively sought to defeat Hatfield's valid attorney lien and, with knowledge of such valid lien, intentionally sought to interfere with Hatfield's existing contracts for legal representation. Pirani Law, through Pirani, additionally sought to prevent disclosure of such circumstances of unethical, illegal, and fraudulent procurement of contracts for representation.

14.  Nunez Law Firm, as identified in the original complaint as Nunez & Associates by virtue of the business cards handed out by McCoy and Ornelas, has been subsequently identified by a contract for legal representation allegedly dated November 25, 2020. **Exhibit 3**. Because it appears to be one and the same, Nunez & Associates and Nunez Law Firm will be identified collectively throughout this pleading as "Nunez & Associates." As is demonstrated by **Exhibit 3**, there is no identifying information to the alleged contract, such as the name of any attorney, any contact address, any phone number to contact any attorney, any state of licensure for any attorney, nor is there any way to connect Nunez Law Firm to any licensed attorney in Arkansas. On July 6, 2022, a search was performed for any licensed attorney in Arkansas having a last name "Nunez," and there are none. There are also no attorneys named Arturo Nunez licensed in Texas. At a hearing conducted by the Washington County Circuit and Probate Court occurring July 7, 2022, Steve Kherkher declared to the courtroom that Arturo Nunez is a person in Mexico with whom Steve Kherkher's law partner at Kherkher Garcia, LLP, Jesus Garcia, Jr., regularly conducts business and legal transactions, meaning there are more than one transaction involving Kherkher Garcia, LLP and the Mexico-based Nunez Law Firm's alleged operator, Arturo Nunez. Steve Kherkher declared to the Washington County Circuit and Probate Court proof of the business connection between Kherkher, Kherkher Garcia, LLP, and something known as either Nunez & Associates or Nunez Law Firm.

15.  Noe Jesus Mancia Polanco, ("Mancia"), individually and as Personal Representative and Special Administrator of the Estate of Recinos, is a resident of Springdale, Arkansas, he is of majority age, he is of sound mind and capacity, and he may or may not be a lawful surviving relative of the decedent, Recinos. Mancia personally caused acts of intimidation against the three lawful heirs to Recinos to compel early termination of Hatfield, and his acts of intimidation occurred in Northwest Arkansas.

## Events Leading to the Retention of Hatfield

16.  On November 23, 2020, Flores and Recinos were tragically killed when a tractor-trailer crossed the line, rolled over, and crushed their vehicle.

17.  The next day, reports of the accident hit the internet. See, e.g., *2 killed, 1 injured in Benton County rollover semi-truck crash*, KATV.com, https://katv.com/news/local/2-killed-1-injured-in-benton-county-rollover-semi-truck-crash (November 24, 2020) (last visited July 11, 2022).

18.  The first funeral home visitation for the victims was on November 27, 2020.

19.  The funeral for the victims was on November 28, 2020.

20.  Case runners McCoy, Ornelas, and Nunez & Associates personally approached the survivors immediately following the injury, they personally attended the funerals, and they personally solicited clients for legal engagement using business cards having the scales of justice printed thereupon to falsely give the appearance of a connection to a legitimate law firm.

21.  Case runners McCoy, Ornelas, and Nunez & Associates promised to pay the funeral expenses of Flores and Recinos and offered full U.S. Citizenship to family members who signed up with law firms specified by McCoy, Ornelas, and Nunez & Associates.

22.  McCoy, Ornelas, and Nunez & Associates made at least two phone calls and sent emails in furtherance of their illegal and unethical efforts to sign potential representatives of Flores and Recinos, including calls and emails between themselves and Kherkher or Kherkher Garcia (collectively the "Kherkher Defendants").

23.  Despite the illegal and unethical advances and promises made by case runners McCoy, Ornelas, and Nunez & Associates, on November 30, 2020, at 8:17 a.m., Recinos' brother Vidal Antonio Recinos ("Vidal") called Hatfield to request representation for the death of Recinos.

24.  Vidal called on behalf of himself, two of Recinos' adult children, Laura Yaneth Mancia Recinos ("Laura") and Ever Noe Mancia Recinos ("Ever Noe"), and one minor child R.M.S.

25.  Hatfield immediately met with Vidal, Laura, Ever Noe, and R.M.S at or about 9:00 a.m. November 30, 2020, to discuss their case options. Vidal, Laura, and Ever Noe signed the Attorney-Client Agreement and Power of Attorney (the "Hatfield Contract") at this meeting. A true and correct copy of the valid Hatfield Contract is attached as **Exhibit 2**.

### The Hatfield Contract

26.  At issue in the underlying lawsuit giving rise to Hatfield's claims are the wrongful death claims directed at J.B. Hunt Transport, Inc. and Keondrick Banks by the survivors of the decedents Flores and Recinos.

27.  Hatfield claims a legal interest in such claims because of his contingency contract for representation of the Estate of Recinos, as authorized by signatures by three of the surviving heirs.

28.  Ark. Code Ann. § 16-22-304(a)(1) creates a lien of attorney which "attaches to any settlement, verdict, report, decision, judgment, or final order in his or her client's favor, and the proceeds thereof in whosoever's hands they may come."

29.  Hatfield was lawfully engaged to serve as counsel to assert wrongful death claims against JB Hunt and others by written contract duly executed by the surviving family members of Recinos.

30.  Hatfield's engagement was memorialized in writing by the Hatfield Contract.

31.  Vidal is an adult brother of the decedent, and he signed the Hatfield Contract and authorized Hatfield to open an Estate and advance all attendant claims associated therewith.

32.  Laura is the adult daughter of the decedent, and she signed the Hatfield Contract and authorized Hatfield to open an Estate and advance all attendant claims associated therewith.

33.  Ever Noe is an adult son of the decedent, and he signed the Hatfield Contract and authorized Hatfield to open an Estate and advance all attendant claims associated therewith.

34.  Any of the foregoing individuals are legally permitted in the State of Arkansas to serve as an as special administrator of the Estate of their deceased mother Recinos and to serve the interests of the Estate and other beneficiaries.

35.  The Hatfield Contract is a valid contract.

36.  Such contract for legal services was for claims of wrongful death against J.B. Hunt and its agents, including Keondrick Banks.

37.  Such contract for legal services constitutes an express agreement by the signatories to compensate Hatfield on a contingency basis whereby Hatfield would invest his time, expertise, and out-of-pocket actual costs of suit.

38.  The three adult survivors attested the case was not solicited by Hatfield in any manner.

39.  The three adult survivors attested no one has received any reward from Hatfield for recommending the clients to Hatfield.

40.  The three adult survivors attested none were promised any support or reward by Hatfield before signing the Hatfield Contract.

41.  On November 30, 2020, all signatories to the Hatfield Contract affirmed both in writing and in person verbally they had not previously retained other counsel prior to retaining Hatfield.

42.  On July 7, 2022, the Court in the probate case for the Estate of Recinos directed Defendants to disclose their contracts for representation. Pirani and Pirani Law (collectively the "Pirani Defendants") used interstate wire or radio communications to provide these documents to Hatfield's counsel following the hearing in the Washington County Circuit and Probate court. **Exhibits 3 and 4**.

43.  The Attorney Employment Contract purports to have been executed by Mancia, Laura, and Ever Noe on November 25, 2020. **Exhibit 3**. The signatures of Laura and Ever Noe directly contradict their verbal and written attestations to Hatfield that they were unrepresented as of November 30, 2020. On information and fair review of the **Exhibit 3**, it is evident the signatures of Laura and Ever Noe were added to the Attorney Employment Contract document after they had already signed the Hatfield Contract and not on November 25.

44.  All signatories to the Hatfield Contract were majority age and were competent to execute such contract. Each did so without duress.

45.  All signatories to the Hatfield Contract were fully aware of the document they were signing.

46.  Hatfield also had an interpreter present to explain all aspects of the Hatfield Contract and the scope of representation.

47.  Hatfield and his team immediately began work on the file and communicated regularly and consistently with his clients to create the Estate. Hatfield regularly communicated with Gaby Martinez, the niece, in order to obtain relevant information for all survivors.

48. On November 30, 2020, Hatfield received extensive information about all survivors and received photos, identification cards, and other survivor information necessary to create the Estate of Recinos.

49. As of November 30, 2020, Hatfield prepared all necessary paperwork for survivor and brother of the deceased Vidal Recinos to serve as the administrator for the Estate.

50. The Hatfield Contract states, "In consideration of the services rendered by said attorneys, I hereby assign and convey to said attorneys as their compensation, the following present and undivided interest in said claim or claims and grant to them a lien on my claim." **Exhibit 2** (emphasis added).

51. The Hatfield Contract explicitly secured an undivided 33⅓% interest in the claim that forms the basis of this lawsuit. *See* **Exhibit 2.**

52. The 1989 amendments to the Attorney Lien Law, Ark. Code. Ann.§ 16-22-301 *et seq.*, permit an attorney "to rely on the contracts they make with their clients whether those contracts contemplate a contingency fee or otherwise." *Lancaster v. Fitzhugh*, 310 Ark. 590, 592, 839 S.W.2d 192, 193 (1992). An attorney who has "initiated action on his client's behalf and then been discharged [may] rely on his contract and recover a contingent fee from not only the client, but third persons as well." *Id*. (citing *Lockley v. Easley*, 302 Ark. 13, 786 S.W.2d 573 (1990)).

53. Hatfield relies on the Hatfield Contract and seeks recovery of his contingency fee as permitted under Arkansas' Attorney Lien Law, Ark. Code. Ann.§ 16-22-301 *et seq*.

## Hatfield's Expertise

54. Hatfield has legal expertise in the field of catastrophic injuries, has represented clients adverse to J.B. Hunt Transport, Inc., and has an established a good reputation and proven record of representing injured individuals and families in Northwest Arkansas and across the State of Arkansas.

55. Hatfield operates his law office in Springdale, Arkansas, which is in very close proximity to the residence of his clients Vidal, Laura, and Ever Noe.

56. Hatfield is well known in the community. He advertises his legal expertise in trucking litigation to Northwest Arkansas. For example, Hatfield's website provides a detailed explanation of what an injured person or family should do following a large truck accident. The explanation provided by Hatfield's firm includes his services of analyzing police reports, checking driver's logs and truck maintenance records, and assessing whether the traffic rules were followed when the accident occurred. Hatfield's advertising is customary to the legal community.

57. After engaging his clients, any of whom would serve as a valid representative of the Estate, Hatfield's firm efficiently completed the legal work required to establish and create an Estate for the deceased to advance wrongful death claims, as is required by Ark. Code Ann. § 16-62-101(a)(1).

## Applicable Ethics and Criminal Laws

58. Arkansas attorney professional ethics Rule 8.4 prohibits misconduct:

> (a) violate or attempt to violate the rules of professional conduct, knowingly assist or induce another to do so, or do so through the acts of another;

> (b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;

> (c) engage in conduct involving dishonesty, fraud, deceit, or misrepresentation;

> (d) engage in conduct that is prejudicial to the administration of justice;

> (e) state or imply an ability to influence improperly a government agency or official; or to achieve results by means that violate the Rules of Professional Conduct or other law; or (f) knowingly assist a judge or judicial officer in conduct that is a violation of applicable rules of judicial conduct or other law.

59. Arkansas attorney professional ethics Rule 1.5 requires attorneys reduce to writing contingency engagement terms.

60. Arkansas attorney professional ethics Rule 1.8 prohibits attorneys from advancing funeral costs or making other promise to induce or solicit a legal fee agreement:

> A lawyer shall not provide financial assistance to a client in connection with pending or contemplated litigation, except that: (1) a lawyer may advance court costs and expenses of litigation, the repayment of which may be contingent on the outcome of the matter; and (2) a lawyer representing an indigent client may pay court costs and expenses of litigation on behalf of the client.

61. Arkansas attorney professional ethics Rule 7.3 prohibit solicitation in death claims until 30 days following the accident. Arkansas ethics rules applicable to all attorneys in Arkansas protects survivors of catastrophic death cases.

62. Arkansas attorney professional ethics Rule 7.3 prohibits all written advertising directed to injured persons, subject to the following requirements:

> (1) include on the bottom left-hand corner of the face of the envelope the word "Advertisement" in red ink, with type twice as large as that used for the name of the addressee;
>
> (2) only be sent by regular mail;
>
> (3) not have the appearance of legal pleadings or other official documents;
>
> (4) plainly state in capital letters "ADVERTISEMENT" on each page of the written communication;
>
> (5) begin with the statement that "If you have already retained a lawyer, please disregard this letter";
>
> (6) include the following statement in capital letters: "ANY COMPLAINTS ABOUT THIS LETTER OR THE REPRESENTATION OF ANY LAWYER MAY BE DIRECTED TO THE SUPREME COURT COMMITTEE ON PROFESSIONAL CONDUCT, C/O CLERK, ARKANSAS SUPREME COURT, 625 MARSHALL STREET, LITTLE ROCK, ARKANSAS 72201"; and,

(7) shall comply with all applicable rules governing lawyer advertising.

63. Arkansas attorney professional ethics Rule 7.3 also prohibits in-person or phone solicitation, other than exemptions not applicable here, especially when:

(2) the solicitation involves coercion, duress, harassment, fraud, overreaching, intimidation, or undue influence; or

(3) the subject of the solicitation is known to the lawyer to be represented in connection with the matter concerning the solicitation by counsel, except where the subject has initiated the contact with the lawyer.

64. Section 38 of the Texas Penal Code prohibits barratry, including Section 38.12(a)(2) which prohibits any person from soliciting employment, either in person or by telephone, for himself or another with intent to obtain an economic benefit.

65. Section 38 of the Texas Penal Code prohibits barratry, including Section 38.12(a)(3) which prohibits any person from paying or advancing or offering to pay or advance to a prospective client money or anything of value to obtain employment, with intent to obtain an economic benefit. That Kherkher and Pirani knew of the barratry scheme and continued representation is probative of the intentional tortious conduct alleged in this amended complaint.

66. Section 38 of the Texas Penal Code prohibits barratry, including Section 38.12(a)(4) which prohibits any person from paying or offering to pay third parties to solicit employment, with intent to obtain an economic benefit.

67. Section 38 of the Texas Penal Code prohibits barratry, including Section 38.12(a)(6) which prohibits any person from accepting or agreeing to accept money or anything of value to solicit employment, with intent to obtain an economic benefit.

