UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

JASON M. HATFIELD, P.A.                                                          PLAINTIFF

v.                                    No. 5:22-cv-05110

CESAR ORNELAS; STEVEN KHERKHER;
MICHAEL McCOY; NOE JESUS MANCIA
POLANCO; NUNEZ & ASSOCIATES;
KHERKHER GARCIA, LLP; TONY PIRANI;
PIRANI LAW, PA                                                                  DEFENDANTS

## OPINION AND ORDER

Before the Court are the Motions to Dismiss of Defendants Steven Kherkher and Kherkher

Garcia, LLP (Doc. 26); Defendants Michael McCoy, Nunez & Associates, and Cesar Ornelas

(Doc. 34); Defendant Noe Jesus Mancia Polanco (Doc. 36); and Defendants Tony Pirani and Pirani

Law, PA (Docs. 56, 59). The Court has also considered Defendants' memorandum briefs in

support of these motions (Docs. 27, 35, 60), Plaintiff's responses to Defendants' motions (Docs.

44–46, 61), and Defendants' replies to those responses (Docs. 52, 55). For the reasons stated

below, Defendants' motions are GRANTED IN PART AND DENIED IN PART.

### I.   Background

Plaintiff Jason Hatfield ("Hatfield") alleges as follows:

On November 23, 2020, Ana Delia Mejia Flores ("Mejia")[1] and Flor Maribel Recinos

Valle ("Recinos") were killed in Benton County, Arkansas, when a tractor-trailer truck crossed the

---

[1] The complaint refers to Ana Delia Mejia Flores as "Flores." In Spanish naming convention, the father's family name is a person's first surname and the mother's family name is the second surname. Nina Evason, *Spanish Culture: Naming*, CULTURAL ATLAS (2018), https://culturalatlas.sbs.com.au/spanish-culture/spanish-culture-naming. The father's family name is more commonly used to address people. *Id.* Accordingly, this opinion will refer to Ana Delia Mejia Flores as "Mejia."

1

centerline and rolled over onto their vehicle.  (Doc. 18, p. 1).  The truck was owned by J.B. Hunt Transport, Inc., and operated by Keondrick Banks.  *Id.* at 11.  News outlets reported the crash the next day.  *See, e.g.*, *2 killed, 1 Injured in Benton County Rollover Semi-Truck Crash*, KATV (November 24, 2020),  https://katv.com/news/local/2-killed-1-injured-in-benton-county-rollover-semi-truck-crash.

Such reporting attracted the attention of two so-called "case runners," Michael McCoy and Cesar Ornelas.  (Doc. 18, pp. 3–4, 10).  McCoy and Ornelas are Texas residents who engage in barratry, better known by the derogatory term "ambulance chasing," a practice where lawyers seek out victims and families immediately following an accident.  *Id.* at 3–5.  Barratry is illegal in Texas and prohibited by the Arkansas rules governing attorney ethics.  *Id.*  Hatfield alleges that McCoy and Ornelas target families in the immediate aftermath of an accident, attending victims' funerals and promising to pay the funeral expenses if the family will sign a representation contract with an entity called "Nunez & Associates," or with another firm with which they have an arrangement. *Id.*; *id.* at 26.  "Nunez & Associates" is the alter ego of a Mexican law firm, Nunez Law Firm, operated by an attorney not licensed to practice in Texas or Arkansas.  *Id.* at 9.  If the families later try to back out of their contracts, McCoy and Ornelas will not let them do so because the funeral expenses have already been paid.  *Id.* at 3–5.  McCoy and Ornelas have been sued for barratry in Texas on many occasions.  *Id.* at 25.  They often conspire with funeral home directors to recruit grieving families who are in the process of burying an accident victim.  *Id.*

In the aftermath of the November 23 crash, McCoy, Ornelas, and Nunez & Associates (collectively, "Nunez Defendants") were able to learn of both the accident and the funeral arrangements online.  (Doc. 18, p. 25).  Hatfield alleges that they used wire and radio communications to discuss the accident and make plans to attend the funeral in order to obtain

clients. *Id.* at 26. McCoy and Ornelas approached Recinos and Mejia's survivors immediately after the injury, soliciting them as clients on behalf of Nunez & Associates. *Id.* at 10. Not only did the Nunez Defendants promise to pay for the Recinos and Mejia funerals, but they promised full U.S. citizenship to family members who signed on with the specified law firms. *Id.* The Nunez Defendants made at least two phone calls and sent multiple e-mails in furtherance of their efforts to obtain the families' business. *Id.* at 11. Ultimately, Ornelas and McCoy arranged to pay the funeral expenses for both Recinos and Mejia. *Id.* at 28.

At 8:17 A.M. on November 30, Recinos' brother Vidal Antonio Recinos ("Vidal")[2] called Hatfield to request representation in the matter of his sister's death. (Doc. 18, p. 11). Hatfield is an Arkansas licensed attorney whose office is in Springdale, Arkansas. *Id.* at 3. His office is very close to the home of Recinos' family. *Id.* at 15. He is a well-known and highly experienced catastrophic injury lawyer in Northwest Arkansas, frequently litigating against J.B. Hunt. *Id.* at 14. Hatfield advertises his legal expertise in trucking litigation, including the analysis of evidence specifically relevant to truck accidents. *Id.* at 15.

Within an hour of Vidal's call on November 30, Hatfield met with Vidal; two of Recinos' adult children, Laura and Ever; and Recinos' minor child, R.M.S. (Doc. 18, p. 11). The adults signed an attorney-client agreement with Hatfield ("Hatfield Contract") at that meeting. *Id.*; *see also* Doc. 18-2. The Hatfield Contract grants Hatfield a 33-and-one-third-percent lien on the Recinoses' wrongful death claim against J.B. Hunt. (Doc. 18-2). It also required the signers to attest that Hatfield did not solicit the case, that nobody received a reward from Hatfield for recommending the signers to Hatfield, and that they were not promised any support or reward for

---

[2]     Because several members of the Recinos family are involved in this case, the Court refers to Flor Maribel Recinos Valle's family members by their first names for clarity. No disrespect is intended.

signing.  *Id.*  Vidal, Laura, and Ever also affirmed both in writing and in person that they had not previously retained other counsel.  (Doc. 18, p. 13).  Hatfield had an interpreter present to explain the documents to them.  *Id.*  After the Hatfield Contract was signed, Hatfield went to work immediately to create an estate for Recinos.  *Id.*  He gathered information about all of Recinos' survivors, including photos and identification cards, and prepared all the paperwork necessary for Vidal to serve as administrator.  *Id.* at 14.

Also on November 30, a lawyer named Steven Kherkher ("Kherkher") traveled to Northwest Arkansas.  (Doc. 18, p. 18).  Kherkher lives in Houston and is licensed to practice law in both Texas and Arkansas.  *Id.* at 6.  Kherkher's firm, Kherkher Garcia, apparently has an arrangement with McCoy whereby cases involving tractor-trailer truck crashes are referred by the Nunez Defendants to Kherkher Garcia.  *Id.* at 28.  Kherkher and Kherkher Garcia (collectively, "Kherkher Defendants") allegedly knew of Ornelas and McCoy's fraudulent promises of citizenship to the families of the dead women.  *Id.* at 29.[3]  The purpose of Kherkher's visit was to meet personally with Recinos' and Mejia's families.  *Id.* at 18.  During his visit, he learned that Vidal, Laura, and Ever had entered into the Hatfield Contract.  *Id.*  Kherkher, on behalf of the Kherkher Defendants, then called Hatfield from Texas to demand that Hatfield cease representing Vidal, Laura, and Ever.  *Id.* at 19.  On this call, Kherkher claimed that the Recinoses "can't fire me.  I paid the funeral expenses."  (Doc. 18-9, p. 2).

