**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION**


**JASON M. HATFIELD, P.A.**                                                    **PLAINTIFF**

**VS.**                              **CASE NO. 5:22-CV-05110-PKH**

**MICHAEL MCCOY, ET AL.**                                         **DEFENDANTS**

---

**KHERKHER DEFENDANTS' BRIEF IN SUPPORT OF MOTION
TO EXCLUDE TESTIMONY OF RALPH SCOTT, JR., PH.D.**

---

Defendants Kherkher Garcia, LLP ("Kherkher Garcia"), Steven Kherkher, Jesus Garcia, and Kevin Haynes (collectively, the "Kherkher Defendants"), and for their Brief in Support of their Motion to Exclude Testimony of Ralph Scott, Jr., Ph.D., state:

**<u>INTRODUCTION</u>**

Plaintiff Jason M. Hatfield, P.A. ("Hatfield") has designated Ralph Scott, Jr., Ph.D., ("Dr. Scott") as an expert witness he plans to call at trial to provide various opinions related to the amount of monetary damages the jury should award in this case. Dr. Scott's opinions relate to loss of life damages as well as damages for loss of future income, loss of corresponding fringe benefits, and lost household services related to the Estate of Flor Maribel Recinos Valle. *See, generally*, Report of Ralph Scott, Jr., Ph.D., a true and correct copy of which is attached hereto as <u>Exhibit A</u>. While some of those damages may be recoverable in a wrongful death case, this is not that type of case. Rather, this is an action brought pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO") with pendant state law claims. None of those claims involve a wrongful death claim on behalf of the Estate of Flor Maribel Recinos Valle.

The crux of Hatfield's claims in this case is his erroneous belief that he was illegally prevented from representing the Estate of Flor Maribel Recinos Valle ("Ms. Recinos") in a wrongful death action filed by the Kherkher Defendants in Washington County, Arkansas. That action, however, was settled before trial and no jury was ever tasked with determining the amount of monetary damages to award on any claims. In the instant case, Hatfield theoretically hopes to introduce Dr. Scott's testimony at trial so this federal jury can speculate as to what the hypothetical jury in the state court matter might have awarded in damages despite the fact that case never got close to trial. Hatfield's case-within-a-case approach has no application to this RICO action.

The Court should exclude Dr. Scott's opinions and testimony for several reasons. First, the Court (like many other courts before) should exclude Dr. Scott's opinions regarding loss of life damages because, under applicable law, the valuation of a decedents' loss of life is an issue squarely within the jury's realm of experience and understanding, and allowing such expert testimony would invade the functions of the jury. Second, a straightforward application of the *Daubert* standard reveals that Dr. Scott's testimony is inherently unreliable because it is not based upon reliable and peer-reviewed methods and procedures of economics. Third, the Court should not allow Dr. Scott to testify as to his opinions regarding loss of future income, loss of fringe benefits, or the value of lost household services, because they are not an element of damages available to an estate in Arkansas and are, therefore, irrelevant. Fourth, the Court should not allow Dr. Scott to testify as to the value of lost household services because he has no knowledge of the household services Ms. Recinos provided and the value of any such services is also within the province of the jury. Fifth, the Court should not allow Dr. Scott to testify about punitive damages because there is no clear and convincing evidence from the underlying state court matter that would put punitive damages at issue if that case had ever gone to trial.

## **LEGAL STANDARD**

"Expert opinion testimony is admissible only if it 'will assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Peterson v. City of Plymouth*, 60 F.3d 469, 475 (8th Cir. 1995) (quoting Fed. R. Evid. 702). "Federal Rule of Evidence 702 governs the admissibility of expert testimony, and under this rule the district court is vested with a gatekeeping function," which ensures that any and all expert testimony is relevant and reliable. *In re Bair Hugger Forced Air Warming Devices Products Liability Lit.*, 9 F.4th 768, 776-77 (8th Cir. 2021). "Rule 702's 'screening requirement' has been boiled down to a three-part test." *Id.*, at 777. "First, the testimony must be useful to the finder of fact in deciding the ultimate issue of fact, meaning it must be relevant." *Id.* "Second, the expert must be qualified to assist the finder of fact." *Id.* "Third, the testimony must be reliable or trustworthy in an evidentiary sense." *Id.* The proponent of expert testimony bears the burden of proving its admissibility by a preponderance of the evidence. *Id.* at 776. However, even when expert testimony is otherwise admissible, it should be excluded under Federal Rule of Evidence 403 if its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence. *United States v. Coutentos*, 651 F.3d 809, 821 (8th Cir. 2011).

