### IN THE UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF ARKANSAS
### FAYETTEVILLE DIVISION

**JASON M. HATFIELD, P.A.**                                        **PLAINTIFF**

**VS.**                        **CASE NO. 5:22-CV-05110-PKH**

**MICHAEL MCCOY, ET AL.**                                        **DEFENDANTS**

---

### BRIEF IN SUPPORT OF KHERKHER DEFENDANTS'
### MOTION FOR SUMMARY JUDGMENT

---

G. Spence Fricke
AR Bar No. 79068
gsfricke@barberlawfirm.com
Jerry D. Garner
AR Bar No. 2014134
jgarner@barberlawfirm.com

Dale Jefferson*
TX Bar No. 10607900
jefferson@mdjwlaw.com

Randy Gordon*
TX Bar No. 00797838
rdgordon@duanemorris.com
Lucas Wohlford*
TX Bar No. 24070871
lwohlford@duanemorris.com

BARBER LAW FIRM PLLC
425 West Capitol Avenue
Suite 3400
Little Rock, Arkansas 72201
Telephone: (501) 372-6175

MARTIN, DISIERE,
JEFFERSON & WISDOM
LLP
Niels Esperson Building
808 Travis Street
Suite 1100
Houston, Texas 77002
Telephone: (713) 632-1700

DUANE MORRIS LLP
100 Crescent Court
Suite 1200
Dallas, Texas 75201
Telephone: (214) 257-7200

*Admitted Pro Hac Vice*

***Attorneys for Defendants Kherkher Garcia, LLP,
Steven Kherkher, Jesus Garcia, and Kevin Haynes***

## INTRODUCTION

Plaintiff Jason M. Hatfield, P.A. ("Hatfield") filed this lawsuit asserting a myriad of claims seeking to recover a contingent fee derived from a hypothetical jury verdict in a wrongful death case that he indisputably never prosecuted. At the outset of this case, Hatfield avoided dismissal of many of his claims because the Court was required to give deference to his salacious allegations. The undisputed facts revealed during discovery, however, tell an entirely different story than the one Hatfield contrived in his pleadings. For instance, the evidence in this case puts the lie to Hatfield's unfounded allegations of case runners handing out business cards at funerals, fraudulently backdated attorney engagement agreements, and fraudulent promises of citizenship to the families of deceased accident victims. Those scurrilous allegations have always been false and unsupported by any evidence. The evidence in this case confirms that none of Hatfield's claims can withstand summary judgment. For the reasons explained herein, the Court should grant the Kherkher Defendants' Motion for Summary Judgment.

## FACTUAL BACKGROUND

Pursuant to Local Rule 56.1, the Kherkher Defendants have separately filed a Statement of Undisputed Material Facts ("SUMF") which is incorporated herein.

## SUMMARY JUDGMENT STANDARD

Summary judgment should be granted if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Kirklin v. Joshen Paper & Packaging of Ark. Co.*, 911 F.3d 530, 534 (8th Cir. 2018). "[T]he plain language of [this Rule] mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient

to establish the existence of an element essential to that party's case," and such a failing necessarily renders all other facts immaterial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

## ARGUMENT AND AUTHORITIES

I.     **THE KHERKHER DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON ALL OF HATFIELD'S PURPORTED RICO CLAIMS (COUNTS 1–6).**

    A.     **Hatfield Lacks Standing to Bring any RICO Claims.**

To prevail on any of his purported claims brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, Hatfield must establish, as a threshold matter, that he has RICO standing.  *See* 18 U.S.C. § 1964(c).  "A RICO plaintiff only has standing, and can only recover to the extent that, he or she has been injured in his or her business or property by the conduct constituting the violation."  *Hamm v. Rhone-Poulenc Rorer Pharm, Inc.*, 187 F.3d 941, 951 (8th Cir. 1999) (cleaned up).  As discussed below, Hatfield lacks standing to bring any RICO claims against the Kherkher Defendants because Hatfield's alleged injury—the loss of a speculative contingent fee derived from a hypothetical settlement or jury verdict—is not a cognizable RICO injury, nor is there any evidence that this hypothetical injury was directly and proximately caused by any RICO violation.  In addition, Hatfield lacks standing under 18 U.S.C. §§ 1962(a) and (b) because he has not even alleged, much less produced evidence, that he suffered any injury for which he could recover under those RICO sections.

       1.     **Hatfield's Purported Loss of a Speculative Contingent Fee from a Hypothetical Settlement or Verdict is not a Cognizable RICO Injury.**

To establish a cognizable RICO injury, Hatfield must present "proof of a concrete financial loss, and not mere injury to a valuable intangible property interest."  *Regions Bank v. J.R. Oil Co.*, 387 F.3d 721, 728 (8th Cir. 2004).  Injury to a mere expectancy interest or the loss of a potential opportunity is insufficiently concrete to confer RICO standing.  *Id.* at 728-29; *see also Price v Pinnacle Brands, Inc.*, 138 F.3d 602, 607 (5th Cir. 1998) ("Injury to mere expectancy interests or

to an 'intangible property interest' is not sufficient to confer RICO standing"); *In re Taxable Mun. Bond Sec. Lit*., 51 F.3d 518, 523 (5th Cir. 1995); *Hecht v. Commerce Clearing House, Inc.*, 987 F.2d 21, 24 (2d Cir. 1990) (holding "injury in the form of lost business commissions . . . is too speculative to confer standing"); *Circiello v. Alfano*, 612 F. Supp.2d 111, 114 (D. Mass. 2009) (holding the lost opportunity to have realized a $10 million wrongful death award is not a cognizable RICO injury); *Bowen v. Adidas Am., Inc.*, 541 F. Supp.3d 670, 679-80 (D.S.C. 2021). To be sure, the RICO statute "requires identification of actual, not hypothetical harm . . ." *Regions Bank*, 387 F.3d at 730.

