UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

JASON M. HATFIELD, P.A.                                                                                         PLAINTIFF

v.                                         No. 5:22-cv-05110

CESAR ORNELAS; STEVEN KHERKHER;
MICHAEL McCOY; NOE JESUS MANCIA
POLANCO; NUNEZ & ASSOCIATES;
KHERKHER GARCIA, LLP; TONY PIRANI;
PIRANI LAW, PA; JESUS GARCIA; KEVIN
HAYNES                                                                                                                 DEFENDANTS

**OPINION AND ORDER**

Before the Court are the Motion to Dismiss brought by Defendants Michael McCoy, Nunez & Associates, and Cesar Ornelas (collectively, "Nunez Defendants") (Doc. 156), the adoption of that motion by Jesus Garcia, Kevin Haynes, Steven Kherkher, and Kherkher Garcia, LLP ("Kherkher Defendants") (Doc. 161), and the separate Motion for Judgment on the Pleadings brought by the Kherkher Defendants (Doc. 189). The Court has also considered Defendants' memorandum briefs in support of these motions (Docs. 157, 190), Plaintiff Jason M. Hatfield, P.A.'s responses to Defendants' motions (Docs. 172, 192), and Defendants' replies to those responses (Docs. 177, 197). For the reasons stated below, Defendants' motions are GRANTED IN PART AND DENIED IN PART.

For the sake of efficiency, the Court assumes the reader's familiarity with the allegations in Hatfield's Third[1] Amended Complaint. The Court takes these allegations as true for purposes of ruling on these motions. *Schriener v. Quicken Loans, Inc.*, 774 F.3d 442, 444 (8th Cir. 2014).

---

[1] The motions at issue here were brought in response to Hatfield's Second Amended Complaint, but the most recent amendment was for the sole purpose of nonsuiting a claim. *See* Docs. 238, 252.

1

## I. RICO Standing – Recinos Estate

Defendants challenge Hatfield's standing to bring a claim under the Racketeer Influenced and Corrupt Organization ("RICO") Act, 18 U.S.C. § 1962. To demonstrate standing under RICO, a plaintiff must have been "injured in [its] business or property" by a violation of that statute. *Bridge v. Phoenix Indem. Co.*, 553 U.S. 639, 647 (2008). The law requires "some direct relation between the injury asserted and the injurious conduct alleged." *Anza v. Ideal Steel Corp.*, 547 U.S. 451, 457 (2006) (quoting *Holmes v. Sec. Inv. Protection Corp.*, 503 U.S. 258, 268 (1992)). The questions of interest, injury, and causation often overlap in the context of this inquiry, and the interplay of cases touching on these concepts (most notably *Bridge*, *supra*, and *Regions*, *infra*) has caused confusion for both the parties and the Court. For the purposes of clarity, the Court feels it prudent to address these elements of standing individually here.

### a. Nature of Affected Interest

Defendants characterize Hatfield's injury as a "mere injury to a valuable intangible property interest" or a "[m]ere expectancy interest" insufficient to support RICO standing. (Doc. 157, p. 5). The Court disagrees.

RICO permits civil suits by individuals "injured in [their] business or property" by violations of that statute. *Bridge*, 553 U.S. at 647 (2008). However, it does not permit recovery based on "mere injury to a valuable intangible property interest" or "mere expectancy interests." *Regions Bank v. J.R. Oil Co., LLC*, 387 F.3d 721, 728 (8th Cir. 2004). The question here is whether Hatfield's alleged injury is to his "business or property" and, if so, whether the interest is merely to a valuable intangible property interest or expectancy interest.

Initially, it is helpful to pin down exactly what Hatfield is claiming here. In the Court's view, Hatfield has stated two theories of RICO injury with regard to the Recinos estate:

2

interference with its November 30 contract (hereinafter "Hatfield Contract") and interference with the resulting lien of attorney. The Court will address these in turn.

1. Interference with November 30 Contract

Logic would dictate that interference with a contract for professional services constitutes an injury to business; precedent tends to agree. The Ninth Circuit, for example, has held that intentional interference with a contract and interference with prospective business relations created RICO liability. *Diaz v. Gates*, 420 F.3d 897, 900 (9th Cir. 2005) (en banc). The Ninth Circuit reasoned that because intentional interference with a contract was a tort in California, "California law protects the legal entitlement to . . . contractual relations." *Id.* Accordingly, the plaintiff had a legally cognizable interest in his contractual relationships which created a "specific business []  interest" under RICO. *Id.* A Ninth Circuit panel later summarized the *Diaz* holding as follows: "an injury is compensable under RICO if the injury constitutes 'harm to a specific business or property interest' and if the alleged business or property interest is cognizable under state law." *Newcal Indus., Inc. v. Ikon Office Sol's*, 513 F.3d 1038, 1055 (9th Cir. 2008) (quoting *Diaz*).

