UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

JASON M. HATFIELD, P.A.                                         PLAINTIFF

v.                            No. 5:22-cv-05110

CESAR ORNELAS; STEVEN KHERKHER;
MICHAEL McCOY; NOE JESUS MANCIA
POLANCO; NUNEZ & ASSOCIATES;
KHERKHER GARCIA, LLP; TONY PIRANI;
PIRANI LAW, PA; JESUS GARCIA; KEVIN
HAYNES                                                         DEFENDANTS

**OPINION AND ORDER**

Before the Court are the Motions for Summary Judgment brought by Jason M. Hatfield,

P.A. ("Hatfield") (Doc. 198); Jesus Garcia, Kevin Haynes, Steven Kherkher, and Kherkher Garcia,

LLP (collectively, "Kherkher Defendants") (Doc. 283); and Michael McCoy, Cesar Ornelas, and

Nunez & Associates (collectively, "Nunez Defendants") (Doc. 287).   The Court has also

considered the memorandum briefs (Docs. 199, 284, 288) and statements of fact (Docs. 200, 285,

289) in support, as well as the responses in opposition (Docs. 209, 211, 217, 307, 309), counter-

statements of fact (Docs. 210, 212, 216, 308, 310), and replies in support (Docs. 229–31, 311–12).

Additionally, the Court has considered materials from a related Arkansas case, *Estate of Flor*

*Recinos Valle*, which have been submitted to this Court.   (Docs. 318-1, 318-2, 328-1, 328-2, 328-

3, 329-1, 329-2, 329-3, 342-2, 342-3, 343-2, 343-3, 344-1, 344-2, 344-3, 348-1).   All parties have

briefed the effect of the Arkansas court's ruling on the pending case in this Court.   (Docs. 327–

331).   Based on the Arkansas ruling, the Nunez Defendants have moved to dismiss this matter for

lack of jurisdiction.   (Doc. 325).   The Court has considered their brief in support of that motion

(Doc. 326) and Hatfield's response in opposition (Doc. 337).   For the reasons stated below,

Defendants' motions for summary judgment will be GRANTED IN PART AND DENIED IN

PART.  Hatfield's motion for summary judgment will be DENIED.  The Nunez Defendants' motion to dismiss will likewise be DENIED.

For the sake of efficiency, the Court assumes the reader's familiarity with the documents listed in the preceding paragraph and the arguments contained therein.

### I.    Background

#### a.   Procedural Background

This is a complex case in every sense of the term, involving nearly a dozen individual and corporate parties who have been represented by a total of sixteen attorneys over the course of the litigation.  Hatfield, the plaintiff, brings its claims under the Racketeer Influenced and Corrupt Organization Act (RICO), 18 U.S.C. §§ 1961–64, a terse statute interpreted by "a body of case law that, charitably speaking, is less than pellucid[.]"  *Alix v. McKinsey & Co.*, 23 F.4th 196, 202 (2d Cir. 2022).  Both the RICO claims and a number of related state claims have been vigorously litigated in this Court.  Meanwhile, parallel litigation has been ongoing in the Circuit Court of Washington County, Arkansas, regarding Hatfield's entitlement to an attorney's lien which is also at issue in this federal case.  Because Hatfield sought to collect on the lien from the proceeds of an estate in probate, the Court will refer to the Arkansas litigation as the "probate case" and to the Washington County Circuit Court as the "probate court."

Before the probate court, Hatfield asserted its lien against the Estate of Flor Recinos Valle ("Estate"), which litigated through its personal representative, Noe Mancia.  Mancia was principally represented in the probate court by Tony Pirani of Pirani Law, PA and Steven Kherkher of Kherkher Garcia, LLP.  The probate court heard over twelve hours of testimony on the lien

issue in August and September of 2023.  (Doc. 348-1, p. 2).[1]  In November of 2023, the probate court heard additional argument from the parties' counsel.  *Id.*  On December 1, 2023, the parties submitted "a substantial volume of evidence . . . by stipulation" for the probate court's consideration, including some documents gathered or created as part of the federal case.  *Id.* at 3.  The parties filed "trial briefs" with the probate court on December 15, 2023.  *Id.*  After two hours of closing arguments on December 21, 2023, the probate court orally ruled for Hatfield.  *Id.* at 3–4.

The probate court's oral ruling came roughly a month before the federal case was scheduled to be tried and in the midst of this Court's efforts to resolve the parties' newly ripe motions for summary judgment.  By the time this Court received a copy of the probate court's final orders, the federal trial was less than three weeks out.  The Court ordered expedited briefing on the res judicata effects of the probate court's orders, but it quickly became clear that there was insufficient time to resolve the complex questions involved before the trial began.  Further, even assuming a speedy resolution of the res judicata issue, the motions for summary judgment could not be resolved until after the res judicata issue was settled, leaving the status of the case, claims, and parties uncertain until the eve of the trial itself.  Accordingly, the Court cancelled the trial.  (Doc. 338).

Because both are potentially dispositive, and because the Court's findings regarding res judicata bear on which facts may be taken as true for purposes of summary judgment, the Court will take up the res judicata issues together with the parties' motions for summary judgment.

b.  *Legal Background*

---

[1] Citations to the record in this opinion reference the automatically-generated CM/ECF page number, not the document's native numbering.

On a motion for summary judgment, the movant has the burden to show that there is no genuine dispute of material fact and that it is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56.  The same standard applies to cross-motions for summary judgment, with each motion reviewed in its own right and each opposing party "entitled to the benefit of all inferences favorable to them which might reasonably be drawn from the record." *Wermager v. Cormorant Twp. Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983).  Once the movant has met its burden, the non-movant must present specific facts showing a genuine dispute of material fact exists for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  For there to be a genuine dispute of material fact, the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66–67 (8th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

Before reaching the parties' arguments for summary judgment, however, the Court must analyze the res judicata effect of the probate court's order.  "Res judicata means that a thing or matter has been definitely and finally settled and determined on its merits by the decision of a court of competent jurisdiction." *Beebe v. Fountain Lake Sch. Dist.*, 231 S.W.3d 628, 635 (Ark. 2006) (internal quotations omitted).  "Res judicata consists of two facets, one being issue preclusion and the other claim preclusion."[2] *Id.* (internal quotations omitted).  Claim preclusion applies to subsequent cases asserting the same "claim or cause of action." *Baptist Health v. Murphy*, 373 S.W.3d 269, 278 (Ark. 2010).  By contrast, issue preclusion applies on the more granular level of "issues of law or fact." *Beebe*, 231 S.W.3d at 635.  Issue preclusion was the only aspect of res

---

[2] Confusingly, the term "res judicata" is sometimes used to refer only to claim preclusion. *See id.* at 636 (referring to the fifth element of the test for claim preclusion as "the fifth element of res judicata").  Likewise, issue preclusion is often referred to by its older synonym, "collateral estoppel." *See id.* at 635.  For clarity, this Court will endeavor to use the terms "claim preclusion" and "issue preclusion," but not all cited or quoted material will do the same.

judicata briefed substantively by the parties, and the commonalities between the federal and probate cases which might be characterized as identical claims or causes of action are more easily disposed of by the doctrines of mootness and statutory standing. Accordingly, the Court proceeds to exclusively analyze issue preclusion.

## II.  Application of Issue Preclusion

As recounted in this Court's order cancelling the jury trial in this matter (Doc. 338), Arkansas law applies to determine what issues raised in the probate matter are precluded from relitigation in this federal matter. Per the Arkansas Supreme Court:

> Collateral estoppel, or issue preclusion, bars the relitigation of matters directly and necessarily litigated in a previous action. Specifically, collateral estoppel requires that (1) the issue sought to be precluded must be the same as that involved in the prior litigation; (2) the issue must have been actually litigated; (3) the issue must have been determined by a valid and final judgment; and (4) a determination must have been essential to the judgment.

