UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

JASON M. HATFIELD, P.A.                                                                                    PLAINTIFF

v.                                            No. 5:22-cv-5110

CESAR ORNELAS; STEVEN KHERKHER;
MICHAEL McCOY; NOE JESUS MANCIA
POLANCO; NUNEZ & ASSOCIATES;
KHERKHER GARCIA, LLP; TONY PIRANI;
PIRANI LAW, PA; JESUS GARCIA; KEVIN
HAYNES                                                                                                    DEFENDANTS

**OPINION AND ORDER**

Before the Court are three motions to exclude expert testimony filed by the Defendants[1] in this case (Docs. 259, 261, 265), and one motion to exclude expert testimony filed by the Plaintiff (Doc. 274). The Court has also reviewed the briefs and exhibits that the parties have filed in support of, and in opposition to, their respective motions. *See* Docs. 260, 262–64, 266–67, 276–78, 294–98, 303. The motions will be GRANTED IN PART AND DENIED IN PART as explained below.

For the sake of brevity, the Court will avoid rehashing the procedural history, claims, and allegations in this case. The Court assumes the reader's familiarity with these background matters, as well as with the arguments the parties have advanced for and against the instant motions. In brief, this is a lawsuit about a lawsuit. Hatfield contends that the Defendants improperly or illegally poached its clients and settled their case on less favorable terms than

---

[1] Technically, the defense motions were filed by Kherkher Garcia, LLP, Steven Kherkher, Jesus Garcia, and Kevin Haynes (collectively, the "Kherkher Defendants"). But all other Defendants subsequently filed notices stating that they join and adopt the Kherkher Defendants' filings relating to the motions to exclude. *See* Docs. 269, 291, 304.

1

Hatfield could have. Hatfield seeks to recover the sum Hatfield would have earned from the case without Defendants' interference.

I. **Legal Standard**

Federal Rule of Evidence 702 governs the admissibility of expert testimony. It states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. The proponent of expert testimony bears the burden of proving its admissibility by a preponderance of the evidence. *See In re Bair Hugger Forced Air Warming Devices Prods. Liability Litig.*, 9 F.4th 768, 776 (8th Cir. 2021). Eighth Circuit caselaw recognizes that Rule 702 embodies a "liberal thrust" in favor of admitting expert testimony. *See id.* at 777. In other words, exclusion of expert testimony is the exception rather than the rule. *Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1100 (8th Cir. 2006). However, "[t]rial judges are tasked with a gatekeeping role to 'ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Shipp v. Murphy*, 9 F.4th 694, 700 (8th Cir. 2021) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)). "It is within the broad discretion of the trial court whether to allow expert testimony." *Koslov v. Associated Wholesale Grocers, Inc.*, 818 F.3d 380, 393 (8th Cir. 2016) (internal quotations omitted).

II. **John Everett and Rex Terry**

The Court will begin with the dueling experts John Everett and Rex Terry. Both witnesses are experienced and esteemed Arkansas attorneys. They propose to offer opinions on whether the settlement that the Defendants obtained in the underlying lawsuit was reasonable and whether

Mr. Hatfield could have obtained a better result than the Defendants did. Unsurprisingly, Hatfield's expert (Mr. Everett) opines that the settlement was not reasonable and that Mr. Hatfield could have done better, while Defendants' expert (Mr. Terry) disagrees. Each side wants the opposing expert's testimony excluded, and each side quibbles with the factual basis and methodology supporting the opposing expert's opinions.

With one caveat (discussed below), the Court will not exclude either witness's testimony. The Court believes the jury will find it helpful to hear experienced attorneys discuss how lawyers evaluate the settlement value of cases and how they go about preparing for trial. These matters are relevant to Hatfield's claims in this case, and the Court does not believe the jury is likely to be confused by either witness's testimony. Both witnesses are obviously well-qualified to opine on such matters, having decades of experience as trial lawyers and litigators. To the extent either side disputes the factual basis for the opposing expert's opinion, that "goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001) (quoting *Hose v. Chicago Nw. Transp. Co.*, 70 F.3d 968, 974 (8th Cir. 1996)).

