IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

JASON M. HATFIELD, P.A.                                             PLAINTIFF

V.                              CASE NO. 5:22-CV-5110

TONY PIRANI and PIRANI LAW, PA                                    DEFENDANTS

## MEMORANDUM OPINION AND ORDER

Before the Court are Plaintiff Jason M. Hatfield, P.A.'s ("Hatfield") Motion for Summary Judgment (Doc. 364) against Defendants Tony Pirani and Pirani Law, PA ("the Pirani Defendants"), as well as the various materials that these parties have filed in support of or opposition to this Motion. *See* Docs. 364–67, 372, 376, 378, 381, and all attachments thereto. Also before the Court is Hatfield's Motion to Unseal Document (Doc. 382). For the reasons given below, Hatfield's Motion for Summary Judgment is **DENIED** and Hatfield's Motion to Unseal is **GRANTED**.

## I.      BACKGROUND

Hatfield is a law firm which brought this lawsuit against a large number of defendants, including other law firms, alleging that they used certain illegal and unethical tactics to poach some clients from it. On November 23, 2020, Ana Delia Mejia Flores ("Mejia") and Flor Maribel Recinos Valle ("Recinos") were killed by a tractor-trailer truck that rolled over onto their vehicle in Benton County, Arkansas. *See* Doc. 253, ¶ 110. One week later, on November 30, 2020, Ms. Recinos's brother and adult children signed a contract with Hatfield ("the Hatfield Contract") for representation in a wrongful-death case against J.B. Hunt Transport, Inc., which owned the truck that had killed the women. *See*

1

*id.* at ¶¶ 150–62.  However, unbeknownst to Hatfield at that time, five days earlier Ms. Recinos's adult children had signed a contract with the "Nunez Law Firm" (which Hatfield alleges is *not* actually a law firm licensed to practice law anywhere inside the United States) for representation in the same wrongful-death matter ("the Nunez Contract").  *See id.* at ¶¶ 111–18; Doc. 253-5, § 5.  Hatfield alleges that the Nunez Contract was procured by several non-lawyers from Texas who met with Ms. Recinos's survivors at a funeral home in Arkansas, and who induced them to sign the contract with promises of financial aid for the funeral and assistance with gaining United States citizenship.  *See id.* According to Hatfield, these methods violated the Arkansas Rules of Professional Conduct for attorneys as well as Texas law, rendering the Nunez Contract invalid and unenforceable.

At some point soon after the Nunez Contract was signed, the individuals who procured the Nunez Contract hired Steven Kherkher and his law firm Kherkher Garcia, LLP to provide representation to the clients in the Nunez Contract matter.  Mr. Kherkher emailed Jason Hatfield (the proprietor of Hatfield) on December 1, 2020 and instructed Hatfield to "stand down" and cease its representation of Recinos's survivors.  *See* Doc. 253, ¶ 194; *see also* Doc. 253-13.  Mr. Kherkher and Mr. Hatfield also spoke on the phone on that day or the next.  *See id.*  Hatfield states that it then ceased representation of these clients, allegedly in reliance on the false claim that the Nunez Contract was a valid contract for legal representation.  *See, e.g.*, Doc. 235, ¶¶ 529, 532, 538.  On January 21, 2021, the Pirani Defendants signed a written agreement with "Nunez & Associates" and Kherkher Garcia, LLP under which Kherkher Garcia, LLP and Pirani Law, PA would "take principal responsibility" for the same wrongful-death litigation.  *See* Doc. 253-2, p. 2.

Pirani Law and Kherkher Garcia opened a probate matter ("the Probate Case") in the Washington County Circuit Court for the Estate of Ms. Recinos, which litigated through its personal representative, Noe Mancia. *See* Doc. 352, p. 2. Hatfield asserted an attorney's lien against the Estate in the Probate Case, based on the Hatfield Contract. *See id.* Hatfield also filed the instant lawsuit in this Court against a variety of individuals and firms, asserting various claims under the federal Civil Racketeering Influenced Corrupt Organization Act ("RICO") and under Arkansas law.