68. Section 38 of the Texas Penal Code prohibits barratry, including Section 38.12(b)(1) which prohibits any person from knowingly financing the commission of barratry, including the personal solicitation of clients or the offering of money to clients in exchange for legal representation. That Kherkher and Pirani knew of the barratry

scheme and continued representation is probative of the intentional conduct alleged in this amended complaint.

69. Section 38 of the Texas Penal Code prohibits barratry, including Section 38.12(b)(2) which prohibits any person from knowingly investing funds the person knows or believes are intended to further barratry, including the personal solicitation of clients or the offering money to clients in exchange for legal representation.

70. Section 38 of the Texas Penal Code prohibits barratry, including Section 38.12(b)(2) which prohibits any person, who is a professional, from knowingly accepting employment within the scope of their license that resulted from improper personal solicitation. That Kherkher and Pirani knew or later learned of the barratry scheme and continued representation is probative of the intentional tortious conduct alleged in the amended complaint.

## Kherkher's Intentional Interference with the Hatfield Contract

71. Hatfield was engaged by three lawful heirs.

72. Hatfield began and completed substantial work on the matter, to include creating all paperwork to establish an Estate having Vidal Recinos as the administrator.

73. Kherkher traveled to Northwest Arkansas on November 30, 2020, to personally meet with survivors of both decedents in violation of governing ethics rules.

74. During his personal visit to Arkansas, Kherkher learned of Hatfield's Contract.

75. Kherkher, individually and on behalf of Kherkher Garcia, personally contacted Hatfield by telephone and followed that communication by email.

76. The Kherkher Defendants made at least two interstate phone calls to Hatfield with the intent to knowingly and willingly further a scheme to defraud Hatfield of his legitimate business expectancy and clients.

77. The Kherkher Defendants made at least two interstate phone calls to Hatfield with the intent to knowingly and willingly further a scheme to defraud Vidal, Laura, and

Ever Noe of at least 6⅔% of any settlement made on their behalf. This is because Hatfield's contract was an attorneys' fee of 331/3 % recovery whereas Kherkher Garcia's contract was for 40% of recovery.

78. The Kherkher Defendants sent at least two interstate emails to Hatfield with the intent to knowingly and willingly further a scheme to defraud Hatfield of his business expectancy and clients.

79. The Kherkher Defendants sent at least two interstate emails to Hatfield with the intent to knowingly and willingly further the scheme to defraud Vidal, Laura, and Ever Noe of at least 6⅔% of any settlement made on their behalf.

80. Kherkher first demanded via phone call originating in Texas to Hatfield in Arkansas that Hatfield cease representing Vidal, Laura, or Ever Noe.

81. Kherkher explicitly acknowledged the existence and validity of Hatfield's contract on December 1, 2020, by email.

82. Kherkher declared "You are instructed to stand down. *Both our clients* terminate any representation from you and your law firm. Also please do not communicate with them anymore." **Exhibit 5** (emphasis added).

83. It was thus with specific knowledge of Hatfield's already-executed written contract that the Kherkher Defendants forbade Hatfield from further legal work.

84. Kherkher then directed and coordinated with Laura and Ever Noe to cut off Hatfield from further communications with Vidal, Laura, and Ever Noe.

85. Hatfield's emails, text messages, and phone calls thus went unreturned by Vidal, Laura, and Ever Noe, and Hatfield's additional point of contact ceased communicating with Hatfield after December 2, 2020.

86. Each of Hatfield's three clients fell silent and did not respond to Hatfield's efforts to file the documents to enable the creation of an estate for the deceased or to resolve or address the substance of Hatfield's contractual and statutory attorney's lien.

87. As direct result of Kherkher's actions and demands that Hatfield cease work and no longer communicate with Vidal, Laura, and Ever Noe, Hatfield could not utilize his expertise on this case, was not permitted to contribute to a positive outcome for his clients, and was not permitted to assist in advancing the case against the JB Hunt defendants.

## Hatfield's Notice of Lien

88. In satisfaction of Ark. Code Ann. § 16-22-304(a)(1), Hatfield promptly sent notice of Hatfield's valid attorney's lien to the adverse party via certified mail, return receipt requested, on December 7, 2020. Both notice of the lien, together with proof of actual delivery, is provided as **Exhibit 7**.

89. Hatfield properly served notice of Hatfield's attorney's lien upon the adverse party, J.B. Hunt Transport, Inc. and Keondrick Banks, through counsel Attorney Christy Comstock. **Exhibit 7.**

90. Comstock was the attorney of record representing J.B. Hunt Transport, Inc. in that she later filed the original Answer for defendants in Washington County Circuit Court Case No. 72CV-20-2759.

91. Likewise, notice of said lien was also sent to Kherkher, of Kherkher Garcia, LLP, Houston, Texas, via certified mail, return receipt requested, on December 7, 2020. **Exhibit 7**.

92. Both lawful notices were delivered, signed for, and copies of the PS Form 3811 proof of delivery green cards directed to Comstock and Kherkher were returned to Hatfield on December 11 and 12, 2020, respectively. **Exhibit 7**.

93. No special form is required for an attorney's lien, although Hatfield's lien fully complies with all aspects of Ark. Code Ann. § 16-22-304.

94. Hatfield's notice identifies with specificity all causes of action involving the deceased and specifically identifies the motor vehicle accident which was the subject

matter of the subsequently-filed case assigned Washington County Circuit Court Case No. 72CV-20-2759.

95.  Hatfield's notice outlines his services and efforts regarding the creation of a proper Estate to lawfully advance the case in Arkansas courts.

96.  It would have been unethical and improper for Hatfield to have secured the signatures of Laura and Ever Noe on any Notice of Lien given Kherkher's unequivocal demand for Hatfield to cease all communications.

### Kherkher's Intentional Interference
### with the Hatfield Contract, continued

97.  Kherkher did not claim to represent Vidal, but Kherkher applied pressure to Laura and Ever Noe sufficient to discourage Vidal from communicating with Hatfield.

98.  As a result of Kherkher's actions and instructions, Vidal refused to return all contact from Hatfield.

99.  Hatfield had no way to continue with his existing contract for representation with Vidal without communication and approval from Vidal, and Hatfield could not file the documents he prepared to establish the Estate to lawfully advance the wrongful death claims.

100.  After nearly five months of inaction in the liability suit for wrongful death against the JB Hunt defendants in Arkansas Circuit Court, Hatfield inspected the pleadings to find the Kherkher Defendants had utterly failed to open an estate and thus the entire case was at risk of dismissal for failure to comply with Arkansas law.

101.  On May 13, 2021, Hatfield sent a last email request to Gaby Martinez, who had been a point of contact for Vidal, to update Vidal of the fact that an estate has still not been created. He requested a call back from Vidal or Gaby.

102.  Vidal communicated the fact of the Kherkher Defendant's failure to create an estate to advance the claims to one or more of his relatives.

103.  Pirani, Pirani Law, Kherkher, Kherkher Garcia, and Nunez & Associates were on actual notice of and aware of Hatfield's Contract dated November 30, 2020, by virtue of Hatfield's Notice of Lien he served upon Kherkher and Kherkher Garcia via certified mail.

104.  Despite having actual notice of the lien claimed by Hatfield, the Kherkher Defendants worked to respond to the fact of Vidal alerting his relatives of the failure on the part of the Kherkher Defendants to open an estate to advance the wrongful death claims by hiring Tony Pirani and Pirani Law.

105.  In response to Hatfield giving Vidal a reminder of the lack of estate, Pirani and Pirani Law actively sought to communicate with Vidal to replace Hatfield as counsel and instead secure a contract for legal representation between Vidal and Pirani, Pirani Law, Kherkher, Kherkher Garcia, and Nunez & Associates.

106.  At no time after Kherkher instructed Hatfield to stand down and after Hatfield's clients ceased all communications did Hatfield have the ethical or legal right to interject his representation into the underlying liability case against the JB Hunt defendants.

107.  On June 3, 2021, Vidal responded to unauthorized and unethical contact from the Pirani Defendants and the Kherkher Defendants and signed a contract with Pirani, Pirani Law, Kherkher, Kherkher Garcia, and Nunez & Associates. **Exhibit 4**.

108.  On July 29, 2021, Pirani and Pirani Law opened an Estate for Recinos.

109.  At no time could Hatfield have assisted in this case because of Kherkher's initial instructions to refrain and cease all communications and because of subsequent unethical efforts by Pirani, Pirani Law, Kherkher, Kherkher Garcia, and Nunez & Associates taking steps to prevent the survivors from communicating or cooperating with Hatfield.

110.  Hatfield was never allowed to participate in any proceedings by Kherkher or Pirani and was not invited to attend mediation or offer any legal services for the Estate,

despite having been retained to do so and despite Hatfield's valid lien notices to the Kherkher Defendants and to the Pirani Defendants.

111. The wrongful death plaintiff survivors and the JB Hunt defendants, in the Circuit Court case, attended mediation on or about April 5, 2022. The parties tentatively reached a settlement of all claims and did so without ever alerting Hatfield to the mediation prior to settling the claims.

112. At no time did anybody working with the wrongful death plaintiff survivors contact Hatfield to allow him to participate in the case, the mediation, or the resolution. Rather, at all relevant times the Kherkher Defendants and the Pirani Defendants sought to intentionally defeat the Hatfield Contract using unethical and intentionally tortious means.

## Mancia's Intentional Interference with the Hatfield Contract

113. Mancia was married to Recinos. However, Recinos filed for divorce prior to her death. **Exhibit 6.**

114. Hatfield was specifically informed that Mancia was very abusive to Recinos, and she sought divorce from him a decade ago.

115. As shown by Mancia's signature on the court filings, Mancia agreed to the divorce and even waived formal service for the divorce papers. Mancia waived all notice of all further divorce proceedings. Mancia consented to a final judgement and absolute divorce from Recinos. Such document was FILED as matter of public record. **Exhibit 6.**

116. Hatfield was specifically informed that Mancia was not understood by the other survivors to be married to the decedent, Recinos.

117. Hatfield was specifically informed that Mancia did not reside with Recinos prior to her death, despite making representations to the Washington County Circuit and Probate Court in advancing the Probate and Civil wrongful death claims, as personal representative.

118.  Mancia learned of Recino's death; he stepped forward to bring a wrongful death claim on his behalf and falsely declared to the Washington County Circuit Court in the creation of the Estate that he resided in the same home as did Recinos.

119.  Mancia is not a proper party to serve as personal representative and does not represent the best interests of all other survivors. Had a Court of competent jurisdiction known of these false statements and history, it would have inquired more to ascertain the proper Representative for the Estate.

120.  Survivors Vidal, Laura, and Ever Noe hired Hatfield to represent the estate on November 30, 2020.

121.  Mancia later learned of their engagement of Hatfield, and he personally caused acts of intimidation against the three lawful heirs to compel early termination of Hatfield.

122.   Mancia's acts of intimidation occurred in Northwest Arkansas and included threats and other threats of physical abuse.

123.  Survivors Vidal, Laura, and Ever Noe were gravely concerned for their safety and for those of other survivors.

124.  Kherkher was aware of Mancia's control and desire to control the entire estate and serve as the personal representative of Recinos' estate.

125.  Kherkher coordinated with Mancia to ensure all survivors terminated any other contracts for legal representation to unify only the Kherkher Garcia firm to be retained.

126.  The non-attorney case runners McCoy and Ornelas assisted in the effort to compel a signature on other contract pages for Laura and Ever Noe.

127.  The Kherkher Defendants, McCoy, Ornelas, Nunez & Associates, and Mancia were specifically aware of the Hatfield Contract, and all acted in an intentional manner to cancel or otherwise interfere with Hatfield's legitimate business interests to compel signatures of Laura and Ever Noe on the Nunez Law Firm contract. **Exhibit 3**.

128.  Such interference included improper, unlawful, and unethical means and threats of intimidation and threats of violence, among other threats.

129.  As a result of the efforts by Mancia, with full knowledge by Kherkher, the interference efforts worked and Vidal, Laura, and Ever Noe ceased all communication with Hatfield, thereby preventing him from serving his clients. Such acts of intimidation occurred using interstate commerce via phone, text messaging, and email.

130.  Kherkher conveyed the message to Hatfield to cease all work as allegedly from Vidal, Laura, and Ever Noe, using interstate commerce via email. **Exhibit 5**.

## The Texas Case-Runners' Funeral Home Scheme

131.  The accident that caused the death of Recinos and Flores occurred on November 23, 2020. Both were traveling together in the same vehicle involved in the truck operated by J.B. Hunt and its agent.

132.  The fact of the accident was widely reported in local news outlets beginning the evening of November 23, 2020.

133.  The funerals for Recinos and Flores were held together at the same location and on the same day, on November 28, 2020.

134.  The fact of the funerals taking place on the same day, November 28, 2020, was public information by virtue of website advertisements on the funeral home website.

135.  The funerals were held at Westfield Chapel Funeral Home in Springdale, Arkansas on November 28, 2020.

136.  Ornelas and McCoy are not licensed attorneys, but they are experts in manipulating survivors at funeral homes given their shared extensive history in the funeral home industry.

137.  Ornelas and McCoy have been sued in Texas for barratry on many occasions. In one example, the claims detail a kickback scheme involving Ornelas paying a kickback of $100,000.00 to a funeral home director as part of the client-funneling scheme.

138.   Ornelas and McCoy used interstate wire and radio communications to discuss the accident and make a shared plan to attend the funeral in Springdale, Arkansas.

139.   Ornelas and McCoy travelled to Springdale, Arkansas to secure signatures on contracts for legal representation.

140.   Ornelas and McCoy fraudulently claimed they were part of a law firm known as Nunez & Associates, as shown by **Exhibit 1**.

141.   The Arkansas Office of the Committee on Professional Conduct confirmed there is no such firm registered in Arkansas and no attorney with the last names of "Nunez," or "Ornelas" licensed in Arkansas. Neither is there an attorney named "Mike McCoy" licensed in Arkansas.

142.   Ornelas, a non-lawyer, is a master at illegally running cases for law firms. As evidenced in past lawsuits filed against him in Texas, such as the case filed in 2019 in the District Court of Bexar County, Texas, Case No. 2019CI23441.

143.   Ornelas typically hands out business cards to a family of the deceased following a catastrophic injury. Not long ago, Ornelas identified as a "Group of Legal Specialties." The GLS published a how-to manual when illegally enticing families to sign with Ornelas, as shown below, together with business cards each handed to prospective clients and funeral homeowners:

144.   Ornelas illegally conspires with other funeral home directors to lure grieving families into signing contracts for legal representation with law firms with which he has an economic stake or arrangement.