The Kherkher Defendants were assisted in their efforts by Noe Jesus Mancia Polanco ("Mancia").  (Doc. 18, p. 10).  Mancia and Recinos had previously been married, but Recinos filed for and Mancia consented to a divorce in 2012.  (Doc. 18-6).  The court documents show, and the

---

[3]     Indeed, when later confronted by Hatfield, Kherkher allegedly did not deny that such promises had been made.  (Doc. 18, p. 33).

family stated to Hatfield, that Mancia was abusive to Recinos.  *Id.*; Doc. 18, p. 23.  Hatfield was told that the family did not understand Mancia to have been married to Recinos at the time of her death.  (Doc. 18, p. 23).  Upon learning of Recinos' death, Mancia wanted to control the Recinos estate.  *Id.* at 24.  Kherkher knew of this and coordinated with Mancia to ensure that no family member retained a firm other than Kherkher Garcia.  *Id.*  After learning that Vidal, Laura, and Ever had signed the Hatfield Contract, Mancia used acts of intimidation and threats of physical abuse to convince them to terminate the Hatfield Contract.  *Id.*  This intimidation, of which Kherkher had full knowledge, occurred via phone, text, and e-mail.  *Id.* at 25.  With assistance from McCoy and Ornelas, Mancia and the Kherkher Defendants eventually compelled Laura and Ever to sign a new contract ("Kherkher Contract") with Kherkher Garcia and Nunez & Associates.  *Id.* at 24; *see* Doc. 18-3.  The exact date of signature is unknown, but if the Kherkher Contract existed as of December 1, 2020, Hatfield asserts that it was procured illegally, unethically, and through fraud.  *Id.* at 32.

Kherkher e-mailed Hatfield on December 1, stating the following: "You are instructed to stand down.  Both our clients terminate any representation from you and your law firm.  Also please do not communicate with them anymore."  (Doc. 18, p. 19; *see also* Doc. 18-5).  Kherkher allegedly lied to Hatfield, saying that he already had a contract with Hatfield's clients.  *Id.* at 32.  Kherkher then instructed Laura and Ever to cease communication with Hatfield and to have Vidal do the same.  *Id.* at 19.  He delivered these instructions via interstate wire and mail channels.  *Id.* at 31.  After that point, none of the three contacted Hatfield, frustrating his efforts to file the documents to create the estate.  *Id.* at 19, 21.  Without Vidal's cooperation, Hatfield could not file the estate documents to advance the wrongful death claims.  *Id.* at 21.

Hatfield was suspicious of Kherkher's claims, especially in light of the short time frame involved. (Doc. 18-2, p. 2). The Kherkher Defendants never advertised in Northwest Arkansas, and Hatfield asserts that they would not be found by a Northwest Arkansas resident's internet search for "truck accident lawyer." (Doc. 18, p. 31). Indeed, no survivor of Recinos or Mejia found the Kherkher Defendants through the internet. *Id.* When Hatfield asked how Kherkher was hired, Kherkher claimed that the families had been referred to the Kherkher Defendants by a Northwest Arkansas firm. In fact, no Arkansas firm was retained in the case until the next year. *Id.* Hatfield claims that these statements, made over the course of at least two e-mails and two interstate phone calls, were meant to defraud him into dissociating from his clients and relinquishing his lien. *Id.*; *id.* at 18–19. As of November 30, 2020, however, Hatfield claims that his contract was the only lawful, valid, and voluntarily executed contract for representation. *Id.* at 32. Furthermore, Hatfield says he would probably have represented both the Recinos and Mejia estates if not for Defendants' conduct. *Id.* Hatfield claims to enjoy a good reputation among the Hispanic community in Northwestern Arkansas, as well as in the area more broadly, and advertises widely there. *Id.* at 33. Additionally, the Recinos heirs had already hired him.

On December 7, Hatfield sent notice of his attorney's lien to Christy Comstock (the attorney of record for J.B. Hunt and Keondrick Banks) and to Kherkher. (Doc. 18, p. 20; *see also* Doc. 18-7). He sent both notices by certified mail with a return receipt required. *Id.* at 20. Both return receipts were signed. (Doc. 18-7). Under Arkansas law, a notice of attorney's lien is supposed to be signed by the client of the lawyer asserting the lien. Ark. Stat. Ann. § 16-22-304. However, Hatfield asserts that it would have been unethical to have Laura and Ever sign the document because Kherkher had already told him not to communicate with them. (Doc. 18, p. 21).

On December 29, 2020, Kherkher filed a wrongful death suit against J.B. Hunt ("Mancia Suit"). (Doc. 18, p. 37). The plaintiff was "Noe Jesus Mancia Polanco, As Next Friend of R.R.M." *Id.* However, under Arkansas law, an action for injury to a person who dies as a result must be filed by the decedent's executor or administrator. Ark. Code. Ann. § 16-62-101(a)(1). On February 4, 2021, all Defendants sought dismissal of the Mancia Suit based on the failure to comply with Arkansas law. (Doc. 18, p. 37). Ultimately, there was no progress in the case for five months after it was filed. *Id.* at 21. Hatfield knew the relevant law and had planned from the beginning to create an estate, so he would not have made such a mistake, but he lacked the ethical or legal right to intervene in the Mancia suit. *Id.* at 22. However, Hatfield ultimately discovered that the case had made no progress and was in danger of dismissal. *Id.* On May 13, 2021, Hatfield passed this information to Vidal through a third party, and Vidal mentioned the failure to create an estate to at least one relative. In response to Vidal's evident dissatisfaction, the Kherkher Defendants hired Tony Pirani and Pirani Law (collectively, "Pirani Defendants"). The Kherkher Defendants, Pirani Defendants, and Nunez & Associates took steps to keep the survivors from communicating or cooperating with Hatfield. *Id.* The Pirani Defendants then solicited Vidal as a client for themselves, the Kherkher Defendants, and Nunez & Associates despite knowing that Vidal still had an ongoing contract with Hatfield. *Id.* at 37.

On June 3, 2021, Vidal signed a contract for legal representation ("Pirani Contract") with the Pirani Defendants, Kherkher Defendants, and Nunez & Associates. (Doc. 18, p. 22). The contract assessed a 40% contingent fee for any award or settlement after the suit was filed. (Doc. 18-4, p. 3). Nunez & Associates was entitled to 45% of the fee, Kherkher Garcia to 45%, and Pirani Law to the remaining 10%. *Id.* at 5. At the time, Pirani allegedly knew that the clients had been unethically procured by Nunez & Associates, but Pirani took no steps to disavow the

association.  *Id.* at 38.  On July 29, 2021, the Pirani Defendants opened an estate for Recinos, naming Mancia as personal representative.  *Id.* at 22.  On August 12, 2021, Pirani filed an amended complaint in the Mancia Lawsuit to correct Kherkher's legal error.  *Id.* at 38.

On April 5, 2022, the parties in the wrongful death case attended mediation and reached a tentative settlement.  (Doc. 18, p. 23).  Hatfield was never notified of either the mediation or the settlement, although J.B. Hunt's counsel contacted him to let him know that the case had settled.  *Id.*; *id.* at 39.  Furthermore, at no time prior to settlement was there any expert witness disclosure, deposition, written discovery or requests for admission by either party, or motion practice.  *Id.* at 38–39.  By contrast, Hatfield claims that his firm would have performed a comprehensive review of the evidence, interviewed witnesses, performed research and accident reconstruction, and engaged economic experts.  *Id.* at 39.  Therefore, Hatfield says he would have secured an equal or better result for both estates but for Defendants' actions.  *Id.*

After asserting his attorney's lien and giving proper notice, Hatfield asked to see copies of the Kherkher and Pirani Contracts to determine the order in which the firms were hired.  (Doc. 18, p. 35).  Kherkher and Pirani refused.  *Id.*  When Hatfield issued a Notice of Deposition for the family members, the Kherkher and Pirani defendants actively sought to prevent the deposition.  *Id.*  They also thwarted Hatfield's attempts to obtain more information from the funeral home.  *Id.* at 35–36.  On July 7, 2022, Kherkher admitted in court that the case had been given to him by a Mexico-based law firm not licensed to practice in Arkansas.  *Id.* at 34.  This contradicted his earlier statement to Hatfield that the case had been referred to him by a firm in Northwest Arkansas.  He also admitted that he had paid funeral expenses for both decedents.  *Id.*  Kherkher coordinated with Ornelas and McCoy to arrange for payment of the funeral expenses.  *Id.* at 29.