## **ARGUMENT**

**A.      Dr. Scott's Opinions as to Loss of Life Damages are Irrelevant and Seek to Usurp the Role of the Jury.**

By far the largest component of Dr. Scott's opinions and anticipated testimony in this case relates to his calculation of loss of life damages for Ms. Recinos. Loss of life damages seek to compensate the decedent "for the loss of the value that the decedent would have placed on his or her own life." *Durham v. Marberry*, 356 Ark. 481, 492, 156 S.W.3d 242, 249 (2004). Despite

this subjective standard based upon what Ms. Recinos believed, Hatfield intends to offer the testimony of Dr. Scott, an economist, to provide opinions as to the value of Ms. Recinos' life. *See* Ex. A–C of Dr. Scott's Report.

The Court should exclude that testimony for two separate reasons. First, as a threshold matter, Hatfield should not be allowed to introduce expert testimony in support of the claim for loss of life damages because the pertinent inquiry — the value of a lost human life measured from the perspective of the decedent — is squarely within the jury's purview. An economist is no better equipped to place a dollar figure on loss of life value under the *Durham* standard than the ordinary juror. Not only would expert testimony not be helpful to the jury's determination of that issue, but it would also invade the function of the jury. That problem is compounded in this case where Hatfield seeks to use Dr. Scott's opinions and testimony in mind-bending fashion to have this federal court jury speculate as to what a hypothetical jury in a state court wrongful death case that never went to trial might have awarded in loss of life damages. For these reasons, Dr. Scott's opinions on loss of life damages should be excluded from trial.

Second, even if loss of life damages were an appropriate area for expert opinions — and many courts, including in this district, have squarely held it is not — Dr. Scott's opinions are inherently unreliable under the *Daubert* standard and are therefore inadmissible. Dr. Scott's valuation uses the "value of statistical life" ("VSL"), a methodology developed by the federal government for budgetary and regulatory purposes, purposes which have nothing to do with a decedent's personal belief as to the value of her life. Dr. Scott intends to offer VSL values to the jury as examples of the "residual value" of Ms. Recinos' life — the intangible element of life that cannot be compensated with lost earnings. Dr. Scott uses the VSL in a manner in which its creators never meant for it to be applied. No peer reviewed articles support the use of VSL in this manner.

The data Dr. Scott uses in his calculations of the VSL has not and cannot be tested, and the data also does not bear any relation to the actual circumstances of Ms. Recinos' life.  Dr. Scott has not made any effort to prove that VSL is a proper method to use in valuing loss of life damages or to connect the particular VSL values that he selected to the facts in this case, and state and federal courts in Arkansas have refused to permit him to present these opinions.  In fact, Dr. Scott himself acknowledges that he has never been permitted to provide such testimony to any federal jury and, in his own words, his methodology is "controversial."  Deposition of Ralph Scott, Jr., Ph.D., a true and correct copy of which is attached hereto as Exhibit B, at 50:16–51:1.  This Court should do the same.

      1.     **Dr. Scott's Opinions and Testimony are Not Admissible to Establish Loss of Life Damages Because that Inquiry Falls Within the Purview of the Jury.**

The value of a person's life is a matter firmly within the purview of the jury, and therefore expert testimony is not admissible to determine loss of life damages.  Under Arkansas law, loss of life damages seek to compensate the decedent "for the loss of the value that the decedent would have placed on his or her own life."  *Durham*, 356 Ark. at 492, 156 S.W.3d at 249.  This concept — the value of a human life — is uniquely within the understanding of a jury.  *See Morrin v. Kopling*, 2014 Conn. Super. LEXIS 2083, at *45 (Conn. Sup. Aug. 26, 2014) ("'Establishing damages for wrongful death is a task peculiarly within the expertise of a jury' insofar as it 'defies any precise mathematical computation.'").  The Arkansas Supreme Court stated as much in *Durham*, noting that the determination of loss of life damages is "within the purview of the jury" because:

> No rule has been established – and in the nature of things can be – for determining what compensation should be paid for loss of life, for pain and suffering, for loss or decrease of earning power, for mental anguish accompanied by physical injury, for loss of companionship, and for the various elements entering into damages actions.

*Durham*, 356 Ark. at 493, 156 S.W.3d at 249.  A jury asked to determine a decedent's loss of life is considering "the destruction of the capacity to carry on life's activities."  *Id.*, at 490, 156 S.W.3d at 247.  It is a task of "measuring the immeasurable."  *McMullin v. United States*, 515 F. Supp. 2d 914, 927 (E.D. Ark. 2007) (discussing the fact finder's valuation of a 17-month-old child's loss of life).