Hatfield's alleged injury has been a moving target throughout this case.  Hatfield initially described his injury as a lost "business expectancy" in representing both the Mejia and Recinos estates.  (Doc. 18 ¶¶ 76, 78, 247, 279, 287, 291, 302, 323, 377, 385, 392, 467, 509, 510, 511, 512, 513, 528, 533).  Perhaps realizing that a lost business expectancy is not a cognizable RICO injury, Hatfield later sought to recast his injury as the loss of "a valuable contract he would have otherwise possessed," which he contends constitutes "an injury to his business of legal representation and an injury to his property interest in the employment contract."  (Doc. 199, at 20).  Although Hatfield has been unable to clearly and consistently articulate what his alleged injury is, his current live pleading and his damages disclosures confirm that he is seeking to recover for the supposed loss of a speculative contingent fee he hypothetically would have earned if he had actually represented the Recinos estate in Ms. Recinos' wrongful-death case.  Specifically, Hatfield's Third Amended Complaint alleges Hatfield is "entitled to an award as calculated from what a jury would have likely decided" if he had prosecuted Ms. Recinos' wrongful death case on behalf of the Recinos estate.  (Doc. 253 ¶ 325).  And Hatfield's damages disclosures state that Hatfield is seeking to recover either: (1) 33% of the settlement amount the Kherkher Defendants obtained for the Recinos

estate; or (2) 33% of the amount a hypothetical jury would have awarded the Recinos estate if Hatfield had presented Ms. Recinos' wrongful-death case to a jury. (*SUMF*, at ¶ 123). This is not a cognizable RICO injury.

To begin with, Hatfield's alleged injury is premised on the purely speculative assumption that he would have actually represented the Recinos estate in Ms. Recinos' wrongful-death case. Under Arkansas law, the personal representative of a decedent's estate has the sole and exclusive right to bring a wrongful-death action on behalf of the estate. Ark. Code Ann. § 16-62-102(b).[1] The Arkansas Supreme Court has long held that "the personal representative is clearly the party to bring the wrongful-death action, and that the other statutory beneficiaries have no standing to bring the lawsuit or to even choose counsel to pursue the claim." *See Douglas v. Holbert*, 335 Ark. 305, 313, 983 S.W.2d 392, 396 (1998); *see also Holmes v. McClendon*, 349 Ark. 162, 173, 76 S.W.3d 836, 843 (Ark. 2002). For good cause shown, a probate court may appoint a special administrator of a decedent's estate to perform specific acts, such as bringing a wrongful-death action on behalf of the estate. Ark. Code Ann. § 28-48-103. When a special administrator is appointed to pursue a wrongful-death action, the special administrator has "the sole authority to pursue the wrongful-death action on behalf of all the statutory beneficiaries." *Douglas*, 983 S.W.2d at 397. Thus, under Arkansas law, there is a significant legal distinction between a *legal heir*, who merely has a right to some portion of a wrongful-death recovery, and the *personal representative* or special administrator of a decedent's estate, who has the sole and exclusive authority to bring a wrongful-death case and select the counsel who will pursue that case.

---

[1] A wrongful death action may be brought by all the decedent's legal heirs, collectively, only if there is no personal representative of the decedent's estate. Ark. Code Ann. § 16-62-102(b).

Here, Hatfield's alleged injury is based entirely on the contract he purportedly had with three heirs of Ms. Recinos for approximately 24 hours. Although Hatfield may have convinced these three heirs to sign his one-page, fill-in-the-blank contract on which he handwrote the words "wrongful death," that contract did not guarantee, or even make it reasonably likely, that Hatfield would ultimately represent the Recinos estate in Ms. Recinos' wrongful-death case. Indeed, even assuming Hatfield had a valid and enforceable contract to represent these three heirs of Ms. Recinos (which the Kherkher Defendants dispute), Ms. Recinos had multiple other heirs that Hatfield never even met who could have been appointed the special administrator of the Recinos estate. And, as it turned out, none of the three individuals Hatfield claims to have briefly represented was ultimately appointed the special administrator of the Recinos estate.

Because Hatfield never actually represented the Recinos estate, he never had any right or authority under Arkansas law to represent any party in Ms. Recinos' wrongful-death case. Consequently, Hatfield never had a cognizable business or property interest in Ms. Recinos' wrongful-death case and cannot claim a "concrete financial loss" of any expected contingent fee he may have hoped to earn from that case. At most, Hatfield had a fleeting contractual relationship with three individuals who hypothetically might have been appointed as the special administrator of the Recinos estate. In this way, Hatfield's alleged loss of a contingent fee from Ms. Recinos' wrongful-death case is inherently hypothetical, premised, as it is, on unfounded speculation that one of the three heirs who signed his contract ultimately might have been appointed the special administrator of the Recinos estate. It is well established that such a hypothetical injury to a mere expectancy interest is insufficient to confer RICO standing. For this reason alone, the Court should enter summary judgment for the Kherkher Defendants on all of Hatfield's purported RICO claims.

Moreover, Hatfield's alleged injury is also based on the speculative assumption that he would have obtained either the same settlement as the Kherkher Defendants or a greater recovery for the Recinos estate in a hypothetical jury trial.  Hatfield, however, has produced no competent evidence demonstrating even a reasonable probability that he would have, or could have, achieved these results.  Instead, Hatfield has designated a single expert witness, John Everett, to offer purely speculative, unfounded, and inadmissible opinions regarding the results Hatfield would have obtained if he had ever actually represented the Recinos estate in Ms. Recinos' wrongful-death case.[2]  Notwithstanding Everett's speculative and inadmissible opinions, however, the undisputed evidence demonstrates that Hatfield has never even successfully tried a wrongful death case to jury verdict, nor has he ever settled a wrongful death case for anywhere near the settlement amount the Kherkher Defendants obtained for the Recinos estate.  (*SUMF*, at ¶ 124).  Because Hatfield can only speculate as to the result he might have obtained for the Recinos estate in a hypothetical settlement or jury trial, his alleged injury is far too speculative and hypothetical to confer RICO standing and his RICO claims should be dismissed with prejudice.

Finally, Hatfield's purported right to claim an attorney lien based on his supposed contract with three heirs of Ms. Recinos does not establish a concrete financial loss sufficient to confer RICO standing.  Hatfield contends that, for purposes of his alleged RICO injury, his business or property interests are defined by reference to state law.  (Doc. 199, at 18-19).  Under Arkansas law, an attorney who is discharged by a client after entering into an engagement agreement can either bring suit under the attorney-lien statute (which Hatfield has already done) or seek a common law remedy based on the engagement agreement.  *Emery Hughes Corp. v. Audrianna Grisham, P.A.*, 2011 Ark. 230 (unpublished).  Under the attorney-lien statute, an attorney

---

[2] The Court should exclude all of Everett's testimony and opinions.  *See* Docs. 261 & 262.

discharged without cause may recover the full amount of the contracted fee, while an attorney discharged with cause is limited to a reasonable fee for services rendered prior to discharge under the theory of quantum meruit. *Id.* (citing *Salmon v. Atkinson*, 355 Ark. 325, 331, 137 S.W.3d 383 (2003)). "In contrast, the only common law remedy available to attorneys suing on their contingent fee contracts is quantum meruit.'" *Id.* (quoting *Lancaster v. Fitzhugh*, 310 Ark. 590, 592, 839 S.W.2d 192, 193 (1992)).  Thus, outside of an attorney-lien claim, Arkansas law limits a discharged attorney's interest in a contingent fee contract to the value of the reasonable services rendered and expenses incurred prior to the termination of the contract. *Id.*  Here, the undisputed evidence conclusively establishes that Hatfield's interest in the contract he purportedly had with three heirs of Ms. Recinos for approximately 24 hours has absolutely zero value in this forum. Indeed, Hatfield incurred no expenses on behalf of these three heirs, nor did he render any legal services to them that in any way advanced their claims in the recovery from Ms. Recinos' wrongful death case.  (*SUMF*, at ¶ 111).  As such, even if Hatfield attempts to recast his alleged injury as the loss of his interest in the contract he claims he had with three heirs of Ms. Recinos, he still cannot establish a concrete financial loss that is sufficient to confer RICO standing.  The Court should enter summary judgment on all of Hatfield's purported RICO claims.