The First and Sixth Circuits take a slightly different view, stating that "[a]lthough 'some role does exist for state law,' the question of 'where to set the "business or property" threshold depends on federal statutory purpose, and that purpose is likely to support a definition that is uniform throughout the country.'" *Jackson v. Sedgwick Claims Mgmt. Servs.*, 731 F.3d 556, 565 (6th Cir. 2013) (en banc) (quoting *DeMauro v. DeMauro*, 115 F.3d 94, 96–97 (1st Cir. 1997)). So what was that statutory purpose? In *Holmes v. Sec. Inv. Prot. Corp.*, the Supreme Court noted that Congress modeled the "business or property" requirement on a provision of the Clayton Act. 503 U.S. 258, 267 (1992). The Supreme Court has interpreted the Clayton Act's "business or property" provision based on the plain meaning of those terms as set forth in Webster's Third New

3

International Dictionary, 1961 edition. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 338 (1979). And Webster's Third New International Dictionary, 1961 edition, defines business as (among other things) "commercial or mercantile activity customarily engaged in as a means of livelihood." *Bowens v. Adidas Am., Inc.*, 84 F.4th 166, 173 (4th Cir. 2023) (defining "business" for RICO purposes by reference to this definition).

Turning to the present case, Arkansas recognizes a cause of action for "tortious interference [with] a contractual relationship or business expectancy." *Crockett v. C.A.G. Inv's, Inc.*, 361 S.W.3d 262, 267 (Ark. 2010). Under the reasoning of *Diaz*, Hatfield would have a cognizable business interest in the November 30 contract. Further, the making of contracts for representation by a lawyer is certainly "commercial or mercantile activity customarily engaged in as a means of livelihood." Therefore, it falls within the definition of "business" used by the Fourth Circuit, a definition which appears to fit the bill for a uniform, legislatively intended definition of "business" as sought by the Sixth and First Circuits. Accordingly, Hatfield's interest in the November 30 contract is a cognizable business injury under any of the prevailing definitions.

Defendants claim that, regardless, Hatfield's interest is not cognizable. First, they argue that an interest in a potential future judgment is not cognizable under RICO. As a general proposition, this may well be true. *See, e.g., Taylor v. Bettis*, 976 F. Supp. 2d 721, 737 (E.D.N.C. 2013) ("Th[e] possibility of a judgment in Plaintiffs' favor, and the possibility of a right to recover therefrom, is not a cognizable injury under RICO. It is, rather, a 'mere expectancy.'"); *Keeton v. Gynecare Worldwide*, 2016 WL 2753866, at *3 (S.D. Fla. January 29, 2016) (expectation interest in proceeds of a lawsuit "mere expectancy" or "intangible property interest"). But while Hatfield's *damages* may have depended on a hypothetical future judgment, Hatfield's *interest* was in the Hatfield Contract. And a contract is a cognizable business interest, even if the resulting profit is

4

speculative.[2]  *See Herzer v. Redstone*, 2018 WL 5094933, at *5 (C.D. Cal. July 10, 2018) (distinguishing a "business or contractual interest in [a revocable] Trust—whether present or future" from a bare expectancy interest in a revocable trust's funds).  Indeed, the profitability of many contracts is speculative, but this does not render them unenforceable in court.  Similarly, the fact that Hatfield may have ultimately made no money from the November 30 contract does not make its interest in that contract less cognizable.

Defendants also claim that, because the underlying lawsuit was for personal injury damages, Hatfield's interest in the contract cannot create standing under RICO.  It bears noting that there is an active circuit split concerning whether personal injury damages can support a RICO claim.  *Compare Jackson*, 731 F.3d at 565–66; *Doe v. Roe*, 958 F.2d 763, 767 (7th Cir. 1992); and *Grogan v. Platt*, 835 F.2d 844, 845 (11th Cir. 1988); *with Horn v. Med. Marijuana, Inc.*, 80 F.4th 130, 133 (2d Cir. 2023); *Diaz*, 420 F.3d at 900.  The Eighth Circuit has yet to weigh in, although the Supreme Court has been asked to.  *See Med. Marijuana, Inc. v. Horn*, Supreme Court Doc. No. 23-365.  But even when courts have held that personal injury damages cannot give rise to a RICO claim, they have done so on the grounds that a personal injury is not an "injury to business or property."  *Jackson*, 731 F.3d at 558 ("[P]laintiffs have not pled an injury to their 'business or property' as required under § 1964(c)[.]"); *Doe*, 958 F.2d at 770 (fact that plaintiff "can show a financial loss does not, by definition, establish that she has suffered a business or property injury

---

[2] The Eighth Circuit has indicated that even a contractual interest is not cognizable where it had "no value from its inception" or where the plaintiff, aware of all material facts, waived enforcement before bringing a RICO action. *Regions*, 387 F.3d at 727, 730–31 (plaintiff held junior security interest in encumbered collateral and failed to assert its right to repayment during the defendant's bankruptcy); *see also Bowen*, 84 F.4th at 174 (plaintiff "cannot now sue under RICO to recover benefits he voluntarily surrendered").  However, the alleged facts of this case do not fall into either category.  The contract was not affirmatively valueless, only of uncertain value; and Hatfield alleges that any waiver was the product of Defendant's misrepresentations.