*Nat'l. Bank of Com. v. Dow Chem. Co.*, 1 S.W.3d 445, 449 (Ark. 1999); *see also Scott v. City of Sherwood*, --- F.4th ---, 2024 WL 930486, at *2 (8th Cir. 2024) (same). Later cases have stated a fifth requirement: that the parties to whom preclusion is applied must have been parties, or privies of parties, to the prior litigation. *Crockett v. C.A.G. Inv., Inc.*, 381 S.W.3d 793, 799 (Ark. 2011). The Court will address these elements in turn.

### a.  Identity of Issues

Many of the issues raised in this federal case were also raised in the probate case and vice versa. *See* Doc. 348-1, pp. 2–3 (evidence from federal case admitted in probate proceeding). The Court's review of both records indicates that the following issues arose, to one extent or another, in both cases:

- The validity of Hatfield's lien.

- The validity of Hatfield's contract with certain heirs of Ms. Recinos ( "the clients").

- Whether the clients intended to engage Hatfield for representation in the wrongful-death case.

- Why Hatfield was terminated as counsel for the clients.

- The means by which the November 25 "Nunez Law Firm" contract was procured.

- The validity of the November 25 "Nunez Law Firm" contract.

- Whether Nunez & Associates is a real law firm.

The Nunez Defendants claim there is another overlapping issue: that of Hatfield's damages. According to them, the probate court "orders establish the full amount of Hatfield's lien and attorneys' fees earned under its contract related to the Recinos estate and award that amount[,]" meaning that "Hatfield has received all the fees to which it is entitled and cannot get more in this case because to do so would be to relitigate issues[.]" (Doc. 327, p. 5). The Nunez Defendants are correct so far as the lien itself is concerned, an issue the Court will address later in this opinion. However, the probate court's orders do not purport to determine Hatfield's entitlement to any funds beyond the lien proceeds themselves. *See* Docs. 318-1, 318-2. Accordingly, the Court cannot say that the nature or amount of Hatfield's RICO damages besides the lien proceeds was at issue in both cases.

### b. *Actual Litigation*

"In the context of collateral estoppel, 'actually litigated' means that the issue was raised in the pleadings, or otherwise, that the [party to be estopped] had a full and fair opportunity to be heard, and that a decision was rendered on the issue." *Powell v. Lane*, 289 S.W.3d 440, 445 (Ark. 2008). The Court will consider the identified issues one at a time to determine whether they meet these criteria.

<u>The validity of Hatfield's lien.</u>  Before the probate court,  the Estate characterized the validity of Hatfield's lien as "the narrow legal issue before this [probate] Court," filing a "Motion to Determine and Quash" the lien and contending therein that the lien was invalid.  (Doc. 342-2, pp. 2–3).  Indeed, the Estate styled its "trial brief" in advance of the final probate hearing as a brief in support of its motion to quash.  (Doc. 342-3, p. 2).  The probate court began this final hearing by announcing that "we are here . . . *on the validity of a lien* and the contracts regarding Mr. Kherkher[,]" which Kherkher agreed "sound[ed] about right[.]"  (Doc. 329-2, p. 997) (emphasis added).  Both parties in the probate matter proceeded to discuss the lien during the hearing.  *E.g., id.* at 1045 ("We ask that you award the entire [amount] to Jason Hatfield, under the statutory lien analysis."); 1055 (Kherkher claims "the opposing counsel has failed to show their burden of proof, that they have a lien on this money."); 1074 ("Mr. Hatfield has no legal, valid lien.").  Finally, the probate court rendered a decision on the lien issue, stating that "Hatfield has a perfected lien over all claims and the Estate, generally."  (Doc. 318-1, p. 6).  Accordingly, the validity of Hatfield's lien was actually litigated.

<u>The validity of Hatfield's contract.</u>  Like the lien that it supported, Hatfield's contract and its validity were front and center during the probate proceedings.  The Estate's motion to quash the lien included a section on "Hatfield's Invalid Contract and Lack of Formation."  (Doc. 342-3, pp. 9–10).  The Estate's final merits brief, styled as a brief in support of its motion to quash, argued in part that Hatfield's contract was "invalid from the start" and that Arkansas' attorney "lien statute cannot be used to enforce a fee contract that was never properly formed."  (Doc. 342-2, pp. 2–3).  The same brief asserted that "there was never a contract formed between Hatfield [and the clients] for Hatfield's representation of their wrongful death claims[,]" then devoted four pages to legal and factual arguments in support of this assertion.  *Id.* at 18–22.  In one interaction with the court,

when discussing the appropriate scope of the final merits hearing, Kherkher asserted that "we ought to focus on the lien and the contract and what the family's intention was when they came to see Mr. Hatfield for family law custody issues." (Doc. 343-3, p. 45).

Indeed, at the final merits hearing, both Kherkher and Pirani presented arguments against the Hatfield contract's validity. Kherkher presented three main arguments, one of which was that "the clients . . . never signed with Hatfield." (Doc. 329-2, p. 1055). He asserted that "this Court needs to determine whether there was a contract with Mr. Hatfield. And as you know, the lien statute requires a valid contract." *Id.* at 1074. He asserted a laundry list of reasons for the Hatfield contract's invalidity—"undue influence, misrepresentation, violation of confidence, fraud, concealment"—and directed the probate court to review the Estate's briefing on the issue. *Id.* at 1085. For his part, Pirani expressed an "understanding [that] what is squarely before the Court, is the validity of Mr. Hatfield's contract, and if Mr. Hatfield does not have a valid contract, he does not have a valid lien." *Id.* at 1094. He referred to other issues raised by Hatfield as attempts "to distract from whether are [sic] not Mr. Hatfield has a valid contract[.]" *Id.* at 1096. Ultimately, the probate court "found the contract for representation by Hatfield to be both valid and enforceable[.]" (Doc. 348-1, p. 4). Accordingly, the validity of Hatfield's contract was actually litigated.

The clients' intent to retain Hatfield for the accident case. Key to the Estate's argument that Hatfield's contract was invalid was the assertion that the clients did not intend to hire Hatfield for representation in the accident case and did not know that they had signed a contract for such representation. The introductory pages of the Estate's final merits brief stated that the clients "only met with Hatfield for representation on a family law matter, and not to pursue a wrongful death claim" and that "[t]here was never any mutual assent to Hatfield's proposed terms for wrongful

death representation, making the contract invalid from the start." (Doc. 342-2, pp. 2–3). The Estate argued that "neither Vidal, Ever, nor Laura—the only three members of the Recinos family who met with Hatfield—thought the Hatfield contract was for representation in a wrongful death case." *Id.* at 12. The Estate cited the well-known rule of contract law that "if there is no meeting of the minds, there is no contract" to argue that Hatfield's contract was invalid. *Id.* at 19 (citing *Williamson v. Sanofi Winthrop Pharms.*, 60 S.W.3d 428, 434 (Ark. 2001)). Indeed, Kherkher expressed a desire "to focus on the lien and the contract and *what the family's intention was when they came to see Mr. Hatfield for child custody issues*." (Doc. 343-3, p. 45 (emphasis added)).

At the final hearing, Hatfield's attorney reiterated the evidence offered to show that the clients had intended to hire Hatfield in the wrongful death case and understood the contract which they signed. (Doc. 329-2, pp. 1013–14). Kherkher, for his part, cited the clients' testimony that they did not understand themselves to have hired Hatfield, also highlighting irregularities in Hatfield's client intake procedure. *Id.* at 1080–84. And Pirani characterized the clients as having "repeatedly testified" that they had been "misled and tricked by Mr. Hatfield" into signing the contract. *Id.* at 1095.

The probate court did not explicitly determine whether the clients intended to hire Hatfield for the wrongful death case. However, as the Estate pointed out, there cannot be a contract under Arkansas law without a finding that both parties assented to the terms thereof. Therefore, the decision that the Hatfield contract was valid necessarily includes the decision that both Hatfield and the clients assented to the contract's terms. *Cf.* RESTATEMENT (SECOND) OF JUDGMENTS § 27(g) (Am. L. Inst. 1982) ("If several issues are litigated in an action, and a judgment cannot properly be rendered in favor of one party unless all of the issues are decided in his favor, and judgment is given for him, the judgment is conclusive with respect to all the issues."); *Beaver v.*

*John Q. Hammons Hotels, Inc.*, 102 S.W.3d 903, 906 (Ark. Ct. App. 2003) (noting that the Arkansas "supreme court has relied upon section 27 of the second Restatement" of Judgments in several cases). Accordingly, whether the clients intended to retain Hatfield in the wrongful death case was an issue actually litigated in the probate case.