However, the Court will not permit Mr. Everett to opine on Mr. Hatfield's character, credibility, reputation in the community, or similar matters unless Defendants place such matters at issue. The Court believes that such evidence is largely irrelevant and that much of it would run afoul of Federal Rule of Evidence 404(a), which forbids "[e]vidence of a person's character or character trait . . . to prove that on a particular occasion the person acted in accordance with that character or trait." And insofar as these subjects are relevant to Mr. Hatfield's competence and ability as a lawyer to have prosecuted the underlying litigation, the Court believes Mr. Hatfield's own testimony regarding his relevant experience and his preparation for the

3

underlying litigation will be far more illuminating for the jury than any third-party expert testimony about his character, reputation, or credibility.

### III. Ralph Scott, Jr., Ph.D.

The Court turns next to Hatfield's damages expert, Ralph Scott, Jr., Ph.D. Dr. Scott, an economist, seeks to offer expert testimony regarding the damages report that he would have provided Hatfield if he had been retained by the plaintiff in the underlying lawsuit. Such a report would have played a role in settlement discussions, and Dr. Scott could have presented his analysis to a jury if the case went to trial. Given this, Dr. Scott's testimony is relevant to what results Hatfield might have obtained in a hypothetical settlement or trial of the wrongful death case.

Dr. Scott's proposed testimony is multifaceted, and Defendants raise numerous objections to it. The Court will address the challenged portions of Dr. Scott's testimony in turn.

*a. Value of Statistical Life*

Dr. Scott estimates Ms. Recinos' hedonic damages (that is, the value that she would have placed on her own life) at between $12,711,719.30 and $13,851,936.70. (Doc. 259-1, p. 3). Dr. Scott bases his opinion chiefly on the "value of a statistical life (VSL) published and utilized by government entities in cost benefit studies." *Id.* at 2. These government entities, in turn, calculate VSL based on the additional price consumers are willing to pay for safety features, the additional salary employers must pay to entice workers to take dangerous jobs, and hypothetical questions concerning how much consumers would pay to reduce risk of death. *Id.* at 40–41. The government uses this data to estimate how much the average person is willing to pay to avert a given risk of death. *Id.* at 39.

When an individual is willing to sacrifice $1,000 per year (in safety upgrade costs, lower wages, and/or hypothetical payments) to reduce his or her annual chance of death by 1 in 10,000, the government assumes that this individual would similarly pay $2,000 to reduce those chances by 2 in 10,000, or $5,000 for a reduction of 5 in 10,000.  (Doc. 259-1, p. 39).  Taking this assumption to its extreme yields a figure of $10,000,000 annually to reduce the annual chances of death by 10,000 in 10,000 (that is, to eliminate them altogether), an amount which the government would characterize as that person's VSL.  *Id.*  Even as it offers this example, however, the government warns that the $10,000,000 figure should not be taken at face value as the price a person would pay to save his or her own life: "The assumption of a linear relationship between risk and willingness to pay (WTP) breaks down when the annual WTP becomes a substantial portion of annual income, so the assumption of a constant VSL is not appropriate for substantially larger risks."  *Id.*  In other words, the fact that a person is willing to pay $1,000 for a 1-in-10,000 annual reduction in mortality risk says little about their willingness to avoid larger risks by expending larger sums.

Because VSL is most accurate at valuing small reductions in risk, the government bases its VSL calculations on what a large group of people is collectively willing to pay to alleviate small risks.  Specifically, it bases VSL on "the aggregate dollar amount that a large group of people would be willing to pay for a reduction of their individual risks of dying in a year, such that we would expect one fewer death among the group during that year on average."  (Doc. 259-1, p. 54).  For example, if 10,000 people are willing to pay an average of $1,000 each to reduce their individual annual chances of death by 1 in 10,000, the sum of their contributions ($10 million) represents the amount these people are collectively willing to spend to prevent the sum of these chances of death (1).

5

The government uses VSL as a tool in cost-benefit analysis when implementing safety measures. (Doc. 259-1, pp. 39, 54). Specifically, VSL allows the government to "compare[] the total willingness to pay for the . . . risk reductions from these policies to the additional costs that people will bear if the policies are adopted." *Id.* at 54. For example, in a city composed of the 10,000 hypothetical people mentioned above, a project which saved an average of one life per year at an annual cost of less than $10 million would likely pass a cost-benefit analysis. Notably, however, the government disclaims the use of VSL to determine the actual value a specific person would pay to avoid certain death. *Id.* at 54 ("Importantly, [VSL] is not an estimate of how much money any single individual or group would be willing to pay to prevent the certain death of any particular person.").