The validity of Hatfield's lien was vigorously contested in the Probate Case, as was the validity of the Nunez Contract. *See id.* at 2–3. Eventually, on December 21, 2023, the probate court ruled in Hatfield's favor. *Id.* at 3. The probate court's ruling had significant consequences for the instant matter. Following extensive briefing on cross-motions for summary judgment, this Court issued an Order in which it ruled, among many other things, that under principles of *res judicata* the probate court's ruling bound this Court to "treat[] the following issues as settled and [to] instruct the jury accordingly:"

- Hatfield's lien was valid and enforceable.
- Hatfield's contract was valid.
- The clients intended to hire Hatfield to represent them in the wrongful death matter.
- Hatfield was not terminated for cause.
- The Nunez Contract was solicited or procured improperly.
- The Nunez Contract is invalid because it was improperly solicited or procured.

(Doc. 352, p. 24). This Court's ruling on the summary-judgment motions pending at that time dismissed some of Hatfield's claims but left many of them alive for trial. *See id.* at 37.

A little over a month later, Hatfield settled and dismissed its claims against all but the Pirani Defendants. *See* Docs. 360, 362. This Court then entered an Order re-opening

the remaining parties' opportunity to move for summary judgment against each other.  In explaining that decision, the Order observed:

> Significantly, [the Pirani Defendants have] not had the opportunity to move for summary judgment in this matter, as the Court declined to extend [their] time to so move in light of a fast-approaching trial date.  Further, due to the factual and legal complexities of Plaintiff's case and to Court-imposed page limits, Plaintiff has necessarily been limited in its ability to brief the issues as they relate specifically to [the Pirani Defendants].  . . .  Therefore, to ensure that the time and expense of a six-day trial are not incurred unnecessarily, the Court will allow the parties a second opportunity to move for summary judgment.

(Doc. 364, p. 1).

The Pirani Defendants opted not to avail themselves of this additional opportunity.  However, Hatfield did.  Hatfield had previously sought summary judgment against the Pirani Defendants only on its RICO claims; that relief was denied.  *See* Doc. 352, pp. 32–33.  So this time, Hatfield seeks summary judgment against the Pirani Defendants on its claims against them under Arkansas law for fraud and civil conspiracy.  That motion has been fully briefed and is now ripe for decision.

## II.    LEGAL STANDARD

Summary judgment is appropriate if "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Nat'l Bank of Com. of El Dorado v. Dow Chem. Co.*, 165 F.3d 602, 606 (8th Cir 1999) (quoting Fed. R. Civ. P. 56).  "[A] genuine issue of material fact exists if: (1) there is a dispute of fact; (2) the disputed fact is material to the outcome of the case; and (3) the dispute is genuine, that is, a reasonable jury could return a verdict for either party."  *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 401 (8th Cir. 1995).  The moving party bears the burden of proving the absence of any material factual disputes and that they are entitled

to judgment as a matter of law, but the nonmoving party may not rest upon mere denials

or allegations in the pleadings and must set forth specific facts to raise a genuine issue

for trial.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 324 (1986).  "Credibility determinations, the weighing of the

evidence, and the drawing of legitimate inferences from the facts are jury functions, not

those of a judge . . . .  The evidence of the non-movant is to be believed, and all justifiable

inferences are to be drawn in his favor."  *Anderson*, 477 U.S. at 255.

### III.    DISCUSSION

The Court will begin its discussion with Hatfield's claim of fraud against the Pirani

Defendants.  In Arkansas, a plaintiff must prove the following five elements in order to

show fraud: (1) the defendant made a false representation, usually of material fact; (2)

the defendant knew or believed the representation was false; (3) the defendant intended

to induce reliance by the plaintiff; (4) the plaintiff justifiably relied on the false statement;

and (5) the plaintiff suffered resulting damage.  *See Wiseman v. Batchelor*, 315 Ark. 85,

89 (1993).  The reader will note from the timeline in the "Background" Section above that

the Pirani Defendants did not contract to represent Hatfield's former clients until after

Hatfield had ceased representation of those clients.  Unsurprisingly, then, Hatfield's fraud

claim against the Pirani Defendants is based entirely on statements those Defendants

made after Hatfield's representation of those clients came to an end.  Specifically, Hatfield

points to false statements the Pirani Defendants made "in pleadings and in open court"

to the judges in the Probate Case "to defeat Hatfield's lien priority, with the purpose of

depriving Hatfield of his fees which were protected by the lien statute."  *See* Doc. 365, p.

9.  As for reliance and damage, Hatfield argues that it was "justified in relying on those

filings and advocated position necessitating responsive research, drafting, filing, and argument of the Defendants['] materially false statements for which he incurred considerable expense." *Id.* at 10.