145.   McCoy works closely with Ornelas. McCoy was the main contact for the GLS group. McCoy uses the same phone number on his business card, **Exhibit 1**, as he did for the "Group of Legal Specialties" contact number. The information below is from a lawsuit against both McCoy and Ornelas. This is a booklet that was prepared by McCoy

and Ornelas and is used to coach funeral home directors into becoming recruiters for McCoy and Ornelas's illegal scheme. **Exhibit 8**.

146.  The brochure that Ornelas and McCoy created is criminally prohibited and is





**The Sequence**

1.  When the death call comes in, get as much information as possible (name of the deceased, location of the accident and what happened, etc.)
2.  Contact the GLS rep with the information as soon as possible.
3.  GLS will do the research and call the funeral home back on the viability of the case prior to the family coming in for the arrangement conference.
4.  Set the stage with the family using the language examples included in this brochure.
5.  Once the family asks "who?", refer to the GLS rep and contact the rep during the arrangement conference.
6.  Once we get the go ahead from the family and the paperwork is signed, we will coordinate getting the monies to the funeral home for the funeral expenses.
7.  The GLS rep will keep the funeral home up to date on the progress of the case.

**Example: GLS Introduction Language**

Mr. Funeral Director, we don't have much money and need to look at cremation or some type of service that we can afford.

"I understand Mr. and Mrs. Jones. Again, I am truly sorry for your loss. It is tragic what happened and I feel really badly for you and your family. I know you have many emotions running through your mind right now. We want to provide you a service that works best for you, but it is very important that you have someone acting on your behalf that is making sure that witness stories aren't changing and that evidence is not disappearing. There are people out there that will make sure your interests are protected and will even help with funeral expenses as well as other expenses."

Mr. Funeral Director, who would that be?

"It is a group that helps families all over the country and they can be a big help to you. So, why don't we select the type of service that you really want and we will get them on the phone in just a bit."

used to target one of the most vulnerable populations immediately following a fatality. It preys upon people who cannot afford funeral services and urges funeral home directors to play an active role in the illegal procurement of attorney fee contracts.

147.  McCoy also advertises in church bulletins, and he has a case-running partnership with other law firms, too.

148. McCoy claims to have "partner" law firms. Discovery will help uncover the extent of his "partner" network. For example, the apparent choice for an 18-wheeler case law firm is Kherkher Garcia, whereas other law firms handle product defect cases.

149. It is unethical and illegal for attorneys in Texas and Arkansas to have fee-splitting arrangements with non-attorneys such as McCoy and Ornelas.

150. Ornelas and McCoy, neither of whom are attorneys, use their "existing relationships" and "partnerships" with "partner firms" to get paid.

151. Ornelas and McCoy adopt unethical, deceptive, misleading, high-pressure tactics to sign up clients and families for law firms.

152. Ornelas and McCoy offer payment of funeral expenses to entice families to sign with them and their "partner firms."

153. Ornelas and McCoy did in fact arrange for the payment of the funeral expenses for Recinos.

154. Ornelas and McCoy arranged for the payment of the funeral expenses for Flores.

155. Ornelas and McCoy illegally and unethically offered other forms of compensation to entice families to sign with them and their "partner firms."

156. Ornelas or McCoy offered the false promise of United States citizenship to one or more family members to entice and secure certain contracts for legal representation relating to the Estate of Recinos.

157. Ornelas or McCoy offered the false promise of United States citizenship to one or more family members to entice and secure certain contracts for legal representation relating to the Estate of Flores.

## Attorney Kherkher's Active Role in the Scheme

158.  Kherkher, individually and as authorized agent of Kherkher Garcia, made payment of the funeral expenses for Recinos with full knowledge doing so was unethical and illegal.

159.  The Kherkher Defendants actively communicated with Ornelas and McCoy to assist in the negotiation and payment of funeral expenses.

160.  The Kherkher Defendants made payment of the funeral expenses for both decedents with full knowledge doing so was both unethical and illegal and would serve as substantial motivation for other remaining survivors to feel compelled to sign with Nunez & Associates.

161.  Arkansas Rules of Professional Conduct prohibit attorneys from advancing funeral expenses as inducement to contract. Kherkher is an attorney licensed in Arkansas and Texas. Kherkher has admitted to an Arkansas court such conduct is unethical by proclaiming "Guilty as charged!"

162.  The Kherkher Defendants were aware how Ornelas or McCoy promised one or more family members United States citizenship to entice and unlawfully entice signatures on his contracts for legal representation relating to the Estate of Recinos.

163.  The Kherkher Defendants were aware Ornelas or McCoy fraudulently promised one or more family members United States citizenship to entice and unlawfully entice signatures on his contracts for legal representation relating to the two decedents' survivors.

164.  Kherkher and Kherkher Garcia have an illegal and unethical partnership with non-attorney case-runners Ornelas and McCoy wherein the law firm shares legal fees with non-attorneys with full knowledge doing so was unethical and illegal.

165.  Texas and Arkansas Rules of Professional Conduct prohibit sharing fees with non-lawyers.

166.   Kherkher, individually and as authorized agent of Kherkher Garcia, engaged or had partnership with case-runners Ornelas and McCoy prior to when they dispatched to attend the funerals in Springdale, Arkansas with full knowledge doing so was unethical and illegal. Kherkher stated in open court to the Washington County judge on July 7, 2022, how his firm had a prior business relationship with the Nunez Law Firm, a purported Mexico-based firm.

167.   The Kherkher Defendants paid non-attorney case-runners Ornelas and McCoy and directed them to attend the funerals in Springdale, Arkansas with full knowledge doing so was unethical and illegal.

168.   The Kherkher Defendants were in regular communication with non-attorney case-runners Ornelas and McCoy and assisted in securing illegal and unethical contracts for legal representation with the survivors of the families of Flores and Recinos with full knowledge doing so was unethical and illegal.

169.   The Kherkher Defendants were in regular communication with paid non-attorney case-runners Ornelas and McCoy and was aware that not all survivors agreed to sign with a law firm following the funeral.

170.   The Kherkher Defendants became aware that Hatfield had signed a proper and valid contract for legal representation for at least three survivors of Recinos.

171.   The Kherkher Defendants called Hatfield using interstate phone systems to perpetuate a fraud upon Hatfield and the three survivors of Recinos.

172.   The Kherkher Defendants intentionally concocted a fraudulent premise on which to demand Hatfield cease work and did so using interstate channels of commerce and communication, both on the phone and via email. The Kherkher Defendants falsely claimed to have received the case from an Arkansas law firm.

173.   The Kherkher Defendants intentionally concealed the fact of the case runner procurement of any engagement, if any.

174. The Kherkher Defendants falsely and fraudulently declared to have in their possession a contract with Hatfield's clients Laura and Ever Noe and did so using interstate wire and mail channels.

175. The Kherkher Defendants falsely and fraudulently interfered with the Hatfield Contract using interstate wire and mail channels.

176. Kherkher, individually and as authorized agent of Kherkher Garcia, likewise employed interstate wire and mail channels when directing Hatfield's three clients to cease all communications with Hatfield, making it impossible for Hatfield to carry out his duties and obligations to them.

177. At all times relevant to these claims, Kherkher and Kherkher Garcia never advertised in Northwest Arkansas.

178. A general Internet search by a resident in Northwest Arkansas for "truck accident lawyer" or other similar terms does not reveal any advertisements by either Kherkher or Kherkher Garcia.

179. No survivors to either Recinos and Flores discovered Kherkher or Kherkher Garcia through the Internet.

180. In response to a question by Hatfield inquiring on how Kherkher was hired, Kherkher lied and falsely represented to Hatfield that Kherkher Garcia was hired by survivors on referral by an Arkansas law firm doing business in Northwest Arkansas.

181. No Arkansas firm was retained until the Pirani Defendants appeared.

182. Kherkher's statements of having been referred the case by an Arkansas law firm were intentionally and materially false.

183. The Kherkher Defendants demanded Hatfield cease all work but offered no real evidence to Hatfield of any prior contract with Hatfield's clients.

184. Kherkher uttered his concocted and false statements to fraudulently induce Hatfield into voluntarily disassociating from his clients and voluntarily relinquishing Hatfield's attorney's lien.

185.  Kherkher falsely and fraudulently declared to Hatfield that Kherkher already had a valid contract with the survivors to both victims and stated that his contract predated Hatfield's contract.

186.  Kherkher specifically stated, falsely and with intent to defraud, that he already had a contract with each of Hatfield's clients.

187.  Kherkher uttered such false statement to induce Hatfield into voluntarily disassociating from Vidal, Laura, and Ever Noe and voluntarily relinquishing Hatfield's attorney's lien.

188.  Kherkher, individually and as authorized agent of Kherkher Garcia, knowingly and intentionally interfered with Hatfield's contract for legal representation using fraud and deception using interstate wire and mail channels.

189.  As of November 30, 2020, neither Kherkher nor Kherkher Garcia held a lawful, valid, nor voluntarily executed contract with any survivors to either Recinos or Ana Delia Mejia Flores.

190.  As of November 30, 2020, neither Nunez & Associates or Nunez Law Firm held a lawful, valid, nor voluntarily executed contract with any survivors to either Recinos or Ana Delia Mejia Flores.

191.  As of December 1, 2020, if there were any signed engagement contract at all, it had been procured through fraud, illegal means, and unethical means, including but not limited to, the illegal use of Texas-based case-runners associated with a Mexico-based firm under false pretense and false and unethical promise of United States citizenship.

192.  Hatfield is the only attorney in that timeframe to have had any lawful, valid, and voluntarily executed contract for legal services with any survivor to the accident of either Recinos or Flores.

193.  It is more likely than not Hatfield would have secured both estates because the deceased families knew Hatfield, they purposely sought out Hatfield for legal representation, and they signed a contract with Hatfield.

194.  It is more likely than not Hatfield would have represented both estates because the Hispanic community in Northwest Arkansas knows and trusts Hatfield's substantial representation of injured workers in their community in both workers' compensation claims and personal injury matters.

195.  Three of the surviving relatives already sought out Hatfield because of his excellent reputation when serving the Northwest Arkansas and the Springdale, Arkansas community and also due to Hatfield's extensive advertising efforts and investment.

196.  Hatfield was contacted by the surviving heirs to Recinos, they physically came to his Springdale office, and all three personally met with Hatfield. Each signed a written contract for him to represent them, on November 30, 2020, and they did so with no undue influence or issues. Conversely, Kherkher obtained his contract, if at all, by fraud and in violation of criminal and professional ethics rules.

197.  After Hatfield had a signed contract, Hatfield immediately began work in creating the Estate documents, subject only to final clarification from other family members on their addresses and dates of birth.

198.  Multiple attorneys can represent various aspects of a wrongful death case.

199.  Kherkher falsely declared he represented survivors to the companion traveling in the same car, Ana Delia Mejia Flores, who died in the same accident.

200.  **Exhibit 9** is an email dated December 2, 2020, confirming Kherkher's admission via declaration "they can't fire me, I paid the funeral expenses."

201.  **Exhibit 9** also echoes promises were made to the family members by Kherkher's case-runners or by Kherkher regarding the unlawful promise of citizenship on condition for signing with Kherkher's law firm.

202.  Kherkher did not refute nor respond to **Exhibit 9**.

203.  Reasonable attorneys would have responded to refute such statements if untrue.

204. Kherkher personally declared "guilty as charged!" in open court proceedings on July 7, 2022, thereby expressly admitting to his improper payment of funeral expenses for both decedents.

205. Such payment of funeral expenses was done using interstate commerce and funding. This payment served as unlawful enticement to force all survivors to use Kherkher and Kherkher Garcia.

206. Kherkher did what no other Arkansas licensed attorney could ethically do to procure engagement and serve as leverage preventing termination.

207. Using interstate wire or radio communications, Kherkher deliberately lied to Hatfield on the point of an Arkansas law firm having referred him the case. Rather, on July 7, 2022, Kherkher admitted in open court that he got the case from a Mexico-based law firm who was not licensed to practice in Arkansas.

208. Despite what Kherkher told Hatfield, *i.e.*, that his firm was referred by a local Arkansas firm, Kherkher knowingly conspired, as part of a criminal enterprise with other attorneys and non-attorneys, to recruit or pay for contracts in a complex barratry scheme prohibited by law and ethics obligations.

209. Kherkher is an attorney licensed in both Arkansas and Texas, and he is a resident of Texas. His barratry scheme was accomplished, in large part, from his regular law business in Texas using Texas resident case-runners.

210. Proceeds of settlement and resolution of one of the two underlying wrongful death claims have been disbursed to Texas and into the hands of Kherkher and Kherkher Garcia, Pirani and Pirani Law, and Nunez & Associates. Certain representations to the Washington County Probate Court in connection with securing distribution to the Nunez Law Firm or Nunez & Associates is against public policy, i.e., to pay non-attorney case runners and Mexico-based firms for unethical case procurement.

211.  The barratry scheme began in Texas, was coordinated by Kherkher in Texas, Kherkher's case-runners were sent to the funeral from either Mexico or Texas, and the ill-gotten gains from that illegal solicitation has been returned to Texas.

212.  The Texas Penal Code squarely prohibit Kherkher's, McCoy's, Ornelas', and Nunez & Associates' criminal conduct.

213.  The Texas Penal Code also prohibits the Pirani Defendants from continuing representation after learning of the barratry schemes.

214.  The Arkansas professional ethics rules squarely prohibit case running, paying for funeral expenses, and making false statements in procurement of legal contracts. To order to overcome such rules, the Kherkher Defendants and the case runners McCoy, Ornelas, and Nunez & Associates engaged in fraudulent conduct in continuing to state to the survivors their conduct did comply with the applicable rules and professional obligations. See **Exhibit 4**.

### The Defendants' Efforts to Conceal the Truth

215.  After asserting a valid attorney's lien and giving notice of the lien in the probate and wrongful death case, Hatfield initially attempted to secure discovery to resolve the timing and manner of engagement of Kherkher's firm and Pirani's firm by asking for a copy of their agreement.

216.  Kherkher and Pirani refused to do so.

217.  Hatfield resorted to issuing a Notice of Deposition for Plaintiffs after Hatfield intervened as a matter of right in the underlying wrongful death lawsuit.