The Kherkher and Pirani Defendants only disclosed their contracts to Hatfield and the state court when they sought distribution of attorney's fees after the settlement. *Id.* at 39. Further, no court has ever authorized the Estate of Recinos to execute a contract with any of the lawyer or law firm defendants. *Id.* at 40. Proceeds from the settlement of one of the wrongful death claims (either Mejia or Recinos) have flowed to the Kherkher and Pirani Defendants and Nunez & Associates. *Id.* at 34.

The purported Kherkher Contract (Doc. 18-3) is part of the record. It is dated five days prior to the Hatfield Contract. (Doc. 18, p. 8 n. 3). However, there are several details which, according to Hatfield, indicate that the Kherkher Contract was falsified in relevant part. For instance, it is dated only two days after Recinos' death. *Id.* None of the relatives' signatures are dated, and the dates on the paper are not in the handwriting of any relative. The first page is sized and formatted differently from the subsequent pages. Finally, the document's metadata indicates that it was created on May 24, 2022. *Id.* This contract imposes a 40% contingent fee, half of which goes to Kherkher Garcia and half to Nunez & Associates. (Doc. 18-3).

Hatfield filed the present lawsuit on June 7, 2022. His operative complaint (Doc. 18) states fifteen causes of action:

1. A Racketeering Influenced Corrupt Organization Act (RICO) claim under 18 U.S.C. § 1962(a) against the Nunez, Kherkher and Pirani Defendants. Section 1962(a) forbids income derived "directly or indirectly" from racketeering activity from being used and invested, "directly or indirectly . . . in acquisition of any interest in, or the establishment or operation of, any enterprise" engaged in or affecting interstate or foreign commerce.

2. A RICO claim under 18 U.S.C. § 1962(b) against the Nunez, Kherkher, and Pirani Defendants. Section 1962(b) forbids any person from using a pattern of racketeering

activity to "acquire or maintain, directly or indirectly, any interest in or control of any enterprise" engaged in or affecting interstate or foreign commerce.

3. A RICO claim under 18 U.S.C. § 1962(c) against the Nunez, Kherkher, and Pirani Defendants.  Section 1962(c) forbids employees or associates of enterprises engaged in or affecting interstate or foreign commerce from participating in the activities of that enterprise through a pattern of racketeering activity.

4. A RICO claim under 18 U.S.C. 1962(d) against the Nunez, Kherkher, and Pirani Defendants.  Section 1962(d) forbids conspiracy to violate Sections 1962(a), (b), or (c).  In Count 4, Hatfield alleges a conspiracy to violate 1962(a).

5. A second claim under 18 U.S.C. 1962(d) against the Nunez, Kherkher, and Pirani Defendants, this one for conspiracy to violate 1962(b).

6. A third claim under 18 U.S.C. 1962(d) against the Nunez, Kherkher, and Pirani defendants for conspiracy to violate 1962(c).

7. A claim under the Arkansas Deceptive Trade Practices Act (Ark. Code Ann. § 4-88-101 *et seq.*) (ADTPA) against the Nunez, Kherkher, and Pirani Defendants. The ADTPA forbids "[d]isparaging the goods, services, or business of another by false or misleading representation of fact" and "any other unconscionable, false, or deceptive act or practice in business, commerce, or trade."  Ark. Code Ann. § 4-88-107(a).

8. A claim for intentional interference with Hatfield's contract with Laura and Ever against the Nunez and Kherkher Defendants and Mancia.

9. A claim for intentional interference with Hatfield's contract with Vidal against the Kherkher and Pirani Defendants and Nunez & Associates.

10. A claim for intentional interference with a business expectancy for the legal representation of Mejia's estate against the Nunez and Kherkher Defendants.

11. A claim for fraud against the Kherkher and Pirani Defendants.

12. A claim for civil conspiracy against all Defendants.

13. A claim for punitive damages against all Defendants.

14. A claim for declaratory relief voiding the purported Kherkher Contract against Nunez & Associates.

15. A claim for declaratory relief voiding the Pirani Contract against Nunez & Associates, Kherkher Garcia, and Pirani Law.

## II.   Legal Standard

On a motion to dismiss under Rule 12(b)(6), courts in the Eighth Circuit proceed as follows:

> We accept the well-pled allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Schriener v. Quicken Loans, Inc.*, 774 F.3d 442, 444 (8th Cir. 2014). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 . . . (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 . . . We assess plausibility considering only the complaint and materials that are "necessarily embraced by the pleadings and exhibits attached to the complaint," *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 697 n.4 (8th Cir. 2003), "draw[ing] on [our own] judicial experience and common sense," *Iqbal*, 556 U.S. at 679 . . . Further, we "review the plausibility of the plaintiff's claim as a whole, not the plausibility of each individual allegation." *Zoltek Corp. v. Structural Polymer Grp.*, 592 F.3d 893, 896 n.4 (8th Cir. 2010).

*Meardon v. Register*, 994 F.3d 927, 934 (8th Cir. 2021).

Defendants would do well to refresh their knowledge concerning these basic points of civil procedure.  The Kherkher, Nunez, and Pirani Defendants, for instance, include in their Motions to Dismiss an e-mail to Hatfield from a member of the Recinos family.  (Doc. 27, p. 24; Doc. 35, p.

24; Doc. 60, p. 25).  They claim that the e-mail is "necessarily embraced by the complaint" under *Mattes*, and thus may be considered on a motion to dismiss, because attached to Hatfield's complaint were e-mails between himself and Kherkher which were sent on the same date.  The e-mail from the relative, while related to the subject matter at issue, is mentioned in neither the complaint itself nor any of the attachments.  Therefore, the Court cannot fathom how this e-mail is "necessarily embraced" by Hatfield's complaint.[4]  The remaining defendant, Mancia, includes factual assertions in his motion to dismiss with no evidence to back them up, let alone law supporting their inclusion.  (Doc. 36, p. 3 (claiming that Hatfield knew of the Kherkher contract in advance, brought up the crash during an appointment for an unrelated matter, and lied to his clients about whether Texas lawyers could try cases in Arkansas)).  Needless to say, none of this will be considered in the Court's ruling on these motions.

## III.    Rule 8

As an initial matter, the Nunez Defendants argue that Hatfield's complaint should be dismissed for failure to comply with Rule 8 of the Federal Rules of Civil Procedure.  (Doc. 35, p. 33).  The Kherkher and Pirani Defendants also raise Rule 8, but do not request dismissal.  (Doc. 27, pp. 1–2; Doc. 60, pp. 1–2).  The Court declines to dismiss Hatfield's complaint on Rule 8 grounds.

Under Rule 8, a complaint requires "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(1).  The Kherkher, Nunez, and Pirani Defendants seem to take issue primarily with the complaint's length.  However, length alone does

---

[4]     These Defendants also argue that the e-mail should be admitted under Federal Rule of Evidence 106, which permits the introduction of "Remainder of or Related Writings" where a writing has already been introduced.  However, the e-mail is not part of any e-mail conversation attached to the complaint, and insofar as it is "related," the same can be said for any other writing relevant to the dispute.  Therefore, Rule 106 does not apply.

not seem to be grounds for dismissal under Rule 8.  Rather, the cases cited by Defendants either involved much longer complaints or complaints which were legally nonsensical.  *See* Fed. R. Civ. P. 8(d)(1) ("Each allegation [in a complaint] must be simple, concise, and direct.").  In *Mangan v. Weinberger*, cited by the Nunez defendants, the plaintiff filed two complaints which were later consolidated: a 428-page complaint with 28 counts against 130 military personnel in both their individual and official capacities; and a 622-page, 64-count complaint against the United States, both of which "consist[ed] of rambling factual allegations."  848 F.2d 909, 910 (8th Cir. 1988).  The District Court dismissed an amended version due to it being "rambling and needlessly long and confusing" and "only a slight improvement over the initial complaints."  *Id.*  In the only other case cited by the Nunez defendants, the complaint only "occupie[d] 16 printed pages" and was dismissed for being "16 printed pages of disconnected, incoherent, and rambling statements."  *Koll v. Wayzata State Bank*, 397 F.2d 124, 125 (8th Cir. 1968).  And in the lone case cited by the Kherkher and Pirani Defendants, the 53-page complaint at issue led the court to comment as follows: "A complaint is not a puzzle, however, and we are loathe to allow plaintiffs to tax defendants, against whom they have levied very serious charges, with the burden of solving puzzles in addition to the burden of formulating an answer to their complaint."  *In re Buffets, Inc. Sec. Litigation*, 906 F.Supp. 1293, 1298 (D. Minn. 1995) (quoting *In re GlenFed, Inc.*, 42 F.3d 1541, 1553–54 (9th Cir. 1994)).