The task of valuing loss of life is a particularly human undertaking; it "is not something to be measured in dollars and cents because the worth of human life is incommensurate with money." *Bennett v. United States*, No. 4:04-CV-00076-JLH (E.D. Ark. Mar. 3, 2005).  As the Hawaii Supreme Court aptly stated when it rejected the use of expert testimony in the context of loss of life damages:

> ***The measurement of the joy of life is intangible.  A jury may draw upon its own life experience in attempting to put a monetary figure on the pleasure of living***.  It is "a uniquely human endeavor . . . requiring the trier of fact to draw upon the virtually unlimited factors unique to us as human beings."  ***Testimony of an economist would not aid the jury in making such measurements because an economist is no more expert at valuing the pleasure of life than the average juror***.  "[T]he loss of enjoyment of life resulting from a permanent injury is . . . not subject to an economic calculation."

*Montalvo v. Lopez*, 884 P.2d 345, 366–67 (Haw. 1994) (emphasis added) (citations omitted).

Allowing Dr. Scott to impose his unreliable opinions into an area that is well within the jury's ability to determine on its own would be unduly prejudicial to defendants because it would lend Hatfield's damages theories the air of authority inherent to expert testimony while usurping the jury's role as the fact finder.  Indeed, Dr. Scott himself testified that there is no way for an expert to testify as to the value that a particular individual decedent would have placed on their own life.  *See* <u>Exhibit B</u>, at 46:15–25.  For these reasons, Hatfield should not be allowed to present Dr. Scott's testimony in support of their claims related to loss of life damages in the underlying state court matter that never went to trial.

**2.     Dr. Scott's Opinions and Testimony are Neither Reliable Nor Relevant Under the *Daubert* Standard Governing the Admissibility of Expert Testimony and Therefore Should be Excluded.**

Beyond the fact that expert testimony is inappropriate on the question of loss of life damages, Dr. Scott's opinions do not pass muster under the test for the admissibility of expert testimony.  Under Rule 702 of the Federal Rules of Evidence, if "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue" then a "witness who is qualified as an expert by knowledge, training, or education may testify in the form of an opinion or otherwise[.]"  Fed. R. Evid. 702.  The United States Supreme Court's seminal decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), provides the analytical framework for the Court's consideration of the admissibility of expert and scientific testimony.

The *Daubert* test imposes two distinct requirements for the admission of proffered expert testimony.  509 U.S. at 589–93.  First, the evidence must be reliable, meaning that the underlying methodology from which the expert derives the evidence (not draws a conclusion) must have its basis in "scientific knowledge."  *Id*.  Second, the evidence must be relevant, such that the proffered expert testimony must assist the trier of fact to understand or determine a fact in issue.  *Id*.  Because the interpretation of Rule 702 is a flexible one, "[t]he focus, of course, must be solely on principles and methodology, *not on the conclusions that they generate*."  *Daubert*, 509 U.S. at 594–95 (emphasis added).  This standard applies to all expert testimony, not just "scientific" testimony.  *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999).

This Court's chief role in this analysis is that of a "gate-keeper."  *Daubert*, 509 U.S. at 597.  In this role, the Court makes a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology can

be applied to the facts at issue." *Id*. at 592–93.  The United States Supreme Court held in *Daubert* that Fed. R. Evid. 702 imposes an obligation on the trial court "to ensure that any and all scientific testimony . . . is not only relevant, but reliable." *Id.* at 589.  The Court's principle responsibility in its gate-keeping function "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.,* 536 U.S. at 152.

The proponent of expert testimony carries the burden of satisfying the *Daubert* requirements, meaning that Hatfield has the burden of proving that Dr. Scott meets the standard. *United States v. Williams*, 95 F.3d 723, 729 (8th Cir. 1996).  In attempting to meet this burden for admission of the expert's opinion testimony, the proponent of the evidence cannot rest upon the expert's conclusory opinions and self-serving explanations as to why his or her theories are reasonable and reliable with reference to the factual data applicable to the case.  *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  Thus, if any one of the foundational elements of an expert opinion— qualifications, reliable method, fit, basis in data used by experts—is found lacking, the proffered evidence is not admissible.  Dr. Scott's opinions fall far short of this standard.

> **a.     Dr. Scott's Opinions are Unreliable Because They Satisfy None of the Factors Used to Determine Reliability of Expert Opinions.**

With regard to the reliability requirement, the *Daubert* court discussed four factors for making a determination as to whether proffered expert testimony has a basis in valid principles and methodology:

1)      whether the theory or technique can be and has been tested;

2)      whether the theory or technique has been subjected to peer review and publication;

3)     the known rate of error of the technique and the existence and maintenance of standards controlling the technique's operation; and

4)     whether the technique is generally accepted in the scientific community.

*Daubert*, 509 U.S. at 593–96.  This list is non-exhaustive, so other factors might also be considered in the inquiry as well.