> ### 2.     Hatfield's Hypothetical Injury was not Directly and Proximately Caused by any RICO Violation.

Even if Hatfield could demonstrate a cognizable RICO injury, he would still lack RICO standing because the undisputed evidence conclusively establishes that his alleged injury was not directly and proximately caused by any RICO violation.  "The phrase 'by reason of' as used in § 1964(c) means causation under the traditional tort 'requirements of proximate or legal causation, as opposed to mere factual or 'but for' causation.'" *Regions Bank*, 387 F.3d at 728 (internal quotations omitted).  The Supreme Court has repeatedly held that proximate cause for purposes of

RICO standing "requires some direct relation between the injury asserted and the injurious conduct alleged." *Hemi Group, LLC v. City of New York*, 559 U.S. 1, 9 (2010) (internal quotation omitted). "A link that is 'too remote,' 'purely contingent,' or 'indirect' is insufficient." *Id.*. Consequently, RICO standing is lacking when there is a "discontinuity between the RICO violation and the asserted injury," such that the plaintiff's alleged injuries could have resulted from factors other than the defendants' alleged RICO violation. *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 459 (2006); *see also Bieter Co. v. Blumquist*, 987 F.2d 1319, 1326 (8th Cir. 1993). As the Supreme Court has explained, "[t]he direct-relation requirement avoids the difficulties associated with attempting to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent factors . . .." *Bridge v. Phoenix Bond & Indemn. Co.*, 553 U.S. 639, 654 (2008). In this way, the proximate-cause requirement prevents RICO cases from devolving into "speculative" proceedings laden with "intricate, uncertain inquiries" regarding the cause of the plaintiff's alleged injury. *Anza*, 547 U.S. at 459-60.

Hatfield has not produced a single shred of evidence that his purported loss of a contingent fee from Ms. Recinos' wrongful-death case was directly and proximately caused by any RICO violation. On the contrary, the undisputed evidence conclusively establishes that various other factors prevented Hatfield from earning a contingent fee from Ms. Recinos' wrongful-death case. First, the undisputed evidence conclusively establishes that the three heirs of Ms. Recinos who Hatfield convinced to sign his one-page, fill-in-the-blank contract never even intended to retain Hatfield to pursue Ms. Recinos' wrongful-death case. Rather, every member of the Recinos family who met with Hatfield on November 30, 2020, unequivocally testified that the only reason they met with Hatfield was to explore a family law matter related to the adoption of Ms. Recinos' minor child. (*SUMF*, at ¶¶ 57–61). Second, none of the Recinos family members who met with Hatfield

understood that the document they signed in Hatfield's office was a contract for representation in Ms. Recinos' wrongful-death case. (*Id.*, at ¶¶ 80–81). Had they known that Hatfield's contract related to a wrongful-death case, rather than a child custody matter, they never would have signed it. (*Id.*, at ¶ 82). Third, all of the Recinos family members who met with Hatfield terminated any relationship they had with him within 24 hours of the meeting. Ever and Laura terminated their relationship with Hatfield as soon as they learned he claimed to represent them in Ms. Recinos' wrongful-death case. (*Id.*, at ¶¶ 88–98). And, although Vidal did not even know Hatfield purported to represent him in connection with Ms. Recinos' wrongful-death case, he understood Hatfield could not help him with the child-custody matter because of his immigration status, so he asked his niece to direct Hatfield to stop any work on his behalf. (*Id.*, at ¶¶ 99–101). Fourth, the three Recinos heirs who met with Hatfield each testified that they were not pressured by the Kherkher Defendants or any other defendant to cancel Hatfield's purported contract. (*Id.*, at ¶¶ 96, 103–104). Fifth, even if the three Recinos heirs who met with Hatfield had not almost immediately terminated their relationships with him, there was only a hypothetical possibility that any of them would have been appointed as the special administrator of the Recinos estate, and thus there was no more than a hypothetical possibility that Hatfield would have ever represented the Recinos estate. Sixth, even if Hatfield had ever actually represented the Recinos estate in Ms. Recinos' wrongful-death case, Hatfield has offered nothing beyond pure speculation that he would have obtained a favorable result from which he would have recovered a contingent fee.

Hatfield has produced no evidence, and could never prove, that his purported loss of a contingent fee from Ms. Recinos' wrongful-death case was proximately caused by a RICO violation. Hatfield's failure to earn a contingent fee from Ms. Recinos' wrongful-death case was because none of Ms. Recinos' heirs ever wanted Hatfield to represent them in that case, not because

of any purported RICO violation.  Accordingly, Hatfield cannot satisfy the proximate-cause element of RICO standing, and the Court should enter summary judgment for the Kherkher Defendants on all of Hatfield's purported RICO claims for this additional reason.

### 3.    As a Matter of Law, Hatfield Cannot Establish that he Suffered any Injury for which he Could Recover under §§ 1962(a) or (b).

Although Hatfield lacks standing to bring any RICO claims against the Kherkher Defendants for the reasons set forth above, he also plainly lacks standing under 18 U.S.C. §§ 1962(a) and (b) because he has not even alleged, much less produced any evidence, that he has suffered the type of injury for which he could recover under these RICO sections.