5

within the meaning of § 1964(c). Most personal injuries . . . will entail some pecuniary consequences."); *Grogan*, 835 F.2d at 847 (finding that Congress did not intend for definition of "business or property" to reach personal injury damages). As discussed above, Hatfield had a cognizable business interest in the Hatfield Contract. The Court will not read the law to dictate that otherwise-cognizable contractual interests are stripped of RICO's protections merely because the contract relates to *the counterparty's* personal injury.

### 2. Interference with Lien of Attorney

Hatfield also claims that Defendants' misrepresentations deprived it of a lien arising from the November 30 contract. Specifically, Hatfield claims that Defendants' misrepresentations to the state probate court about the validity of Defendants' own contract (hereinafter the "Nunez Contract") thwarted Hatfield's recovery of the lien proceeds.

As relevant here, Black's Law Dictionary defines a lien as "[a] legal right or *interest* that a creditor has in another's *property*[.]" (Black's Law Dictionary, 11th ed. 2019). A lien is, therefore, an interest in property. Caselaw supports the proposition that interference with a lien can give rise to a RICO action. *Kruse v. Repp*, 611 F. Supp. 3d 666, 693 (S.D. Iowa 2020) (encumbering a property to prevent placement of a judgment lien caused RICO injury). Indeed, the Supreme Court has indicated that interference with *the acquisition of* a lien can give rise to a RICO action. *Bridge*, 553 U.S. at 649. It stands to reason, therefore, that a lien represents a cognizable property interest for RICO purposes.

### b. Injury

The Court now turns to whether Hatfield was injured in its interests. In the Eighth Circuit, "a showing of injury requires proof of concrete financial loss, and not mere injury to a valuable intangible property interest." *Regions*, 387 F.3d at 729 (quoting *Steele v. Hosp. Corp. of Am.*, 36

6

F.3d 69, 70 (9th Cir. 1994)). The Ninth Circuit, which originated this standard, has indicated that the thwarted intent to monetize a cognizable interest gives rise to a concrete loss. *Diaz*, 420 F.3d at 900–01 (difference between current and future employment, both cognizable interests under applicable law, "is not relevant to whether there was an injury to 'business or property'" although "it may be easier to prove causation or determine damages for a plaintiff who has lost current employment"); *accord. Ainsworth v. Owenby*, 326 F. Supp. 3d 1111, 1126 (D. Or. 2018) ("Although the [*Diaz*] plaintiff was entitled to no wages from prospective employers and any financial loss was therefore as yet unrealized, his injury was tangible because not only did he possess a valuable property interest, but he had a present intent to monetize it."). Concrete financial loss, in other words, need not involve the loss of money already in a plaintiff's possession.

What, then, makes a financial loss "concrete"? The Fifth Circuit has said that "the test[3] is a factual one" such that "[a] plaintiff need not show that the other party *would have been obliged* to confer a benefit, only that the other party *would have conferred* the benefit." *Gil Ramirez Grp., L.L.C. v. Houston Ind. Sch. Dist.*, 786 F.3d 40, 409–10 (5th Cir. 2015). In that case, a contractor alleged that a school district stopped assigning it work due to corruption by other contractors. *Id.* at 409. However, the award of any contracts was at the district's discretion, meaning that even without the interference of competitors, the contractor might not have been assigned any contracts. *Id.* The Fifth Circuit held that the district's "discretion to award fewer contracts, or no contracts

---

[3] Rather than the Eighth and Ninth Circuit's requirement of "proof of concrete financial loss, and not mere injury to a valuable intangible property interest," the Fifth Circuit says that a "plaintiff's injury must be 'conclusive' and cannot be 'speculative.'" *Gil Ramirez Grp., L.L.C. v. Houston Ind. Sch. Dist.*, 786 F.3d 400, 409 (5th Cir. 2015) (quoting *In re Taxable Mun. Bond. Sec. Litig.*, 51 F.3d 518, 523 (5th Cir. 1995)). However, the Fifth Circuit rule is taken from the summary of an analysis in which the Fifth Circuit cites the Ninth Circuit's "concrete financial loss"/"not mere injury to a valuable property interest" standard, which the Eighth Circuit would later adopt, with approval. *In re Taxable Mun. Bond.*, 51 F.3d at 523. Accordingly, this Court concludes that the Fifth Circuit's standard is materially identical to the Eighth Circuit's.