    <u>The reason for Hatfield's termination.</u> In its probate pleadings, the Estate offered a simple explanation for Hatfield's termination: Hatfield had never been hired in the first place, and the clients took steps to cancel the purported contract as soon as they learned of it. "Had they known the Hatfield contract related to the accident that caused Ms. Recinos' death," the Estate argued, "they would not have signed it. . . . [T]he Recinos family took immediate action to cancel the Hatfield contract when they learned Hatfield claimed to represent them for a wrongful death claim." (Doc. 342-2, p. 20). Elsewhere, the Estate argued that Hatfield had "abandoned" the clients by failing to complete any work on their case after being told by Kherkher and the clients to stop, with such abandonment constituting "cause" to cancel the contract. (Doc. 342-3, pp. 13–14). At the final merits hearing, Hatfield's counsel attributed the cancellation to pressure from the defendants and Hatfield's stoppage of work to ethical obligations. (Doc. 329-2, p. 1045). Pirani, for his part, pressed the argument that the clients "were misled and tricked by Mr. Hatfield, and when they found out what had happened they immediately took action to cancel" the purported contract. *Id.* at 1095. Ultimately, the probate court found that Hatfield was not terminated for cause. (Doc. 318-2, p. 2). Accordingly, the issue of why Hatfield was terminated was actually litigated before the probate court.

    <u>The means by which the "Nunez Law Firm" contract was procured.</u> This issue received attention in both parties' briefing. Hatfield's final merits brief led off by alleging "a pay-to-refer scheme involving a funeral home who personally arranged for families to meet nonlawyers Mike

McCoy and Cesar Ornelas." (Doc. 343-1, p. 2). The Estate did not dispute that a meeting had taken place or that the funeral director had arranged it, but emphasized that lawyers were present during the meeting and that it was arranged at the families' request. (Doc. 342-2, pp. 5–7).

At the final hearing, Hatfield presented solicitation "scripts" allegedly distributed by McCoy to funeral directors. (Doc. 329-2, p. 1015). Hatfield also introduced texts indicating the funeral director sent McCoy the accident report and McCoy agreed to pay up to $15,000 for each funeral *before* the Recinos family had contacted the funeral home. *Id.* at 1016–17. Indeed, a large portion of Hatfield's argument time was taken up by a rundown of the alleged case-running scheme. *Id.* at 1014–28. Hatfield also claimed that Kherkher had paid some of the Recinos family's living expenses, that there had been promises of citizenship made to the clients, and that but for the allegedly illicit activity, Hatfield would have been the only firm engaged in the wrongful-death case. *Id.* at 1037, 1044.

Kherkher continued to reiterate the Estate's version of events, emphasizing that the meeting was at the request of the families and that inter-industry networking to obtain new clients is a normal and legal part of business. (Doc. 329-2, pp. 1056–57). He acknowledged that it was against Arkansas ethics rules for a lawyer to pay for a funeral, but stated that he had not known that and had self-reported to the Arkansas Bar after learning of the rule. *Id.* at 1058. He also argued that violations of Arkansas professional conduct rules do not void a contract. *Id.*

Ultimately, the probate court held the initial "Nunez Law Firm" contract "and all subsequently signed engagement contracts involving Mr. Pirani, Mr. Kherkher, or the Nunez Law Firm[ ] are invalid because of the way in which such contracts for representation were procured or solicited." (Doc. 318-1, p. 3). Accordingly, the manner in which Defendants' contracts were procured was actually litigated before the probate court.

The validity of the November 25 "Nunez Law Firm" contract.   In the probate court, Hatfield filed a "motion for partial summary judgment on the issue of the invalidity of the Nunez Law Firm contract."  (Doc. 343-2, p. 2).  In response, the Estate argued the threshold matter of Hatfield's standing to void this contract.   (Doc. 342-2, pp. 3, 25–26).  In the alternative, it argued that violations of professional conduct rules were insufficient to void the contract; its third-string argument was that no rules had been violated.  *Id.* at 26–28.  At the final hearing, the probate judge said that "we are here . . . on the validity of a lien *and the contracts regarding Mr. Kherkher*," which Kherkher agreed "sound[ed] about right."  (Doc. 329-2, p. 997) (emphasis added).  Kherkher was a signatory to the "Nunez Law Firm" contract.   Both Hatfield and the Estate presented argument about the "Nunez Law Firm" contract's validity and Hatfield's standing to challenge it. *See id.* at 999, 1001–02 (counsel for Hatfield); 1055, 1058, 1072, 1090 (Kherkher); 1098 (Pirani). Ultimately, the probate court ruled that "Kherkher-Garcia, Pirani, and Nunez . . . have no valid contract based on the way it was procured." *Id.* at 1106.  Accordingly, the validity of the November 25 "Nunez Law Firm" contract was actually litigated in the probate court.

Whether Nunez & Associates is a real law firm.   This "issue" encompasses several interrelated questions as to Nunez & Associates' status.  Hatfield told the probate court that Nunez & Associates was a "Texas general partnership" which "has nothing to do with the practice of law in the United States" and used the misleading name "Nunez Law Firm."  (Doc. 343-2, pp. 14–15). The Estate, meanwhile, maintained that Nunez & Associates was a real law firm in Mexico and that "Nunez Law Firm" was simply an informal name for it.  (Doc. 342-2, pp. 27–28).   The status of Nunez & Associates was further raised by both parties at the final merits hearing.  (Doc. 329-2, pp. 1000–02, 1032–33 (Hatfield); 1053, 1063 (Kherkher); 1100 (Pirani)).

However, the status of Nunez & Associates was not raised in one particularly important place: the probate court's final judgment. While the November 25 "Nunez Law Firm" contract was ruled invalid "based on the way it was procured," *id.* at 1106, the probate court failed to mention exactly what about the procurement invalidated the contract. It could have been the involvement of a nonexistent law firm, or rather a non-law firm masquerading as a foreign law firm. But it could also have been the solicitation of survivors impermissibly soon after a death, the use of an improper referral, procedural irregularities with the drafting of the contract itself, or some combination of these. In any case, this Court cannot determine that a decision was rendered on the specific issue of Nunez & Associates' status. Accordingly, this issue was not "actually litigated" under the Arkansas issue preclusion rule.

### c. Determined by Valid and Final Judgment

To be given preclusive effect, an issue must be determined by a valid and final judgment. This Court has already held that the probate court's written orders are "valid and final judgments" for issue preclusion purposes. (Doc. 338, p. 1).

Here, the probate court explicitly resolved several issues in its written orders. It found the "Nunez Law Firm" contract invalid and stated that the invalidity arose from the manner of the contract's procurement. (Doc. 318-1, p. 3). It found that Hatfield "has a perfected lien[,]" *id.* at 6, and elaborated that this lien was "valid and having priority." (Doc. 318-2, p. 2). It "also f[ound] Hatfield was not terminated for cause." *Id.*

One written order of the probate court states that at the end of the final merits hearing, it found from the bench that "the contract for representation by Hatfield [was] both valid and enforceable[.]" (Doc. 348-1, p. 4). The transcript of the final hearing reveals only a discussion of the lien, not the contract. *See* Doc. 329-2, pp. 1105–06. However, this Court need not resolve the

issue of whether the probate court's later characterization of its earlier ruling counts as a determination by a final and valid judgment.  Arkansas caselaw, including that offered by the Estate, shows that a valid contract is a prerequisite to a valid lien of attorney.  *See Lee v. Daniel*, 91 S.W.3d 464, 466–68 (Ark. 2002) (challenge to contract validity treated as "argument[] for reversal" of attorney lien award); *Mack v. Brazil, Adlong & Winningham, PLC*, 159 S.W.3d 291, 294 (Ark. 2004) (trial court held that combination of valid contract for representation and substantial compliance with attorney's lien statute establishes valid lien); Doc. 342-2, p. 19 ("It is true the statute only allows a lien for attorney's fees based upon valid contracts of employment[.]") (citing *Midland Valley R. Co. v. Johnson*, 215 S.W. 665, 667 (Ark. 1919)).  From this, the Court infers that the ruling for Hatfield on the lien's validity necessarily involved a ruling for Hatfield on the Hatfield Contract's validity.  RESTATEMENT (SECOND) OF JUDGMENTS § 27(g); 18 CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4420 (3d ed. 1998) ([T]he simple fact of victory or defeat of a plaintiff or defendant establishes decision of all the issues that would have had to be resolved to support the result.")