A court applying Federal Rule of Evidence 702 conducts a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts at issue." *Daubert*, 509 U.S. at 593. In this case, the Court finds that Dr. Scott's proposed VSL testimony cannot properly be applied to the facts at issue. VSL is a metric designed to account for a large population's desire to avoid a small statistical risk of death. Here, Dr. Scott proposes to use VSL to estimate a specific woman's desire to avoid certain death. This represents a complete inversion of VSL's proper application. Accordingly, Dr. Scott's testimony fails the second requirement of the *Daubert* assessment, and therefore fails the assessment itself. *See Gier ex rel. Gier v. Educ. Serv. Unit No. 16*, 66 F.3d 940, 944 (8th Cir. 1995) (affirming dismissal where expert used test designed only for therapy placement to reach conclusions about fact of abuse).[2]

---

[2] Several Circuits have also questioned whether VSL meets *Daubert's* first prong, that of methodological validity. *See, e.g., Smith v. Jenkins*, 732 F.3d 51, 66–67 (1st Cir. 2013) ("[S]pending on items like air bags and smoke detectors is probably influenced as much by

To be sure, Dr. Scott's report attempts to distinguish Dr. Scott's testimony from other VSL testimony which has been held inadmissible in various federal courts. Specifically, Dr. Scott represents himself as "simply providing factual data that could be helpful to the jury and relied on by the trier of fact" instead of "assigning an actual value to a specific life." (Doc. 259-1, p. 3). But the fact remains that the jury is tasked with determining how Ms. Recinos would have valued her own life. Testimony concerning the aggregate value that a large group of people places on small individual reductions in risk is simply irrelevant to this inquiry, and "[i]rrelevant evidence is not admissible." Fed. R. Evid. 402. Further, the fact that such evidence is couched in terms of "Value of Statistical Life" would create a danger of misleading the jury which would substantially outweigh any minimal relevance of such testimony, rendering it inadmissible under Federal Rule of Evidence 403 as well.

Hatfield argues that the exclusion of Dr. Scott's testimony is not a simple matter of this Court applying *Daubert* in the first instance. Rather, Hatfield says, the relevant question is what impact Dr. Scott's testimony would have had in the settlement or verdict reached in a hypothetical *Arkansas* wrongful-death case. Accordingly, Hatfield argues, the standard is whether an *Arkansas* court would have allowed in Dr. Scott's testimony, as many Arkansas courts

---

advertising and marketing . . . and by government-mandated safety requirements as it is by any consideration by consumers of how much life is worth. Also, many people may be interested in a whole range of safety devices and believe they are worthwhile, but are unable to afford them. More fundamentally, spending on safety items [is] perhaps more a measure of how cautious a person is than how much he or she values life. . . . And as for . . . wage-risk premiums . . . [t]o say that the salary paid to those who hold risky jobs tells us . . . how much we value life ignores the fact that humans are moved by more than monetary incentives.") (quoting *Mercado v. Ahmed*, 974 F.2d 863, 871 (7th Cir. 1992)) (some alterations in original); *Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235, 1245 (10th Cir. 2000) (collecting cases). While this Court shares these concerns, the fact that VSL cannot properly be applied to the facts at issue is dispositive here.

have evidently done, and how attorneys would have evaluated that possibility for settlement purposes.

The Court is unpersuaded by this argument. First, Arkansas uses the same *Daubert* standard as the federal courts. *Jackson v. State*, 197 S.W.3d 468, 473 (Ark. 2004). It is therefore far from certain that an Arkansas court in a wrongful-death matter would have admitted Dr. Scott's testimony, notwithstanding the fact that other Arkansas courts have done so in the past. This uncertainty would also have played a role in settlement negotiations prior to any trial. These considerations would put a federal jury in the position of needing to make a factual determination about a legal determination; that is, needing to determine how an Arkansas court would have evaluated the *Daubert* issue or how attorneys would have determined an Arkansas court would have evaluated the *Daubert* issue.