There is a fundamental problem with Hatfield's theory of fraud here, specifically with respect to reliance. Arkansas caselaw is clear that when a plaintiff expends effort to *contest* falsehoods, this does not constitute reliance on those false statements; in fact, it is the very opposite thereof. For example, in the analogous case of *Wiseman v. Batchelor*, the Arkansas Supreme Court explained:

> False statements, by themselves, are not sufficient to state a claim for fraud. An assertion of justifiable reliance by Wiseman must accompany allegations of misrepresentation, or there must be some foundation for such reliance set out in the complaint. Here, we see none. Indeed, *quite the opposite appears true, since Wiseman contested the misstatements in the bankruptcy petition and ultimately succeeded in having the bankruptcy court deny Weaver a discharge*. In our reading of Wiseman's complaint, the grievance complained of seems more akin to abuse of process by the appellee to hinder collection of a judgment rather than reliance on falsehoods to his detriment.

315 Ark. at 89 (emphasis added). The procedural posture in *Wiseman* was different from here since the issue was presented at the pleading stage rather than on summary judgment; but the critical legal principle is the same and the facts are strongly analogous. Thus Hatfield has not shown that he relied on any of the Pirani Defendants' false statements, and so he is not entitled to summary judgment on his claim against them for fraud.

The Court turns now to Hatfield's claim for civil conspiracy against the Pirani Defendants. Importantly, a defendant who is not liable as a direct actor for a particular tort may nevertheless "incur liability as a participant in a conspiracy which results in one or more overt acts by others constituting" that tort. *See Mason v. Funderburk*, 247 Ark.

521, 529 (1969).  However, just as importantly, civil conspiracy "is not a separate tort and must be based on the underlying tortious activity."  *Varner v. Peterson Farms*, 371 F.3d 1011, 1016 (8th Cir. 2004).  To prove a civil conspiracy, a plaintiff must show: (1) a combination of two or more persons; (2) to accomplish a purpose that is unlawful or oppressive, or to accomplish some purpose that is not in itself unlawful but by unlawful, oppressive, or immoral means; and (3) resulting injury to the plaintiff.  Here, Hatfield advances two separate theories for summary judgment on its claim of civil conspiracy against the Pirani Defendants: one based on the underlying tort of intentional interference with a contract of business expectancy; and the other based on the underlying tort of fraud.

The Court will deal first with the theory based on intentional business interference. Under Arkansas law, there are four elements in the tort of intentional business interference: (1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interfering party; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted.  *See Baptist Health v. Murphy*, 2010 Ark. 358, at *15.  Additionally, the conduct by the interfering parties must be "at least 'improper.'"  *Id.*  Hatfield has established as a matter of law that this underlying tort occurred.  In fact, that conclusion is compelled by this Court's previous ruling on *res judicata*.  As already noted above, that ruling entailed (among other things) that the Hatfield Contract was valid, that the clients intended to hire Hatfield to represent them in the wrongful death matter, that Hatfield was not terminated for cause, and that the Nunez Contract was solicited or procured

improperly.  Given the undisputed evidence that Mr. Kherkher repeatedly communicated with Mr. Hatfield about the Hatfield Contract and instructed Hatfield to "stand down" and cease representing the clients, and that Hatfield then complied with these demands, there is no factual dispute that the interfering parties knew about the Hatfield Contract and intentionally induced or caused the termination of that business relationship or expectancy, thereby damaging Hatfield.  Given the multiplicity of parties involved, there also is no material dispute that a civil conspiracy to commit this tort existed.

However, proving the underlying tort's commission and the existence of a civil conspiracy to commit it is not enough to establish liability on the part of the Pirani Defendants.  Hatfield must prove that the Pirani Defendants intentionally joined the conspiracy, and that their acts taken in furtherance of it—here, making allegedly false statements to the court in the Probate Case—were done with "a specific intent to accomplish the contemplated wrong." *See Chambers v. Stern*, 347 Ark. 395, 404 (2002). In other words, if the Pirani Defendants made false statements in the Probate Case while sincerely believing those statements not to be false, then those statements cannot form the basis for civil conspiracy liability on their part.