218.  The Kherkher Defendants and Pirani Defendants actively sought to prevent such depositions of the survivors, who are material fact witnesses, in order to conceal the case procurement.

219.  Hatfield served a subpoena for documents relating to the funeral home upon Pirani and Kherkher consistent with Ark. R. Civ. P. 45, which requires a 3-day advance

notice of such subpoena prior to serving the subpoena upon the funeral home regarding payment by McCoy, Ornelas, Nunez, or Kherkher for both Recinos and Flores. The Kherkher Defendants and Pirani Defendants actively sought to prevent such discovery to conceal the truth of payment of the funeral expenses.

220. Hatfield had confirmed the funeral home was paid by Kherkher prior to sending such subpoena but needed to obtain and authenticate the records demonstrating the illegal payments.

221. The Kherkher Defendants and Pirani Defendants objected to the subpoena, sought a protective order, and sought to prevent the disclosure of such documents to conceal the truth of payment of funeral expenses.

222. Hatfield did not formally serve the funeral home for such documents and has not been permitted access to that evidence and specific payment information for both decedents.

223. On. July 7, 2022, Kherkher announced in open court that he was "Guilty as charged!" to payment of those funeral expenses. Other questions remain, including whether McCoy, Ornelas, or Nunez & Associates paid some portion of such funeral expenses.

224. The Arkansas Supreme Court grants trial courts authority to disgorge fees earned using unethical or illegal means. *Crawford & Lewis v. Boatmen's Trust Co.*, 338 Ark. 679, 1 S.W.3d 417 (1999). Public policy supports the disgorgement of fees because the Kherkher Defendants and Pirani Defendants are acting on unlawfully and fraudulently procured contracts for representation initiated by McCoy, Ornelas, and Nunez & Associates.

## Kherkher's Incompetent Original Lawsuit

225. Kherkher signed his name to an original complaint on December 29, 2020.

226. In violation of Arkansas law, Kherkher sued on behalf of "Noe Jesus Mancia Polanco, As Next Friend of R.R.M., et al."

227. Ark. Code. Ann. § 16-62-101(a)(1) requires "For wrongs done to the person or property of another, an action may be maintained against a wrongdoer, and the action may be brought by the person injured or, after his or her death, by his or her executor or administrator against the wrongdoer. . ."

228. Kherkher's lawsuit was patently defective and violated Arkansas law.

229. Predictably, on February 4, 2021, all Defendants affirmatively sought dismissal of the entire case for Kherkher's utter failure to comply with basic Arkansas law, Ark. Code. Ann. § 16-62-101(a)(1), and pursuant to Ark. R. Civ. P. 12(b)(6).

230. In contrast to Kherkher's failure to comply with the requirements of Arkansas law, Hatfield would not have made such error.

231. In fact, as of November 30, 2020, Hatfield had already completed pleadings to establish and create an Estate, which complied with basic Arkansas law and pleading requirements, and which were in the name of Vidal Recinos, the adult brother of the deceased.

232. Kherkher's omissions caused undue avoidable delay for these survivors.

233. Five months after the original, patently defective complaint was filed by Kherkher, and four months after Defendants sought dismissal of all claims for failure to follow the law, Arkansas attorney Tony Pirani entered his appearance.

234. On information and belief, it was not until May 2021 that Mr. Pirani was engaged as counsel by Plaintiffs.

235. Pirani contacted Vidal with full knowledge of Hatfield's prior representation of Vidal and valid contract with Vidal.

236. Pirani sought to engage Vidal on behalf of Pirani, Kherkher, and Nunez.

237. At that point in time, Pirani was fully aware of the procurement of these clients using a Mexico-based case-running firm Nunez & Associates. Pirani took no steps to disavow himself from this association but instead sought to further memorialize his involvement and allowed his fees from both Nunez & Associates and Kherkher Garcia.

238. Upon learning of Pirani's entry to the case, Hatfield sent a reminder of Hatfield's lien via email to counsel for the adverse parties, including Attorney Barrett Deacon representing J.B. Hunt Transport, Inc. and newly-entered Tony Pirani representing the Estate, on July 23, 2021.

239. It was not until July 29, 2021, that Tony Pirani filed a Petition for Appointment of Personal Representative and Special Administrator of Estate for Recinos.

240. It was not until August 12, 2021, that Tony Pirani filed a First Amended Complaint to correct Kherkher's glaring omission and violation of Arkansas law and pleading standards.

241. Nearly eight months lapsed from when Kherkher filed the defective lawsuit to when Pirani filed pleadings that complied with basic pleading requirements in Arkansas.

## Work Not Performed by Kherkher or Pirani

242. At no time in this case prior to settlement has there been any expert witness disclosure.

243. At no time in this case prior to settlement has there been any deposition.

244. At no time in this case prior to settlement has there been any written discovery filed with any court by Plaintiffs to Defendants.

245. At no time in this case prior to settlement have there been any requests for admission filed with any court as propounded by Plaintiffs to Defendants.

246.  At no time in this case prior to settlement has there been any motion practice, such as a motion to dismiss, a motion for summary judgment, a motion to compel, or any substantive motion.

## Work Hatfield was Ready to Perform

247.  Hatfield had a legitimate business expectancy and was fully competent and ready to undertake all representation of both estates.

248.  But for the actions of all defendants, Hatfield would have secured the same or better result for these survivors of both estates.

249.  At all times relevant to this matter, Hatfield stood ready, willing, and able to assist the family in receiving a maximum compensation.

250.  Hatfield and his attorneys and professionals in his office stood ready to provide comprehensive review of the evidence, interview witnesses, perform and conduct research and accident reconstruction, engage economic experts, and ably represent these clients and the Estates.

251.  It was all defendants, and not Hatfield, who prevented Hatfield from contributing to a successful outcome for the survivors and estates.

252.  On April 5, 2022, Hatfield received notification from counsel for J.B. Hunt the case had settled. Such information was reasonably expected following Hatfield's proper lien and notice sent to J.B. Hunt's counsel.

253.  At no time prior to seeking distribution of their attorneys' fees, using a petition to distribute attorneys' fees – which was filed under seal and not viewable to the public, have the Kherkher Defendants or Pirani Defendants provided Hatfield or the Circuit or Probate Court of Washington County with the actual contract of legal engagement, settlement, or allocation of distribution of fee.

254.  At no time prior to seeking distribution of their attorneys' fees have the Kherkher Defendants or Pirani Defendants provided a copy of the engagement contract

between Kherkher and any Personal Representative of the Estate, much less a written contract between Kherkher and Vidal Antonio Recinos, Laura Yaneth Mancia Recinos, or Ever Noe Mancia Recinos.

255.  At no time has any Court of competent jurisdiction authorized the Estate to execute any engagement contract with Pirani, Pirani Law, Nunez & Associates, Kherkher, or Kherkher Garcia.

256.  At all relevant times to this case, the only contract on which any suit has been brought was the one unlawfully procured using case-runners McCoy and Ornelas involving Nunez & Associates or the Mexico-based Nunez Law Firm.

## Predicate Acts — Mail Fraud 18 U.S.C. § 1341

257.  The foregoing facts and statements are incorporated by reference.

258.  McCoy, Ornelas, Nunez & Associates, Kherkher, Kherkher Garcia, Pirani, and Pirani Law knowingly and willingly participated in a scheme to defraud Hatfield.

259.  McCoy, Ornelas, Nunez & Associates, Kherkher, Kherkher Garcia, Pirani, and Pirani Law knowingly and willingly participated in a scheme to defraud Vidal, Laura, and Ever Noe, among other survivors.

260.  McCoy, Ornelas, Nunez & Associates, Kherkher, Kherkher Garcia, Pirani, and Pirani Law acted knowledgeably and intentionally.

261.  McCoy, Ornelas, Nunez & Associates, Kherkher, Kherkher Garcia, Pirani, and Pirani Law acted with the intent to defraud.

262.  The actions of McCoy, Ornelas, Nunez & Associates, Kherkher, Kherkher Garcia, Pirani, and Pirani Law were committed voluntarily and purposefully.

263.  McCoy, Ornelas, Nunez & Associates, Kherkher, Kherkher Garcia, Pirani, and Pirani Law used the U.S. mails for the purpose of executing the scheme or plan to defraud.

## Predicate Acts — Wire Fraud 18 U.S.C. § 1343

264. The foregoing facts and statements are incorporated by reference.

265. McCoy, Ornelas, Nunez & Associates, Kherkher, Kherkher Garcia, Pirani, and Pirani Law knowingly and willingly participated in a scheme to defraud Hatfield.

266. McCoy, Ornelas, Nunez & Associates, Kherkher, Kherkher Garcia, Pirani, and Pirani Law knowingly and willingly participated in a scheme to defraud Vidal, Laura, and Ever Noe, among other survivors to both estates.

267. McCoy, Ornelas, Nunez & Associates, Kherkher, Kherkher Garcia, Pirani, and Pirani Law acted knowledgeably and intentionally.

268. McCoy, Ornelas, Nunez & Associates, Kherkher, Kherkher Garcia, Pirani, and Pirani Law acted with the intent to defraud.

269. The actions of McCoy, Ornelas, Nunez & Associates, Kherkher, Kherkher Garcia, Pirani, and Pirani Law were committed voluntarily and purposefully.

270. McCoy, Ornelas, Nunez & Associates, Kherkher, Kherkher Garcia, Pirani, and Pirani Law made interstate wire and radio communications for the purpose of executing the scheme or plan to defraud.

# Counts

## Count One — Civil Racketeering Influenced Corrupt Organization Act, § 1962(a) Investment
### against McCoy, Ornelas, Nunez & Associates, Kherkher, Kherkher Garcia, Pirani, and Pirani Law

271. The foregoing facts and statements are incorporated by reference.

272. McCoy, Ornelas, Nunez & Associates, Kherkher, Kherkher Garcia, Pirani, and Pirani Law were invested in an enterprise.

273. McCoy, Ornelas, Nunez & Associates received income from committing or aiding and abetting two or more predicate acts of Mail Fraud or Wire Fraud in the last ten years.

274. Specifically, McCoy, Ornelas, Nunez & Associates used interstate communication via wire or radio and interstate carriage of mail and parcels through the U.S. mails on two or more occasions in the last ten years to further their enterprise to fraudulently and unethically cause the termination of the Hatfield Contract in favor of their own contracts from which they received income.

275. Specifically, Defendants McCoy, Ornelas, and Nunez & Associates used interstate communication via wire or radio and interstate carriage of mail and parcels through the U.S. mails on two or more occasions in the last ten years to coordinate with the Kherkher Defendants or the Pirani Defendants to illegally pose as attorneys to further the execution of contracts from which they received income.

276. Specifically, Defendants McCoy, Ornelas, and Nunez & Associates used interstate communication via wire or radio and interstate carriage of mail and parcels through the U.S. mails on two or more occasions in the last ten years to coordinate with the Kherkher Defendants or the Pirani Defendants to illegally and unethically procure clients from which they received income.

277. Specifically, Defendants McCoy, Ornelas, and Nunez & Associates used interstate communication via wire or radio and interstate carriage of mail and parcels through the U.S. mails on two or more occasions in the last ten years to participate with the Kherkher Defendants or the Pirani Defendants to transmit and receive unlawful engagement contracts procured through deception or false promise that some or all survivors would be granted United States Citizenship in exchange for signing from which they received income.

278. Specifically, Defendants McCoy, Ornelas, and Nunez & Associates used interstate communication via wire or radio and interstate carriage of mail and parcels through the U.S. mails on two or more occasions in the last ten years to participate with the Kherkher Defendants or the Pirani Defendants to transmit and receive unlawful

engagement contracts procured through deception or unlawful promise to pay funeral expenses in exchange for signing from which they received income.

279.  Specifically, Defendants McCoy, Ornelas, and Nunez & Associates used interstate communication via wire or radio and interstate carriage of mail and parcels through the U.S. mails on two or more occasions in the last ten years to coordinate with the Kherkher Defendants or the Pirani Defendants to interfere with the Hatfield's business expectancy from which they received income.

280.  Specifically, Defendants McCoy, Ornelas, and Nunez & Associates used interstate communication via wire or radio and interstate carriage of mail and parcels through the U.S. mails on two or more occasions in the last ten years to run a calculated scheme designed to prey on legally protected survivors, pay kickbacks to funeral homes, pay funeral expenses in exchange for representation, and apply pressure to potential clients on behalf of law firms including but not limited to the Kherkher Defendants and the Pirani Defendants, from which they received income.

281.  The Kherkher Defendants received income from committing or aiding and abetting two or more predicate acts of Mail Fraud or Wire Fraud in the last ten years.

282.  Specifically, the Kherkher Defendants used interstate communication via wire or radio and interstate carriage of mail and parcels through the U.S. mails on two or more occasions in the last ten years to further their enterprise to fraudulently and unethically cause the termination of the Hatfield Contract in favor of their own contracts from which they received income.

283.  Specifically, the Kherkher Defendants used interstate communication via wire or radio and interstate carriage of mail and parcels through the U.S. mails on two or more occasions in the last ten years to coordinate with McCoy, Ornelas, Nunez & Associates, or the Pirani Defendants to do what the Kherkher Defendants could not do directly: secure clients in violation of the Texas Penal Code, the Texas Rules of

Professional Conduct, and the Arkansas Rules of Professional Conduct from which they received income.

284. Specifically, the Kherkher Defendants used interstate communication via wire or radio and interstate carriage of mail and parcels through the U.S. mails on two or more occasions in the last ten years to participate with McCoy, Ornelas, Nunez & Associates, or the Pirani Defendants to transmit and receive unlawful engagement contracts procured through deception or false promise that some or all survivors would be granted United States Citizenship in exchange for signing from which they received income.

285. Specifically, the Kherkher Defendants used interstate communication via wire or radio and interstate carriage of mail and parcels through the U.S. mails on two or more occasions in the last ten years to participate with McCoy, Ornelas, Nunez & Associates, or the Pirani Defendants to transmit and receive unlawful engagement contracts procured through deception or unlawful promise to pay funeral expenses in exchange for signing from which they received income.

286. Specifically, the Kherkher Defendants used interstate communication via wire or radio and interstate carriage of mail and parcels through the U.S. mails on two or more occasions in the last ten years to participate with McCoy, Ornelas, Nunez & Associates, or the Pirani Defendants to negotiate, arrange, and transmit payment of funeral expenses in exchange for signing representation contracts from which they received income.

287. Specifically, the Kherkher Defendants used interstate communication via wire or radio and interstate carriage of mail and parcels through the U.S. mails on two or more occasions in the last ten years to coordinate with McCoy, Ornelas, Nunez & Associates, or the Pirani Defendants to interfere with the Hatfield's business expectancy from which they received income.

288.  The Pirani Defendants received income from committing or aiding and abetting two or more predicate acts of Mail Fraud or Wire Fraud in the last ten years.

289.  Specifically, the Pirani Defendants used interstate communication via wire or radio and interstate carriage of mail and parcels through the U.S. mails on two or more occasions in the last ten years to further their enterprise to fraudulently and unethically cause the termination of the Hatfield Contract in favor of their own contract from which they received income.

290.  Specifically, the Pirani Defendants used interstate communication via wire or radio and interstate carriage of mail and parcels through the U.S. mails on two or more occasions in the last ten years to coordinate with McCoy, Ornelas, Nunez & Associates, or the Kherkher Defendants to do what the Pirani Defendants could not do directly: secure clients in violation of the Arkansas Rules of Professional Conduct from which they received income.

291.  Specifically, the Pirani Defendants used interstate communication via wire or radio and interstate carriage of mail and parcels through the U.S. mails on two or more occasions in the last ten years to coordinate with McCoy, Ornelas, Nunez & Associates, or the Kherkher Defendants to interfere with the Hatfield's business expectancy from which they received income.

292.  Specifically, the Pirani Defendants used interstate communication via wire or radio and interstate carriage of mail and parcels through the U.S. mails on two or more occasions in the last ten years to participate with McCoy, Ornelas, Nunez & Associates, or the Kherkher Defendants to transmit and receive unlawful engagement contracts procured through deception or false promise that some or all survivors would be granted United States Citizenship in exchange for signing from which they received income.

293.  At least a part of the proceeds of the settlement of the Estates of both Recinos and Flores was used to acquire or maintain an interest in, or to operate, this enterprise;

namely, the Kherkher Defendants and the Pirani Defendants unlawfully shared their legal fees with Ornelas, McCoy, and Nunez & Associates in payment for the fraudulent procurement of contracts for legal representation involving the Estates of both Recinos and Flores.

294. McCoy, Ornelas, Nunez & Associates, Kherkher, Kherkher Garcia, Pirani, and Pirani Law participated together through this pattern of racketeering activity from which they received income.

295. McCoy, Ornelas, Nunez & Associates, Kherkher, Kherkher Garcia, Pirani, and Pirani Law are associated in fact through association, employment, and agency.

296. The Kherkher Defendants are associated in fact through incorporation, employment, and agency.

297. The Pirani Defendants are associated in fact through incorporation, employment, and agency.

298. McCoy, Ornelas, Nunez & Associates, Kherkher, Kherkher Garcia, Pirani, and Pirani Law are associated in fact with each other through their contracts and their collaborative and coordinated efforts to advance their purpose and enterprise.

299. McCoy, Ornelas, Nunez & Associates, Kherkher, Kherkher Garcia, Pirani, and Pirani Law used or invested all or part of the income derived from their pattern of racketeering activity in the enterprise.

300. Specifically, McCoy, Ornelas, Nunez & Associates, Kherkher, Kherkher Garcia, Pirani, and Pirani Law used or invested all or part of the income derived from their pattern of racketeering activity to illegally and unethically secure clients using non-attorney case-runners for law firms.

301. Specifically, McCoy, Ornelas, Nunez & Associates, Kherkher, Kherkher Garcia, Pirani, and Pirani Law used or invested all or part of the income derived from their pattern of racketeering activity to avoid the Hatfield Contract in order to increase the value of their respective shares in the representation of the Estate of Recinos.

302.  Specifically, McCoy, Ornelas, Nunez & Associates, Kherkher, Kherkher Garcia, Pirani, and Pirani Law used or invested all or part of the income derived from their pattern of racketeering activity to avoid Hatfield business expectancy in order to increase the value of Defendants' respective shares in the representation of the Estate of Flores.

303.  The enterprise McCoy, Ornelas, Nunez & Associates, Kherkher, Kherkher Garcia, Pirani, and Pirani Law was engaged in, or the activities of McCoy, Ornelas, Nunez & Associates, Kherkher, Kherkher Garcia, Pirani, and Pirani Law affected, interstate or foreign commerce, at least between Arkansas, Texas, and Mexico.

304.  The use by McCoy, Ornelas, Nunez & Associates, Kherkher, Kherkher Garcia, Pirani, and Pirani Law of or investment of income in the enterprise injured Hatfield's business.

305.  The use by McCoy, Ornelas, Nunez & Associates, Kherkher, Kherkher Garcia, Pirani, and Pirani Law of or investment of income in the enterprise played a substantial part in bringing about or actually causing Hatfield to lose profits or money.

306.  Hatfield's loss was either a direct result or a reasonably probable consequence of Defendants' acts.

307.  The commission by McCoy, Ornelas, Nunez & Associates, Kherkher, Kherkher Garcia, Pirani, and Pirani Law of the acts of racketeering, or the pattern of racketeering activity, or conduct of the affairs of the enterprise through the pattern of racketeering activity directly resulted in Hatfield's damages or played a substantial role in producing Hatfield's damages.

308.  But for the conduct of McCoy, Ornelas, Nunez & Associates, Kherkher, Kherkher Garcia, Pirani, and Pirani Law, Hatfield would have represented at least the estate of Recinos, but also more likely than not the estate of Flores.

309. The use by McCoy, Ornelas, Nunez & Associates, Kherkher, Kherkher Garcia, Pirani, and Pirani Law of or investment of income in the enterprise injured Hatfield's former clients' property.

310. The use by McCoy, Ornelas, Nunez & Associates, Kherkher, Kherkher Garcia, Pirani, and Pirani Law of or investment of income in the enterprise caused Hatfield's former clients to lose money.

311. The use by McCoy, Ornelas, Nunez & Associates, Kherkher, Kherkher Garcia, Pirani, and Pirani Law of or investment of income in the enterprise played a substantial part in bringing about or actually causing Hatfield's former clients to lose a greater share of the estate proceeds.

312. Hatfield's former clients' loss was either a direct result or a reasonably probable consequence of the acts of McCoy, Ornelas, Nunez & Associates, Kherkher, Kherkher Garcia, Pirani, and Pirani Law.

## Count Two — Civil Racketeering Influenced Corrupt Organization Act, § 1962(b) Acquisition or Maintenance
### against McCoy, Ornelas, Nunez & Associates, Kherkher, Kherkher Garcia, Pirani, and Pirani Law

313. The foregoing facts and statements are incorporated by reference.

314. Hatfield specifically claims that McCoy, Ornelas, Nunez & Associates, Kherkher, Kherkher Garcia, Pirani, and Pirani Law acquired or maintained an interest in or control of the enterprise through a pattern of racketeering activity.

315. Defendants McCoy, Ornelas, and Nunez & Associates are associated in fact through association, employment, and agency.

316. The Kherkher Defendants are associated in fact through incorporation, employment, and agency.

317. The Pirani Defendants are associated in fact through incorporation, employment, and agency.

318.  All Defendants are associated in fact with each other through their contracts and their collaborative and coordinated efforts to advance their purpose and enterprise.

319.  The enterprise is intended to illegally and unethically secure clients using non-attorney case-runners for law firms.

320.  The enterprise is intended to illegally and unethically secure clients using false promises of U.S. Citizenship.

321.  The enterprise is intended to illegally and unethically secure clients using payments for funeral expenses.

322.  The enterprise is intended to avoid the Hatfield Contract in order to increase the value of Defendants' respective shares in the representation of the Estate of Recinos.

323.  The enterprise is intended to avoid Hatfield's business expectancy in order to increase the value of Defendants' respective shares in the representation of the Estate of Flores.

324.  Defendants McCoy, Ornelas, and Nunez & Associates obtained, received, gained, supported, preserved, continued, or sustained a right, claim, title, legal share in the enterprise that is an association in fact by and between themselves and with Kherkher, Kherkher Garcia, Pirani, and Pirani Law.

325.  Alternatively, the Defendants McCoy, Ornelas, and Nunez & Associates regulated, directed, governed, or managed an enterprise that is an association in fact by and between themselves and with Kherkher, Kherkher Garcia, Pirani, and Pirani Law.

326.  Defendants McCoy, Ornelas, and Nunez & Associates engaged in interstate communication via wire or radio and interstate carriage of mail and parcels through the U.S. mails on two or more occasions in the last ten years for the purposes of furthering this enterprise.

327.  Defendants McCoy's, Ornelas', and Nunez & Associates' interest or control in the enterprise was associated with or connected to the pattern of racketeering activity.

328.  The Kherkher Defendants obtained, received, gained, supported, preserved, continued, or sustained a right, claim, title, legal share in the enterprise that is an association in fact by and between themselves and with McCoy, Ornelas, Nunez & Associates, Pirani, and Pirani Law.

329.  Alternatively, the Kherkher Defendants regulated, directed, governed, or managed an enterprise that is an association in fact by and between themselves and with McCoy, Ornelas, Nunez & Associates, Pirani, and Pirani Law.

330.  The Kherkher Defendants engaged in interstate communication via wire or radio and interstate carriage of mail and parcels through the U.S. mails on two or more occasions in the last ten years for the purposes of furthering this enterprise.

331.  The Kherkher Defendants' interest or control in the enterprise was associated with or connected to the pattern of racketeering activity.

332.  The Pirani Defendants obtained, received, gained, supported, preserved, continued, or sustained a right, claim, title, legal share in the enterprise that is an association in fact by and between themselves and with McCoy, Ornelas, Nunez & Associates, Kherkher, and Kherkher Garcia.

333.  Alternatively, the Pirani Defendants regulated, directed, governed, or managed an enterprise that is an association in fact by and between themselves and with McCoy, Ornelas, Nunez & Associates, Kherkher, and Kherkher Garcia.

334.  The Pirani Defendants engaged in interstate communication via wire or radio and interstate carriage of mail and parcels through the U.S. mails on two or more occasions in the last ten years for the purposes of furthering this enterprise.

335.  The Pirani Defendants' interest or control in the enterprise was associated with or connected to the pattern of racketeering activity.

336.  The enterprise of McCoy, Ornelas, Nunez & Associates, Kherkher, Kherkher Garcia, Pirani, and Pirani Law was engaged in, or the activities of the Defendants'

enterprise affected, interstate or foreign commerce, at least between Arkansas, Texas, and Mexico.

337. The interest or control by McCoy, Ornelas, Nunez & Associates, Kherkher, Kherkher Garcia, Pirani, and Pirani Law in the enterprise injured Hatfield's business.

338. The interest or control by McCoy, Ornelas, Nunez & Associates, Kherkher, Kherkher Garcia, Pirani, and Pirani Law in the enterprise played a substantial part in bringing about or actually causing Hatfield to lose profits or money.

339. Hatfield's loss was either a direct result or a reasonably probable consequence of Defendants' acts, including the interest or control in the enterprise by McCoy, Ornelas, Nunez & Associates, Kherkher, Kherkher Garcia, Pirani, and Pirani Law.

340. The conduct of the affairs of the enterprise of McCoy, Ornelas, Nunez & Associates, Kherkher, Kherkher Garcia, Pirani, and Pirani Law through the pattern of racketeering activity directly resulted in Hatfield's damages or played a substantial role in producing Hatfield's damages.

341. But for the conduct of McCoy, Ornelas, Nunez & Associates, Kherkher, Kherkher Garcia, Pirani, and Pirani Law, Hatfield would have represented at least the estate of Recinos, but also more likely than not the estate of Flores.

342. The interest or control by McCoy, Ornelas, Nunez & Associates, Kherkher, Kherkher Garcia, Pirani, and Pirani Law in the enterprise injured Hatfield's former clients' property.

343. The interest or control by McCoy, Ornelas, Nunez & Associates, Kherkher, Kherkher Garcia, Pirani, and Pirani Law in the enterprise caused Hatfield's former clients to lose money.

344. The interest or control by McCoy, Ornelas, Nunez & Associates, Kherkher, Kherkher Garcia, Pirani, and Pirani Law in the enterprise played a substantial part in bringing about or actually causing Hatfield's former clients to lose a greater share of the estate proceeds.

345. Hatfield's former clients' loss was either a direct result or a reasonably probable consequence of the acts of McCoy, Ornelas, Nunez & Associates, Kherkher, Kherkher Garcia, Pirani, and Pirani Law including the interest or control in the enterprise.

### Count Three — Civil Racketeering Influenced Corrupt Organization Act, § 1962(c) Participation against McCoy, Ornelas, Nunez & Associates, Kherkher, Kherkher Garcia, Pirani, and Pirani Law

346. The foregoing facts and statements are incorporated by reference.

347. Hatfield specifically claims that McCoy, Ornelas, Nunez & Associates, Kherkher, Kherkher Garcia, Pirani, and Pirani Law participated in the enterprise through a pattern of racketeering activity.

348. Defendants McCoy, Ornelas, and Nunez & Associates are associated in fact through association, employment, and agency.

349. The Kherkher Defendants are associated in fact through incorporation, employment, and agency.

350. The Pirani Defendants are associated in fact through incorporation, employment, and agency.

351. All Defendants are associated in fact with each other through their contracts and their collaborative and coordinated efforts to advance their purpose and enterprise.

352. The Defendants' enterprise was engaged in, or the activities of the Defendants' enterprise affected, interstate or foreign commerce, at least between Arkansas, Texas, and Mexico.

353. Defendants were employed by or associated with the enterprise.

354. Defendants McCoy, Ornelas, and Nunez & Associates have at least minimal association with the enterprise.

355. Defendants McCoy, Ornelas, and Nunez & Associates know something about the enterprise's activities as they relate to the racketeering activity whether or not they are aware of all racketeering activities of each of the participants in the enterprise.

356. The Kherkher Defendants have at least minimal association with the enterprise.

357. The Kherkher Defendants know something about the enterprise's activities as they relate to the racketeering activity whether or not they are aware of all racketeering activities of each of the participants in the enterprise.

358. The Pirani Defendants have at least minimal association with the enterprise.

359. The Pirani Defendants know something about the enterprise's activities as they relate to the racketeering activity whether or not they are aware of all racketeering activities of each of the participants in the enterprise.

360. Defendants conducted or participated in the conduct of the enterprise's affairs.

361. Defendants McCoy, Ornelas, and Nunez & Associates participated in the operation or management of the enterprise itself in such a way, directly or indirectly, as to have played some part in directing the affairs of the enterprise.

362. Defendants McCoy's, Ornelas', and Nunez & Associates' association with or employment by the enterprise facilitated their commission of the racketeering acts.

363. Defendants McCoy's, Ornelas', and Nunez & Associates' commission of the predicate acts had some direct or indirect effect on the enterprise.

364. The Kherkher Defendants participated in the operation or management of the enterprise itself in such a way, directly or indirectly, as to have played some part in directing the affairs of the enterprise.

365. The Kherkher Defendants association with or employment by the enterprise facilitated their commission of the racketeering acts.

366. The Kherkher Defendants commission of the predicate acts had some direct or indirect effect on the enterprise.

367.  The Pirani Defendants participated in the operation or management of the enterprise itself in such a way, directly or indirectly, as to have played some part in directing the affairs of the enterprise.

368.  The Pirani Defendants association with or employment by the enterprise facilitated their commission of the racketeering acts.

369.  The Pirani Defendants commission of the predicate acts had some direct or indirect effect on the enterprise.

370.  Defendants McCoy, Ornelas, and Nunez & Associates participated in committing or aiding and abetting two or more predicate acts of Mail Fraud or Wire Fraud in the last ten years.

371.  Specifically, Defendants McCoy, Ornelas, and Nunez & Associates used interstate communication via wire or radio and interstate carriage of mail and parcels through the U.S. mails on two or more occasions in the last ten years to participate in their enterprise to fraudulently and unethically cause the termination of the Hatfield Contract in favor of Defendants' contracts.

372.  Specifically, Defendants McCoy, Ornelas, and Nunez & Associates used interstate communication via wire or radio and interstate carriage of mail and parcels through the U.S. mails on two or more occasions in the last ten years to participate with the Kherkher Defendants or the Pirani Defendants to illegally pose as attorneys to further the execution of contracts for legal representation.

373.  Specifically, Defendants McCoy, Ornelas, and Nunez & Associates used interstate communication via wire or radio and interstate carriage of mail and parcels through the U.S. mails on two or more occasions in the last ten years to participate with the Kherkher Defendants or the Pirani Defendants to illegally and unethically procure clients.

374.  Specifically, Defendants McCoy, Ornelas, and Nunez & Associates used interstate communication via wire or radio and interstate carriage of mail and parcels

through the U.S. mails on two or more occasions in the last ten years to participate with the Kherkher Defendants or the Pirani Defendants to transmit and receive unlawful engagement contracts procured through deception or false promise that some or all survivors would be granted United States Citizenship in exchange for signing representation contracts.

375. Specifically, Defendants McCoy, Ornelas, and Nunez & Associates used interstate communication via wire or radio and interstate carriage of mail and parcels through the U.S. mails on two or more occasions in the last ten years to participate with the Kherkher Defendants or the Pirani Defendants to transmit and receive unlawful engagement contracts procured through deception or unlawful promise to pay funeral expenses in exchange for signing representation contracts.

376. Specifically, Defendants McCoy, Ornelas, and Nunez & Associates used interstate communication via wire or radio and interstate carriage of mail and parcels through the U.S. mails on two or more occasions in the last ten years to participate with the Kherkher Defendants or the Pirani Defendants to negotiate, arrange, and transmit payment of funeral expenses in exchange for signing representation contracts.

377. Specifically, Defendants McCoy, Ornelas, and Nunez & Associates used interstate communication via wire or radio and interstate carriage of mail and parcels through the U.S. mails on two or more occasions in the last ten years to participate with the Kherkher Defendants or the Pirani Defendants to interfere with the Hatfield's business expectancy.

378. Specifically, Defendants McCoy, Ornelas, and Nunez & Associates used interstate communication via wire or radio and interstate carriage of mail and parcels through the U.S. mails on two or more occasions in the last ten years to participate in a calculated scheme designed to prey on vulnerable survivors, pay kickbacks to funeral homes, pay funeral expenses in exchange for representation, and apply pressure to

potential clients on behalf of law firms including but not limited to the Kherkher Defendants and the Pirani Defendants.

379.  The Kherkher Defendants participated in committing or aiding and abetting two or more predicate acts of Mail Fraud or Wire Fraud in the last ten years.

380.  Specifically, the Kherkher Defendants used interstate communication via wire or radio and interstate carriage of mail and parcels through the U.S. mails on two or more occasions in the last ten years to participate in the enterprise to fraudulently and unethically cause the termination of the Hatfield Contract in favor of Defendants' contracts.

381.  Specifically, the Kherkher Defendants used interstate communication via wire or radio and interstate carriage of mail and parcels through the U.S. mails on two or more occasions in the last ten years to participate with McCoy, Ornelas, Nunez & Associates, or the Pirani Defendants to do what the Kherkher Defendants could not do directly: secure clients in violation of the Texas Penal Code, the Texas Rules of Professional Conduct, and the Arkansas Rules of Professional Conduct.

382.  Specifically, the Kherkher Defendants used interstate communication via wire or radio and interstate carriage of mail and parcels through the U.S. mails on two or more occasions in the last ten years to participate with McCoy, Ornelas, Nunez & Associates, or the Pirani Defendants to transmit and receive unlawful engagement contracts procured through deception or false promise that some or all survivors would be granted United States Citizenship in exchange for signing representation contracts.

383.  Specifically, the Kherkher Defendants used interstate communication via wire or radio and interstate carriage of mail and parcels through the U.S. mails on two or more occasions in the last ten years to participate with McCoy, Ornelas, Nunez & Associates, or the Pirani Defendants to transmit and receive unlawful engagement contracts procured through deception or unlawful promise to pay funeral expenses in exchange for signing representation contracts.

384. Specifically, the Kherkher Defendants used interstate communication via wire or radio and interstate carriage of mail and parcels through the U.S. mails on two or more occasions in the last ten years to participate with McCoy, Ornelas, Nunez & Associates, or the Pirani Defendants to negotiate, arrange, and transmit payment of funeral expenses in exchange for signing representation contracts.

385. Specifically, the Kherkher Defendants used interstate communication via wire or radio and interstate carriage of mail and parcels through the U.S. mails on two or more occasions in the last ten years to participate with McCoy, Ornelas, Nunez & Associates, or the Pirani Defendants to interfere with the Hatfield's business expectancy.

386. The Pirani Defendants participated in committing or aiding and abetting two or more predicate acts of Mail Fraud or Wire Fraud in the last ten years.

387. Specifically, the Pirani Defendants used interstate communication via wire or radio and interstate carriage of mail and parcels through the U.S. mails on two or more occasions in the last ten years to participate in the enterprise to fraudulently and unethically cause the termination of the Hatfield Contract in favor of Defendants' contract.

388. Specifically, the Pirani Defendants used interstate communication via wire or radio and interstate carriage of mail and parcels through the U.S. mails on two or more occasions in the last ten years to participate with McCoy, Ornelas, Nunez & Associates, or the Kherkher Defendants to do what the Pirani Defendants could not do directly: secure clients in violation of the Arkansas Rules of Professional Conduct.

389. Specifically, the Pirani Defendants used interstate communication via wire or radio and interstate carriage of mail and parcels through the U.S. mails on two or more occasions in the last ten years to participate with McCoy, Ornelas, Nunez & Associates, or the Kherkher Defendants to transmit and receive unlawful engagement contracts procured through deception or false promise that some or all survivors would be granted United States Citizenship in exchange for signing representation contracts.

390.  Specifically, the Pirani Defendants used interstate communication via wire or radio and interstate carriage of mail and parcels through the U.S. mails on two or more occasions in the last ten years to participate with McCoy, Ornelas, Nunez & Associates, or the Kherkher Defendants to transmit and receive unlawful engagement contracts procured through deception or unlawful promise to pay funeral expenses in exchange for signing representation contracts.

391.  Specifically, the Pirani Defendants used interstate communication via wire or radio and interstate carriage of mail and parcels through the U.S. mails on two or more occasions in the last ten years to participate with McCoy, Ornelas, Nunez & Associates, or the Kherkher Defendants to negotiate, arrange, and transmit payment of funeral expenses in exchange for signing representation contracts.

392.  Specifically, the Pirani Defendants used interstate communication via wire or radio and interstate carriage of mail and parcels through the U.S. mails on two or more occasions in the last ten years to participate with McCoy, Ornelas, Nunez & Associates, or the Kherkher Defendants to interfere with the Hatfield's business expectancy.

393.  The participation by McCoy, Ornelas, Nunez & Associates, Kherkher, Kherkher Garcia, Pirani, or Pirani Law in the enterprise injured Hatfield's business.

394.  The participation in the enterprise by McCoy, Ornelas, Nunez & Associates, Kherkher, Kherkher Garcia, Pirani, or Pirani Law played a substantial part in bringing about or actually causing Hatfield to lose profits or money.

395.  Hatfield's loss was either a direct result or a reasonably probable consequence of Defendants' acts, including these defendants' participation in the enterprise.

396.  The participation by McCoy, Ornelas, Nunez & Associates, Kherkher, Kherkher Garcia, Pirani, or Pirani Law in the affairs of the enterprise through the pattern of racketeering activity directly resulted in Hatfield's damages or played a substantial role in producing Hatfield's damages.

397.  But for Defendants' conduct, Hatfield would have represented at least the estate of Recinos, but also more likely than not the estate of Flores.

398.  Defendants' participation in the enterprise injured Hatfield's clients' property.

399.  Defendants' participation in the enterprise caused Hatfield's clients to lose money.

400.  Defendants' participation in the enterprise played a substantial part in bringing about or actually causing Hatfield's clients to lose a greater share of the estate proceeds.

401.  Hatfield's clients' loss was either a direct result or a reasonably probable consequence of the Defendants' acts including Defendants' participation in the enterprise.

### Count Four — Civil Racketeering Influenced Corrupt Organization Act, § 1962(d) Conspiracy to Violate 18 U.S.C. § 1962(a)
#### against McCoy, Ornelas, Nunez & Associates, Kherkher, Kherkher Garcia, Pirani, and Pirani Law

402.  The foregoing facts and statements are incorporated by reference.

403.  Hatfield specifically claims that McCoy, Ornelas, Nunez & Associates, Kherkher, Kherkher Garcia, Pirani, and Pirani Law conspired to violate 18 U.S.C. § 1962(a).

404.  Defendants McCoy, Ornelas, and Nunez & Associates understood the nature or unlawful character of the conspiratorial plan.

405.  The Kherkher Defendants understood the nature or unlawful character of the conspiratorial plan.

406.  The Pirani Defendants understood the nature or unlawful character of the conspiratorial plan to maintain an illegal, unethical, and unlawfully procured engagement contract using case runners and an unlicensed Mexico-based firm, or plan to intentionally defeat and supplant Hatfield Contract with Vidal.

407.  Defendants McCoy, Ornelas, and Nunez & Associates are associated in fact through association, employment, and agency, as demonstrated by the admissions in open court by Steve Kherkher, the business cards, and the Nunez contract Exhibit 3.

408.  The Kherkher Defendants are associated in fact through incorporation, employment, and agency, as demonstrated by the application for payment of attorneys' fees for Kherkher Garcia, Nunez Law firm, and Pirani Law.

409.  The Pirani Defendants are associated in fact through incorporation, employment, and agency, as demonstrated by Exhibit 4.

410.  All Defendants are associated in fact with each other through their contracts and their collaborative and coordinated efforts to advance their purpose and enterprise, as shown by Exhibits 3 and 4 and the statements offered by Steve Kherkher to his association with Arturo Nunez in Mexico.

411.  Defendants McCoy, Ornelas, and Nunez & Associates agreed to join with the Kherkher Defendants and the Pirani Defendants to achieve the objectives of the conspiracy in the last ten years.

412.  Defendants McCoy, Ornelas, and Nunez & Associates were aware of the existence and purpose of the enterprise, to wit: to invest all or part of the income from their pattern of racketeering activity to further the purposes of the enterprise as alleged in Count One.

413.  The Kherkher Defendants agreed to join with Defendants McCoy, Ornelas, Nunez & Associates, and the Pirani Defendants to achieve the objectives of the conspiracy in the last ten years.

414.  The Kherkher Defendants were aware of the existence and purpose of the enterprise, to wit: to invest all or part of the income from their pattern of racketeering activity to further the purposes of the enterprise as alleged in Count One.

415.  The Pirani Defendants agreed to join with Defendants McCoy, Ornelas, Nunez & Associates, and the Kherkher Defendants to achieve the objectives of the conspiracy in the last ten years.

416.  The Pirani Defendants were aware of the existence and purpose of the enterprise, to wit: to invest all or part of the income from their pattern of racketeering activity to further the purposes of the enterprise as alleged in Count One as demonstrated by the petition for payment of fees in the probate matters of both decedents.

417.  Defendants agreed the enterprise would be conducted through a pattern of racketeering activity as alleged in Count One.

418.  Defendants adopted the goal of furthering or facilitating the enterprise whether or not each of agreed to undertake all of the acts necessary for the enterprise as alleged in Count One.

### Count Five — Civil Racketeering Influenced Corrupt Organization Act, § 1962(d) Conspiracy to Violate 18 U.S.C. § 1962(b)
### against McCoy, Ornelas, Nunez & Associates, Kherkher, Kherkher Garcia, Pirani, and Pirani Law

419.  The foregoing facts and statements are incorporated by reference.

420.  Hatfield specifically claims that McCoy, Ornelas, Nunez & Associates, Kherkher, Kherkher Garcia, Pirani, and Pirani Law conspired to violate 18 U.S.C. § 1962(b).

421.  Defendants McCoy, Ornelas, and Nunez & Associates understood the nature or unlawful character of the conspiratorial plan.

422.  The Kherkher Defendants understood the nature or unlawful character of the conspiratorial plan.

423.  The Pirani Defendants understood the nature or unlawful character of the conspiratorial plan.

424. Defendants McCoy, Ornelas, and Nunez & Associates are associated in fact through association, employment, and agency.

425. The Kherkher Defendants are associated in fact through incorporation, employment, and agency.

426. The Pirani Defendants are associated in fact through incorporation, employment, and agency.

427. All Defendants are associated in fact with each other through their contracts and their collaborative and coordinated efforts to advance their purpose and enterprise.

428. Defendants McCoy, Ornelas, and Nunez & Associates agreed to join with the Kherkher Defendants and the Pirani Defendants to achieve the objectives of the conspiracy in the last ten years.

429. Defendants McCoy, Ornelas, and Nunez & Associates were aware of the existence and purpose of the enterprise, to wit: to acquire or maintain an interest in or control of the enterprise through a pattern of racketeering activity as alleged in Count Two.

430. The Kherkher Defendants agreed to join with Defendants McCoy, Ornelas, Nunez & Associates, and the Pirani Defendants to achieve the objectives of the conspiracy in the last ten years.

431. The Kherkher Defendants were aware of the existence and purpose of the enterprise, to wit: to acquire or maintain an interest in or control of the enterprise through a pattern of racketeering activity as alleged in Count Two.

432. The Pirani Defendants agreed to join with Defendants McCoy, Ornelas, Nunez & Associates, and the Kherkher Defendants to achieve the objectives of the conspiracy in the last ten years.

433. The Pirani Defendants were aware of the existence and purpose of the enterprise, to wit: to acquire or maintain an interest in or control of the enterprise through a pattern of racketeering activity as alleged in Count Two.

434. Defendants agreed the enterprise would be conducted through a pattern of racketeering activity as alleged in Count Two.

435. Defendants adopted the goal of furthering or facilitating the enterprise whether or not each of agreed to undertake all of the acts necessary for the enterprise as alleged in Count Two.

### Count Six — Civil Racketeering Influenced Corrupt Organization Act, § 1962(d) Conspiracy to Violate 18 U.S.C. § 1962(c)
#### against McCoy, Ornelas, Nunez & Associates, Kherkher, Kherkher Garcia, Pirani, and Pirani Law

436. The foregoing facts and statements are incorporated by reference.

437. Hatfield specifically claims that McCoy, Ornelas, Nunez & Associates, Kherkher, Kherkher Garcia, Pirani, and Pirani Law conspired to violate 18 U.S.C. § 1962(c).

438. Defendants McCoy, Ornelas, and Nunez & Associates understood the nature or unlawful character of the conspiratorial plan.

439. The Kherkher Defendants understood the nature or unlawful character of the conspiratorial plan.

440. The Pirani Defendants understood the nature or unlawful character of the conspiratorial plan.

441. Defendants McCoy, Ornelas, and Nunez & Associates are associated in fact through association, employment, and agency.

442. The Kherkher Defendants are associated in fact through incorporation, employment, and agency.

443. The Pirani Defendants are associated in fact through incorporation, employment, and agency.

444. All Defendants are associated in fact with each other through their contracts and their collaborative and coordinated efforts to advance their purpose and enterprise.

445.  Defendants McCoy, Ornelas, and Nunez & Associates agreed to join with the Kherkher Defendants and the Pirani Defendants to achieve the objectives of the conspiracy in the last ten years.

446.  Defendants McCoy, Ornelas, and Nunez & Associates were aware of the existence and purpose of the enterprise, to wit: to participate in the enterprise through a pattern of racketeering activity as alleged in Count Three.

447.  The Kherkher Defendants agreed to join with Defendants McCoy, Ornelas, Nunez & Associates, and the Pirani Defendants to achieve the objectives of the conspiracy in the last ten years.

448.  The Kherkher Defendants were aware of the existence and purpose of the enterprise, to wit: to participate in the enterprise through a pattern of racketeering activity as alleged in Count Three.

449.  The Pirani Defendants agreed to join with Defendants McCoy, Ornelas, Nunez & Associates, and the Kherkher Defendants to achieve the objectives of the conspiracy in the last ten years.

450.  The Pirani Defendants were aware of the existence and purpose of the enterprise, to wit: to participate in the enterprise through a pattern of racketeering activity as alleged in Count Three.

451.  Defendants agreed the enterprise would be conducted through a pattern of racketeering activity as alleged in Count Three.

452.  Defendants adopted the goal of furthering or facilitating the enterprise whether or not each of agreed to undertake all of the acts necessary for the enterprise as alleged in Count Three.

## Count Seven — Deceptive Trade Practices
### against McCoy, Ornelas, Nunez & Associates, Kherkher, Kherkher Garcia, Pirani, and Pirani Law

453. The foregoing facts and statements are incorporated by reference.

454. Arkansas Code Ann. § 4-88-101 *et seq.* criminalizes deceptive trade practices.

455. Arkansas Code Ann. § 4-88-107(a)(1) prohibits disparaging the goods, services, or business of another by false or misleading representation of fact.

456. Arkansas Code Ann. § 4-88-107(a)(10) prohibits engaging in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade.

457. Arkansas Code Ann. § 4-88-107(b) provides that "deceptive and unconscionable trade practices listed in this section are in addition to and do not limit the types of unfair trade practices actionable at common law or under other statutes of this state."

458. Arkansas Code Ann. § 4-88-108(a)(1) prohibits any deception, fraud, or false pretense when used in the sale or advertisement of any services.

459. Arkansas Code Ann. § 4-88-113 permits any person who suffers actual damage or injury resulting from an offense or violation may recover actual damages and reasonable attorneys' fees.

460. Hatfield suffered damage when non-lawyers McCoy, Ornelas, Nunez & Associates engaged in deception, fraud, disparagement, unconscionable acts, and false pretense when approaching and advertising to the survivors of Recinos and Flores, including Hatfield's clients Vidal, Laura, and Ever Noe.

461. Hatfield suffered damage when not-yet-hired Kherkher and Kherkher Garcia engaged in deception, fraud, disparagement, unconscionable acts, and false pretense when approaching and advertising to the survivors of Recinos and Flores, including Hatfield's clients Vidal, Laura, and Ever Noe.

462. Hatfield suffered damage when non-lawyers McCoy, Ornelas, Nunez & Associates, Kherkher, and not-yet-engaged Kherkher Garcia engaged in deception, fraud, and false pretense when approaching Hatfield concerning the Hatfield Contract.

463. Hatfield relied to his detriment on the deceptive and fraudulent statements made by the Kherkher Defendants on behalf of themselves, McCoy, Ornelas, and Nunez & Associates.

464. In detrimental reliance on the deceptive trade practices of the Kherkher Defendants on behalf of themselves, McCoy, Ornelas, and Nunez & Associates, Hatfield ceased his work to establish the necessary estates, lost contact with his clients, and took no actions to move his clients' case forward.

465. In detrimental reliance on the deceptive trade practices of Defendants, Hatfield was prevented from participating in settlement discussions.

466. Hatfield's damages include amounts due under his valid attorney's lien as alleged above.

467. Hatfield's damages include the loss of Hatfield's business expectancy to represent the Estate of Recinos and the Estate of Flores as alleged above.

468. At the direction of and operating in concert with the Kherkher Defendants, McCoy falsely declared to such survivors he worked for a law firm authorized to represented clients in the United States.

469. At the direction of and operating in concert with the Kherkher Defendants, McCoy falsely promised United States Citizenship to such survivors to unlawfully procure and induce signatures on one or more engagement contracts.

470. At the direction of and operating in concert with the Kherkher Defendants, McCoy used false pretense when communicating about the legal services offered, ultimately, by Kherkher and Kherkher Garcia, and Nunez & Associates or Nunez Law Firm.

471. At the direction of and operating in concert with the Kherkher Defendants, McCoy used false pretenses when communicating about funeral expense payment to entice signatures on legal contracts.

472. At the direction of and operating in concert with the Kherkher Defendants, Ornelas falsely declared to such survivors he worked for a law firm when he did not by offering a business card having materially false information which led a reasonable viewer to conclude he worked with a legitimate law firm in the United States.

473. At the direction of and operating in concert with the Kherkher Defendants, Ornelas falsely promised United States Citizenship to such survivors.

474. At the direction of and operating in concert with the Kherkher Defendants, Ornelas used false pretense when communicating about the legal services offered, ultimately, by Defendants Kherkher, Kherkher Garcia, Nunez & Associates, Pirani, and Pirani Law.

475. At the direction of and operating in concert with the Kherkher Defendants, Ornelas used false pretenses when communicating about funeral expense payment to entice signatures on legal contracts.

476. Kherkher directed McCoy, Ornelas, and Nunez & Associates to do that which he could not do himself: pay for funeral services in knowing violation of the rules governing his profession, both as an Arkansas-licensed attorney and Texas-licensed attorney. In so doing, he engaged in false pretense and deception to such survivors. Such conduct is not the practice of law.

477. Hatfield secured a lawful, ethically secured contract for legal representation using no false statements nor duress prior to when Kherkher paid for such funeral services.

478. Kherkher caused the termination of Hatfield by (a) making payment he could not legally or ethically make to the funeral home, and (b) urging family members to apply undue pressure to Hatfield's clients who already signed the Hatfield Contract.

479.  Due to the intentional and deliberate acts, statements, or false pretense of Ornelas, McCoy, Nunez & Associates, Kherkher, Kherkher Garcia, Pirani, and Pirani Law, Hatfield's clients ceased to communicate with him any longer and Hatfield lost the opportunity to continue work on the case.

480.  Due to the intentional and deliberate acts, statements, or false pretense of Ornelas, McCoy, Nunez & Associates, Kherkher, Kherkher Garcia, Pirani, and Pirani Law, Hatfield was prevented from working for the estate of Ana Delia Mejia Flores.

481.  Due to the intentional and deliberate acts, statements, or false pretense of Ornelas, McCoy, Nunez & Associates, Kherkher, Kherkher Garcia, Pirani, and Pirani Law, Hatfield was prevented from working for the estate of Recinos.

482.  Hatfield was deprived of a substantial contingency fee on the wrongful death claims for the estate of Flores.

483.  Hatfield was deprived of a substantial contingency fee on the wrongful death claims for the estate of Recinos.

484.  Hatfield was damaged in an amount to be ascertained at trial.

### Count Eight — Intentional Interference with Plaintiff's Contract for the Representation of the Estate of Recinos by Laura and Ever Noe
#### against McCoy, Ornelas, Nunez & Associates, Kherkher, Kherkher Garcia, and Mancia

485.  The foregoing facts and statements are incorporated by reference.

486.  Hatfield had a valid contractual relationship for representation of the Estate of Recinos, as authorized by signatures by surviving adult heirs Laura and Ever Noe.

487.  The Hatfield Contract is not contingent on any condition precedent.

488.  The Hatfield Contract is a fully executed and binding contract for legal services containing a valid attorney's lien under Ark. Code Ann. § 16-22-304(a)(1) which left compensation to be calculated based upon an agreed-upon and defined formula.

489.  The Kherkher Defendants, McCoy, Ornelas, Nunez & Associates, and Mancia had knowledge of Hatfield's valid contractual relationship for representation of the Estate of Recinos through their receipt of multiple notices of Hatfield's attorneys' lien, including phone calls, emails, and mail delivered by the U.S. Postal Service.

490.  The Kherkher Defendants, McCoy, Ornelas, Nunez & Associates, and Mancia had actual knowledge of Hatfield's valid contractual relationship for representation of the Estate of Recinos from at least Hatfield's clients Laura and Ever Noe.

491.  The knowledge by the Kherkher Defendants, McCoy, Ornelas, Nunez & Associates, and Mancia of Hatfield's valid contractual relationship for representation of the Estate of Recinos is further evidenced by Kherkher's response to stand down from "our clients."

492.  The intentional and improper interference by the Kherkher Defendants, McCoy, Ornelas, Nunez & Associates, and Mancia induced or caused a disruption or termination of Hatfield's contractual relationship for representation of the Estate of Recinos, as authorized by signatures of surviving adult heirs Laura and Ever Noe.

493.  The actions by the Kherkher Defendants, McCoy, Ornelas, Nunez & Associates, and Mancia to interfere with and terminate Hatfield's valid attorney's lien caused Hatfield substantial damages in an amount to be determined at trial.

494.  The disruption or termination by the Kherkher Defendants, McCoy, Ornelas, Nunez & Associates, and Mancia of Hatfield's valid contractual relationship for representation of Laura and Ever Noe regarding the Estate of Recinos was a proximate cause of Hatfield's damages.

## Count Nine — Intentional Interference with Plaintiff's Contract for the Representation of the Estate of Recinos by Vidal
### against Nunez & Associates, Kherkher, Kherkher Garcia, Pirani, and Pirani Law

495. The foregoing facts and statements are incorporated by reference.

496. Hatfield had a valid contractual relationship for representation of the Estate of Recinos, as authorized by signatures of surviving adult heir Vidal.

497. The Hatfield Contract is not contingent on any condition precedent.

498. The Hatfield Contract is a fully executed and binding contract for legal services containing a valid attorney's lien under Ark. Code Ann. § 16-22-304(a)(1) which left compensation to be calculated based upon an agreed-upon and defined formula.

499. The Kherkher Defendants, Pirani Defendants, and Nunez & Associates had knowledge of Hatfield's valid contractual relationship for representation of the Estate of Recinos through their receipt of multiple notices of Hatfield's attorneys' lien, including phone calls, emails, and mail delivered by the U.S. Postal Service.

500. The Kherkher Defendants, Pirani Defendants, and Nunez & Associates had actual knowledge of Hatfield's valid contractual relationship for representation of the Estate of Recinos from at least Hatfield's clients Laura and Ever Noe.

501. The knowledge by Kherkher Defendants, Pirani Defendants, and Nunez & Associates of Hatfield's valid contractual relationship for representation of the Estate of Recinos is further evidenced by Kherkher's response to stand down from "our clients."

502. The intentional and improper interference by Kherkher Defendants, Pirani Defendants, and Nunez & Associates induced or caused a disruption or termination of Hatfield's contractual relationship for representation of the Estate of Recinos, as authorized by signatures of the surviving adult heir Vidal.

503. The Pirani Defendants directly contacted Vidal to solicit him for representation on behalf of themselves, the Kherkher Defendants, and Nunez & Associates, despite

having actual notice and knowledge Vidal was still represented by Hatfield pursuant to the Hatfield Contract, in direct violation of Ark. R. Prof. Cond. 4.2. The Pirani Defendants were ethically prohibited from contacting or communicating with Vidal.

504.  The Kherkher Defendants and Nunez & Associates ratified the actions of the Pirani Defendants by their signatures to the June 3, 2021 Power of Attorney and Contingent Fee Contract purporting to establish representation of Hatfield's client, Vidal. **Exhibit 4**.

505.  The June 3, 2021 Power of Attorney and Contingent Fee Contract memorializes the intentional interference with the Hatfield Contract by Defendants Nunez & Associates, Kherkher, Kherkher Garcia, Pirani, and Pirani Law.

506.  The actions by Kherkher Defendants, Pirani Defendants, and Nunez & Associates to interfere with and terminate Hatfield's valid attorney's lien caused Hatfield substantial damages in an amount to be determined at trial.

507.  The disruption or termination by Kherkher Defendants, Pirani Defendants, and Nunez & Associates of Hatfield's valid contractual relationship for representation of the Estate of Recinos was a proximate cause of Hatfield's damages.

## Count Ten — Intentional Interference with Business Expectancy for the Legal Representation of the Estate of Flores
### against McCoy, Ornelas, Nunez & Associates, Kherkher, and Kherkher Garcia

508.  The foregoing facts and statements are incorporated by reference.

509.  Hatfield had a valid business expectancy for the legal representation of the Estate of Flores.

510.  Defendants McCoy, Ornelas, Nunez & Associates, Kherkher, and Kherkher Garcia had knowledge of Hatfield's valid business expectancy for the legal representation of the Estate of Flores.

511. The intentional and improper interference of Defendants McCoy, Ornelas, Nunez & Associates, Kherkher, and Kherkher Garcia induced or caused a disruption or termination of Hatfield's business expectancy for the legal representation of the Estate of Flores.

512. Defendants McCoy's, Ornelas', Nunez & Associates', Kherkher's, and Kherkher Garcia's actions to interfere with and terminate Hatfield's valid business expectancy caused Hatfield substantial damages in an amount to be determined at trial.

513. Defendants McCoy's, Ornelas', Nunez & Associates', Kherkher's, and Kherkher Garcia's disruption or termination of Hatfield's valid business expectancy for the legal representation of the Estate of Flores was a proximate cause of Hatfield's damages.

### Count Eleven — Fraud
#### against Kherkher, Kherkher Garcia, Pirani, and Pirani Law

514. The foregoing facts and statements are incorporated by reference.

515. The Kherkher Defendants and Pirani Defendants made false statements of material facts to Hatfield, including the validity of the exclusive representation of the estates and the timing of The Kherkher Defendants' and Pirani Defendants' contracts with the estates, as set out more fully above.

516. The Kherkher Defendants made material misrepresentations of fact to Hatfield concerning the dates Mancia purportedly signed the November 25, 2020 Attorney Employment Contract.

517. The Kherkher Defendants made material misrepresentations of fact to Hatfield concerning the dates Laura purportedly signed the November 25, 2020 Attorney Employment Contract.

518. The Kherkher Defendants made material misrepresentations of fact to Hatfield concerning Laura's desire to terminate Hatfield's representation.

519.  The Kherkher Defendants made material misrepresentations of fact to Hatfield concerning the dates Ever Noe purportedly signed the November 25, 2020 Attorney Employment Contract.

520.  The Kherkher Defendants made material misrepresentations of fact to Hatfield concerning Ever Noe's desire to terminate Hatfield's representation.

521.  The Kherkher Defendants made material misrepresentations of fact to Hatfield concerning the November 25, 2020 Attorney Employment Contract, including how it was solicited.

522.  The Pirani Defendants made material misrepresentations of material facts concerning the June 3, 2021 Power of Attorney and Contingent Fee Contract, including how it was solicited.

523.  The Pirani Defendants were agents of the Kherkher Defendants in the negotiation of the June 3, 2021 Power of Attorney and Contingent Fee Contract. Statements and actions of the Pirani Defendants are attributable to the Kherkher Defendants.

524.  The Kherkher Defendants and Pirani Defendants either knew or believed that the representations were false.

525.  The Kherkher Defendants and Pirani Defendants intended to induce Hatfield to refrain from acting in reliance upon the misrepresentations.

526.  Hatfield justifiably relied on the misrepresentations of the Kherkher Defendants and Pirani Defendants in refraining from acting and as a result sustained damages.

527.  The Kherkher Defendants' and Pirani Defendants' actions to interfere with and terminate the Hatfield Contract caused Hatfield to sustain substantial damages in an amount determined at trial.

528.  The Kherkher Defendants' and Pirani Defendants' actions to interfere with and terminate Hatfield's valid business expectancy caused Hatfield to sustain substantial damages in an amount to be determined at trial.

## Count Twelve — Civil Conspiracy
### against McCoy, Ornelas, Nunez & Associates, Kherkher, Kherkher Garcia, Pirani, Pirani Law, and Mancia

529.  The foregoing facts and statements are incorporated by reference.

530.  Defendants knowingly entered into a conspiracy.

531.  Hatfield has alleged all of the elements necessary to obtain a verdict against defendants on the underlying claim of Deceptive Trade Practices as fully set forth above.

532.  Hatfield has alleged all of the elements necessary to obtain a verdict against defendants on the underlying claim of Intentional Interference with the Hatfield Contract as fully set forth above.

533.  Hatfield has alleged all of the elements necessary to obtain a verdict against defendants on the underlying claim of Intentional Interference with Business Expectancy for the Legal Representation of the Estate Flores as fully set forth above.

534.  Hatfield has alleged all of the elements necessary to obtain a verdict against defendants on the underlying claim of fraud as fully set forth above.

535.  Defendants and co-conspirators committed one or more overt acts in furtherance of their conspiracy as fully set forth above.

536.  Defendants' conspiracy proximately caused damages to Hatfield in an amount to be determined at trial.

## Count Thirteen — Punitive Damages
### against McCoy, Ornelas, Nunez & Associates, Kherkher, Kherkher Garcia, Pirani, Pirani Law, and Mancia

537.  The foregoing facts and statements are incorporated by reference.

538.  Defendants knew or ought to have known, in the light of the surrounding circumstances, that their conduct would naturally and probably result in damage, and they continued such conduct with malice or in reckless disregard of the consequences from which malice may be inferred.

539.  Defendants intentionally pursued a course of conduct for the purpose of causing damage.

540.  Hatfield is entitled to punitive damages in an amount to be determined at trial.

## Count Fourteen — Declarative Relief Voiding
## the purported November 25, 2020
## Attorney Employment Contract
### against Nunez & Associates

541.  The foregoing facts and statements are incorporated by reference.

542.  Fraud vitiates everything it touches. *Henry v. Mitchell*, 2013 Ark. 246, at 8, 428 S.W.3d 454, 460.

543.  The public policy of Arkansas prohibits attorneys from soliciting potential litigants in person unless the person is an attorney, close relative, or has a previous professional relationship with the lawyer. Ark. R. Prof. Cond. 7.3(a).

544.  Solicitation of potential clients is permitted in writing, so long as all such writings comply with the provisions of Ark. R. Prof. Cond. 7.3(b).

545.  However, the public policy of Arkansas prohibits attorneys from soliciting potential litigants by written communications in wrongful death claims for 30 days after the event giving rise to such claim. Ark. R. Prof. Cond. 7.3(c).

546.  Here, had the potential representatives of the Estate of Recinos been unrepresented, which they were not, solicitation would only have been proper by a

written communication complying with Ark. R. Prof. Cond. 7.3 sent not earlier than December 23, 2020.

547. On the other hand, the public policy of Arkansas prohibits attorneys from any solicitation whatsoever if the subject of the solicitation is known to the lawyer to be represented in connection with the matter concerning the solicitation by counsel. Ark. R. Prof. Cond. 7.3(e)(3).

548. Here, Vidal, Laura, and Ever Noe were represented by Hatfield prior to the contact of Nunez & Associates.

549. The public policy of Arkansas prohibits attorneys from violating or attempting to violate the rules of professional conduct, knowingly assisting or inducing another to do so, or doing so through the acts of another. Ark. R. Prof. Cond. 8.4(a).

550. Nunez & Associates is not a law firm authorized to practice law in Arkansas.

551. The Kherkher Defendants knew at all times Nunez & Associates is not a law firm authorized to practice law in Arkansas.

552. Nevertheless, the Kherkher Defendants authorized Nunez & Associates to be their agents, make representations on their behalf, and commit the Kherkher Defendants to contracts.

553. Nunez & Associates represented itself as a law firm to the potential representatives of the Flores and Recinos estates.

554. Nunez & Associates represented to the potential representatives of the Flores and Recinos estates that it was authorized to commit the Kherkher Defendants to the representation of the estates.

555. Nunez & Associates represented to the potential representatives of the Flores and Recinos estates that it was authorized to pay the funeral expenses of Flores and Recinos if the Kherkher Defendants and Nunez & Associates represented the estates.

556. Nunez & Associates represented to the potential representatives of the Flores and Recinos estates that all family members would receive U.S. Citizenship if the Kherkher Defendants and Nunez & Associates represented the estates.

557. The November 25, 2020 Attorney Employment Contract split fees 50/50 between the Kherkher Defendants and non-lawyers Nunez & Associates.

558. Plaintiff seeks an order declaring any contract for legal representation as between Defendant Nunez & Associates and the representatives of the Estate of Recinos was obtained and procured by fraud.

559. Plaintiff seeks an order declaring any contract for representation as between Defendant Nunez & Associates and the Estate of Recinos is null and void as against public policy.

560. Plaintiff seeks an order declaring the Hatfield Contract to be the only lawful contract for legal representation on which the wrongful death case brought on behalf of the Estate of Recinos against J.B. Hunt Transport, Inc. and Keondrick Banks, and that the Hatfield Contract takes priority over all other contracts for representation.

561. Plaintiff seeks an order declaring any contract for representation between Defendants Kherkher, Kherkher Garcia, Nunez & Associates and the Estate of Flores was likewise obtained by fraud.

562. Plaintiff seeks an order declaring any contract for representation between Defendants Kherkher, Kherkher Garcia, Nunez & Associates and the Estate of Flores is null and void as against public policy.

563. Plaintiff seeks an order declaring the Hatfield Contract to be the only lawful contract for legal representation on which the wrongful death case brought on behalf of the Estate of Flores against J.B. Hunt Transport, Inc. and Keondrick Banks, and that the Hatfield Contract takes priority over all other contracts for representation.

564. Plaintiff seeks an order disgorging all proceeds derived by Defendants Kherkher, Kherkher Garcia, Nunez & Associates as a result of their criminal, unethical, and fraudulent conduct.

### Count Fifteen — Declarative Relief Voiding the June 3, 2021 Power of Attorney and Contingent Fee Contract
### against Nunez & Associates, Kherkher Garcia and Pirani Law

565. The foregoing facts and statements are incorporated by reference.

566. Fraud vitiates everything it touches. *Henry v. Mitchell*, 2013 Ark. 246, at 8, 428 S.W.3d 454, 460.

567. Nunez & Associates is not a law firm authorized to practice law in Arkansas.

568. The Kherkher Defendants knew at all times Nunez & Associates is not a law firm authorized to practice law in Arkansas.

569. The Pirani Defendants knew at all times Nunez & Associates is not a law firm authorized to practice law in Arkansas.

570. Nunez & Associates represented itself as a law firm to the potential representatives of the Flores and Recinos estates.

571. Nunez & Associates represented to the potential representatives of the Flores and Recinos estates that it was authorized to commit the Kherkher Defendants and the Pirani Defendants to the representation of the estates.

572. Nunez & Associates represented to the potential representatives of the Flores and Recinos estates that it was authorized to pay the funeral expenses of Flores and Recinos if the Kherkher Defendants, the Pirani Defendants, and Nunez & Associates represented the estates.

573. Nunez & Associates represented to the potential representatives of the Flores and Recinos estates that all family members would receive U.S. Citizenship if the

Kherkher Defendants, the Pirani Defendants, and Nunez & Associates represented the estates.

574. The November 25, 2020 Attorney Employment Contract reduced the beneficiaries of the Estate of Recinos potential recovery by 6⅔% from the amount to which they would have been entitled under the Hatfield Contract.

575. The November 25, 2020 Attorney Employment Contract split fees with non-lawyers, to wit: 45% to the Kherkher Defendants; 45% to non-lawyers Nunez & Associates; and 10% to the Pirani Defendants.

576. Plaintiff seeks an order declaring any contract for legal representation as between Defendants Kherkher, Kherkher Garcia, Nunez & Associates, Pirani, and Pirani Law and the representatives of the Estate of Recinos was obtained and procured by fraud.

577. Plaintiff seeks an order declaring any contract for representation as between Defendants Kherkher, Kherkher Garcia, Nunez & Associates, Pirani, and Pirani Law and the Estate of Recinos is null and void as against public policy.

578. Plaintiff seeks an order declaring the Hatfield Contract to be the only lawful contract for legal representation on which the wrongful death case brought on behalf of the Estate of Recinos against J.B. Hunt Transport, Inc. and Keondrick Banks, and that the Hatfield Contract takes priority over all other contracts for representation.

579. Plaintiff seeks an order declaring any contract for representation between Defendants Kherkher, Kherkher Garcia, Nunez & Associates, Pirani, and Pirani Law and the Estate of Flores was likewise obtained by fraud.

580. Plaintiff seeks an order declaring any contract for representation between Defendants Kherkher, Kherkher Garcia, Nunez & Associates, Pirani, and Pirani Law and the Estate of Flores is null and void as against public policy.

581. Plaintiff seeks an order declaring the Hatfield Contract to be the only lawful contract for legal representation on which the wrongful death case brought on behalf of

the Estate of Flores against J.B. Hunt Transport, Inc. and Keondrick Banks, and that the Hatfield Contract takes priority over all other contracts for representation.

582. Plaintiff seeks an order disgorging all proceeds derived by Defendants Kherkher, Kherkher Garcia, Nunez & Associates, Pirani, and Pirani Law as a result of their criminal, unethical, and fraudulent conduct.

583. Plaintiff demands a jury trial.

584. Plaintiff intends to amend these pleadings upon the discovery of additional information.

WHEREFORE, Jason M. Hatfield, P.A. seeks the following relief:

(1) damages on all counts in an amount to be determined at trial;

(2) trebling thereof for Counts One, Two, Three, Four, Five, and Six pursuant to 18 U.S.C. § 1964(c);

(3) punitive damages for the intentional torts asserted in Counts Seven, Eight, Nine, Ten, Eleven, and Twelve;

(4) costs and attorney's fees of the action awardable pursuant to 18 U.S.C. § 1964(c); and

(5) all other relief to which he is entitled.

JASON M. HATFIELD, P.A.

Mark Murphey Henry, Ark. Bar No. 97170
HENRY LAW FIRM
P.O. Box. 4800
Fayetteville, Arkansas 72702
Telephone: (479) 368-0555
Email:       mark@henry.us