Here, Hatfield's complaint spans 80 pages, encompassing 15 counts against 8 defendants, with an additional 43 pages of exhibits attached.  (Doc. 18).  This is not a "short" complaint by any stretch of the imagination, and it could conceivably be better organized and less repetitive. However, much of the length is attributable to the nature of the allegations themselves. Furthermore, and perhaps more importantly, the language and claims are concise and

comprehensible, with the causes of action clearly stated.  All Defendants have been able to mount thorough and timely responses to the allegations therein.  While the Court certainly appreciates brevity in briefing,[5] it declines to dismiss Hatfield's otherwise "simple, concise, and direct" complaint based solely on its length and organization.

## IV.    Standing to Void Kherkher-Nunez Contract

The Kherkher and Nunez Defendants claim that Hatfield lacks standing to void the Kherkher-Nunez Contract.  (Doc. 25, pp. 29–30; Doc. 27, pp. 34–35; Doc. 60, pp. 35–36).  The Court declines to rule on this question at present.  When a plaintiff brings a state claim in federal court, state law determines whether the plaintiff has standing.  *See Metro. Express Servs., Inc. v. City of Kansas City, Mo.*, 23 F.3d 1367, 1369 (8th Cir. 1994) (collecting cases).  In Arkansas, a plaintiff "must have an interest which has been adversely affected or rights which have been invaded" in order to have standing.  *Toland v. Robinson*, 590 S.W. 146, 150 (Ark. 2019).  In other words, "only a claimant who has a personal stake in the outcome of the controversy has standing." *Id.*  Here, in the event that the Kherkher-Nunez Contract is ultimately found to predate the Hatfield Contract, Hatfield will have an adversely affected interest and a personal stake in its validity.  If the Kherkher-Nunez Contract is found to postdate the Hatfield Contract, on the other hand, no harm will flow to Hatfield from the Kherkher-Nunez Contract itself, only from Defendants' fraud in causing Hatfield and the Recinos to abandon the Hatfield Contract.  Hatfield would be no more or less injured if the contract was valid or not.  Because the date of execution of the Kherkher-

---

[5]     On the topic of brevity, the Court notes that the Pirani and Nunez Defendants' 12(b)(6) memoranda copy significant portions of the Kherkher Defendants' 12(b)(6) memorandum word for word.  Out of respect for the time and resources of all involved, not least its own, the Court requests that the parties simply state when they wish to adopt others' arguments instead of reproducing the arguments in full.  Parties are asked to specify the document, document number, and section or page range being specifically adopted.

Nunez Contract is a disputed fact and pled in the alternative by Hatfield, it cannot be resolved on a 12(b)(6) motion.  Therefore, the Court must reserve ruling on Hatfield's standing to void the Kherkher-Nunez Contract until after a factual determination is made.

## V.    Standing to Void Pirani Contract

Under the reasoning detailed above, the Court finds that Hatfield lacks standing to void the Pirani Contract because it undisputedly postdates the Hatfield Contract.  Hatfield is no better or worse off if the contract is valid than if it is invalid.  Rather, his harm flows from Defendants' interference in his attorney-client relationship with Vidal.

## VI.    Jurisdiction to Enforce Lien

The Kherkher, Nunez, and Pirani Defendants argue that this Court lacks jurisdiction to enforce Hatfield's lien of attorney.  The Court disagrees.

Title 16, chapter 22, section 304 of the Arkansas Code governs liens of attorney in Arkansas.  It provides that "[t]he court or commission before which an action was instituted, or in which an action may be pending at the time of settlement, compromise, or verdict, or in any circuit court of proper venue, upon the petition of the client or attorney at law, shall determine and enforce the lien created by this section."  Ark. Code Ann. § 16-22-304(e) (2003).  Defendants argue that this means only an Arkansas circuit court can enforce such a lien.  However, liens under this statute are frequently litigated and enforced in the federal courts.  *See, e.g.*, *McKinney ex rel. McKinney v. Bridgestone/Firestone, Inc.*, 41 F.App'x. 19 (8th Cir. 2002) (summary judgment properly granted on issue of lien validity); *In re Cuker Interactive, LLC*, 2022 WL 612671, at *2 (9th Cir. Mar. 2, 2022) (applying § 16-22-304(a)(1) to rule lien valid).  Further, under Arkansas precedents, this statute is to be "liberally construed" in favor of the suing attorney.  *Mack v. Brazil, Adlong &*

*Winningham, PLC*, 159 S.W.3d 291, 295 (Ark. 2004).  Accordingly, this Court does not interpret § 16-22-304(e) to preclude its jurisdiction.

Relatedly, the Pirani Defendants note that Hatfield is pressing his claim as part of the Arkansas circuit court proceedings in the Mancia Lawsuit.  (Doc. 59, p. 2).  This does not affect this Court's jurisdiction.  There are certain circumstances in which an ongoing state case can be so similar to a federal one that it is proper for the federal court to abstain.  In the Eighth Circuit, the two cases must be "parallel" and "exceptional circumstances" must warrant abstention.  *Fru-Con Constr. Corp. v. Controlled Air, Inc.*, 574 F.3d 527, 534 (8th Cir. 2009).  For cases to be parallel, "a substantial similarity must exist between the state and federal proceedings, which similarity occurs when there is a substantial likelihood that the state proceeding will *fully* dispose of the claims presented in the federal court." *Id.* at 535 (emphasis added).  When any doubts exist as to the parallel nature of the concurrent proceedings, the district court may not abstain.  *Id.*  Here, the two sets of proceedings are not at all parallel.  One is a wrongful-death suit under state law in which Hatfield is involved only to enforce a lien; one is a federal RICO complaint in which Hatfield alleges a racketeering scheme and several state-law torts.  A resolution in the state proceedings will not fully dispose of the claims Hatfield presents in this Court.

Mancia raises the point that if Hatfield's allegations are true, he has a valid lien of attorney, and thus he will have suffered no damages because he will ultimately be paid in full.[6]  All of the claims Hatfield brings require a showing of damages.  Under this logic, Hatfield's claims would be resolved by a state-court award of the lien proceeds.

---

[6]     Mancia raises this point in the context of the state-law claims against him, but as damages are a requirement of all the claims brought by Hatfield, the Court considers the argument more globally.

At first blush, this is a compelling argument.  While Hatfield was unable to obtain his clients' signature on the written notice, Arkansas courts will excuse the absence of a client's signature if all other requirements are met.  *Metro. Life Ins. Co. v. Roberts*, 411 S.W. 2d 299, 300 (Ark. 1967).  Therefore, if Hatfield can prove that the Hatfield Contract predates the Kherkher Contract, he will be able to recover.  And while Hatfield alleges that he was more diligent and competent than the lawyer Defendants, he does not definitively plead that he would have made a better recovery, only that his result would have been at least as good.  Therefore, the lien initially seems to be a full remedy for any damages Hatfield suffered.

However, this argument falls apart on closer scrutiny.  If the lien is ultimately held to be invalid, Hatfield would make no recovery and could still argue that he suffered damages.  Even if the lien is eventually ruled valid, Hatfield's relief will have been delayed by Defendants' alleged actions in presenting a forged contract to the Arkansas court and preventing Hatfield from gathering evidence.  This delay may cause damages of its own, including litigation costs and a decline in the money's real value due to inflation.  Thus, even if the lien is ruled valid and enforced, Hatfield may still have suffered damages.

When this Court or the Arkansas court delivers a final ruling on the lien's validity, the parties will be expected to address the impact of such determination on Hatfield's claims and the Court's jurisdiction.  In the meantime, however, the Court will continue to exercise jurisdiction over Hatfield's claims.

## VII.   Jurisdiction over Nunez & Associates

The Nunez Defendants argue that Hatfield has not adequately pled this Court's personal jurisdiction over Nunez & Associates.  The Court disagrees.

Arkansas permits personal jurisdiction to the maximum extent provided by the Due Process Clause.  Ark. Code Ann. § 16-4-101.  Therefore, Hatfield only needs to demonstrate that Nunez & Associates has sufficient minimum contacts with Arkansas so as not to offend traditional notions of fair play and substantial justice.  *Whaley v. Esebag*, 946 F.3d 447, 451 (8th Cir. 2020).  In other words, the conduct and connection with Arkansas must be such that Nunez & Associates could reasonably anticipate being hailed into an Arkansas court.  *Id.*  The Eighth Circuit uses a five-part test to assess minimum contacts, with the first three factors being the most important:  "(1) the nature and quality of contacts with the forum state; (2) the quantity of such contacts; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) convenience of the parties."  *Burlington Indus., Inc. v. Maples Indus., Inc*, 97 F.3d 1100, 1102 (8th Cir. 1996).

The first factor favors this Court's jurisdiction.  Ornelas and McCoy, as agents of Nunez & Associates, are alleged to have deliberately traveled to Arkansas to personally solicit the business of Arkansas residents for a case ultimately filed in Arkansas state court.  This indicates that Nunez & Associates' contacts with Arkansas were not "random, fortuitous, or attenuated . . . but rather were central to an alleged scheme to purposely avail [it]self of the privilege of conducting activities in Arkansas."  *Whaley*, 946 F.3d at 451 (internal quotations and citations omitted).  Accordingly, this factor favors a finding of personal jurisdiction over Nunez & Associates.  *See id.*

The second factor, the quantity of contacts, is more neutral.  Hatfield has not pled that Ornelas and McCoy made more than one trip to Arkansas on Nunez & Associates' behalf.  While Ornelas and McCoy did pay for both the Recinos and Flores funerals, presumably transactions with an Arkansas business, Hatfield does not claim that they did so on Nunez & Associates' behalf.

18

On the other hand, Hatfield alleges that Ornelas and McCoy "personally approached the survivors immediately following the injury, they personally attended the funerals, and they personally solicited clients for legal engagement." (Doc. 18, p. 10). This indicates that the single trip included at least two in-person conversations and potentially several more. These discussions were "within a reasonable quantity as to be expected for the negotiation and establishment of a business relationship" of this nature; accordingly, they do not sway the analysis. *Whaley*, 946 F.3d at 452.

The third factor, the relation of the cause of action to the contacts, favors the Court's jurisdiction. Hatfield alleges a RICO scheme in which Nunez & Associates coordinated to "illegally and unethically procure clients from which they received income" and "transmit and receive unlawful engagement contracts procured through deception." (Doc. 18, pp. 42–43). Accordingly, Ornelas and McCoy's actions in Arkansas were in furtherance of the scheme alleged by Hatfield. Further, the injuries Hatfield complains of stem from Nunez & Associates' original contact with Hatfield's clients, without which they almost certainly would not have become involved with Kherkher. Therefore, the contacts relate substantially to the RICO claim and are relevant to the other claims as well. Accordingly, this factor favors a finding of personal jurisdiction over Nunez & Associates.

The fourth factor, Arkansas' interest in providing a forum for its residents, favors this Court's jurisdiction because Hatfield is an Arkansas resident. The fifth factor, convenience of the parties, also favors jurisdiction here. Not much is known about Nunez & Associates, making it unclear where it is headquartered and what forums would be convenient for it. However, Hatfield is an Arkansas resident, as are three of Nunez & Associates' co-defendants: Mancia, Pirani, and Pirani Law. Further, Kherkher is licensed to practice in Arkansas, and the Kherkher Defendants sought to represent clients in an Arkansas wrongful-death case and are currently doing so in

19

Arkansas state court.  This indicates that Arkansas is a convenient forum (or at least not a terribly inconvenient forum) for them.  Accordingly, the final two factors favor this Court's jurisdiction.

As four of the five factors favor this Court's jurisdiction over Nunez & Associates, the Court concludes that it has jurisdiction over Nunez & Associates.

## VIII.    RICO Allegations

The Kherkher, Nunez, and Pirani Defendants argue that Hatfield fails to state a claim against them under RICO.  The Court disagrees.

The RICO Act makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. 1962(c).[7]  To prove a violation of § 1962(c), a plaintiff must show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  *Crest Constr. II, Inc. v. Doe*, 660 F.3d 346, 353 (8th Cir. 2011).  In addition, a plaintiff must demonstrate that they have suffered an actual injury.  *Gomez v. Wells Fargo Bank, N.A.*, 676 F.3d 655, 660 (8th Cir. 2012).  Defendants do not raise, and the Court therefore does not address, the conduct element. They do, however, assert that no racketeering activity took place, that they did not form an enterprise, that their alleged acts do not amount to a "pattern," and that Hatfield has suffered no actual injury.  The Court will address these in turn.

The Kherkher and Pirani Defendants also argue that the present suit "takes RICO far beyond its appropriate limits" because "this is obviously not a mafia case."  (Doc. 18, p. 9; Doc.

---

[7]    The Act also forbids, and Hatfield also alleges, certain financial activities related to racketeering under §§ 1962 (a)–(b), *see supra*.  However, it appears that Defendants here challenge only the § 1962(c) claim, as it is the only one they address.  *See* Doc. 27, pp. 9–21; Doc. 35, pp. 6–18; Doc. 60, pp. 10–23.

60, p. 10).  However, an "enterprise" under RICO does not need to be a Mafia organization.  It does not need a hierarchical structure, chain of command, established rules, or even a name.  *Boyle v. United States*, 556 U.S. 938, 948 (2009).  Nor must the predicate acts be "sophisticated, diverse, complex, or unique," as even old-fashioned shakedowns will suffice.  *Id.*  Accordingly, this argument is without merit.

        a.  <u>Racketeering Activity</u>

RICO defines "racketeering activity" as one of numerous "predicate acts," including mail fraud, wire fraud, bank fraud, and obstruction of justice.  18 U.S.C. § 1961(1).  Hatfield predicates his RICO claim on allegations of mail and wire fraud.  (Doc. 18, pp. 39–40).  "When pled as RICO predicate acts, mail and wire fraud require a showing of: (1) a plan or scheme to defraud, (2) intent to defraud, (3) reasonable foreseeability that the mail or wires will be used, and (4) actual use of the mail or wires to further the scheme." *Wisdom v. First Midwest Bank, of Poplar Bluff*, 167 F.3d 402, 406 (8th Cir. 1999) (citation omitted).  Additionally, "in alleging fraud . . . a party must state with particularity the circumstances constituting fraud," although "malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).  Specifically, "the complaint must plead the 'who, what, where, when, and how' of the alleged fraud." *Drobnak v. Anderson Corp.*, 561 F.3d 778, 783 (8th Cir. 2009) (quoting *United States ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 556 (8th Cir. 2008)).  When the facts constituting the fraud are peculiarly within the opposing party's knowledge, they may be pled on information and belief.  *Drobnak*, 561 F.3d at 783–84.

The first element, that of a plan or scheme to defraud, is not limited to criminal conduct.  "The crime of mail fraud is broad in scope and its fraudulent aspect is measured by a non-technical standard, condemning conduct which fails to conform to standards of moral uprightness,

fundamental honesty, and fair play." *Murr Plumbing, Inc., v. Scherer Brothers Fin. Servs. Co.*, 48 F.3d 1066, 1069 n.6 (8th Cir. 1995). Here, Hatfield alleges that the Nunez and Kherkher Defendants coordinated to impermissibly procure vulnerable clients (against Texas law and Arkansas legal ethics rules) by using false claims (such as the offer of citizenship) and unethical incentives (such as the payment of funeral expenses). Then, he alleges that the Kherkher, Nunez, and Pirani Defendants schemed to thwart Hatfield's legitimate contract in order to profit from the unethically-obtained clients.[8] This is sufficient to show a plan or scheme to defraud, as well as the "who" (Defendants as perpetrators, Recinoses/Mejias and Hatfield as victims), "what" (procuring the clients, lying to Hatfield about a preexisting contract, and pressuring the clients to abandon the Hatfield contract), "when" (in late November of 2020 and spring of 2021), "where" (the Fayetteville area), and "how" (through the promises of citizenship and payment of funeral expenses, as well as a forged contract and verbal misrepresentations to Hatfield and the improper solicitation of Vidal) of the fraud claim. Accordingly, Hatfield has stated the first element of a mail and wire fraud claim.

Hatfield has also met the second element of his mail and wire fraud claims by pleading that these defendants "acted with the intent to defraud" (Doc. 18, pp. 40–41), which may be alleged generally. Fed. R. Civ. P. 9(b). As to the third element, because Hatfield alleges that the Pirani

---

[8] The Nunez, Kherkher, and Pirani Defendants cite *Allen v. Allison*, 155 S.W.3d 682 (Ark. 2004), for the proposition that the Arkansas Rules of Professional Conduct cannot form a basis for civil liability. *Id.* at 153 ("No cause of action should arise from a violation [of the RPC], nor should it create any presumption that a legal duty has been breached."). Even if the Court were to read this state case as limiting what a federal court can deem to violate "standards of moral uprightness, honesty, and fair play," *Murr Plumbing*, 48 F.3d at 1069 n.6, the Court finds that attempting to recruit clients at a funeral five days after a horrible accident falls short of moral uprightness, and false representations are clearly dishonest by definition. Although the Pirani Defendants did not participate in this conduct themselves, knowing of it and seeking to profit from the clients obtained as a result (as Hatfield alleges) likewise falls short of "moral uprightness."

Defendants are domiciled in Arkansas while the Kherkher and Nunez Defendants are domiciled in Texas and the Nunez Defendants traveled to Arkansas at one point, it can be reasonably assumed at the pleading stage that these defendants coordinated via interstate mail or wire.  Finally, Hatfield alleges that such communications were in fact made via interstate mail or wire on at least two occasions within the past ten years (Doc. 18, pp. 42–45).  Hatfield pleads that Kherkher specifically called and e-mailed Hatfield in an effort to make him stand down.  He pleads that mail or wire was used to transmit the fraudulently-obtained Pirani Contract.  He also alleges that the Nunez Defendants used the mail or wires to coordinate their trip to Arkansas, among other things, which is as much detail as he can be expected to allege before discovery.  Therefore, Hatfield has stated a wire fraud claim against the Nunez, Kherkher, and Pirani Defendants.

> b.  Existence of an Enterprise

A RICO enterprise has three basic structural characteristics: "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose."  *Boyle*, 556 U.S. at 946.  Here, Hatfield alleges that the Nunez, Kherkher, and Pirani Defendants operated together with the purpose of acquiring cases, so the first characteristic is met here.  The second characteristic does not require "a hierarchical structure or chain of command; decisions may be made on an ad hoc basis and by any number of methods." *Id.* at 948.  Rather, "the group must function as a . . . unit." *Id.*  Here, Hatfield alleges that the Nunez, Kherkher, and Pirani Defendants coordinated their activities, that the Nunez Defendants frequently procured cases for the Kherkher Defendants, and that the Pirani Defendants were brought in to interfere with Vidal and Hatfield's relationship.  This indicates that the parties had a working relationship with each other as well as distinct roles in the scheme.  Finally, Hatfield alleges that the enterprise stretched from mere days after the fatal accident to post-settlement

litigation over Hatfield's lien, during which time these Defendants acquired two sets of clients, settled two cases, and received at least one payout.  This was sufficient time to accomplish the enterprise's goals, which were indeed accomplished.  Therefore, Hatfield has properly alleged the existence of an enterprise.

Defendants assert that they cannot collectively be an "enterprise" because they have no association besides their participation in the alleged scheme.  However, the Eighth Circuit has held that "[s]eparating the enterprise from the pattern of racketeering activity is generally not problematic when a legal entity is involved." *Atlas Pile Driving Co. v. DiCon Fin. Co.*, 886 F.2d 986, 996 (8th Cir. 1989) (quoting *United States v. Kragness*, 830 F.2d 842, 855 n. 10 (8th Cir. 1987)).  In *Atlas*, the enterprise's participants consisted of a real estate development corporation, a carpentry subcontractor, a construction loan company, a real estate holding company that also performed general contracting, and the individuals who had formed them.  *Atlas*, 886 F.2d at 988. The Eighth Circuit held that because the enterprise "sold real estate, loaned money to develop properties, performed subcontracting work, and built single-family residences," it had the required "organizational pattern . . . beyond what was necessary to perpetuate the predicate crimes." Similarly, Defendants here are law firms and their affiliates, including two lawyers.  Absent the fraud alleged, they could have legitimately solicited clients, litigated cases, and affiliated with one another.  Therefore, Hatfield has properly pled that these Defendants acted as an enterprise.

The Kherkher and Pirani Defendants claim that they were not party to the Nunez Defendants' case-running scheme and therefore cannot be involved in an enterprise to illegally and unethically secure clients.  The Kherkher Defendants, however, cannot get around Hatfield's pleadings.  Hatfield alleges that the Kherkher Defendants coordinated with the Nunez Defendants to pay the decedents' funeral expenses and even used their payment of the funeral expenses to

prevent the Recinos from firing them.  Further, Hatfield alleges that the Nunez and Kherkher Defendants have an arrangement whereby the former procure big-rig cases for the latter.  Coupled with the fact that Nunez Law Firm was also a party to the Kherkher Contract, Hatfield has plausibly alleged that the Kherkher Defendants were involved in illegally and unethically securing clients. *Salinas v. United States*, 522 U.S. 52, 64 (1997) ("If [RICO] conspirators have a plan which calls for some conspirators to perpetrate the crime and others to provide support, the supporters are as guilty as the perpetrators.").

Similarly, while the Pirani Defendants were not part of the case during the case-running itself, Hatfield alleges that they unethically solicited Vidal as a client despite knowing of Vidal's existing contract with Hatfield.  Hatfield also alleges that the Pirani, Nunez, and Kherkher Defendants worked together to prevent Vidal from communicating with Hatfield before Vidal signed the Pirani Contract.  Taken with the Pirani Defendants' knowledge of the Nunez and Kherkher Defendants' earlier unethical activities, this certainly indicates a scheme to illegally and unethically secure clients.  Therefore, the Pirani Defendants are properly alleged to have been part of the conspiracy.  *Salinas*, 522 U.S. at 65 ("A [RICO] conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive . . . offense, but it suffices that he adopt the goal of furthering or facilitating the . . . endeavor.)

    c.  <u>Pattern of Racketeering</u>

"[T]o prove a pattern of racketeering activity a plaintiff . . . must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989).  Predicates are related if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* at 240.  Here,

Hatfield alleges that the predicates were committed with the purpose of obtaining and maintaining legal contracts, resulted in contracts with both of the decedents' families, had at least the Kherkher and Nunez Defendants as regular participants (with participation by the Pirani Defendants later on), and targeted families of the recently deceased. This is sufficient to show a relationship between the predicates.

The predicates must also amount to or otherwise constitute a threat of continuing racketeering activity. *H.J. Inc.*, 492 U.S. at 239. "[T]he threat of continuity is sufficiently established where the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes." *Id.* at 242–43. As alleged, the Nunez Defendants are such an association, flouting Texas law with their solicitation practices. "The continuity requirement is likewise satisfied where it is shown that the predicates are a regular way of conducting defendant's ongoing legitimate business." *Id.* at 243. Here, the Kherkher Defendants operate a law firm, and allegedly have a standing arrangement with the Nunez Defendants to acquire clients in big-rig cases. As such, a threat of continuity has been established twice over. Therefore, Hatfield has properly pled a pattern of racketeering.

    d.  <u>Actual Injury</u>

"To have standing to make a RICO claim, a party must have 1) sustained an injury to business or property 2) that was caused by a RICO violation." *Gomez*, 676 F.3d at 660 (quoting *Asa-Brandt, Inc. v. ADM Inv. Servs., Inc.*, 344 F.3d 738, 752 (8th Cir. 2003)). The Supreme Court requires a showing of proximate causation to establish actual injury in a RICO case. *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992). This entails "some direct relation between the injury asserted and the injurious conduct alleged." *Id.*

*Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008), controls here.  In that case, Cook County assigned valuable tax liens on a rotating basis to buyers who agreed not to charge property owners a penalty in addition to the delinquent taxes.  *Id.* at 642–43.  To ensure fairness, Cook County forbade buyers from using agents or related entities to put simultaneous bids on the same parcel.  *Id.* at 643.  When one buyer secretly used related entities to bid in violation of the rule, another buyer sued, alleging a RICO conspiracy between the entities.  *Id.* at 644–45.  The Supreme Court held that the plaintiff buyer was actually injured by the defendants' scheme because it "lost valuable liens [it] otherwise would have been awarded."  *Id.* at 649.  The fact that the predicate fraud was on Cook County, and not the plaintiff, was irrelevant:

> Suppose an enterprise that wants to get rid of rival businesses mails misrepresentations about them to their customers and suppliers, but not to the rivals themselves.  If the rival businesses lose money as a result of the misrepresentations, it would certainly seem that they were injured in their business "by reason of" a pattern of mail fraud, even though they never received, and therefore never relied on, the fraudulent mailings.

*Id.* at 649–50.

With respect to the Recinos estate, Hatfield has pled actual injury under *Bridge*.  As alleged, Hatfield had a valid contract with the Recinoses, and the Nunez, Kherkher, and Pirani Defendants induced Hatfield's clients to abandon it.  Accordingly, the Defendants' actions directly caused Hatfield to lose the opportunity to litigate a valuable claim which would otherwise have been "his case."  His injury as pled is less attenuated than that of the *Bridge* plaintiff, as the Recinos case had previously been "Hatfield's," while in *Bridge* the plaintiff was only assigned a smaller percentage of liens in the first instance.  Therefore, Hatfield has pled actual injury proximately caused by the scheme to acquire the decedents' survivors as clients.

Defendants cite *Regions Bank v. J.R. Oil Co., LLC*, 387 F.3d 721 (8th Cir. 2004), for the proposition that a "showing of injury requires proof of concrete financial loss, and not mere injury

27

to a valuable intangible property interest." *Regions*, 387 F.3d at 728.  That case held that a security interest, as a contractual right of repayment, was an "intangible property interest."  *Id.* at 730.  It is difficult to see how this holding survives *Bridge*, which found an injury where the plaintiff received a reduced number of such interests in the first instance.  It is true that at least one Eighth Circuit case which postdates *Bridge* cites the *Regions* intangible-property rule.  *See Gomez*, 676 F.3d at 660.  But in that case, no monetary loss was alleged at all, and the interest involved was both nebulous and without intrinsic value.  *Id.* at 661.  Here, by contrast, Hatfield allegedly had a 33% stake in a valuable claim, was allegedly more competent and diligent in the matter than Defendants were, and thus would have made an equal or better recovery for his clients than Defendants did.[9]  If the loss of this contract under these alleged circumstances does not represent a concrete financial loss to business, it is difficult to conceive of what would.

With respect to the Mejia estate, however, Hatfield's claimed injury is too attenuated to confer RICO standing.  There is no indication that these Defendants' actions directly caused the Mejias not to hire Hatfield.  Hatfield was never certain to acquire the business of Mejia's relatives.  Despite Hatfield's extensive advertising and good reputation, the Mejias would not necessarily have hired Hatfield in the absence of Defendants' scheme.  Perhaps they had a family member or close friend who was a lawyer, or would have preferred a firm that took a smaller percentage of the award.  Absent an allegation that the Mejias approached him seeking representation or had a steady business relationship with his firm,[10] the fact that Hatfield was the most likely choice does

---

[9]     These allegations also dispose of Defendants' claim that Hatfield would not necessarily have achieved a favorable settlement just because Defendants did.

[10]     Hatfield does allege in general terms that "Hatfield would have secured both estates because the deceased [sic] families knew Hatfield, they purposely sought out Hatfield for legal representation, and they signed a contract with Hatfield."  (Doc. 18, p. 32).  Taken on its own, this might indicate that there was a preexisting contractual relationship with the Mejias.  However, he

not mean that he would have been the ultimate choice in the absence of Defendants' scheme. *See Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 459 (2006) ("Ideal's lost sales could have resulted from factors other than petitioners' alleged acts of fraud. Businesses lose and gain customers for many reasons.")  This distinguishes the Mejia case from the Recinos case (where Hatfield had already been hired), *Bridge* (where the plaintiff was certain to receive some liens under the rotating assignment scheme, certain to receive fewer liens if fraudulent buyers were part of the group, and suing over this aggregate effect instead of any particular lien), and the *Bridge* hypothetical about false allegations mailed to customers and suppliers (since these were existing, not potential, customers and suppliers and the hypothetical stipulates that they were lost "as a result of" the mailings).  Accordingly, Hatfield has not pled actual injury as a result of the scheme to obtain the Mejia case.  Because the standing requirement applies to RICO generally as opposed to § 1962(c) alone, Hatfield has not stated a claim as to the Mejia case for any of his RICO allegations.

## IX.  Intentional Interference with a Contractual Expectation or Business Expectancy

All Defendants argue that Hatfield has not stated a claim for intentional interference with a contractual expectation or business expectancy under Arkansas law.[11]  The Court disagrees.

Under Arkansas law, the elements of tortious interference with contractual expectations are "(1) the existence of a valid contractual relationship or a business expectancy; (2) knowledge of the relationship or expectancy on the part of the interfering party; (3) intentional interference

---

goes on to say that only "[t]hree of the surviving relatives already sought out Hatfield." *Id.* at 33. The only relatives specifically stated in the complaint to have sought out Hatfield are Vidal, Laura, and Ever, all heirs of Recinos.  In context, therefore, it is not reasonable to infer that any of the individuals who sought Hatfield out were heirs of Mejia.

[11]     The Nunez, Kherkher, and Pirani Defendants base their arguments in large part on the assertion that the Kherkher Contract preceded the Hatfield Contract and not vice versa.  However, as Hatfield has adequately pled to the contrary, the Court must ground its analysis in his version of events.

inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted." *Stewart Title Guar. Co. v. Am. Abstract & Title Co.*, 215 S.W.3d 596, 601 (Ark. 2005). In addition, the interference must be improper. *Id.* Here, Hatfield has adequately pled the first three elements. He claims that the Hatfield Contract was the only valid contract as of November 30; that Defendants knew of the contract; and that they misled and coerced Laura, Ever, and Vidal into abandoning the Hatfield Contract and eventually signing the Kherkher and Pirani Contracts. Further, as it cannot be seriously contested that lies and coercion are "improper," Hatfield has adequately pled the nature of the interference.

This leaves the question of Hatfield's damages. Mancia argues that Hatfield cannot prove this element because (1) Hatfield voluntarily abandoned the contract and (2) if Hatfield has a valid lien of attorney as he claims, he will recover his agreed-to share of any settlement. The first point can be dismissed out of hand, as Hatfield adequately pleads that he was lied to about the existence of an earlier contract and prevented from contacting his clients. The second point was addressed *supra* within the discussion of the Court's jurisdiction over Hatfield's claims. Accordingly, Hatfield has stated an intentional interference claim with regard to the Hatfield Contract.

Hatfield has also stated a claim for intentional interference with a business expectancy in the Mejia case. Under Arkansas law, "[a]ny prospective business relationship that would be of pecuniary value constitutes a valid business expectancy." *Stewart*, 215 S.W.3d at 603 (quoting RESTATEMENT (SECOND) OF TORTS § 766B, cmt. c (1979)). Hatfield's allegations that he was a well-known accident lawyer in the area and that the Mejias knew him appear sufficient to establish the Mejias as a "prospective business relationship." *See Stewart*, 215 S.W.3d at 603 ("In such cases, there is a background of business experience on the basis of which it is possible to estimate

with some fair amount of success both the value of what has been lost and the likelihood that the plaintiff would have received it if the defendant had not interfered.") (quoting W. Page Keeton et al., PROSSER & KEETON ON THE LAW OF TORTS § 130, at 1006–09 (5th ed. 1984)).  This establishes the first element.  As for the second and third elements, Hatfield alleges that the Nunez and Kherkher Defendants "had knowledge of Hatfield's valid business expectancy" and that their interference was "intentional." (Doc. 18, pp. 72–73).  Under Federal Rule of Civil Procedure 9(b), these general allegations are sufficient to establish knowledge and intent.  Hatfield's allegations regarding the interference itself are sparse, but the Court can infer that they consisted of the unethical and fraudulent solicitation of the Mejias.  Finally, Hatfield alleges that he would have received an identical or better result for the Mejias than did Defendants, thereby earning himself a valuable contingency fee.  Accordingly, Hatfield has also stated a claim for intentional interference with a business expectancy with regard to the Mejia case.

## X.   Arkansas Deceptive Trade Practices Act

Defendants argue that Hatfield's Arkansas Deceptive Trade Practice Act claim is improper because the ADTPA does not apply to the practice of law.  This Court agrees.  The Arkansas Supreme Court has frequently held as much.  *See, e.g., Bennett & DeLoney, P.C. v. State ex rel. McDaniel*, 388 S.W.3d 12, 15–16 (Ark. 2012) (lawyers could not be sued under ADTPA for collecting illegally high fees for dishonored checks as part of their law practice); *Born v. Hosto & Buchan, PLLC*, 372 S.W.3d 324, 334 (Ark. 2010) (lawyers could not be sued under ADTPA for improper debt-collecting practices which were part of their business, even where the plaintiff debtor was not a client of the firm).  This is because "[o]versight and control of the practice of law is under the exclusive authority of the judiciary."  *Preston v. Stoops*, 285 S.W.3d 606, 609 (Ark. 2008).  The deceptive trade practices alleged in this case took place within the context of

Defendants' practice of law.  Therefore, Hatfield cannot state a claim under the ADTPA.  Because no set of facts would allow Hatfield to circumvent the clear rule in the Arkansas cases, this claim will be dismissed with prejudice.

**XI.   Fraud**

The Kherkher Defendants argue that Hatfield's fraud claim against them fails because he does not allege that false representations were made to him or that he relied on those representations.  The first point is flatly wrong, as Hatfield alleges that Kherkher lied to him about having a preexisting contract with the Recinoses.  The second is more questionable.  Hatfield claims that Kherkher's misrepresentation induced him to give up his clients' case, but he also alleges that Defendants' endeavors to prevent his clients from communicating with him made it impossible to proceed.  Nevertheless, Hatfield's action in filing a lien of attorney shortly after Kherkher made the misrepresentations to him indicate that he thought his relationship with at least some of the clients was over.  On a motion to dismiss, drawing all reasonable inferences in Hatfield's favor, this is enough to infer that Hatfield did abandon the case as to Laura and Ever.

With this in mind, Hatfield has stated a constructive fraud claim under Arkansas law.  The elements for this cause of action are "(1) a false representation of a material fact; (2) knowledge that the representation is false or that there is insufficient evidence upon which to make the representation; (3) intent to induce action or inaction in reliance upon the representation; (4) justifiable reliance on the representation; and (5) damage suffered as a result of reliance." *Worley v. City of Jonesboro*, 385 S.W.3d 908, 915 (Ark. Ct. App. 2011).  As stated above, Hatfield alleges that Kherkher lied about a preexisting contract.  Kherkher would naturally have known that this was a false representation and told it as a means of getting Hatfield to "stand down."  While Hatfield was suspicious of Kherkher, he did ultimately rely on the representation and was justified

32

in doing so given that his clients had abruptly stopped communicating with him, which corroborated Kherkher's story.  Finally, as discussed above, the loss of the contract caused Hatfield financial damage which may not be fully remedied even if his lien is enforced.  Accordingly, Hatfield has stated a constructive fraud claim against the Kherkher Defendants under Arkansas law.

Hatfield also raises fraud claims against the Pirani Defendants, but these are much less detailed.  He alleges only that "[t]he Pirani Defendants made material misrepresentations of material facts concerning the [Pirani Contract], including how it was solicited."  (Doc. 18, p. 73).  This falls well short of Rule 9's requirement that the "who, what, when, where, and how" of fraud claims be pled with specificity.  Accordingly, Hatfield has failed to state a claim for fraud against the Pirani Defendants.

## XII.    Civil Conspiracy

Defendants argue that Hatfield's civil conspiracy claim should be dismissed because Hatfield has not stated a claim for an underlying tort.  As detailed above, Hatfield has stated claims for two underlying torts.  Further, he has met the pleading requirements for civil conspiracy by alleging "a combination of two or more persons to accomplish a purpose that is unlawful or oppressive or to accomplish some purpose, not in itself unlawful, oppressive or immoral, by unlawful, oppressive or immoral means, to the injury of another."  *Dodson v. Allstate Ins. Co.*, 47 S.W.3d 866, 876 (Ark. 2001).  Hatfield has alleged both a combination to accomplish an unlawful purpose (interference with a contractual expectancy and fraud) and a combination to accomplish an otherwise-acceptable purpose (acquiring clients) through unlawful, oppressive, or immoral means (including by interfering with Hatfield's contract).  Accordingly, Hatfield has stated a claim for civil conspiracy under Arkansas law.

## XIII.    Punitive Damages

Mancia argues that Hatfield has not shown the malice required for an award of punitive damages.  The Court disagrees.  In Arkansas, a plaintiff seeking punitive damages must prove that "[t]he defendant knew or ought to have known, in light of the surrounding circumstances, that his or her conduct would naturally and probably result in injury or damage and that he or she continued the conduct with malice or in reckless disregard of the consequences, from which malice may be inferred."  Ark. Code Ann. § 16-55-206(1).  Here, Hatfield alleges that Mancia coerced the Recinoses into abandoning the Hatfield contract using threats of violence.  As such, he either knew or should have known that he was interfering with Hatfield's contract to Hatfield's detriment, and proceeded regardless.  Therefore, Hatfield properly states a claim for punitive damages under Arkansas law.

## XIV.    Conclusion

IT IS THEREFORE ORDERED that:

- Count 7 of Hatfield's First Amended Complaint, relating to ADTPA, is DISMISSED WITH PREJUDICE.

- Count 11 of Hatfield's First Amended Complaint, the fraud allegation, is DISMISSED WITHOUT PREJUDICE as to the Pirani Defendants but remains for trial as to the Kherkher Defendants.

- Count 15 of Hatfield's First Amended Complaint, seeking to void the Pirani Contract, is DISMISSED WITHOUT PREJUDICE.

- Counts 1–6 of Hatfield's First Amended Complaint, relating to RICO violations, remain for trial with the caveat that Hatfield has only pled actual injury as to the Recinos estate, not the Mejia estate.

- All other claims remain for trial.

IT IS SO ORDERED this 9th day of November, 2022.

/s/ P. K. Holmes, III
P.K. HOLMES, III
U.S. DISTRICT JUDGE