Dr. Scott has testified that he will use the federal government's value of statistical life ("VSL") estimates to inform the jury as to the value of Ms. Recinos' life.  *See* <u>Exhibit B</u>, at 33:16–34:21.  The use of VSL to establish loss of life damages is inherently unreliable under the *Daubert* standard.  Hatfield cannot show that this methodology meets any of the enumerated criteria listed above.  In fact, courts have found that proponents of expert opinions "calculating" loss of life based upon VSL have failed to show that the methodology has been generally accepted in the scientific community.

For instance, an Illinois federal court cited a study in the *Journal of Forensic Economics* finding that more than 80% of economists surveyed *would **not** use VSL* for the purpose of determining lost enjoyment of life.  *Stokes v. John Deere Seeding Grp.*, No. 4:12-CV-04054-SLD, 2014 U.S. Dist. LEXIS 21725, at *18 (C.D. Ill. Feb. 21, 2014) (citing Michael L. Brookshire, et al., *A 2009 Survey of Forensic Economists: Their Methods, Estimates, and Perspectives*, 21 J. Forensic Econ. 5 (2009)).  This study "must at least raise strong doubts as to whether [this] methodology can be termed 'generally accepted.'"  *Id.*  Ultimately, "there is no basic agreement among economists as to what elements ought to go into life valuation."  *Id.* (quoting *Mercado v. Ahmed*, 756 F. Supp. 1097, 1103 (N.D. Ill. 1991)).  Obviously, Dr. Scott's method does not have general acceptance in the scientific community.  Indeed, even Dr. Scott acknowledges that his approach to loss of life calculations is "controversial." <u>Exhibit B.</u>, at 50:16–51:1.

The opinions Dr. Scott seeks to provide in this case are routinely excluded by federal courts in Arkansas.  For instance, United States District Judge Brian S. Miller previously concluded that Dr. Scott's methodology is unreliable because it cannot be tested.  *See Smith v. Trans-Carriers, Inc.*, No. 4:15-CV-253-BSM (E.D. Ark. May 17, 2016).  After reciting the *Daubert* reliability factors, Judge Miller explained his conclusion as follows:

> "Loss-of-life damages seek to compensate a decedent for the loss of the value that the decedent would have placed on his or her own life." *Durham v. Marberry*, 156 S.W.3d 242, 248 (Ark. 2004).  This court has explained that an expert opinion similar to the one being proffered by Dr. Scott cannot be tested because the value a decedent would have placed on his own life cannot truly be determined.  *See McMullin v. United States*, 515 F. Supp. 2d 914, 924 (E.D. Ark. 2007).  "Stated otherwise, [Arkansas law on loss-of-life damages] does not provide the standard as to which an expert could apply his/her expertise." *Id.* at 925.  Consequently, the expert testimony being proffered by Dr. Scott is unreliable and is therefore inadmissible."

*Id.*, at 1–2; *see also Hannibal, et al. v. TRW Vehicle Safety Sys., Inc.*, No. 4:16-CV-904-JLH (E.D. Ark. Aug. 9, 2018) (explaining that "an overwhelming majority of courts from other jurisdictions" have found that the VSL methodology does not meet the *Daubert* standard and may not be admitted into evidence); *Travis v. Asus Computer International, et al.*, No. 6:18-CV-6042-BRW (E.D. Ark. Aug. 28, 2019) (excluding Dr. Scott's testimony for loss of life damages for the same reason set out in *Hannibal*); *Stovall v. Mack Trucks, Inc.*, No. 4:16-CV-713-JM, 2022 U.S. Dist. LEXIS 192488, at *5–7 (E.D. Ark. Oct. 21, 2022) (excluding Dr. Scott's expert testimony about loss of life damages based on VSL computations as unreliable and would not assist the jury in determining what value the decedent placed on her own human life as it has nothing to do with the decedent specifically); *Crouch v. Master Woodcraft Cabinetry, LLC*, No. 2:20-CV-00078-KGB, 2021 U.S. Dist. LEXIS 172785, at *10–14 (E.D. Ark. Sept. 13, 2021) (excluding Dr. Scott's expert testimony about his loss of life calculations based on VSL data as unreliable and not helpful to the jury).

Dr. Scott has admitted he has not made any attempt to change his methodology for obtaining loss of life valuations based on the various rulings that have excluded his testimony. *See* Exhibit B, at 37:15–38:10. Dr. Scott has also acknowledged that his methodology in calculating loss of life damages is not subject to being tested by any other expert. *Id.*, at 47:1–10. As such, the Court should reach the same decision as Judges Miller, Wilson, Holmes, Moody, and Baker here, where Dr. Scott is offering opinions based upon the same unreliable methodology.

Hatfield simply cannot meet his burden of demonstrating that Dr. Scott's methodology is reliable under the *Daubert* test for expert opinion testimony. The Court therefore should exclude any effort to provide such opinions at trial.

> **b.      Dr. Scott's Opinions are Not Relevant Because VSL Has Nothing to Do With the Value that Ms. Recinos Placed on Her Own Life.**

The Supreme Court in *Daubert* described the second requirement, relevance, as being an inquiry into "fit." Establishing fit requires the proponent of the evidence to show a "valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Daubert*, 509 U.S. at 591–92. Fit might not always be obvious, and "scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." *Id*. at 591. An example of a case where lack of fit defeated the proffer of expert opinion testimony is *Gier v. Educational Services Unit*, 66 F.3d 940, 944 (8th Cir. 1995). In *Gier*, the Eighth Circuit affirmed the exclusion of psychologist expert opinion testimony that was premised on a methodology that the court found to have usefulness only as a therapy guide, not for a finding on the issue in question, which was whether a child was abused. *Id*. The Eighth Circuit concluded that the methodology lacked sufficient reliability to make factual or investigative conclusions in a legal proceeding. *Id*. In other words, the mere fact that a methodology has some utility in some circumstances does not make it admissible unless its utility extends also to the question at hand in the legal proceedings.

The VSL on which Dr. Scott relies does not extend to the question that would have been before the hypothetical state court jury in the wrongful death case, which is the value that Ms. Recinos would have placed on her own life. *Durham*, 356 Ark. at 492, 156 S.W.3d at 249. Indeed, Dr. Scott admits that he has not made any attempt to determine the value that Ms. Recinos would have placed on her own life, Exhibit B, at 47:11–19, as is required under Arkansas law. For instance, Dr. Scott acknowledges that he was not acquainted with Ms. Recinos, knew nothing about the kind of relationship she had with her family, did not know if she enjoyed any particular activities, whether she was observed any particular religion, or whether she participated in any social groups. *See id.*, at 47:25–48:20.

Rather than addressing the value Ms. Recinos would have placed on her own life, VSL addresses the question of the benefit of regulations in terms of reducing the risk of mortality. *See* Michael A. Livermore, *Cost-Benefit Analysis and Agency Independence*, 81 U. Chi. L. Rev. 609, 647 (2014). Such "studies do not relate in any way to the actual component of damages, the enjoyment of life." *Smith v. Jenkins*, 732 F.3d 51, 67 (1st Cir. 2013) (quoting *Wilt v. Buracker*, 443 S.E.2d 196, 205 n.15 (W.Va.1993)); *see also Sullivan v. U.S. Gypsum Co.*, 862 F.Supp. 317, 321 (D.Kan.1994) ("The studies relied on by Mr. Smith do not use methodology designed to calculate the loss of enjoyment of life, yet are nonetheless extrapolated by Mr. Smith into what he claims to be valid data for ... loss of enjoyment of life."). And as Dr. Scott acknowledged, under his methodology, his loss of life damages calculation would be the same for a happily married mother of two children, active in her hobbies, and active in her community, as compared to a woman who was unhappy, unhealthy, and even suicidal. *See* Exhibit B, at 50:4–15. Dr. Scott's methodology plainly does not take into account any individual characteristics of the decedent or any personal value that person would place on their own life.

VSL has not been generally accepted by the professional community for the purpose of determining loss of life damages.  VSL attempts to measure how cautious a specific group of people are by estimating a risk-money relationship for certain risk levels.  VSL does not measure how much *an*y person values their own life because there is no evidence to suggest that the risk-money relationships used to estimate the VSL can be extrapolated to accurately measure how much *any* person, much less the particular person at issue in this case, values her own life.  And Dr. Scott acknowledges that the federal government's VSL calculations are not designed to place a specific value on any specific person's life in contrast to requirements under Arkansas law for determining loss of life damages.  *See* Exhibit B, at 45:24–46:14.

At a more specific level, Dr. Scott has relied on VSLs from the Department of Transportation ("DOT") and the Environmental Protection Agency ("EPA") in reaching his "calculations" of loss of life damages.  *See* Exhibit A, at Scott 037–60; Exhibit B, at 17:13–18:19.  However, the DOT and EPA have explained that the purpose of VSLs is wholly different.  The DOT has explained specifically that its VSL calculations are done because agencies are required "to evaluate in monetary terms the costs and benefits of their regulations, investments, and administrative actions," and VSL provides a basis for determining "the benefit of preventing a fatality" that is essentially subjective and is "defined as the additional cost that individuals would be willing to bear for improvements in safety (that is, reductions in risks) that, in the aggregate, reduce the expected number of fatalities by one."  Department of Transportation, *Revised Departmental Guidance: Treatment of the Value of Preventing Fatalities and Injuries in Preparing Economic Analyses*, at 1.[1]

---

[1] A PDF version of this document is available at https://tinyurl.com/mr2ks2nn (last accessed Nov. 22, 2023).

More pointedly, the EPA directly contradicts the use of VSL to value an individual lost life: "The EPA does not place a dollar value on individual lives. Rather, when conducting a benefit-cost analysis of new environmental policies, the Agency uses estimates of how much people are willing to pay for small reductions in their risks of dying from adverse health conditions that may be caused by environmental pollution." Environmental Protection Agency, *Mortality Risk Valuation*.[2] In fact, the EPA believes that the "term 'value of statistical life' can give the misleading impression that a 'price' is being placed on individual lives—as a mugger who says, 'Your money or your life!?' In reality, EPA regulations typically lead to small reductions in mortality risks (ranging up to 1 in 1,000 per year) for large numbers of people." *Id*. These agency discussions of the VSL data on which Dr. Scott relies underscore the fact that these regulatory calculations were never meant to be used as a method to determine what value a decedent placed on his or her individual life.

VSL studies used by government agencies to determine the risk-money relationship for assessing small risks for regulatory and budgetary purposes have no valid connection to determining the proper compensation for the decedent's loss of life. The Seventh Circuit succinctly explained the disconnect between VSL willingness-to-pay studies and valuations of lost life for compensatory purposes in *Mercado v. Ahmed*:

> We have serious doubts that [the] assertion that the studies [relied] upon actually measure how much Americans value life . . . . [S]pending on safety items reflects a consumer's willingness to pay to reduce *risk,* perhaps more a measure of how cautious a person is than how much he or she values life. Few of us when confronted with the threat, "Your money or your life!" would, like Jack Benny, pause and respond, "I'm thinking, I'm thinking." Most of us would empty our wallets. Why that decision reflects less the value we place on life than whether we buy an airbag is not immediately obvious.

---

[2]  Available at https://www.epa.gov/environmental-economics/mortality-risk-valuation (last accessed Nov.22, 2023).

974 F.2d 863, 871 (7th Cir. 1992) (emphasis added); *see also Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235 (10th Cir. 2000) ("Attempts to quantify the value of human life have met considerable criticism in the literature of economics as well as the federal court system. Troubled by the disparity of results reached in published value-of-life studies and skeptical of their underlying methodology, the federal courts which have considered expert testimony on hedonic damages in the wake of *Daubert* have unanimously held quantifications of such damages inadmissible.").

The government's VSL estimates simply do not "fit" for the purpose of determining loss of life damages, and any use of those estimates in this case would be grossly misleading to the jury and prejudicial to defendants. Accordingly, the Court should exclude Dr. Scott's testimony as to loss of life damages.

### 3. The Court Should Not Permit Dr. Scott to Act as a Conduit for Hearsay by Repeating VSL Numbers Without Adding any Expert Analysis to Them.

An expert is allowed under Fed. R. Evid. 703 to rely on hearsay in forming his opinion, but he cannot act as a mere conduit for hearsay. "[I]f experts rely on otherwise inadmissible hearsay, that expert's opinion may be admitted only to the extent that the facts or data 'are of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." *United States v. Martinez*, 3 F.3d 1191, 1197 (8th Cir. 1993) (quoting Fed. R. Evid. 703). However, experts "who would act as mere conduits for hearsay" should be excluded. *Williams v. Illinois*, 567 U.S. 50, 80 (2012).

Accordingly, a witness qualified as an expert may not rely upon facts, data, or opinions under Rule 703 without providing additional expert input. As the United States Court of Appeals for the Fifth Circuit has observed, "if the witness has gone to only one hearsay source and seeks merely to summarize the content of that source, then he is acting as a summary witness, not as an expert. Since he is introducing the content of the extrajudicial statements or writings to prove

truth, his testimony, like its source, is hearsay and is inadmissible unless the source qualifies under an exception to the hearsay rule." *United States v. Williams*, 431 F.2d 1168, 1172 (5th Cir. 1970), *aff'd en banc*, 447 F.2d 1285 (5th Cir. 1971), *cert. denied*, 405 U.S. 954 (1972).

Here, Dr. Scott does not add any expertise to the VSL data that he uses. Instead, he merely passed along VSL numbers as a "guide" to the jury to use as it wishes, adding nothing to the government calculations themselves. Indeed, Dr. Scott testified that at trial he would present the VSL data to the jury and leave it up to them to make a calculation. *See* Exhibit B, at 34:11–35:4. Tellingly, Dr. Scott has never done any work to determine whether the VSL data discussed in the DOT and EPA documents are actually correct. *Id.*, at 49:24–50:3. As United States District Judge Billy Roy Wilson once concluded, "having an expert witness simply summarize a document (which is just as easily summarized by a jury) with a tilt favoring a litigant, without more, does not amount to expert testimony." *In re Prempro Prods. Liab. Litig.*, 554 F. Supp. 2d 871, 887 (E.D. Ark. 2008), *aff'd*, 586 F.3d 547 (8th Cir. 2009).

Dr. Scott should not be allowed to serve as a mouthpiece for Hatfield to introduce, and lend an air of authority to, huge VSL values that are not only inappropriate for use in the context of wrongful death damages generally — let alone in a RICO case that does not include a wrongful death claim — but that Dr. Scott does not actually use in applying the tools of the economist's trade. For these reasons, the Court should prohibit Dr. Scott from providing any opinions or testimony about loss of life damages in this case.

## B. Dr. Scott's Opinions Based on Loss of Future Income, Fringe Benefits, and Household Services are Irrelevant and Inadmissible.

As part of his calculation of the economic losses that might have been awarded to the Estate of Ms. Recinos at a hypothetical jury trial in a different case, Dr. Scott includes the future income Ms. Recinos might have earned through her working life expectancy, corresponding fringe benefits

calculated as a percentage of those possible future earnings, and the loss of unidentified household services. *See* <u>Exhibit A</u>, at Scott 001. Such information is inadmissible because future earning capacity, corresponding fringe benefits, and loss of household services are not recoverable elements of damages for the Estate of Ms. Recinos in a wrongful death action.

At common law, "the rights of a tortiously injured person were extinguished by his or her death." *Estate of Hull v. Union Pac. R.R.*, 355 Ark. 547, 550, 141 S.W.3d 356, 358 (2004). A wrongful death action is a statutory creation, and it is in derogation of common law, it is strictly construed, including the recoverable elements of damages. *Id.* In such an action, there are two types of recoverable damages: estate damages and beneficiary damages. Ark. Code Ann. §§ 16-62-101–16-62-102.

"Historically, damages recovered by a decedent's estate under the survival statute, with the exception of funeral expenses, compensated the decedent and *were incurred pre-death*." *Durham*, 356 Ark. at 486, 156 S.W.3d at 244 (emphasis added). Such damages "include damages for medical expenses due to the injury, *lost wages between injury and death*, pain and suffering, etc." *Id.* at 486–87, 156 S.W.3d at 244 (emphasis added).

As Professor Howard Brill explained in his treatise on damages:

> Likewise, the estate has a claim for any earnings lost between the time of the accident and the time of the death; however, *the estate does not have a claim for loss of future earning capacity*. That latter claim is incorporated into the claim asserted by the statutory beneficiaries for pecuniary injuries.

Howard W. Brill & Christian H. Brill, 1 Arkansas Practice Series: Law of Damages, § 34:2 at 858 (6th ed. 2014) (emphasis added).

Here, there is no evidence of lost earnings prior to Ms. Recinos' death. Thus, under Arkansas law there is no basis for a claim on behalf of the estate with respect to lost income,

corresponding fringe benefits calculated as a percentage of that lost income, or the loss of household services.

As discussed above, future lost earning capacity or projected future wage loss is not a recoverable element of damages by an estate in a wrongful death case.  This is important because a wage loss claim is treated differently than pecuniary injuries of a wrongful death beneficiary.  *See Cates v. Brown*, 278 Ark. 242, 248, 645 S.W.2d 658, 661 (1983).  With this consideration in mind, any calculations of projected future gross earnings or earning capacity and fringe benefits are irrelevant as they are not a recoverable element of estate damages and, therefore, do not tend to make any fact of legal significance to the estate's wrongful death claim more or less likely. *See* Fed. R. Evid. 401 & 402.  Irrelevant evidence is inadmissible evidence; therefore, Dr. Scott's projections of lost wages and fringe benefits attributed to Ms. Recinos are inadmissible. And, as discussed in detail above, any attempt to repackage those calculations into a calculation to support loss of life damages is likewise inappropriate.

In addition to being irrelevant, Dr. Scott's opinions as to these items of damages should be excluded because his testimony is particularly speculative and not based on actual data that Dr. Scott could have obtained.  For instance, Dr. Scott opines on the measure of lost wages and fringe benefits related to Ms. Recinos' potential future employment, but he concedes that calculation was based on statistical data for employees in the poultry industry rather than on Ms. Recinos' actual payroll records.  Dr. Scott testified that he would have preferred to have the actual financial information in order to render his opinion, *see* Exhibit B, at 66:21–67:8, but he did not ask for them.

Likewise, despite opining on the value of lost household services, Dr. Scott acknowledged that he has no information whatsoever about the household services Ms. Recinos actually rendered.

*Id.*, at 31:5–32:5.  For instance, Dr. Scott testified that he did not interview any surviving family members to determine what services Ms. Recinos provided in the home and he does not otherwise know what those services might have been.  *Id.*  Instead, Dr. Scott just looked at generic statistical data about the value of household services.  *Id.*  The jury is certainly competent to place a monetary value, if any, on the household services Ms. Recinos might have provided and, as a result, Dr. Scott's opinions and testimony on this issue invade the province of the jury and he should not be allowed to provide any such testimony at trial.

**C.      Dr. Scott's Opinions Based on Punitive Damages are Irrelevant and Inadmissible.**

Dr. Scott also intends to opine and testify about two aspects of punitive damages: (1) the financial data of J.B. Hunt (the defendant in the underlying wrongful death case); and (2) Dr. Scott's computations addressing the relative impact of fines or penalties ranging from various amounts for a family with an income of $70,000.00 and $750,000.00 as compared to the net income of J.B. Hunt.  *See* Exhibit A, at Scott 159–197.  Dr. Scott has **never** been allowed to testify as to the second component of the opinion he expresses here.  *See* Exhibit B, at 64:6–65:2.  The Court should not allow Dr. Scott to present opinions or testimony related to punitive damages at the trial of this case because there is no evidence that punitive damages would have been available in the hypothetical jury trial that never occurred in the state court wrongful death action.

In order to recover punitive damages from a defendant, a plaintiff has the burden of proving that the defendant is liable for compensatory damages and that either or both of the following aggravating factors were present and related to the injury for which compensatory damages were awarded: (1) the defendant knew or ought to have known, in light of the surrounding circumstances, that his or her conduct would naturally and probably result in injury or damage and that he or she continued with malice or in reckless disregard of the consequences, from which

malice may be inferred; or (2) the defendant intentionally pursued a course of conduct for the purpose of causing injury or damage. Ark. Code Ann. § 16-55-206. A plaintiff must satisfy this burden of proof by clear and convincing evidence in order to recover punitive damages from the defendant. Ark. Code Ann. § 16-55-207. Gross negligence is not sufficient to justify punitive damages. *Orsini v. Larry Moyer Trucking, Inc.*, 310 Ark. 179, 182, 833 S.W.2d 366, 367 (1992).

The Court should not allow Dr. Scott to testify about punitive damages because there is no evidence establishing that punitive damages would have been available in the hypothetical trial that never occurred in the state court matter. That case settled well before trial and there was no evidence uncovered during discovery in that case that would have allowed the Estate of Ms. Recinos to establish at all — let alone with clear and convincing evidence — that J.B. Hunt or its driver, Keondrick Banks, acted with malice, in reckless disregard of the consequences, or intentionally harmed Ms. Recinos in the tragic motor vehicle accident that caused her death. Since a hypothetical jury in the state court action would never have been presented with the question of punitive damages, Dr. Scott should not be permitted to introduce opinions or testimony about any such punitive damages related to Ms. Recinos' motor vehicle accident. Dr. Scott's testimony on punitive damages is patently improper and inadmissible.

## CONCLUSION

For the foregoing reasons, the Kherkher Defendants respectfully request that the Court exclude the testimony and opinions of Ralph Scott, Jr., Ph.D. in their entirety.

Respectfully submitted,


By:     */s/ G. Spence Fricke*              
G. Spence Fricke, Ark. Bar No. 79068
gsfricke@barberlawfirm.com
Jerry D. Garner, Ark. Bar No. 2014134
jgarner@barberlawfirm.com
BARBER LAW FIRM PLLC
3400 Simmons Tower
425 West Capitol Avenue
Little Rock, Arkansas 72201
Telephone: (501) 372-6175

-And-

Dale Jefferson, Texas Bar No. 10607900
jefferson@mdjwlaw.com
*Admitted Pro Hac Vice*
MARTIN, DISIERE, JEFFERSON & WISDOM LLP
Niels Esperson Building
808 Travis Street, Suite 1100
Houston, Texas 77002
Telephone: (713) 632-1700

-And-

Randy Gordon, Texas Bar No. 00797838
rdgordon@duanemorris.com
Lucas Wohlford, Texas Bar No. 24070871
lwohlford@duanemorris.com
*Admitted Pro Hac Vice*
DUANE MORRIS LLP
100 Crescent Court, Suite 1200
Dallas, Texas 75201
Telephone: (214) 257-7200

***Attorneys for Defendants Kherkher Garcia, LLP,
Steven Kherkher, Jesus Garcia, and Kevin Haynes***