As discussed at length in the Kherkher Defendants' Motion for Judgment on the Pleadings and Response in Opposition to Hatfield's Motion for Partial Summary Judgment, 18 U.S.C. §§ 1962(a) and (b) have unique standing requirements.  (Doc. 190, at 13-17; Doc. 21, at 16-17).  To establish standing under § 1962(a), a plaintiff must demonstrate "an injury from the use or investment of racketeering income that is separate and distinct from the injuries allegedly caused by the defendant's engaging in the predicate acts."  *Fogie v. THORN Americas, Inc.*, 190 F.3d 889, 895 (8th Cir. 1999); *see also Compagnie De Reassurance D'Ille de France v. New England Reinsurance Corp.*, 57 F.3d 56, 91 (1st Cir. 1995); *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1188 (3d Cir. 1993); *Davis-Lynch, Inc. v. Moreno*, 67 F.3d 539, 550 (5th Cir. 2012); *Vemco Inc. v. Camaradella*, 23 F.3d 129, 133 (6th Cir. 1994).  Similarly, to establish standing under § 1962(b), a plaintiff must establish injury from the defendant's acquisition or maintenance of an interest in or control of a RICO enterprise that is separate and distinct from the injury allegedly caused by the defendants' racketeering activity.  *See, e.g., New England Reinsurance Corp.*, 57 F.3d at 92; *D'Addario v. D'Addario*, 901 F.3d 80, 98 (2d Cir. 2018); *Lightning Lube*, 4 F.3d at 1190; *Abraham v. Singh*, 480 F.3d 351, 357 (5th Cir. 2007); *Advocacy Org. for Patients &*

*Providers v. Auto Club Ins. Ass'n.*, 176 F.3d 315, 329 (6th Cir. 1999); *Danielsen v. Burnside-Ott Aviation Training Cntr., Inc.*, 941 F.2d 1220, 1231 (D.C. Cir. 1991).

Although §§ 1962(a) and (b) require plaintiffs to prove injuries that are separate and distinct from the injury allegedly caused by the defendants' racketeering activity, Hatfield alleges only a single injury in this case—namely, the loss of a speculative contingent fee from a hypothetical settlement or jury verdict. As a matter of law, Hatfield cannot maintain RICO claims under §§ 1962(a), (b), and (c) based on this single injury. What's more, Hatfield has not produced any evidence this single alleged injury was directly and proximately caused by the Defendants' alleged investment of racketeering income or acquisition or maintenance of an interest in or control of a RICO enterprise. Because Hatfield has not even alleged, much less presented any evidence, that he suffered an injury from any alleged violations of §§ 1962(a) and (b) that is separate and distinct from the injury he claims to have suffered from the alleged racketeering activity itself, Hatfield cannot establish that he has standing to bring claims under §§ 1962(a) or (b). Hatfield's purported claims under §§ 1962(a) and (b), as well as Hatfield's purported claims for conspiracy to violate these RICO sections, should be dismissed with prejudice.

### B. As a Matter of Law, Hatfield Cannot Establish that the Kherkher Defendants Committed any acts of Racketeering Activity.

"[T]o prevail under RICO, a plaintiff must demonstrate that a defendant committed acts of racketeering activity, also known as predicate offenses." *Atlas Pile Driving Co. v. DiCon Fin. Co.*, 886 F.2d 986, 990 (8th Cir. 1989). "Racketeering activity" is defined in the RICO statute to encompass dozens of criminal acts "indictable under specified federal statutes." *Id.* Significantly, "RICO does not cover all instances of wrongdoing. Rather, it is a unique cause of action that is concerned with eradicating organized, long-term, habitual ***criminal*** activity." *Crest Const. II, Inc. v. Doe*, 660 F.3d 346, 353 (8th Cir. 2011) (internal quotations omitted and emphasis added).

11

Hatfield bases his purported RICO claims on alleged predicate acts of mail and wire fraud. (Doc. 253 ¶¶ 66-103, 329-504).   In essence, Hatfield claims the Defendants perpetrated a fraudulent scheme to unethically procure wrongful death clients through various violations of the Arkansas Rules of Professional Conduct, and that this conduct violates vague standards of "moral uprightness, fundamental honesty, and fair play."  (Doc. 199, at 3-9).  Hatfield's purported RICO claims based on predicate acts of mail and wire fraud are legally flawed for two reasons.

First, violations of state attorney ethics rules are not RICO predicate acts, nor can they establish violations of the federal mail and wire fraud statutes.  *See, e.g., St. Germain v. Howard*, 556 F.3d 261, 263 (5th Cir. 2009) (holding that alleged violations of rules of professional responsibility did not constitute "the requisite *criminal* acts under RICO" or support RICO claims based on predicate acts of mail and wire fraud); *United States v. Rabbitt*, 583 F.2d 1014, 1025 (8th Cir. 1978) (holding evidence that attorney "acted unethically and violated his cannons as a lawyer . . . although bearing on intent to defraud, do not in and of themselves establish the substantive crime of mail fraud"), *abrogation on other grounds acknowledged in United States v. Foster*, 443 F.3d 978, 984 (8th Cir. 2006); *Bigsby v. Barclays Cap. Real Estate, Inc.*, 170 F.Supp.3d 568, 577 (S.D.N.Y. 2016) ("State ethics rules do not create the basis for a separate claim").  This is confirmed by the Arkansas Rules themselves, which state that: (1) "Violation of a Rule should not give rise to a cause of action against a lawyer nor should it create any presumption in such a case that a legal duty has been breached;" (2) the Rules "are not designed to be a basis for civil liability;" and (3) "The fact that a Rule is a just basis for a lawyer's self-assessment, or for sanctioning a lawyer under the administration of a disciplinary authority, does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the Rule."  Ark. R. Prof. Cond., Scope § 20.  Accordingly, even if Hatfield could demonstrate that the Kherkher Defendants

12

violated the Arkansas Rules, such violations would not be legally sufficient to establish any violations of the federal mail and wire fraud statutes.  Because Hatfield bases his alleged predicate acts of mail and wire fraud exclusively on the Kherkher Defendants' alleged violations of the Arkansas Rules, he cannot establish that the Kherkher Defendants committed any acts of racketeering activity as a matter of law.

Second, Hatfield also cannot prove predicate acts of mail and wire fraud merely by presenting evidence that the Kherkher Defendants engaged in conduct that some might deem to be inconsistent with vague standards of "moral uprightness, fundamental honesty, and fair play."  In the past, the Eighth Circuit has applied this vague standard of morality in distinguishing common law fraud from statutory mail and wire fraud.  *See Atlas Pile Driving Co.*, 886 F.2d 986, 991 (8th Cir. 1989) (citing *United States v. Bishop*, 825 F.2d 1278, 1280 (8th Cir. 1987)); *Abels v. Famers Comm. Corp.*, 259 F.3d 910, 918 (8th Cir. 2001).  More recently, however, the Eighth Circuit has declined to apply this standard, referring to it as "slightly amorphous" and acknowledging that "cases from this circuit and the Supreme Court have offered more concrete guidance on what the mail and wire fraud statutes require."  *United States v. Hamsmeier*, 988 F.3d 428, 436 (8th Cir. 2021); *see also United States v. Steffen*, 687 F.3d 1104, 1113 (8th Cir. 2012) (noting the "moral uprightness, fundamental honesty, and fair play" standard "does not offer much in the way of guidance for determining when specific acts amount to criminal behavior"); *In re EDC, Inc.*, 930 F.2d 1275, 1281 (7th Cir. 1991) (Posner, J.) (criticizing the "moral uprightness, fundamental honesty, and fair play" standard as "extravagant rhetoric" and "hyperbole").  Specifically, the Eighth Circuit clarified that, "[t]o prove the existence of a fraudulent scheme, the government must establish: '(1) there was a deliberate plan of action or course of conduct to hide or misrepresent information; (2) the hidden or misrepresented information was material; and (3) the purpose was

to get someone else to act on it." *Hansmeier*, 988 F.3d at 436 (quoting *United States v. Luna*, 968 F.3d 922, 926 (8th Cir. 2020)).  Here, there is no evidence that the Kherkher Defendants devised or participated in a plan or course of action to make material misrepresentations for the purpose of getting other persons to act on them.  Rather, Hatfield's RICO claims rest exclusively on unsupported sensationalized allegations that the Kherkher Defendants engaged in conduct that was unethical and immoral.  As the Eighth Circuit recently confirmed, the federal mail and wire fraud statutes do not criminalize unethical or immoral conduct.  Accordingly, Hatfield cannot establish that the Kherkher Defendants committed any predicate acts of mail or wire fraud with evidence that they engaged in conduct that might be considered unethical or immoral.

Because all of Hatfield's RICO claims require him to prove that the Kherkher Defendants committed acts of racketeering activity, and because Hatfield cannot prove this necessary element as a matter of law, the Court should enter summary judgment for the Kherkher Defendants on all of Hatfield's purported RICO claims.[3]  After dismissing the federal claims, the Court should decline to exercise supplemental jurisdiction over the remaining state law claims.  *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) explaining that, "[i]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine . . . will point toward declining to exercise jurisdiction over the remaining state-law claims.").

---

[3] In addition to the arguments set forth herein, the Kherkher Defendants also seek summary judgment on Hatfield's purported RICO claims based on the arguments fully briefed in their Motion for Judgment on the Pleadings (Docs 189 and 190) and their Response to Hatfield's Motion for Summary Judgment (Docs. 211 and 212).  Specifically, the Kherkher Defendants incorporate by reference their arguments that Hatfield: (1) fails to allege a pattern of racketeering activity with a sufficient nexus to the alleged RICO enterprise (Doc. 190, at 18-20); (2) fails to state any cognizable claim against Messrs. Haynes or Garcia (Doc. 190 pp. 21-24); (3) fails to establish the existence of a RICO enterprise (Doc. 211, at 19-21); and (4) fails to establish the Kherkher Defendants conducted the affairs of the supposed RICO enterprise.  (Doc. 211, at 24).

II.    **The Kherkher Defendants are Entitled to Summary Judgment on all of Hatfield's Remaining State Law Claims (Counts 7–12).**

A.    **Hatfield's Intentional Interference Claims Fail as a Matter of Law.**

Summary judgment should also be granted as to Counts 7 and 8 of the Third Amended Complaint.  Hatfield contends the Kherkher Defendants intentionally interfered with Hatfield's contract with Laura, Ever, and Vidal to represent the Estate of Ms. Recinos.  (Doc. 253, at ¶¶ 505–527).  The elements of tortious interference are: (1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interfering party; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted. *Baptist Health v. Murphy*, 2010 Ark. 358, at 15, 373 S.W.3d 269, 281–82.  To be actionable, the alleged conduct of the interfering party must "be at least 'improper[.]'" *Id.*

1.    **No contract existed between Hatfield and Ever, Laura, or Vidal.**

Summary judgment should be entered on the intentional interference claim because there was never a contract or business expectancy formed between Hatfield on the one hand and Ever, Laura, or Vidal on the other.  Hatfield bears the burden of proving that a valid contract existed. *See, e.g., Ozan Lumber Co. v. Price*, 219 Ark. 709, 244 S.W.2d 486 (1951).  In Arkansas, the essential elements of a contract are (1) competent parties; (2) subject matter; (3) legal consideration; (4) mutual agreement; and (5) mutual obligations. *Williamson v. Sanofi Winthrop Pharms.*, 347 Ark. 89, 98, 60 S.W.3d 428, 434 (2001).

Arkansas courts are guided by two legal principles when deciding whether a valid contract was formed: "(1) a court cannot make a contract for the parties but can only construe and enforce the contract that they have made; and if there is no meeting of the minds, there is no contract; and (2) it is well settled that in order to make a contract there must be a meeting of the minds as to all

terms, using objective indicators." *Id.* Whether there was a meeting of the minds "necessarily requires an individual inquiry into each party's understanding of the terms of the alleged contract, even using an objective standard." *Id.* "Manifestation of assent may be made wholly or partly by written or spoken words or by other acts or by failure to act." *STAP, Inc. v. Sutterfield*, 2020 Ark. App. 18, at 6, 592 S.W.3d 249, 252. "Both parties must manifest assent to the particular terms of the contract; thus, the terms of the contract must be effectively communicated." *Freeman Holdings of Ark., LLC v. FNBC Bancorp, Inc.*, 2019 Ark. App. 165, at 6, 574 S.W.3d 181, 185.

Here, Hatfield never formed a contract with Ever, Laura, or Vidal to represent the Estate of Ms. Recinos in a wrongful death claim because there was not a meeting of the minds as to all essential terms. The most obvious impediment to the formation of Hatfield's contract is that none of these Recinos family members intended to retain Hatfield for a wrongful death claim but were instead seeking representation for a potential child custody matter. As explained above, Laura, Ever, and Vidal unequivocally testified (on multiple occasions) that they only met with Hatfield for a family law matter, and they did not meet with him to pursue a wrongful death claim. (*SUMF*, at ¶¶ 57–61). Had they known the Hatfield contract related to the accident that caused Ms. Recinos' death, they would not have signed it. (*Id.*, at ¶ 82). None of these family members left the meeting thinking they had retained Hatfield for legal representation about a wrongful death claim. (*Id.*, at ¶¶ 80–81). The Recinos family members' belief is further confirmed by Hatfield's own correspondence where he himself wrote that neither Laura, Ever, nor Vidal could be the representative of Ms. Recinos' estate "[s]ince none of these adult individuals are legal citizens." (*Id.*, at ¶ 85). Moreover, although "wrongful death" was handwritten on the Hatfield contract, Hatfield employee Verania Hernandez, who claims she translated the meeting between Hatfield and the Spanish-speaking Recinos family members, admits that she never explained what

16

"wrongful death" meant to these individuals.  (*Id.*, at ¶ 76).  The undisputed facts confirm that Hatfield cannot establish the Recinos family members assented to his representation for a wrongful death claim.

This lack of mutual assent is further confirmed by the fact that the Recinos family took immediate action to cancel the Hatfield contract when they learned Hatfield claimed to represent them for a wrongful death claim. *See DIRECTV, Inc. v. Murray*, 2012 Ark. 366, 423 S.W.3d 555 (holding that the trial court did not err in finding no mutual assent to the arbitration provision in a contract where the customer cancelled the contract within ten days of receipt of the contract).  Once Ever and Laura learned that Hatfield claimed his contract was for a wrongful death case, they both took action to cancel the contract.  (*SUMF*, at ¶¶ 88–98).  They both sent text messages to Raciel Gonzalez, a Kherkher Garcia paralegal who speaks Spanish, confirming their termination of Hatfield's representation because they wanted to pursue their claim with Kherkher Garcia.  (*Id.*). Ever and Laura intended for their text messages to be relayed to Hatfield in order to inform Hatfield that they were terminating any relationship Hatfield claimed to have had with them.  (*Id.*).

To the extent Hatfield ever represented them, Laura and Ever's representation was terminated by December 1, 2020.  At 8:47 a.m. on December 1, 2020, Mr. Kherkher sent an e-mail to Jason Hatfield informing him that Laura and Ever had terminated Hatfield's representation and that he should stand down.  (*Id.*, at ¶ 97–98).  Mr. Kherkher also relayed the Spanish-language text messages Kherkher Garcia had received from Ever and Laura making clear those individuals did not wish to be represented by Hatfield.  (*Id.*).  There is no dispute that this termination occurred less than 24 hours after Ever, Laura, and Vidal met with Hatfield to discuss a family law matter. Similarly, Vidal had ceased all communication with Hatfield's office by 3:17 p.m. on November 30, 2020, the day of their meeting.  (*Id.*, at ¶ 99).  And because Vidal understood that Hatfield

could not help him due to Vidal's immigration status, Vidal asked his niece tell Hatfield to stop

any work on Vidal's behalf, which she did later that evening.  (*Id.*, at ¶¶ 100–101).  Tellingly, Vidal,

Laura, and Ever never spoke with Hatfield after November 30, 2020.  (*Id.*, at ¶ 102).

The evidentiary record establishes that no valid, enforceable contract was formed between

the Recinos family members and Hatfield for representation in a wrongful death claim.  Because

no such contract was ever formed, Hatfield's intentional interference claims fail as a matter of law.

### 2.    The Kherkher Defendants did not engage in "improper" conduct.

In order to sustain a claim for intentional interference, the alleged interference on the part

of the defendant must be at least "improper."  *K.C. Props. of N.W. Ark., Inc. v. Lowell Inv. Partners,*

*LLC*, 373 Ark. 14, 26, 280 S.W.3d 1, 11–12 (2008).  Arkansas courts consider the following factors

to determine whether an actor's conduct was improper or not: (a) the nature of the actor's conduct;

(b) the actor's motive; (c) the interests of the other with which the actor's conduct interferes; (d)

the interests sought to be advanced by the actor; (e) the social interests in protecting the freedom

of action of the actor and the contractual interests of the other; and (f) the proximity or remoteness

of the actor's conduct to the interference and the relations between the parties.  *Id.*

Hatfield cannot satisfy his burden of proving that the Kherkher Defendants engaged in any

"improper" conduct which intentionally interfered with Hatfield's alleged contract.    The

undisputed factual record confirms that, once Defendant Steve Kherkher learned that his clients

Laura and Ever had met with Hatfield, Mr. Kherkher investigated the matter to determine if Laura

and Ever intended to go forward on their wrongful death claim with Kherkher Garcia as counsel

or whether they in fact wanted to proceed with Hatfield.  (*SUMF*, at ¶ 90).  As discussed above,

Laura and Ever then took immediate action to cancel the Hatfield contract because it was never

their intention or understanding that Hatfield had been retained to pursue a wrongful death claim.

Mr. Kherkher relayed both Laura and Ever's termination correspondence to Hatfield on December

1, 2020. (*Id.*, at ¶¶ 99). Neither Laura nor Ever was pressured or encouraged by any defendant in any way to cancel the Hatfield contract. (*Id.*, at ¶¶ 96). There is nothing improper about Mr. Kherkher speaking with his clients about Hatfield's claimed representation and then relaying Laura and Ever's correspondence terminating Hatfield's services.

The Kherkher Defendants likewise did not engage in any "improper" conduct related to Vidal. As explained above, Vidal understood that Hatfield could not assist him because of Vidal's immigration status. As a result, Vidal asked his niece to inform Hatfield to stop working on his behalf, which she did on the evening of November 30, 2020, the same day as the Hatfield meeting. Later, in 2021, Vidal chose Kherkher Garcia, Nunez & Associates, and Pirani Law, P.A. to represent his interests in Ms. Recinos' wrongful death case. (*Id.*, at ¶ 105). At the time he did so, Vidal did not consider Hatfield to be his lawyer in any capacity. (*Id.*, at ¶ 106). No defendant pressured, coerced, or made any promises to Vidal in order to secure his signature on an attorney engagement contract. (*Id.*, at ¶ 107). Nor was Vidal pressured in any way to cancel the Hatfield contract. (*Id.*, at ¶ 103–104). Because Hatfield cannot establish the Kherkher Defendants engaged in any "improper" conduct, his intentional interference claims fail as a matter of law.

### B.   Hatfield's Fraud Claim Is Also Ripe for Summary Judgment.

Summary judgment should also be granted as to Count 9 of the Third Amended Complaint. Hatfield contends the Kherkher Defendants made false statements of material fact to Hatfield, including (i) statements about the validity of Kherkher Garcia's contracts with Ever, Laura, and Vidal; (ii) statements about Ever and Laura's desire to terminate Hatfield's contract; and (iii) statements about how the Kherkher Garcia contract was formed. (Doc. 253, at ¶¶ 528–541). The Court should enter summary judgment on this claim because the evidentiary record confirms the Kherkher Defendants did not make any material misrepresentations to Hatfield.

The elements of a cause of action for fraud under Arkansas law include (1) a false representation of a material fact; (2) knowledge or belief by the defendant that the representation is false; (3) intent to induce the plaintiff's reliance on the misrepresentation; (4) justifiable reliance by the plaintiff; and (5) resulting damage to the plaintiff. *Yarborough v. DeVilbiss Air Power, Inc.*, 321 F.3d 728, 730 (8th Cir. 2003) (citing *Country Corner Food & Drug, Inc. v. First State Bank & Trust Co. of Conway, Ark.*, 332 Ark. 645, 652, 966 S.W.2d 894, 897 (1998)). Hatfield bears the burden of proof as to each element of his fraud claim. *Muccio v. Hunt*, 2016 Ark. 178, at 4–5, 490 S.W.3d 310, 312–313.

Here, the undisputed factual record confirms that the Kherkher Defendants never made any false representations of material fact to Hatfield. The Kherkher Defendants did not make any false statements of material fact to Hatfield regarding the validity of the Kherkher Defendants' November 25, 2020, contract with Ever and Laura. Likewise, Hatfield cannot identify any material misrepresentation related to the validity of the Kherkher Defendants' contract for representation with Vidal. Further, the undisputed record confirms that the Kherkher Defendants did not make any material misrepresentation to Hatfield regarding Laura and Ever's decision to terminate Hatfield's contract. In fact, Mr. Kherkher relayed the Spanish-language text messages from Laura and Ever in order to convey their message of termination to Hatfield. Nor can Hatfield identify any material misrepresentation the Kherkher Defendants made regarding the formation of the Kherkher Garcia contract. Because Hatfield cannot meet its burden of proving the Kherkher Defendants made any material misrepresentations, Hatfield likewise cannot meet its burden of proving any of the other elements of its fraud claim. Hatfield's mere speculation, conjecture, or fantasy is insufficient to meet proof with proof to avoid summary judgment. *See, e.g., Mann v. Yarnell*, 497 F.3d 822, 827 (8th Cir. 2007).

### C.      Hatfield's Civil Conspiracy Claim Fails As a Matter of Law.

Summary judgment should also be granted as to Count 10 of the Third Amended Complaint.  Hatfield contends the Kherkher Defendants engaged in a civil conspiracy to (a) violate the Arkansas Deceptive Trade Practices Act; (b) intentionally interfere with Hatfield's contract to represent the Estate of Ms. Recinos; (c) intentionally interfere with Hatfield's business expectancy as to the Estate of Mejia; and (d) to commit fraud.  (Doc. 253, at ¶¶ 542–549).  As an initial matter, Hatfield's civil conspiracy claim is easily dismissed as to his ADTPA argument because he has not included any such claim in this Third Amended Complaint and the Court previously dismissed that claim.  (Doc. 63, at 31–32).  Likewise, Hatfield has voluntarily dismissed his intentional interference claim as to the Estate of Mejia.  (Docs. 238, 252).  To the extent that Hatfield's conspiracy claim is related to those causes of action, it should be dismissed with prejudice.

The remaining vestiges of Hatfield's civil conspiracy claim should also be dismissed on summary judgment.  To prove a civil conspiracy, Hatfield has the burden of proving that "two or more persons have combined to accomplish a purpose that is unlawful or oppressive or to accomplish some purpose, not in itself unlawful, oppressive, or immoral, but by unlawful, oppressive, or immoral means, to the injury of another." *Muccio*, 2016 Ark. 178, at 6, 490 S.W.3d at 313.  In order to recover damages from the Kherkher Defendants for conspiracy, Hatfield has the burden of proving four essential elements: (1) the Kherkher Defendants and the other defendants knowingly entered into a conspiracy; (2) that Hatfield has proved all essential elements necessary to obtain a verdict against the Kherkher Defendants on the underlying intentional tort claims (i.e., intentional interference and fraud); (3) that one or more of the co-conspirators committed one or more overt acts in furtherance of the alleged conspiracy; and (4) that the conspiracy proximately caused damage to Hatfield.  *Arkansas' Model Jury Instruction AMI 714*;

*see also Walmart, Inc. v. Cuker Interactive, LLC*, 949 F.3d 1101, 1110 (8th Cir. 2020) ("Arkansas courts presume the Model Jury Instructions to be a correct statement of law.") (citations omitted).

Hatfield cannot establish that he has proved all essential elements of the remaining intentional tort claims that form the basis of the alleged civil conspiracy. As discussed above, Hatfield's intentional interference claim related to the Estate of Ms. Recinos fails as a matter of law because he never formed a contract with Laura, Ever, or Vidal and, even if he did, the Kherkher Defendants did not engage in any "improper" conduct resulting in the termination of that contract. Likewise, Hatfield's fraud claim fails as a matter of law for the reasons discussed above. Moreover, Hatfield cannot meet his burden of proving that the Kherkher Defendants and any other defendant knowingly entered into a conspiracy to intentionally interfere with any contract or commit fraud as to Hatfield. Instead, the undisputed facts confirm the Recinos family retained the Kherkher Defendants five days before Hatfield ever entered the picture and, by the day after Ever, Laura, and Vidal signed the Hatfield contract, each signatory had taken steps to cancel that contract. Hatfield cannot meet his burden of proof and, as a result, the Court should enter summary judgment dismissing his civil conspiracy claim with prejudice.

### D.    Hatfield's Claim for Declaratory Relief is Fatally Defective.[4]

Summary judgment should also be granted as to Count 12 of the Third Amended Complaint. Hatfield seeks a declaratory judgment that the Kherkher Garcia contract with the Recinos family members is void and that Hatfield's contract is the only valid contract for legal representation related to the Estate of Recinos. (Doc. 253, at ¶¶ 554–579). Surprisingly, Hatfield seeks the same relief as to the Estate of Mejia despite the fact Hatfield did not sign any contract

---

[4] Count 11 of the Third Amended Complaint relates to punitive damages, but it is not a separate cause of action. (Doc. 253, at ¶¶ 550–553). For all of the reasons explained herein, the Kherkher Defendants are entitled to summary judgment on each cause of action which would necessarily result in dismissal of any claim for punitive damages.

with that family and has never met them.  *Id.*  Hatfield is not entitled to this relief and this claim should be dismissed with prejudice.

As an initial matter, summary judgment is appropriate on Hatfield's declaratory judgment claim because he lacks standing to assert that the Kherkher Garcia contract is void.  There is no dispute that Hatfield is not a party to that contract, and a stranger to a contract does not have standing to assert that a contract is void.  *See, e.g., Greater Iowa Corp. v. McLendon*, 378 F.2d 783, 792 (8th Cir. 1967) (determining a plaintiff's request for declaratory relief as to contracts to which they were not parties was improper because "the plaintiffs, as strangers to the contracts, have no standing to inject themselves between contracting parties and assert the invalidity of transactions to which the contracting parties are apparently perfectly content to enter and observe." "Consequently, it is our opinion that plaintiffs have no standing to assert the illegality of the contracts entered into between certain Greater Iowa shareholders and the defendants."); *see also DBM, LLC v. Hanger Prosthetics & Orthotics, Inc.*, No. 8:19-CV-429, 2020 U.S. Dist. LEXIS 267653, at *13–19 (D. Neb. July 16, 2020) (dismissing claim for declaratory relief because the plaintiff was not a party to the contract at issue and, as a result, lacked standing to challenge the contract); *Defiance Hosp., Inc. v. Fauster-Cameron, Inc.*, 344 F. Supp. 2d 1097, 1118 (N.D. Ohio 2004) (same);  at *Premier Pyrotechnics, Inc. v. Zambelli Fireworks Mfg. Co.*, No. 05-3112-CV-S, 2005 U.S. Dist. LEXIS 30250, at *3–7 (W.D. Mo. May 31, 2005) (same).

Even if Hatfield had standing to seek this relief, his claim should still be dismissed with prejudice.  For instance, Hatfield asks the Court to declare that his contract with Ever, Laura, and Vidal is the only valid contract for legal representation for a wrongful death claim related to the Estate of Ms. Recinos.  (Doc. 253, at ¶ 575).  Yet, as detailed above, Hatfield never formed a contract with Ever, Laura, or Vidal, and he never intended to have them serve as the representative

23

of Ms. Recinos' estate.  As such, the Hatfield contract cannot be the basis for the declaratory relief Hatfield seeks and Hatfield's claim should be dismissed with prejudice.

Similarly, the premise of Hatfield's claim for declaratory relief is that the Kherkher Garcia contract was purportedly obtained in violation of the Arkansas Rules of Professional Conduct. (Doc. 253, at ¶¶ 556–572).  Hatfield's premise is fatally defective because alleged violations of the Arkansas Rules do not invalidate a contract for legal representation.  *See, e.g., LegalZoom.com v. McIllwain*, 2013 Ark. 370, at 10, 429 S.W.3d 261, 266 ("We further note that the arbitration clause is not unconscionable because it failed to satisfy certain provisions in the Arkansas Rules of Professional Conduct that apply to practicing attorneys.").  And Hatfield's attempt to invalidate the Kherkher Garcia contract based on an alleged violation of the Arkansas Rules contradicts the very purpose of the Rules themselves.  As discussed above, the Arkansas Rules expressly state that they "are not designed to be a basis for civil liability." Ark. R. Prof. Cond., Scope § 20.  In fact, the drafters of the Rules were particularly concerned with an adversary's attempt, like here, to invoke the Rules in litigation to give rise to a cause of action and warned that "the purpose of the Rules can be subverted when they are invoked by opposing parties as procedural weapons."  *Id.*  The Court should reject Hatfield's attempt to weaponize the Arkansas Rules as a way of invalidating a contract to which Hatfield is not even a party.

But, even if Hatfield could use alleged violations of the Arkansas Rules as a basis to invalidate the first-in-time Kherkher Garcia contract, each alleged violation is belied by the undisputed factual record.  More particularly, Hatfield claims the Kherkher Garcia contract was procured through unethical solicitation (Doc. 253, at ¶¶ 556–560), but the undisputed factual record makes clear no improper solicitation occurred.  (*SUMF*, at ¶¶ 10–31).  Next, Hatfield argues the contract was procured through fraud because the contract lists "Nunez Law Firm" rather than

"Nunez & Associates" and that "Nunez Law Firm" is not a legal entity while "Nunez & Associates" is not a law firm authorized to practice law in Arkansas. (Doc. 253, at 561–568, 572). But "Nunez Law Firm" is just another way of referring to Alfredo Nunez's law firm in Mexico named "Nunez & Associates." (*Deposition of Alfredo Nunez*, Doc. 198-5, at 99:19–100:3) (testifying that "Nunez Law Firm" and "Nunez & Associates" are the same business concern).[5] Hatfield next contends the Kherkher Garcia contract should be declared void because the Nunez Defendants allegedly did not disclose to the Recinos heirs that Kherkher Garcia would be working on the file (Doc. 253, at ¶ 569), but the Recinos heirs spoke with Messrs. Kherkher and Garcia during the meeting, and it was explained to them that Kherkher Garcia would be representing them in the wrongful death case. (*SUMF*, at ¶¶ 35–38). Further, Hatfield claims the Recinos heirs were told that Ms. Recinos' funeral would be paid for so long as the Recinos heirs signed the Kherkher Garcia contract (Doc. 253, at ¶ 570), but the Recinos heirs made clear no such inducement occurred. (*SUMF*, at ¶¶ 43–48). Hatfield also claims the contract was procured by promises of citizenship (Doc. 253, at ¶ 571), but there is no evidence in the record to support that baseless allegation and the Recinos heirs unequivocally testified that no one made promises of citizenship to the family members in order to secure their signatures on the contracts. (*SUMF*, at ¶ 47).

## CONCLUSION

For the foregoing reasons, the Kherkher Defendants respectfully request that the Court grant their Motion for Summary Judgment and dismiss each claim in the Third Amended Complaint with prejudice.

---

[5] This is akin to referring to Wright, Lindsey & Jennings LLP as the "Wright Law Firm" or to Friday, Eldredge & Clark, LLP as the "Friday Firm" just to name a few examples.

Respectfully submitted,

By:     */s/ G. Spence Fricke*
        G. Spence Fricke, Ark. Bar No. 79068
        gsfricke@barberlawfirm.com
        Jerry D. Garner, Ark. Bar No. 2014134
        jgarner@barberlawfirm.com
        BARBER LAW FIRM PLLC
        3400 Simmons Tower
        425 West Capitol Avenue
        Little Rock, Arkansas 72201
        Telephone: (501) 372-6175

        -And-

        Dale Jefferson, Texas Bar No. 10607900
        jefferson@mdjwlaw.com
        *Admitted Pro Hac Vice*
        MARTIN, DISIERE, JEFFERSON & WISDOM LLP
        Niels Esperson Building
        808 Travis Street, Suite 1100
        Houston, Texas 77002
        Telephone: (713) 632-1700

        -And-

        Randy Gordon, Texas Bar No. 00797838
        rdgordon@duanemorris.com
        Lucas Wohlford, Texas Bar No. 24070871
        lwohlford@duanemorris.com
        *Admitted Pro Hac Vice*
        DUANE MORRIS LLP
        100 Crescent Court, Suite 1200
        Dallas, Texas 75201
        Telephone: (214) 257-7200

        ***Attorneys for Defendants Kherkher Garcia, LLP,***
        ***Steven Kherkher, Jesus Garcia, and Kevin Haynes***