at all, does not prohibit [the contractor] from demonstrating that but for corruption, it would have continued to receive awards." *Id.* at 410. The Second Circuit has similarly indicated that the proper test for concrete loss is factual. *Commercial Cleaning Servs., L.L.C. v. Colin Serv. Sys., Inc.*, 271 F.3d 374, 383 (2d Cir. 2001). There, a cleaning service alleged that its competitor won a contract by unlawfully employing underpaid illegal immigrants, which allowed it to make a low bid. *Id.* at 379. The Second Circuit stated that "[i]f [the cleaning service] can prove that but for [the competitor's] lower wage costs attributable to its illegal hiring scheme, [the cleaning service] would have won the contract and would have earned a profit on it, it will have shown a[n] . . . injury compensable under RICO." *Id.* at 383.

Here, Hatfield argues that it would have obtained a favorable result in the Recinos wrongful death case. It claims in its complaint that liability was not contested, that Defendants obtained a settlement even though their litigation and investigation of the matter were deficient, and that Jason Hatfield was an experienced and skilled lawyer with previous success against the wrongful-death defendant. Taking the claims as true, this is sufficient to show that Hatfield "would have earned a profit" from the Hatfield Contract.

Hatfield's injury from interference with the lien is still more straightforward. In Arkansas, an attorney's lien attaches to settlement proceeds. *Froelich v. Graham*, 80 S.W.3d 360, 363 (Ark. 2002). The wrongful death case has settled. Interference with the lien, assuming the lien's validity, therefore deprived Hatfield of a share of the settlement proceeds, causing a "concrete financial loss."

Given the above, Hatfield has adequately alleged injuries to cognizable interests.

    c. *Causation*

8

Finally, Hatfield must show that the defendants' RICO violations proximately caused its injury.

It will be helpful to clarify here exactly what RICO violations Hatfield has properly alleged. Hatfield claims that Defendants have committed the RICO predicate violations of mail and wire fraud. The Court's order disposing of the first round of motions to dismiss (Doc. 63) relied on the so-called *Abels* standard to define a "scheme to defraud" as "conduct which fails to conform to standards of moral uprightness, fundamental honesty, and fair play." (Doc. 63, pp. 21–22 (quoting *Murr Plumbing, Inc. v. Sherer Brothers Fin. Servs. Co.*, 48 F.3d 1066, 1069 n.6 (8th Cir. 1995)). However, this rule comes from an older decision, and more recent caselaw has been brought to the Court's attention[4] which narrows the range of "schemes to defraud" that can support a charge of mail or wire fraud. *United States v. Steffen*, 687 F.3d 1104, 1113 (8th Cir. 2012). The *Steffen* standard encompasses acts in violation of "a fiduciary, statutory, or other independent legal duty to disclose material information" as well as "acts taken to conceal, create a false impression, mislead, or otherwise deceive in order to prevent the other party from acquiring material information." *Id.*

Although Defendants' citation of *Steffen* is well-taken, it does not dispose of Hatfield's complaint. Hatfield has alleged the use of a fake law firm to acquire clients and pass fee awards to case runners. Both customers and courts, Hatfield claims, were deceived by the false name "Nunez Law Firm" and by Defendants' representations to the effect that Nunez & Associates was a real law firm working on the case. Certainly, in hiring legal counsel or awarding attorney's fees,

---

[4] The Court would have preferred it if *Steffens*, being apposite caselaw with a direct bearing on Hatfield's cause of action, had been brought to its attention in one of the two rounds of motions to dismiss as opposed to in a response to Hatfield's motion for summary judgment. However, in the interest of justice and judicial efficiency, the Court considers *Steffens* here.

a purported law firm's status as a law firm is "material." *Preston v. United States*, 312 F.3d 959, 961 (8th Cir. 2002) (a material fact is "a fact that would be important to a reasonable person in deciding whether to engage or not to engage in a particular transaction"). Accordingly, Hatfield has alleged a scheme to defraud.

Beyond a scheme to defraud, the elements of mail and wire fraud are "(2) intent to defraud, (3) reasonable foreseeability that the mail [or wires] would be used, and (4) [that] the mail [or wires were] used in furtherance of some essential step in the scheme." *H&Q Properties, Inc. v. Doll*, 793 F.3d 852, 856 (8th Cir. 2015). Hatfield has alleged intent to defraud, and it is foreseeable that the mail or wires would be used in doing so given the interstate and international nature of the alleged conspiracy. That leaves the fourth element, the use of mail or wires "in furtherance of some essential step of the scheme." Hatfield has properly alleged that mail and wires were used to communicate with clients, coordinate between participants, transmit documents with the misleading firm name, file misleading pleadings in court, and tell Hatfield to "stand down" under the false pretense that the contract was valid. Accordingly, Hatfield has alleged all of the elements of wire fraud.

The law requires "some direct relation between the injury asserted and the injurious conduct alleged." *Anza*, 547 U.S. at 457 (quoting *Holmes*, 503 U.S. at 268). Specifically, the asserted injury must be "the harm caused by predicate acts sufficiently related to constitute a pattern[.]" *Id.* Hatfield has alleged predicate offenses of mail and wire fraud; accordingly, it must trace its injury directly to such an instance. In determining the "directness" of an injury for RICO purposes, the Eighth Circuit considers the degree to which the plaintiff's damages are caused by the defendant's actions, the risk of multiple recovery, and other directly injured parties who might bring suit. *Bieter Co. v. Blomquist*, 987 F.2d 1319, 1325 (8th Cir. 1993).

The Court cannot find that Hatfield was "directly" injured by the initial fraudulent solicitation of the survivors which led to the Nunez Contract. Hatfield alleges that it secured the representation of Vidal, Ever, and Laura despite this solicitation, so the solicitation itself did not directly damage Hatfield even if Defendants' tactics were unfair to their competitors. *See Anza*, 547 U.S. at 460 ("A RICO plaintiff cannot circumvent the proximate-cause requirement simply by claiming that the defendant's aim was to increase market share at a competitor's expense."). Further, although there is no particular risk of double recovery, the family members who were solicited would be in the best position to bring suit over the improper solicitation. Accordingly, Hatfield was not directly harmed by the funeral-home solicitation.

The intra-conspiracy and client communications immediately after Hatfield obtained the Hatfield Contract, however, directly harmed Hatfield. As alleged, Defendants were able to use the wires (specifically, phones) to learn from Defendant Mancia about the Hatfield Contract, coordinate travel to Springdale, and pressure Hatfield's clients both over the phone and in person to cancel the Hatfield Contract. At least some of these conversations, Hatfield alleges, involved fraudulent promises of citizenship. The claimed interference targeted Hatfield and the Hatfield Contract directly, causing Hatfield's clients to cease communication and therefore causing (or at least greatly contributing to) a breakdown in the contractual relationship. While the clients themselves could potentially sue over this interference, they (who ultimately won a settlement through Defendants' involvement) would not have more incentive than Hatfield (which ultimately obtained nothing due to Defendants' involvement) to bring such a suit. And because Hatfield claims entitlement to a separate portion of the hypothetical lost judgment (namely, the contingent fee) than its clients would if they sued Defendants, there is no risk of double recovery.

11

Accordingly, the post-Hatfield-contract communications between Defendants and from Defendants to the clients represent a direct cause of Hatfield's injury.

Similarly, Kherkher's communication to Jason Hatfield directing Hatfield to "stand down" because the Nunez Contract was a valid preexisting contract can be said to have directly caused Hatfield's injury. Hatfield pleads that it stopped communication with all three clients because Kherkher claimed there was a preexisting valid contract. The effect of this was to cause Hatfield to abandon the Hatfield Contract under false pretenses. Therefore, Hatfield has properly alleged a direct injury from Kherkher's communication. Further, Hatfield, as the subject of the deception, is in the best position to sue over it, and there is no risk of double recovery for the reasons described above. Accordingly, Hatfield has adequately pleaded direct injury based on Kherkher's misrepresentations.

In addition, Defendants' alleged misrepresentations to the state court represent a direct injury to Hatfield, who was an active participant in that litigation and sought to have the Nunez Contract declared void. Key to the Nunez Contract's validity would have been the legitimacy of the firm that executed it, Nunez. By allegedly knowing of and concealing Nunez's true nature, Defendants deprived Hatfield of an otherwise-valid attorney's lien. Because the funds Hatfield sought would come out of Defendants' share of the settlement and not the clients', Hatfield is best positioned to sue over this misrepresentation and there is no risk of double recovery. Accordingly, Hatfield has adequately pleaded direct injury to the lien interest from Defendants' misrepresentations.

Finally, Hatfield indicates that Defendants misled Vidal by claiming that Vidal could not inherit from his sister's wrongful death settlement if he did not sign on with Defendants. As alleged, however, this does not constitute a direct injury to Hatfield. This alleged misstatement

12

took place long after Vidal ceased communication with Jason Hatfield, making a causal connection to the relationship breakdown tenuous. Further, while Hatfield was not damaged more than any other firm that Vidal chose not to hire, Vidal was allegedly hoodwinked into engaging Defendants and would be the more direct (and more proper) victim in a hypothetical lawsuit over this charge. Given this, Hatfield cannot demonstrate direct damage from the misrepresentation to Vidal.

For the foregoing reasons, the Court finds that Hatfield has demonstrated RICO standing as to its injuries arising from the communications between Defendants, as well as between Defendants and the clients, in the immediate wake of the Hatfield Contract. Hatfield has also demonstrated standing as to its injuries resulting from Kherkher's misrepresentations to Jason Hatfield. Finally, Hatfield has demonstrated standing as to the misrepresentations Defendants made in state court concerning the Nunez Contract and Nunez's involvement in the case.

## II. RICO Standing – Mejia Estate

Hatfield has not, however, stated a RICO claim as to the Mejia estate. Even assuming that Hatfield had a cognizable business or property interest in its expectation of the Mejia family's business, Hatfield cannot show direct injury to that interest. As noted in the Court's opinion on the previous round of motions to dismiss, there were many potential reasons for the Mejias to select a lawyer other than Hatfield: they might have had an established relationship with another lawyer, or they might have preferred a cheaper lawyer or one who personally spoke Spanish. This tends to defeat the causal connection between Defendants' actions and Hatfield's alleged injury. *See Anza*, 547 U.S. at 458 ("[The plaintiff]'s lost sales could have resulted from factors other than [defendants'] alleged acts of fraud. Businesses lose and gain customers for many reasons[.]". Further, Hatfield was not injured more directly than any other firm which the Mejias might have hired. *See id.* at 460 ("A RICO plaintiff cannot circumvent the proximate-cause requirement

simply by claiming that the defendant's aim was to increase market share at a competitor's expense."). For these reasons, Hatfield cannot state a RICO claim as to the Mejia estate.

### III. § 1962(a) Claims – Use or Investment of Racketeering Funds

Defendants argue that Hatfield cannot state a claim under 42 U.S.C. § 1962(a), which prohibits the investment of income derived from racketeering activity into "any interest in, or the establishment or operation of," an enterprise engaged in or affecting interstate or foreign commerce. The Court agrees.

Hatfield's theory of injury under § 1962(a) is that "the income from prior successful executions of the RICO scheme generated income which was not only reinvested in the RICO scheme and which led to a later instance in which Hatfield suffered injuries from the RICO scheme, it was used to run other otherwise lawful businesses such as the Kherkher Garcia and Pirani Law firms." (Doc. 192, p. 6). However, the Eighth Circuit has clearly stated that "to bring a claim under § 1962(a), a plaintiff must allege an injury from the use or investment of the racketeering income that is separate and distinct from injuries allegedly caused by the defendant's engaging in the predicate acts." *Fogie v. THORN Americas, Inc.*, 190 F.3d 889, 896 (8th Cir. 1999).

Hatfield endeavors to distinguish *Fogie* on the grounds that that case dealt with the prospective investment of the plaintiff's lost money in an ongoing RICO scheme rather than the use of "money from previous iterations of the scheme . . . to maintain the scheme such that it could be brought to bear against the plaintiff." (Doc. 192, p. 6). Hatfield points out that one of the cases cited by the *Fogie* court makes such a distinction. *Id.* (citing *Vemco, Inc. v. Camardella*, 23 F.3d 129, 132 (6th Cir. 1994)). However, the Eighth Circuit mentioned *Vemco* only in a string citation after a sentence describing a circuit split. *Fogie*, 190 F.3d at 895. There is no indication in *Fogie* that the Eighth Circuit meant to adopt *Vemco*'s logic, endorse *Vemco*'s reasoning, or invoke *Vemco*

14

for any other purpose than to demonstrate the Sixth Circuit's stance on the basic question. Instead, *Fogie*'s reasoning indicates that the distinct-injury requirement sweeps in Hatfield's claims here: "A distinct injury is required because, if reinvestment 'were to suffice, the use-or-investment injury requirement would be almost completely eviscerated when the alleged pattern of racketeering is committed on behalf of a corporation . . . . Over the long term, corporations generally reinvest their profits, regardless of source.'" *Id.* at 896 (quoting *Brittingham v. Mobil Corp.*, 943 F.2d 297, 305 (3d Cir. 1991)) (alterations in original).

Because Hatfield does not claim an injury from investment distinct from its injury from the predicate acts, its claims under § 1962(a) must be dismissed.

## IV.  § 1962(b) Claims – Acquisition or Maintenance of Interest or Control

The Eighth Circuit has not passed on the injury requirement for standing under § 1962(b), which bars the use of racketeering activity to "acquire or maintain . . . any interest in or control of any enterprise" engaged in or affecting interstate or foreign commerce. However, "all circuits but the Fourth and Eighth require plaintiffs alleging a section 1962(b) violation to identify an 'acquisition or maintenance' injury"; that is, an injury that resulted from acquisition or maintenance but not from a predicate racketeering offense. *D'Addario v. D'Addario*, 901 F.3d 80, 97 (2d Cir. 2018) (citing Jed S. Rakoff and Howard W. Goldstein, *RICO: Civil and Criminal Law and Strategy*, § 3.03[2], 28–29 & n. 23 (2011)); *see also, e.g., Advocacy Org. for Patients and Providers v. Auto Club Ins. Ass'n*, 176 F.3d 315, 329 (6th Cir. 1999) ("[A] complaint for violation of § 1962(b) must allege an 'acquisition or maintenance' injury separate and apart from the injury suffered as a result of the predicate acts of racketeering activity."); *Compagnie De Reassurance D'Ile de France v. New England Reinsurance Corp.*, 57 F.3d 56, 92 (1st Cir. 1995) ("[E]ven assuming that plaintiff proved the underlying RICO violation, they failed to prove any harm

15

beyond that resulting from the fraud which constituted the predicate act.); *Danielson v. Burnside-Ott Aviation Training Ctr., Inc.*, 941 F.2d 1220, 1231 (D.C. Cir. 1991) ("[P]laintiffs must allege an 'acquisition' injury, analogous to the 'use or investment injury' required under § 1962(a) to show injury by reason of a § 1962(b) violation[.]").

Neither the Fourth nor the Eighth Circuit appears to have formally passed on the question of 'acquisition or maintenance' injury. However, Eighth Circuit district courts presented with the question have held that a distinct 'acquisition or maintenance' injury is required to state a § 1962(b) violation for the same reason that a distinct 'investment' injury is required to state a § 1962(a) violation. *Cheng v. Wilcox*, 2023 WL 4059770, at *4 (D. Minn. June 8, 2023); *Airlines Reporting Corp. v. Barry*, 666 F. Supp. 1311, 1315 (D. Minn. 1987); *Midwest Fed. Savings & Loan Ass'n of Minneapolis v. Green Tree Acceptance, Inc.*, 1989 WL 411604, at *7 (D. Minn. Aug. 17, 1989). Because the 'acquisition or maintenance' injury requirement is the majority rule both among Circuits and within this Circuit, and because it is logically consistent with *Fogie*, the Court will adopt it here.

Under this rule, Hatfield has not stated an independent injury caused by Defendants' acquisition or maintenance of an interest in the enterprise. Hatfield argues that mail and wires were used to control the enterprise, but it misunderstands the standard: a plaintiff bringing a § 1962(b) claim must prove that the control of an enterprise *caused damage distinct from* a predicate act, not that the enterprise *was controlled through* predicate acts. Accordingly, Hatfield's § 1962(b) claims will be dismissed.

## V.   § 1962(c) Claims – Pattern of Racketeering Activity

Defendants argue that Hatfield has failed to allege a pattern of racketeering activity with a sufficient nexus to the alleged RICO enterprise. Specifically, Defendants argue that the alleged

16

enterprise was "between all defendants," but that not all of the current defendants were involved in the alleged pattern of Nunez & Associates' wire fraud that Hatfield cites to establish continuity, and that the acts against Hatfield are insufficient on their own to establish a "pattern."

Hatfield alleges that all Defendants "were employed by or associated with the enterprise." (Doc. 151, p. 68).  That is different from alleging that Defendants themselves were the sum total of the enterprise. Indeed, a closer look at the complaint indicates that the "enterprise" in question was the broader case-running scheme involving Nunez & Associates and its partner law firms.  *Id.* at 51 ("Kherkher, Garcia, Haynes, and Kherkher Garcia have known of the unethical and illegal business model of Nunez & Associates and received benefit and paid moneys to the enterprise for years.").  Hatfield has adequately pled that this "enterprise" is longstanding and ongoing.

However, "[t]he requirements of § 1962(c) must be established as to each individual defendant." *Craig Outdoor Advertising, Inc. v. Viacom Outdoor, Inc.*, 528 F.3d 1001, 1027 (8th Cir. 2008).  This includes the requirement that the fraudulent activities *by each defendant* reflect "multiple predicate acts occurring over a substantial period of time (closed-ended continuity) or evidence that the alleged predicate acts threaten to extend into the future (open-ended continuity)." *Id.* at 1028.  Complicating matters further, "mailings are insufficient to establish the continuity factor unless they contain misrepresentations themselves." *Crest Constr. II, Inc. v. Doe*, 660 F.3d 346, 356 (8th Cir. 2011).

The Court finds that Hatfield has adequately pled such continuity for Cesar Ornelas, Mike McCoy, Nunez & Associates, Kherkher Garcia, and Steven Kherkher.  Specifically, Hatfield alleges that "the vast majority" of contracts sent by mail or wire by Nunez & Associates to and from its U.S. affiliated law firms use the misleading name "Nunez Law Firm," particularly those contracts prepared by Kherkher Garcia, Kherkher's firm.  The name "Nunez Law Firm" is alleged

to be misleading to both clients and courts. Steven Kherkher is said to have a decade-long relationship with Cesar Ornelas and his entities, including Nunez & Associates and its predecessor Group of Legal Specialties, during which Ornelas procured cases for Kherkher and his firms. Kherkher Garcia is alleged to have received six cases over two years (involving an unknown total number of contracts) from Nunez & Associates, supposedly with the knowledge and blessing of several law partners. McCoy is a longtime associate of Ornelas who is responsible for transmitting the contracts via wire for countersignature. The circumstances indicate that the predicate mail and wire fraud has gone on for a considerable length of time, supporting a finding of closed-ended continuity. Further, Ornelas states that he does not intend to stop operating Nunez & Associates, which is sufficient to demonstrate open-ended continuity as to both Ornelas and Nunez & Associates. Taken together, this is sufficient to demonstrate the continuity element of § 1962(c) as to all five of these defendants. And continuity is the only element of § 1962(c) that Defendants challenge here. Accordingly, Hatfield has stated a § 1962(c) claims against Ornelas; McCoy; Kherkher Garcia, LLP; Nunez & Associates; and Steven Kherkher.

As to those defendants not named above, the Court does not believe that continuity has been established by the pleading of sufficient, or sufficiently specific, predicate acts. Accordingly, the § 1962(c) claims against Pirani, Pirani Law, Haynes, and Garcia will be dismissed. However, as a § 1962(c) claim has been stated against their codefendants, these defendants may still be liable for conspiracy to violate RICO under 18 U.S.C. § 1962(d).

## VI. § 1962(d) Claims – Conspiracy

Unlike § 1962(c), a charge under § 1962(d) does not require a defendant to commit any RICO predicate actions. *Salinas v. United States*, 522 U.S. 51, 66 (1997). Rather, "[a] conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a

[RICO] offense, but it suffices that he adopt the goal of furthering or facilitating the . . . endeavor." *Id.* at 65.  Here, the endeavor is alleged to have encompassed a fraud on Hatfield, the clients, and the state court through the use of a bogus law firm to funnel attorney fees to non-lawyer case runners.  Hatfield alleges that Pirani (and Pirani Law through Pirani) lied to the state court to perpetuate this fraud; this is sufficient to show an intent to further the RICO offense.  Similarly, Hatfield claims that Haynes drafted pleadings referring to "Nunez Law Firm" and claiming that it had rendered actual legal services in the case.  This, too, shows a goal of furthering or facilitating the fraud.  Accordingly, Hatfield has stated § 1962(d) claims as to these defendants.

Hatfield's § 1962(d) allegations against Garcia are weaker.  Hatfield alleges that Garcia knew of Nunez & Associates' true nature and that he has "actively participated in many fee-splitting agreements with Nunez & Associates."  Although scant, this allegation demonstrates willing participation in the conduct of the overall fee-funneling "enterprise," which is all that § 1962(d) requires.  Accordingly, at the motion to dismiss stage, Hatfield has stated a claim against Garcia under § 1962(d).

Finally, by alleging the commission of the predicate act and coordination with the other members of the conspiracy, Hatfield has stated a plausible conspiracy claim against the § 1962(c) defendants as well.

## VII. Conclusion

IT IS THEREFORE ORDERED that:

- Count 1 of Hatfield's Third Amended Complaint, alleging violations of § 1962(a), is DISMISSED WITH PREJUDICE as to all defendants.

- Count 2 of Hatfield's Third Amended Complaint, alleging violations of § 1962(b), is DISMISSED WITH PREJUDICE as to all defendants.

- Count 3 of Hatfield's Third Amended Complaint, alleging violations of § 1962(c), is DISMISSED WITH PREJUDICE as to Tony Pirani, Pirani Law PA, Jesus Garcia, and Kevin Haynes.  Count 3 remains for trial as to Steven Kherkher, Kherkher Garcia, Cesar Ornelas, Mike McCoy, and Nunez & Associates, with the caveat that Hatfield has only pled injury as to the Recinos Estate.

- Hatfield's claims regarding the Mancia Estate are DISMISSED WITH PREJUDICE.

- All other claims remain for trial.

IT IS SO ORDERED this 22nd day of December, 2023.

/s/ P. K. Holmes, III
P.K. HOLMES, III
U.S. DISTRICT JUDGE