Similarly, by determining that Hatfield's contract was valid, the probate court necessarily determined that the clients entered into it knowingly.  The Estate cited copious law to the effect that there must be a "meeting of the minds" as to all terms of a purported contract.  (Doc. 342-2, p. 19).  Because Hatfield's lien could not have been valid absent a valid contract, and because Hatfield's contract could not have been valid absent agreement by the parties as to its terms, the determination that Hatfield's lien was valid necessarily encompassed a determination that the parties to the Hatfield Contract knowingly agreed to its terms.

Accordingly, these issues were decided by a valid and final judgment of the probate court.

   *d.  Essential to the Judgment*

14

The Court will now consider which of the probate court's findings were essential to its judgment.

First, the determination that Hatfield's lien was valid was essential to the judgment. The validity of Hatfield's lien was the ultimate question before the probate court and a necessary prerequisite for the probate court's award of $1.5 million to Hatfield.

Similarly, the determination that Hatfield was not fired for cause was essential to the judgment. As the Estate pointed out, an attorney terminated for cause may only recover in quantum meruit; that is, "based on the amount of time and expense devoted to the case by the attorney." (Doc. 342-2, p. 30) (quoting *Harrill & Sutter, PLLC v. Kosin*, 378 S.W.3d 135, 142 (Ark. 2011)). While Hatfield was engaged on the case for only eight hours, Hatfield was awarded $1.5 million, which would correspond to an eye-watering rate of nearly $200,000 per hour. Because the $1.5 million award clearly could not be hourly pay for one day's work, it must have been Hatfield's contractual share of the proceeds; therefore, the probate court's $1.5 million judgment in Hatfield's favor would not have been possible without a finding that Hatfield was not terminated for cause, making this finding essential to the judgment.

Because the validity of Hatfield's lien was essential to the judgment, the validity of Hatfield's contract was also essential to the judgment for the reasons explained above. Likewise, because the validity of the contract was essential, the finding of a "meeting of the minds" between Hatfield and the clients was essential as well.

The Kherkher Defendants urge that the finding that the "Nunez Law Firm" contract was invalid was not essential to the judgment. However, the probate court rejected a similar argument in resolving the Estate's motion to reconsider:

> By relying on [the Defendants'] contracts to deny Hatfield's lien in arguing priority, [the Estate it]self put the validity of the contracts squarely at issue. The [probate]

> Court had to rule on evidence and arguments submitted by the [Estate] with respect to other attorney employment contracts, including the Nunez Law Firm Contract allegedly signed five days before Hatfield's contract, for the purpose of determining the validity of Hatfield's lien. [The Estate] put the contracts at issue and the issue of their invalidity was necessarily reached when determining the validity of Hatfield's contract and the lien therein. It is this Court's clear ruling that such contracts were invalid for the way in which they were solicited or procured; such ruling is not a mere observation or passing comment on the part of this Court. This Court declared Mr. Pirani's and Mr. Kherkher's contracts to be invalid, and such a ruling was necessary to the outcome of the lien at issue in this case.

Doc. 348-1, pp. 5–6. When evaluating whether a determination was essential to a judgment, "[t]he appropriate question . . . is whether the issue was actually recognized by the parties as important and by the trier of fact as necessary to the first judgment." RESTATEMENT (SECOND) OF JUDGMENTS § 27(j). Because the parties believed that the issue of contract validity was important, and because the probate court recognized it as necessary to its judgment, this Court finds that the invalidity determination was essential to the judgment in the probate case.

Finally, because the improper procurement of the Nunez contract was the reason for that contract's invalidity, the fact of the improper procurement was essential to the determination that the Nunez contract was invalid and therefore to the judgment itself.

Accordingly, the Court finds that the following determinations of the probate court are eligible for preclusive effect in this matter:

- That Hatfield's lien was valid.

- That Hatfield's contract was valid.

- That there was a "meeting of the minds" between Hatfield and the clients; that is, that Hatfield and the clients knew the contents of Hatfield's contract and intended to enter into it.

- That Hatfield was not terminated for cause.

- That the "Nunez Law Firm" contract was invalid.

16

- That the "Nunez Law Firm" contract was improperly solicited or procured.

    *e.   Privity of the Parties*

While these findings are eligible for preclusive effect in the federal matter, they may only be used against a party to the probate case "or his privies." *Crockett*, 381 S.W.3d at 799.[3]  "Privity exists when two parties are so identified with one another that they represent the same legal right." *Id.*  However, "[t]he true reason for holding an issue to be barred is not necessarily the identity or privity of the parties, but instead to put an end to litigation by preventing a party who has had one fair trial on a matter from relitigating it a second time." *Id.*

Hatfield's counterparty in the probate litigation was the Estate by and through Mancia. Mancia, therefore, is bound by the probate court's determinations. *Scallion v. Whiteaker*, 868 S.W.2d 89, 91 (Ark. Ct. App. 1993) (preclusion applies "[w]hen a party to one action in his individual capacity and to a second action in his representative capacity is, in both cases, asserting or protecting his individual rights").

The Kherkher Defendants argue that, as nonparties in the probate matter, they cannot be bound by the probate court's findings.  The Court disagrees.  In Arkansas, "the attorney-client relationship . . . is sufficient to satisfy the privity requirement" for preclusion purposes. *Jayel Corp. v. Cochran*, 234 S.W.3d 278, 284 (Ark. 2005).  This means that Kherkher and Pirani, both of whom acted as attorneys for the Estate in the probate matter, were in privity with the Estate for issue-preclusion purposes.

---

[3] The Kherkher and Nunez Defendants cite *Hardy v. Hardy* for the proposition that "the party against whom [issue preclusion] is asserted must have been a party to the earlier action[.]" 380 S.W.3d 354, 357 (Ark. 2011).  *Crockett*, however, was issued after *Hardy* and explicitly de-emphasizes the role of identity in the issue-preclusion analysis.  Accordingly, this Court concludes that the broader *Crockett* rule should govern.

Kevin Haynes was also in attorney-client privity with the estate because he entered an appearance in the final merits hearing before the probate court.  Haynes is reflected in the transcript of the final probate hearing as appearing for the defense.  (Doc 329-1, p. 994).  Indeed, Haynes was evidently managing the exhibits during closing arguments and even advised Kherkher to skip a portion of the evidence in the interest of time management.  *Id.* at 1059–60 ("(VIDEO IS STOPPED) . . . MR. KHERKHER: Okay.  Is there another second part?  MR. HAYNES: It's fine, let's keep moving.  MR. KHERKHER: Okay, all right.")  Therefore, Mr. Haynes was in privity with the Estate as its attorney.

In addition, Kherkher Garcia, LLP and Pirani Law, PA are also susceptible to preclusion. The Estate did not hire Steven Kherkher, Kevin Haynes, and Tony Pirani to represent it; it hired the two law firms.  Kherkher, Haynes, and Pirani acted as agents of their respective firms in their representation of the Estate.  The Arkansas Supreme Court "has routinely found that a principal-agent relationship is sufficient to satisfy the privity requirement" for preclusion purposes.  *Jayel*, 234 S.W.3d at 284.  This holds especially true where, as here, the lawyers and their law firms "are so identified with one another that they represent the same legal right."  Pirani Law, PA is a solo practice; there can be no serious question as to the identity of its right with Pirani's.  And although Kherkher and Haynes are not the only partners at Kherkher Garcia, they represented the firm's interest in the probate litigation.  Indeed, had the Estate prevailed over Hatfield in probate court, it was Kherkher Garcia as a firm which would directly receive the contested funds, not Kherkher or Haynes individually.  Accordingly, Kherkher Garcia, LLP and Pirani Law are also in privity with the Estate.

The question of the remaining Kherkher defendant, Jesus Garcia, is somewhat more complicated.  However, to the Court's mind, there are several good reasons to conclude that Garcia

was in privity with Kherkher, Haynes, and Kherkher Garcia.  The first and most obvious is that Garcia had the same financial interest as Kherkher and Haynes in the distribution of the funds, and "[p]rivity exists when two parties are so identified with one another that they represent the same legal right." *Crockett*, 381 S.W.3d at 799.  Illustratively, New York's highest court has found privity between law partners where all partners' "rights to receive payments were coextensive with" the rights of the partner originally sued, the partners' "right to receive [payment] stands or falls with the contract" originally sued over, and the partners' "interests were aligned with" the sued partner's.  *Buechel v. Bain*, 766 N.E.2d 914, 920 (N.Y. 2001).  All of this appears from the record to be true here.

Further, at the time of the final hearing in the probate case, this federal case had been pending against Garcia for several months.  The allegations in the federal case encompassed the probate-court lien litigation, and the parties to the federal case were on notice that the two cases were intertwined such that the federal litigation might be impacted by rulings of the probate court. *See, e.g.,* Doc. 63, p. 17 ("When this Court or the Arkansas court delivers a final ruling on the lien's validity, the parties will be expected to address the impact of such determination on Hatfield's claims and the Court's jurisdiction.").  Indeed, the line between the two lawsuits was frequently a dotted one: G. Spence Fricke, who represents the Kherkher Defendants (including Garcia) in the federal case, was present at several hearings and even sat at the counsel table with Kherkher and Pirani.  (Doc, 329-2, pp. 375, 394, 716–19).  Garcia's federal deposition testimony was offered into evidence in the probate matter.  (Doc. 343-2, p. 10).  And Garcia appears to have been personally present for the final arguments in the probate case.  (Doc. 329-2, p. 1067).  From all of this, the Court infers that Garcia was aware of his own interest in the outcome of the probate litigation.

Finally, Garcia was a partner at Kherkher Garcia, the firm controlling the litigation on behalf of the Estate. This position of power within Kherkher Garcia presumably gave him some degree of control over Kherkher Garcia's actions in the probate litigation. "[A] nonparty is bound by a judgment if she assumed control over the litigation in which that judgment was rendered." *Taylor v. Sturgell*, 553 U.S. 880, 895 (2008). Taking all of the foregoing factors together, the Court concludes that Garcia's interests in, involvement in, and leverage over the litigation allow the application of issue preclusion against him.

Turning to the Nunez Defendants, the Court first finds that Nunez & Associates is subject to issue preclusion. It is undisputed that Nunez & Associates was retained to represent the Recinos family, and later the Estate, regarding the death of Ms. Recinos. Under the terms of the "Nunez Law Firm" Contract, Nunez & Associates "assumed joint responsibility for the handling of the case." (Doc. 253-5, p. 5). Accordingly, Nunez & Associates may properly be bound by the probate court's findings either as a law firm under *Jayel* or as a party with control over the litigation under *Taylor*. Additionally, the testimony of Ornelas and McCoy establishes that Ornelas is the majority owner of Nunez & Associates, meaning that he represents the same legal right as that entity and is properly bound under *Crockett*. Finally, McCoy's liability derives from his actions as an agent of Nunez & Associates, placing him in privity under *Jayel*.

For these reasons, all defendants in this federal matter were in privity with the Estate or one of its privies such that issue preclusion may be applied against them.

### f.   *Other Concerns*

Having established that all parties to this matter are in privity with the Estate or its privies in the probate case, this Court will turn to Defendants' miscellaneous objections to the applicability of issue preclusion.

First, Defendants challenge the soundness of the probate court's decision.  They point out that the final rulings contradict credibility determinations made earlier in the case by a different judge, that there were no detailed findings of fact made as to the manner in which the voided contracts were "procured or solicited," and that a violation of the Arkansas Rules of Professional Conduct is a legally insufficient basis for voiding a contract.  Under Arkansas issue preclusion rules, however, none of this is of any moment: "the fact that a previous decree may have been erroneous or was patently so does not lessen its binding effect."  *Phelps v. Justiss Oil Co.*, 726 S.W.2d 662, 666 (Ark. 1987).  Accordingly, this Court will not second-guess the probate court's reasoning.

Second, Defendants point to the lack of a jury in the probate case.  They cite *Craven v. Fullerton Sanitation Service, Inc.*, for the proposition that "the doctrine [of issue preclusion] may not be applied to bar an employee from having a jury determine factual issues in an action at law against a third party."  206 S.W.3d 842, 845 (Ark. 2005).  However, *Craven* is distinguishable. *Craven* was a case about a work-related accident, and the *Craven* court framed the "sole issue on appeal" as "whether the doctrine of res judicata may be applied to a final judgment of the Worker's Compensation Commission so as to bar the employee's constitutional right to a jury trial against a third-party tortfeasor."  *Id.* at 844.  The court noted that the victim had a state constitutional right to try a tort case to a jury.  *Id.* at 845.  Additionally, it noted that the operative worker's compensation statute expressly preserved the right to sue a third party for a work-related injury. *Id.* at 846.  Finally, it noted that proceedings before the worker's compensation agency were "informal in that [the agency] is not bound by technical or statutory rules of evidence or by technical or formal rules of procedure in conducting a hearing."  *Id.* at 847.  The holding in *Craven*

was, therefore, cabined to the factual and legal context of an administrative worker's compensation appeal, hence the use of the term "employee" in the holding.

The contrast between *Craven* and the present matter is evident.  First, the case at bar is not a worker's compensation matter.  Second, unlike the informal hearing in *Craven*, the judgment to be given preclusive effect here was rendered by a judge in a court of general jurisdiction under the standard rules of civil procedure.  Finally, while the administrative scheme in *Craven* explicitly set forth a right to a jury trial for claims against third parties, nothing in Arkansas' attorney-lien statute (Ark. Code Ann. § 16-22-304) or the statutes governing probate proceedings (Ark. Code Ann. §§ 28-40-101 to 28-40-123) demonstrates similar solicitude for the right to a jury trial in related proceedings.[4]

Besides the factual mismatch, *Craven* is legally inapplicable.  Rather than basing its holding on issue preclusion principles, *Craven* focused primarily on the right to a jury in the Arkansas courts.  However, this Court is a federal court, and "the right to a jury trial in the federal courts is to be determined as a matter of federal law in diversity as well as other actions." *InCompass IT, Inc. v. XO Comms. Servs., Inc.*, 719 F.3d 891, 896 (8th Cir. 2013) (quoting *Simler v. Conner*, 372 U.S. 221, 222 (1963)).  The federal right to a civil trial by jury "does not negate the issue-preclusive effect of a judgment, even if that judgment was entered by a juryless tribunal." *B&B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 150 (2015).  Accordingly, the *Craven* rule does not apply in this matter.

---

[4] Indeed, Ark. Code Ann. § 28-40-121(3)(A), dealing with final orders in probate proceedings, states that "[t]he finding of the fact of death shall be conclusive as to the alleged decedent only if" certain conditions are met.  This indicates that the findings of a probate court are, as a rule, to be considered "conclusive."  And as this provision deals with final orders, it necessarily contemplates that such findings will be "conclusive" in a separate proceeding.

Finally, the Pirani Defendants and Mancia argue that because issue preclusion is an affirmative defense, it cannot be invoked by Hatfield, the plaintiff.  However, the Arkansas Supreme Court permits "offensive collateral estoppel," or the use of issue preclusion by the plaintiff.  *Johnson v. Union Pac. R.R.*, 104 S.W.3d 745, 751 (Ark. 2003).  While offensive collateral estoppel "should be available only in limited cases, . . . the trial court should be given broad discretion to determine if it should be applied."  *Id.*  "The general rule should be that in cases where a plaintiff could easily have joined in the earlier action or where . . . the application of offensive estoppel would be unfair to a defendant, a trial judge should not allow the use of offensive collateral estoppel."  *Id.* (quoting *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331 (1979)).

> [T]he offensive use of collateral estoppel may be unfair (1) where the defendant in the first action is sued for small or nominal damages and thus may not have had great incentive to defend vigorously; (2) where the judgment relied upon as a basis for estoppel is itself inconsistent with one or more previous judgments in favor of the defendant; and (3) where the second action affords the defendant procedural opportunities unavailable in the first action that could cause a different result.

*Id.*

Here, the Court does not believe that allowing Hatfield to use offensive issue preclusion would be unfair to Defendants.  As an initial matter, Hatfield was a party to the probate action, which resolves many fairness concerns related to the doctrine as a whole.  *Johnson*, 104 S.W.3d at 751 (defining offensive collateral estoppel in terms of a plaintiff who was not a party to the first action and noting that this does not promote judicial economy).  Further, the probate litigation concerned a $1.5 million attorney's fee, which can hardly be called "small or nominal damages;" in any event, it was "defend[ed] vigorously."  While Defendants raise the specter of prior rulings

inconsistent with the final judgment, the only[5] inconsistency they highlight has to do with a credibility determination contained in an order at an earlier stage in the proceeding.  (Doc. 328-3, p. 4).  That order specifically left unresolved the issue of the $1.5 million fee and was entered after a hearing at which Hatfield was not represented.  (Doc. 292-2, pp. 283, 294).  From these and the other attendant circumstances, the Court sees no unfairness in allowing Hatfield to invoke issue preclusion in this matter.

## III.    Effect of State-Court Relief

### a.  Findings

Based on the determination of preclusion, the Court treats the following issues as settled and will instruct the jury accordingly:

- Hatfield's lien was valid and enforceable.

- Hatfield's contract was valid.

- The clients intended to hire Hatfield to represent them in the wrongful death matter.

- Hatfield was not terminated for cause.

- The Nunez Contract was solicited or procured improperly.

- The Nunez Contract is invalid because it was improperly solicited or procured.

The final wording of any jury instructions will be established prior to trial.

### b.  Hatfield's Claim for Declaratory Judgment

---

[5] While the Pirani Defendants assert that Hatfield's "lack of standing to challenge the validity of the ["Nunez Law Firm"] contract . . . is itself *res judicata*" (Doc. 330, p. 4), the documents cited refer to Hatfield's standing to challenge proposed petitions for distribution, not the contract itself.  *See* Doc. 328-3, pp. 2–3; Doc. 331, pp. 2–3.

As Hatfield concedes, the probate court's invalidation of Defendants' contracts moots Hatfield's claim for declaratory judgment invalidating those contracts. Accordingly, this claim will be dismissed.

### c. Hatfield's Lien Theory of Injury

All parties contend that the probate court's judgment resolves the RICO claims as to Hatfield's lien theory of injury. Defendants contend that Hatfield's recovery in the probate court defeats Hatfield's ability to show damages arising from the lien litigation, while Hatfield argues that the probate court's findings entitle Hatfield to judgment as a matter of law. The Court will address Defendants' argument here and take up Hatfield's request for judgment as a matter of law in the next section, which deals with the parties' motions for summary judgment.

Defendants argue that Hatfield can no longer demonstrate injury relating to the lien proceeds themselves because Hatfield has received those proceeds. Hatfield argues that the availability of treble damages under the RICO statute means that the receipt of the lien proceeds only reduces Hatfield's damages by one-third. Courts are split on the issue of whether RICO damages should be trebled before or after subtracting any funds recovered, and the Eighth Circuit has not ruled on the issue. However, this Court is persuaded by the Fifth Circuit's approach in *HCB Financial Corp. v. McPherson*, 8 F.4th 335 (5th Cir. 2021). In *HCB*, the Fifth Circuit noted that the statute entitles the plaintiff to triple the damages sustained, concluded that recovery of wrongfully-withheld funds affects the amount of "damages sustained," and held that return of such funds must be accounted for before the net damages are trebled. *Id.* at 343–44. The Second Circuit also endorses this approach: "to the extent of a successful collection, the RICO claim is abated *pro tanto*, prior to any application of trebling." *Stochastic Decisions, Inc. v. DiDomenico*, 995 F.2d

1158, 1166 (2d Cir. 1993). Accordingly, Hatfield may not collect treble damages on the lien proceeds.

Hatfield also asserts that it was damaged by loss of use of the funds during the probate court litigation, specifically the money's decline in value due to inflation. Hatfield cites a previous order of this Court specifying that delayed resolution of the probate matter "*may* cause damages of its own, including . . . a decline in the money's real value due to inflation. Thus, even if the lien is ruled valid and enforced, Hatfield *may* still have suffered damages." (Doc. 63, p. 17) (emphasis added). However, apart from a citation to the Consumer Price Index, Hatfield has introduced no evidence as to these damages. In any event, Hatfield itself has cited a provision of Arkansas law which entitles it to compensation well above the rate of inflation: Ark. Code Ann. § 16-65-114(a)(1)(A), which governs interest on state-court judgments. *HCB*, 8 F.4th at 345 (holding that lost use of money is properly remedied by prejudgment interest, not additional RICO damages). But if Hatfield wishes to collect prejudgment interest under § 16-65-114(a)(1)(A), the probate court is the proper venue, as an Arkansas prejudgment interest statute has no applicability in a federal court deciding a federal cause of action. *Kelley ex rel. PCI Liquidating Trust v. Boosalis*, 974 F.3d 884, 901 (8th Cir. 2020). Accordingly, the Court does not consider lost value due to inflation or hypothetical prejudgment interest as part of Hatfield's RICO claim.

Hatfield's probate-court attorney's fees, however, are properly classified as RICO damages. In the Eighth Circuit, "attorneys' fees . . . incurred in objecting to . . . supposedly fraudulent claims . . . . qualif[y] as an injury to business or property that was proximately caused by a predicate act of racketeering." *Handeen v. Lemaire*, 112 F.3d 1339, 1354 (8th Cir. 1997). While Defendants argue that this category of damages was not properly disclosed in discovery, Hatfield provided a then-current estimated total of his probate-court attorney's fees in October of

2023.  (Doc. 286-3, p. 6).  This discovery filing was signed by Hatfield's attorney, who also represents Hatfield in the probate case and would therefore have personal knowledge of the fee total.  Defendants claim that Hatfield did not specifically disclose that these fees were being sought as RICO damages; however, the paragraph in which the probate court fees were disclosed dealt entirely with RICO damages.  *Id.*  The Court therefore finds that the disclosure was adequate.

Accordingly, Hatfield's RICO claims relating to the lien are not moot, so the Nunez Defendants' motion (Doc. 325) to dismiss for lack of jurisdiction will be denied.  However, Hatfield's pre-trebling RICO recovery on the lien-related claims will be limited to his attorney's fees and litigation costs in the probate court.

## IV.    Summary Judgment - RICO Claims

Many of the parties' legal arguments on the RICO counts are disposed of by the Court's previous order (Doc. 314), which was entered after summary judgment was briefed.  For instance, contrary to Defendants' arguments, the Court has held that Hatfield's loss of the Hatfield Contract is a cognizable injury to its business, that its loss of the attorney's lien is a cognizable injury to its property, that neither injury is so intrinsically speculative as to defeat standing, and that Defendants' alleged conduct could constitute racketeering activity under the *Steffen* standard.  On the other hand, the Court has dismissed Hatfield's claims under 18 U.S.C. §§ 1962(a) and (b) as well as Hatfield's RICO claims related to the Mejia estate.  Now, considering the factual record and the issues determined by the probate court, this Court will evaluate the parties' cross-motions for summary judgment on the RICO counts.

### a.   *Reason for Contract Cancellation*

Defendants argue that Hatfield's loss of the Recinos contingent fee was "because none of Ms. Recinos' heirs ever wanted Hatfield to represent them in that case, not because of any

purported RICO violation." (Doc. 284, p. 9). However, this theory is foreclosed by two precluded issues: that the heirs intended to hire Hatfield in the wrongful death case, and that Hatfield was not fired for cause.

As to the denial of a RICO violation, the circumstances surrounding the cancellation would allow a jury to infer that pressure had been brought to bear on the clients. There is evidence that Mancia exhibited frightening behavior towards the clients around the time he received a call from one of the other Defendants, with all of this taking place before the text messages terminating representation were sent. Contemporary messages show Ornelas congratulating Kherkher after Laura and Ever sent their termination texts, to which Kherkher replied "You too!" (Doc. 201-1, p. 251). The next day, Kherkher told Ornelas that he had instructed Hatfield to cease and desist. *Id.* Despite this, Kherkher stated that he was "still worried about the children flipping" and that Kherkher's paralegal had made several attempts to call them. *Id.*

Taken in the light most favorable to Hatfield, this evidence could allow a reasonable jury to conclude that Defendants utilized the wires to pressure the clients to drop the Hatfield Contract. And because acquiring and maintaining clients is an "essential step in the scheme" alleged by Hatfield, the use of the wires for this purpose would constitute mail fraud. *H&Q Props., Inc. v. Doll*, 793 F.3d 852, 856 (8th Cir. 2015). Accordingly, Hatfield has raised a question of fact as to whether Defendants' interference caused Hatfield's injury.

### b. Requirement of Personal Representative

Defendants argue that Hatfield's RICO injury is speculative because of the way wrongful death cases are litigated in Arkansas. Specifically, Defendants point out that only the appointed personal representative of a decedent's estate may bring a wrongful death case in Arkansas.

Because none of Hatfield's clients were ultimately appointed personal representative, Defendants argue that Hatfield never had a sufficiently concrete interest in the Recinos wrongful-death case.

As the Court explained in its December 22 order, however, questions about whether a business expectancy would have ultimately been realized are factual ones. And here, viewing the facts in the light most favorable to Hatfield, a jury could conclude that one of Hatfield's clients would have been appointed personal representative. Jason Hatfield testified that he was prepared on November 30 to file the paperwork to have Vidal serve as personal representative. Defendants, on the other hand, did not file to have *any* person serve as personal representative until midway through the next year, and there is no indication of any other family members seeking to serve as personal representative. Jason Hatfield indicates that the first person to file to become personal representative would likely have been given the position. Even if there was a theoretical preference for Noe Mancia, the decedent's husband, to serve as personal representative, the specific circumstances of this case (where there is evidence of estrangement and abuse) could well have overcome that. Accordingly, a reasonable jury could conclude that one of Hatfield's clients would have been named personal representative.

### c. *Amount of Settlement/Judgment*

Defendants argue that Hatfield's injury is based on the "speculative assumption" that Hatfield would have obtained an identical or better result than Defendants did, and that Hatfield's injury is accordingly too speculative to confer RICO standing. The Court disagrees.

Here, Hatfield has raised a question of material fact as to whether he would have obtained a better result than Defendants. Hatfield has introduced evidence that JB Hunt never contested liability in the wrongful-death case. Jason Hatfield has testified that he is an experienced attorney who has litigated against J.P. Hunt in the past. Finally, several elements of Defendants'

29

prosecution of the claim (including the delay in establishing an estate and the deficiencies alleged in Mr. Everett's opinion) could be seen as indicating a lack of competence, raising the likelihood that Hatfield would have obtained a better result. Taken together, this is sufficient evidence for a jury to conclude that Hatfield would have obtained a more favorable result than Defendants in the wrongful death case.

If Hatfield can demonstrate that it would have obtained a more favorable settlement than Defendants, even if that settlement was only slightly more favorable, Hatfield will be entitled to damages. "The best reading of § 1964(c)'s injury to business or property requirement is that it refers to the fact of injury and not the amount." *Potomac Elec. Power Co. v. Elec. Motor & Supply, Inc.*, 262 F.3d 260, 265 (4th Cir. 2001). After all, the statute confers "standing on 'any person injured in his business or property,' not any person who can quantify the amount of the injury." *Id.*; *see also Alix*, 23 F.4th at 207 ("The law is well-settled that uncertainty as to amount of damages is not a reason to deny a plaintiff some recovery.")

"For RICO claims, '[w]here injury is established, damages need not be demonstrated with precision." *New England Carpenters Health Benefits Fund v. First DataBank, Inc.*, 248 F.R.D. 363, 371 (D. Mass. 2008) (quoting *In re Zyprexa Prods. Liab. Litig.*, 493 F. Supp. 2d 571, 578 (E.D.N.Y. 2007)). On the other hand, RICO damages "must be 'established by competent proof, not based upon mere speculation and surmise.'" *Ticor Title Ins Co. v. Florida*, 937 F.2d 447, 451 (9th Cir. 1991) (quoting *Fleischhauer v. Feltner*, 879 F.2d 1290, 1299 (6th Cir. 1989)). The question, then, is whether Hatfield has presented sufficient evidence for a jury to reach a nonspeculative damages verdict.

As Defendants have put it, "[t]he task of valuing lost life is a particularly human undertaking; it 'is not something to be measured in dollars and cents because the worth of human

life is incommensurate with money.'"  (Doc. 260, p. 6 (quoting *Bennett v. United States*, No. 4:04-cv-00076-JLH (E.D. Ark. Mar. 3, 2005))).  The nature of this undertaking underpins Defendants' contention that a jury verdict in a wrongful death case has an inherent degree of unpredictability to it.  This is especially true in Arkansas, where testimony that a decedent "was a mother of four, as well as a grandmother, that she was close to her oldest daughter, that she worked as a waitress, that she lived with a man for whom she had come to Arkansas, and that, at the time of the accident, she was on her way to a family get-together" was held to be "substantial evidence from which the jury could have inferred the value she would have placed on her life[.]"  *One Nat. Bank v. Pope*, 272 S.W.3d 98, 103 (Ark. 2008).  But the fact that a jury verdict cannot be precisely estimated from the face of the evidence does not render that jury's decision "speculative or conjectural;" indeed, *Pope* stands for the opposite conclusion.

There is, of course, another layer of uncertainty here: the jury in this case, rather than reaching a verdict in a wrongful death case, will be endeavoring to determine what a separate jury's verdict would have been in a wrongful death case.  But in the Court's opinion, there is nobody better situated to predict the behavior of a Northwest Arkansas jury than a Northwest Arkansas jury.  "[I]t is part of the established tradition in the use of juries as instruments of public justice that the jury be a body truly representative of the community."  *Taylor v. Louisiana*, 419 U.S. 522, 527 (1975) (quoting *Smith v. Texas*, 311 U.S. 128, 130 (1940)).  A jury is in the best position to gauge the thought processes and mores of the local community and to determine how these would have translated, if at all, into a verdict.  Accordingly, the Court believes that this federal jury may estimate a wrongful death verdict without resorting to speculation or conjecture.[6]

---

[6] To avoid yet a third layer of uncertainty, however, the federal jury will be instructed to reach its estimate based only on evidence which would have been before a wrongful-death jury.

Given the foregoing, and construing all facts in the light most favorable to Hatfield, uncertainty as to the exact amount of any recovery does not defeat Hatfield's RICO standing.

### d. Lien Value/Lien Enforcement

As to Hatfield's lien-related claims, Defendants argue that Hatfield's remedies are limited to either seeking the lien's enforcement (which Hatfield has already done) or suing to recover in quantum meruit. However, as detailed above, Hatfield's attorney's fees incurred in enforcing the lien constitute cognizable RICO damages and confer standing in federal court. Therefore, the lien-related RICO claims will remain pending.

### e. Hatfield's Motion for Summary Judgment

Hatfield has also moved for summary judgment on its RICO claims. After the Court's December 22 opinion (Doc. 314), Hatfield's remaining RICO claims are as follows: § 1962(c) claims against Ornelas, McCoy, Nunez & Associates, Kherkher Garcia, and Kherkher; and 1962(d) claims against all defendants except for Mancia. These claims arise from "[t]he intra-conspiracy and client communications immediately after Hatfield obtained the Hatfield Contract," "Kherkher's communication to Jason Hatfield directing Hatfield to 'stand down'[,]" and "misrepresentations to the state [probate] court" relating to Hatfield's lien. *Id.* at 11–12.

Claims arising from the conspiracy-client communications and the Kherkher-Hatfield communications are premised on the idea that the case was "taken" from Hatfield; accordingly, they are premised on the theory that Hatfield would have obtained a better result for the clients. However, on Hatfield's motion for summary judgment, the Court takes the evidence in the light most favorable to the Defendants. The Defendants have presented evidence, including Mr. Terry's testimony, that Hatfield would not have obtained a result equal to or better than Defendants' recovery for the Estate. Construing the record in the light most favorable to Defendants, therefore,

a genuine issue of material fact exists as to whether Hatfield suffered any damages from its termination. Accordingly, summary judgment for Hatfield on the better-result theory is not proper.

As concerns the lien theory of injury, the Kherkher Defendants have alleged that Nunez & Associates is a legitimate Mexican firm, and the Pirani Defendants have alleged that they lacked knowledge that Nunez & Associates was not a law firm. Construing the record in their favor and crediting their deposition testimony, these defendants' allegations are plausible: "Nunez & Associates" was the name of a legitimate Mexican law firm as well as the Texas partnership, and Alfredo Nunez was involved in both. Therefore, because the Kherkher and Pirani Defendants may not have intended to be in any sort of illicit enterprise, Hatfield is not entitled to summary judgment against them on this theory.

As for the Nunez Defendants, Hatfield has failed to brief a crucial element of the underlying predicate acts of fraud: intent. "Intent is an essential element of both wire fraud and mail fraud." *United States v. Louper-Morris*, 672 F.3d 539, 556 (8th Cir. 2012). Hatfield has not met its burden to "identify[] those portions of the record which it believes demonstrate the absence of a genuine issue of material fact" as to this element. *Jones v. Wellpath, LLC*, 77 F.4th 658, 662 (8th Cir. 2023) (internal quotations omitted). Accordingly, the Court cannot grant summary judgment against the Nunez Defendants on the lien theory.

For the foregoing reasons, the parties' motions for summary judgment on Hatfield's RICO claims will be denied.

## V.    Intentional Interference

Defendants argue that they are entitled to summary judgment on Hatfield's intentional interference claim. The Court disagrees.

### a.    Validity of Contract

33

Defendants' principal argument is that the Hatfield Contract was invalid and, therefore, cannot form the basis of an intentional interference claim. Specifically, Defendants argue that the requisite "meeting of the minds" between contracting parties did not take place because the clients did not understand what they were signing and did not intend to sign a contract for representation in the wrongful death matter. However, as detailed above, the probate court's findings preclude each of these conclusions; accordingly, the Court cannot grant summary judgment on these grounds.

### b. *Improper Conduct*

Defendants' second argument for summary judgment on the intentional interference claim is that they did not engage in any "improper" conduct as required to sustain such a claim. Arkansas courts consider seven factors in determining whether conduct is improper for intentional interference purposes:

> (1) the nature of the actor's conduct; (2) the actor's motive; (3) the interests of the other with which the actor's conduct interferes; (4) the interests sought to be advanced by the actor; (5) the social interests in protecting the freedom of the actor and the contractual interests of the other; (6) the proximity or remoteness of the actor's conduct to the interference; and (7) the relations between the parties.

*Baptist Health v. Murphy*, 226 S.W.3d 800, 809 (Ark. 2006).

Here, a jury could conclude that Defendants' conduct was improper. Viewing the facts in the light most favorable to Hatfield, Defendants repeatedly contacted the clients shortly after a family tragedy to induce them to abandon the Hatfield Contract. In doing so, they interfered with Hatfield's executed contract to realize financial gain from the fraudulent "Nunez Law Firm" Contract. The social interest in permitting attorneys to pester grieving clients for employment is minimal and certainly would not outweigh the social interest in promoting Hatfield's and the clients' freedom of contract. There appears to have been a direct causal effect between

34

Defendants' conduct and the cancellation of the Hatfield Contract as to Laura and Ever. While Defendants' motive (securing their own employment) was not an impermissible one, and while there was some relationship between Laura, Ever, and Defendants prior to the conduct at issue, the Court cannot say as a matter of law that a jury could not find this conduct improper.

As for Defendants' later actions with Vidal, the evidence in the record can be construed to show that Vidal was falsely told that he needed to sign up with Defendants in order to obtain a share of the wrongful death proceeds. A jury could certainly find that this was improper.

Given the foregoing, Defendants are not entitled to summary judgment on Hatfield's intentional interference claim.

## VI.    Fraud

Defendants argue that Hatfield has presented insufficient evidence of its fraud claims. The Court agrees in part.

One of Hatfield's theories of fraud is that Kherkher, on behalf of the Kherkher Defendants, misrepresented to Jason Hatfield that Kherkher Garcia was representing Laura and Ever. Hatfield argues that these claims of representation were false because they were based on the "Nunez Law Firm" Contract, which the Kherkher Defendants knew to be invalid. While Hatfield has offered no evidence of an explicit representation of the "Nunez Law Firm" Contract's validity, viewing the facts in the light most favorable to Hatfield, a jury could determine that Hatfield and Kherkher understood a valid contract to be a necessary prerequisite for representation and that Kherkher's statement was therefore misleading. Further, Hatfield has presented sufficient evidence for a jury to conclude that Hatfield relied on the misrepresentation to its detriment and was damaged as a result. Accordingly, the Kherkher Defendants are not entitled to summary judgment on this count.

Hatfield's other theory of fraud concerns Defendants' contract with Vidal.  Hatfield claims that the Pirani Defendants made material misrepresentations of fact as to how this contract was solicited.  However, Hatfield fails to state exactly what these misrepresentations were or provide evidence that Hatfield relied on them.  Accordingly, Hatfield has failed to support its claim for fraud related to Defendants' contract with Vidal on summary judgment.

While the Nunez Defendants have also moved for summary judgment on the fraud claim, Hatfield did not bring any fraud claims against the Nunez Defendants.  Accordingly, as far as the Nunez Defendants are concerned, there is no count on which to grant summary judgment.

## VII.    Civil Conspiracy

Defendants claim that they are entitled to summary judgment on Hatfield's civil conspiracy claim.  The Court agrees in part.  Hatfield claims that a conspiracy existed to violate the Arkansas Deceptive Trade Practices Act (ADTPA), intentionally interfere with Hatfield's contract to represent the Recinos estate, intentionally interfere with Hatfield's business expectancy as to the Mejia Estate; and commit fraud.  However, Hatfield's ADTPA claim has been dismissed, and Hatfield nonsuited its business expectancy claim as to the Mejia estate.  The Court agrees with Defendants that Hatfield has not raised a question of fact as to a conspiracy on these grounds. However, because the Recinos intentional interference claims and fraud claims remain pending as to some defendants, and because Hatfield has raised a question of fact as to coordination between the defendants, Hatfield's civil conspiracy claim survives summary judgment on these grounds.

## VIII.   Declaratory Relief

Finally, Defendants seek summary judgment on Hatfield's request for declaratory relief voiding the Nunez Contract.  As previously stated, Hatfield's declaratory relief claim is now moot. Accordingly, the claim will be dismissed.

IX.    **Conclusion**

IT IS THEREFORE ORDERED that Defendants' motions for summary judgment (Docs. 283, 287) are GRANTED as to Hatfield's fraud claim (to the extent that it is based on Defendants' contract with Vidal) and Hatfield's intentional interference claim (to the extent that it is based on the Arkansas Deceptive Trade Practices Act or a business expectancy in the representation of the Mejia estate). Defendants' motions are otherwise DENIED.

IT IS FURTHER ORDERED that Hatfield's motion for summary judgment (Doc. 198) and the Nunez Defendants' Motion to Dismiss for Lack of Jurisdiction (Doc. 325) are DENIED.

IT IS FURTHER ORDERED that Hatfield's claim for declaratory relief is DISMISSED AS MOOT.

IT IS SO ORDERED this 25th day of March, 2024.

/s/ P. K. Holmes, III

P.K. HOLMES, III
U.S. DISTRICT JUDGE