Both Arkansas and federal courts have a "general 'gatekeeping' obligation . . . when assessing the reliability of [expert] testimony." *Id.* It is the role of this Court, as it would have been the role of an Arkansas court, to keep unreliable expert testimony out of evidence and away from the jury. The *Daubert* inquiry is therefore squarely and exclusively within the purview of the trial court. Asking laypeople to conduct a *Daubert* evaluation on evidence the Court has already determined fails *Daubert* would be an abdication of the Court's gatekeeping duty. Further, it would amount to tasking laypersons with making a legal determination without the benefit of legal research. And this is only the beginning: the jury would then need to determine how a judge would rule on the issue, then predict how *lawyers* would predict a judge would rule on the issue. Asking laypeople to predict how trained legal professionals would assess contested evidence under *Daubert* is simply inappropriate. This Court has assessed the VSL evidence and concluded that it is inadmissible under *Daubert*. The Court presumes that an Arkansas court,

8

following the same law in what this Court considers to be a simple application of the doctrine, would do the same. The jury's task in this case is monumental enough as things stand, and the Court will not further burden it with an inquiry properly conducted by the Court itself.

For the foregoing reasons, the motion to exclude Dr. Scott's testimony will be granted as to the VSL calculation.

    b. *Economic Loss Testimony*

Defendants also object to Dr. Scott's proposed testimony about the income, fringe benefits, and household services Ms. Recinos might have provided to her family had she lived.

First, defendants argue that the Estate itself stands in the shoes of Ms. Recinos and therefore cannot claim such benefits. While this may be technically true, Arkansas law allows for the administrator of a decedent's estate to bring claims on behalf of the surviving family members related to the family's loss of the decedent's services. Indeed, this is so common that the Arkansas Model Jury Instruction 2216, entitled "Measure of Damages—Wrongful Death—Cause of Action," leads off with a statement that the administrator "represents the estate of the deceased and also (names of wife or husband, children, father, mother, sisters. . .)." It immediately goes on to state that "[t]he administrator is suing for the following elements of damage on behalf of [(wife or husband)] [*and*] [(names of statutory beneficiaries)]: (a) pecuniary injuries sustained. . .". And the instruction defines "pecuniary injuries" as "the present value of benefits, including money, goods, and services, that the deceased would have contributed to" her survivors. In Arkansas, "there is a presumption that the model instruction is a correct statement of [Arkansas] law." *Doerhoff v. State*, 675 S.W.3d 877, 882 (Ark. 2023). Accordingly, the Court concludes that the Recinos family's claims of pecuniary injury could have been raised by the Estate's administrator at trial and are therefore relevant to the final size of a hypothetical verdict.

9

Defendants further contend that Dr. Scott's proposed testimony is speculative because it is based on generic statistics concerning wages and fringe benefits in Ms. Recinos' line of work and the generic estimated value of household services rather than specific evidence of Ms. Recinos' wages, fringe benefits, and household services. This question about the accuracy of Dr. Scott's inputs, however, goes to the factual basis for his testimony. And in the Eighth Circuit,

> the factual basis of an expert goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination. Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded.

*Hartley v. Dillard's, Inc.*, 310 F.3d 1054, 1061 (8th Cir. 2002) (quoting *Bonner,* 259 F.3d at 929–30). It cannot be said that the general data Dr. Scott relies on will be of "no assistance" to the jury in determining what pecuniary damages the Recinos heirs suffered. Accordingly, while the use of these statistics is a proper subject for cross-examination, it is not a basis on which this Court can exclude Dr. Scott's opinion.

    c. *Punitive Damages*

Finally, Defendants challenge the admissibility of Dr. Scott's proposed testimony on punitive damages. Specifically, Hatfield intends to have Dr. Scott compare the financial impact of a range of hypothetical punitive damages awards on J.B. Hunt, the defendant in the wrongful-death case, to the financial impact of traffic tickets on an average family. Defendants argue that this testimony is irrelevant and that there is no evidence that punitive damages would have been available against J.B. Hunt.

The Court believes that the proposed testimony is relevant because it will allow the jury to better understand J.B. Hunt's financial situation. *Robertson Oil Co., Inc. v. Phillips Petroleum Co.*, 930 F.2d 1342, 1346 (8th Cir. 1991) (allowing expert testimony "as to what size punitive

award against a company with [the defendant's] net worth would be comparable to a $2, $100 or $1,000 award against a 'common worker'" "as an explanation of what the figures in [the defendant's] financial statements meant.")

As for the sufficiency-of-evidence objection, if Hatfield ultimately cannot raise a fact issue as to J.B. Hunt's liability for punitive damages, the Court will disallow this portion of Dr. Scott's testimony. However, Defendants' assertion that Hatfield can produce no such proof is supported only by the fact that they themselves uncovered none during discovery in the underlying case. (Doc. 260, p. 20). This does not foreclose the possibility that Hatfield would have found some if Hatfield had litigated the underlying case, and Hatfield's theory of damages is based on the idea that Hatfield would have litigated the underlying case more successfully than Defendants. Accordingly, the Court will deny the motion to exclude Dr. Scott's punitive damages opinion at this time. However, Hatfield will not be allowed to present Dr. Scott's punitive damages testimony without presenting some evidence which would support an award of punitive damages.

### IV.    Stark Ligon, Professor Charles Silver, and Mario Melgar Adalid

The Court turns now to the final cluster of contested experts, who would offer opinions on whether Defendants' actions relating to the underlying lawsuit conformed with the ethical rules governing attorney conduct. The experts in question are Stark Ligon (for Hatfield), and Professor Charles Silver and Mario Melgar Adalid (for Defendants). Mr. Ligon intends to opine that certain actions by Defendants violated the Arkansas Rules of Professional Conduct. Professor Silver intends to opine that certain actions by Defendants did not violate the Arkansas Rules of Professional Conduct. And Mr. Adalid intends to opine that certain actions by Defendants did not violate Mexican law governing attorney conduct. Rather than delving into

11

the finer details of these experts' opinions, the Court will make some general findings and rulings to define the scope of how these men will and will not be permitted to opine at trial.

In general, "expert testimony on legal matters is not admissible. Matters of law are for the trial judge, and it is the judge's job to instruct the jury on them." *S. Pine Helicopters, Inc. v. Phx. Aviation Managers, Inc.*, 320 F.3d 838, 841 (8th Cir. 2003). Accordingly, none of these experts will be permitted to opine on the law governing the legal claims and defenses in this case. For example, neither Mr. Ligon nor Professor Silver may opine on what the elements are for claims of RICO violations, fraud, tortious interference, or civil conspiracy, nor may they opine on whether Defendants' conduct meets the elements for any of those claims, nor on what the legal standards governing such claims are, nor on whether Defendants had any particular legal duties, nor whether any Defendants may be vicariously liable for the misconduct of others.

However, there is a difference between opining on matters of law and opining on professional norms and standards—even those governing the conduct of attorneys. Expert opinion testimony on rules of professional conduct is both useful and relevant for helping juries decide, for example, whether attorneys' actions departed from professional standards of care, *see, e.g.*, *Rosemann v. Sigillito*, 785 F.3d 1175, 1179–80 (8th Cir. 2015); *Young v. Blake*, 653 S.W.3d 523, 528–29 (Ark. Ct. App. 2022), or whether attorneys possessed criminal intent when conducting the practice of law, *see, e.g.*, *United States v. Kellington*, 217 F.3d 1084, 1098–99 (9th Cir. 2000); *United States v. Cavin*, 39 F.3d 1299, 1309 (5th Cir. 1994); *United States v. Kelly*, 888 F.2d 732, 743 (11th Cir. 1989). Such scenarios are analogous to the instant case, in which several of the claims include *scienter* elements and in which Hatfield alleges the underlying lawsuit was settled for an unreasonably low amount of money. Therefore, the Court will permit

these experts to opine on the rules governing professional conduct for attorneys and how those rules apply to the facts of this case.

In that vein, the Court will also permit Mr. Adalid to opine on Mexican law governing attorney conduct. Hatfield contends such testimony is irrelevant because the applicable rules on the facts of this case are Arkansas', not Mexico's. But even if that is true, Defendants may attempt to argue to the jury that they had some good-faith basis for believing otherwise; it will be the jury's task to determine whether this assertion is credible and whether Defendants in fact possessed the wrongful intent that Hatfield alleges.

### V.   Conclusion

IT IS THEREFORE ORDERED that Defendants' motions to exclude expert testimony (Docs. 259, 261, 265) and Plaintiff's motion to exclude expert testimony (Doc. 274) are all GRANTED IN PART AND DENIED IN PART as described above.

IT IS SO ORDERED this 10th day of April, 2024.

/s/ P. K. Holmes, III
P.K. HOLMES, III
U.S. DISTRICT JUDGE