On this point, Hatfield runs up against law of the case.  *See Gander Mountain Co. v. Cabela's, Inc.*, 540 F.3d 827, 830 (8th Cir. 2008) (explaining that the law-of-the-case doctrine "requires courts to adhere to decisions made in earlier proceedings in order to ensure uniformity of decisions, protect the expectations of the parties, and promote judicial economy").  Previously, when this Court denied Hatfield's motion for summary judgment on its RICO claims, it made the following findings:

> [T]he Kherkher Defendants have alleged that Nunez & Associates is a legitimate Mexican firm, and the Pirani Defendants have alleged that they

lacked knowledge that Nunez & Associates was not a law firm. Construing the record in their favor and crediting their deposition testimony, these defendants' allegations are plausible: "Nunez & Associates" was the name of a legitimate Mexican law firm as well as the Texas partnership, Alfredo Nunez was involved in both. Therefore, because the . . . Pirani Defendants may not have intended to be in any sort of illicit enterprise, Hatfield is not entitled to summary judgment against them on this theory.

(Doc. 352, p. 33). Nothing has changed on this point since then. Certainly Hatfield has provided evidence that the Pirani Defendants had good reason to know, or at least suspect, that their alleged coconspirators had procured the Nunez Contract through improper means, prior to making allegedly false representations to the probate court on that topic. Most prominently, Hatfield points to a May 4, 2022 email between Mr. Pirani, attorneys from Kherkher Garcia, LLP, and others, in which Mr. Pirani outlined many of Hatfield's allegations regarding the improper procurement of the Nunez Contract, as they had been communicated to him by Hatfield's attorney in the instant case. *See* Doc. 371-1, p. 2. However, one day earlier in that same email chain, Mr. Pirani expressed his belief that they need to have "a frank and candid conversation" with Hatfield's attorney, and states that Hatfield's "basic facts are wrong." *See id.* at 4. The bottom line here is that, as the Court found in its previous Order, when the evidence is viewed in the light most favorable to the Pirani Defendants, a jury could reasonably conclude that they did not intend "to be in any sort of illicit enterprise." (Doc. 352, p. 33). Of course, a jury could also reasonably conclude otherwise. But that is a conclusion for the jury to make at trial—not for this Court to make on summary judgment.

For the same reason, Hatfield's motion must also be denied as it pertains to the fraud theory of civil conspiracy. Here again, there is a material dispute of fact as to whether the Pirani Defendants actually believed any fraud had been committed against

Hatfield at the time they made representations to the contrary to the probate court.  And as this exhausts the theories under which Hatfield moved for summary judgment, Hatfield's Motion must be denied.

This leaves only Hatfield's Motion to Unseal (Doc. 382) for the Court to address. This Court previously granted Hatfield leave to take the deposition of Judge Doug Martin, who presided for some time over the Probate Case, for the limited purpose of examining him about certain *ex parte* statements that Mr. Pirani made to him.  *See* Doc. 227, p. 4. However, the Court directed that this deposition be treated as confidential and filed under seal in this matter, so as to avoid running afoul of Rule 2.10(a) of the Arkansas Rules of Judicial Conduct, which provides that a "judge shall not make any public statement that might reasonably be expected to affect the outcome or impair the fairness of a matter pending or impending in any court, or make any nonpublic statement that might substantially interfere with a fair trial or hearing."  *Id.*  Hatfield now moves to unseal that deposition transcript, which was filed under seal at Doc. 249.  In support of this request, Hatfield argues that "the deposition contained no confidential communications or confidential settlement amounts," and that the Probate Case has since been unsealed. *See* Doc. 382, p. 2.  Thus, Hatfield contends, "the concerns of confidentiality initially justified by Judicial Conduct Rule 2.10(a) are inapplicable in this context."  *Id.*

The Court agrees.  The original Order directing that the deposition be treated as confidential was entered before the deposition was taken, when it was impossible to know with certainty what testimony would ultimately be provided therein.  The Court has reviewed the transcript of Judge Martin's deposition and finds that it does not contain any statements which might reasonably be expected to affect the outcome or impair the

10

fairness of any matter pending or impending in any court, including this one.  Therefore, given the presumptive right to public access that applies to judicial records, *see IDT Corp. v. eBay*, 709 F.3d 1220, 1222–23 (8th Cir. 2013), the Court will direct that this deposition transcript be unsealed.

## IV.    CONCLUSION

**IT IS THEREFORE ORDERED** that Plaintiff Jason M. Hatfield, P.A.'s Motion for Summary Judgment (Doc. 364) is **DENIED** and Hatfield's Motion to Unseal Document (Doc. 382) is **GRANTED**.  The Clerk of the Court is **DIRECTED** to unseal Doc. 249.

**IT IS SO ORDERED** on this 21st day of March, 2025.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE